# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION**, *et al.*,

       Plaintiffs

       v.

**SYSCO CORPORATION**,

and

**USF HOLDING CORP.**,

and

**US FOODS, INC.**,

       Defendants.

Civil Action No. 15-cv-00256 (APM)

**FILED UNDER SEAL
(PUBLIC VERSION)**

## MEMORANDUM IN SUPPORT OF PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUCTION

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................... 7

I.    The FTC Is Likely To Succeed On The Merits ...................................................... 9

    A.    The Acquisition Is Presumptively Unlawful............................................... 10

        1.    The Relevant Product Market Is Broadline Distribution .......................... 11

            a.    Broadline Distribution Is A Distinct Bundle Of Products And Services ........... 12

            b.    Other Channels Are Not In The Product Market ................................. 14

               i.    Systems Distribution Is Not A Substitute........................................ 15

               ii.    Specialty Distribution Is Not A Substitute ...................................... 16

               iii.    Cash-and-Carry Stores Are Not Substitutes................................... 17

        2.    The United States Is A Relevant Geographic Market............................... 18

        3.    Numerous Local Areas Are Relevant Geographic Markets ..................... 22

        4.    The Merger Would Create Extraordinarily High Market Shares And Concentration In Each Relevant Market ................................................... 23

            a.    Market Concentration—Sales To National Customers ....................... 24

            b.    Market Concentration—Sales To Local Customers........................... 25

    B.    Defendants Cannot Rebut The Strong Presumption Of Illegality ............... 26

        1.    The Merger Would Eliminate Critical Head-To-Head Competition ....................... 27

            a.    The Merger Would Substantially Lessen Competition In The National Market 28

            b.    The Merger Would Substantially Lessen Competition In Numerous Local Markets ................................................................................... 30

               i.    Columbia/Charleston, SC Market................................................. 31

                ii.    Omaha/Council-Bluffs, NE/IA Market ......................................... 32

                iii.    Raleigh/Durham, NC Market ....................................................... 33

        2.    Sysco's Proposed Expansion of PFG Through Divestiture Does Not Address The Merger's Anticompetitive Harm.............................................. 34

        3.    Remaining Competitors Cannot Constrain The Merged Firm.................. 38

        4.    Entry And Expansion Would Not Be Timely, Likely, Or Sufficient........ 41

        5.    Defendants' Efficiencies Defense Fails .................................................. 43

II.    The Equities Heavily Favor A Preliminary Injunction ........................................ 44

CONCLUSION ................................................................................................................ 45

## TABLE OF AUTHORITIES

### STATUTES AND REGULATIONS

FTC Act § 5, 15 U.S.C. § 45 …………………………………………………………*passim*

*FTC Act § 13(b), 15 U.S.C. § 53(b) ………………………………………………………*passim*

*Clayton Act § 7, 15 U.S.C. § 18 (2006)  ………………………………………................*passim*

Rules of Practice for Adjudicative Proceedings, 16 CFR § 3.41 (2014) …………………………4

### CASES

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) …………………………………… *passim*

*Chi. Bridge & Iron Co. v. FTC,* 534 F.3d 410 (5th Cir. 2008) ………………………………...10, 41

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) …………………………...*passim*

*FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) …………………………*passim*

*FTC v. Coca-Cola Co.*, 641 F. Supp. 1128 (D.D.C. 1986) ………………………………………...11

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) ……………………………………………………45

 *FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ………………………………………...9

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) …………………………………...*passim*

*FTC v. Illinois Cereal Mills, Inc.*, 691 F.Supp. 1131 (N. D. Ill. 1988) …………………………..9

*FTC v. Libbey, Inc.,* 211 F. Supp. 2d 34 (D.D.C. 2002) …………………………………………...36

*FTC v. PPG Industries*, 798 F.2d 1500 (D.C. Cir. 1986) …………………………………...23, 44

*FTC v. ProMedica Health Sys., Inc.*, No. 3:11-CV-47, 2011 WL 1219281 (N.D. Ohio 2011)…44

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) …………………………………...*passim*

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000) …………………………10, 25, 27

*FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) …………………………………44

*FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981) …………………………………9, 44

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) …………………………..8, 45

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ……………………………11

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ……………………………………..22

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) …………11

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, No. 14-35173, 2015 WL 525540 (9th Cir. Feb. 10, 2015) ……………………………………………………………………44

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ……………………………41

*United States v. Bazaarvoice Inc.,* No. 13-cv-00133-WHO, 2014 U.S. Dist. LEXIS 3284 (N.D. Cal. 2014) …………………………………………………………………………………………..25

*United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86 (1975) …………………………………26

*United States v. Connecticut Nat'l Bank*, 418 U.S. 656 (1974) …………………………………19

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) …………………………………11, 19, 20

*United States v. H&R Block*, 833 F. Supp. 2d 36 (D.D.C. 2011) …………………………*passim*

*United States v. Marine Bancorp.,* 418 U.S. 602 (1974) ………………………………………..10

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) …………………………………10, 19

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) …………………………………*passim*

## OTHER AUTHORITY

*U.S. Dep't of Justice & Fed. Trade Comm'n, 2010 Horizontal Merger Guidelines ……...*passim*

## **INTRODUCTION**

Sysco Corporation and US Foods are the two largest—and only two national—broadline foodservice distributors in the United States.  Today, they compete directly and vigorously for both national accounts and local business.  Their planned merger would eliminate this competition and create a dominant firm that is approximately nine times the size of the next largest broadline distributor.  Without judicial intervention, customers that depend on broadline foodservice distribution services ("broadline distribution"), both nationally and in numerous local markets, will lose the significant benefits of head-to-head competition between the merging parties.  These customers face a substantial risk of higher prices and diminished service compared to what they would receive without the merger.  Accordingly, the Federal Trade Commission ("Commission") seeks a temporary restraining order and preliminary injunction to preserve the status quo pursuant to Section 13(b) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 53(b), pending the full administrative proceeding on the merits, which is scheduled to begin on July 21, 2015.

In hundreds of thousands of venues across the country where food is served away from home—including restaurants, school cafeterias, hotels, and hospitals—food arrives at the kitchen by way of a broadline foodservice distributor.  Broadline distributors offer customers a distinct combination of products and services that other forms of food distribution do not replicate: flexible, next-day delivery of a wide range of branded and private label products, along with value-added services such as menu planning and nutritional analysis.  Because broadline distributors can serve as a "one-stop-shop" for their customers, make deliveries on short notice, and provide value-added services, they are a vital, cost-effective source for most or all of a foodservice operator's food and related products.

Defendants' own statements reveal the anticompetitive nature of this transaction. Internally, Sysco characterizes the proposed merger as "█████████████████████ ████████"[1] US Foods explained to its employees that it is "██████████████████ ██████████████████████"[2] Defendants recognize the intense rivalry from the upper echelons of the company, where senior executives refer to the two companies as "████ ██████████████████████████████████████████, to the trenches of the sales force, where one US Foods sales representative is proudly known as "██████████████ █████"[4] Defendants characterize the competition between themselves as "relentless,"[5] "very aggressive,"[6] and "crazy."[7] As US Foods' COO wrote after the proposed transaction's announcement, "███████████████████████████████████████████████ █████████████████████[8]

This merger would harm competition for two distinct categories of foodservice customers: "National Customers" with numerous facilities geographically dispersed nationwide or across multiple regions of the United States; and local "street" customers (such as independently-owned restaurants), whose distribution needs are limited to a local or regional area. Many National Customers—which include hospitality chains (*e.g.*, █████████████ █████), group purchasing organizations (GPOs) with nationwide members (*e.g.*, █████████ █████), foodservice management companies with nationwide client sites (*e.g.*, █████████ █████████ and restaurant chains—require or choose to contract with a broadline distributor that can service their locations nationally for reasons of efficiency and consistency in products,

---

[1] PX01002-003.
[2] PX00311-002.
[3] *See, e.g.*, PX00508 (Lederer (US Foods) IH Tr. at 158).
[4] PX00308-001.
[5] PX03050-002.
[6] PX03076-001.
[7] PX01033-001.
[8] PX00312-002.

pricing, and service.[9]  By using a broadline distributor with nationwide coverage, National Customers attain the same pricing, service terms, products, product codes, and ordering process across their geographically dispersed locations under a single contract.  As a result, many National Customers are most effectively served by a broadline distributor that has the capability to provide nationwide coverage.  Defendants are the only two single-firm broadline distributors that meet these requirements and, together, command approximately 75% of the broadline distribution sales to National Customers.

As the top two options for many National Customers, Defendants compete fiercely for these accounts.  For National Customers, Sysco and US Foods provide a similar offering that is unmatched by any other broadline distributor.  For example, Sysco and US Foods currently have 72 and 61 broadline distribution centers, respectively, strategically dispersed across the United States;[10] the next largest broadliner has only 24, virtually all of which are located in the eastern United States.[11]  US Foods self-identifies as "███████████████████████████████" noting that it is "███████████████████████████████"[12]  Customers widely recognize Defendants as their two most attractive—if not only—options for nationwide broadline distribution.[13]  As one of Sysco's largest National Customers wrote internally after learning of the merger: "███████████████████████████████"[14]

National Customers consistently rely on competition between the only two truly national broadline distributors, often explicitly playing Defendants off one another to obtain lower pricing

---

[9] Defendants' own documents readily distinguish these "National Customers" from local establishments and recognize their distinct requirements, including the need for "███████████████████████████████" among other needs.  *See, e.g.*, PX09010-004.
[10] PX09062 (Israel Decl.) § III(B)(1).
[11] *Id.*
[12] PX03147-033.
[13] *See, e.g.*, PX00404 (████ Decl.) ¶ 12; PX00436 (████ Decl.) ¶¶ 17-18; PX00448 (████ Decl.) ¶ 9; PX00466 (████ Decl.) ¶ 9.
[14] PX00389-001 (████, Email from ███████████ Dec. 10, 2013).

and better contract terms.  The merger would eliminate this competitive dynamic, with local and regional broadline distributors lacking the scope and scale to constrain the merged entity.[15]  US Foods' executives celebrated this fact after the merger's announcement, remarking that "███

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████"[16]

The proposed merger would also harm competition for local customers.  In many markets, Defendants vie for local customers whose distribution needs are limited to a local or regional area.  Defendants frequently reduce prices and "offer[] hefty signing bonuses" to steal local street business from each other.[17]  The merger would deprive customers of this intense rivalry, which plays out daily in numerous local markets (*see* Appendix A).

Administrative proceedings already are under way to determine expeditiously whether this merger violates Section 7 of the Clayton Act, which prohibits mergers "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce . . . in any section of the country."  15 U.S.C. § 18.  The administrative proceeding, with extensive discovery and up to 210 hours of live testimony, will provide a forum for all parties to present plenary evidence regarding the likely effects of the merger.  16 CFR § 3.41 (2014).  To preserve the Commission's ultimate ability to order effective relief and prevent interim harm to consumers, Section 13(b) of the FTC Act authorizes this Court to grant preliminary relief.  Preliminary relief is appropriate if, after considering the Commission's likelihood of success on the merits and weighing the equities, the Court determines that such

---

[15] *See, e.g.,* PX00404 (████ Decl.) ¶¶ 12-13; PX00448 (████ Decl.) ¶¶ 13-14; PX00421 (████ Decl.) ¶¶ 17-18; PX00401 (████████ Decl.) ¶¶ 12-15.
[16] PX00103-002.
[17] PX03105-002.

relief would serve the public interest.  15 U.S.C. § 53(b).  The Commission easily meets that standard here.

The public interest would suffer in the absence of preliminary relief.  If consummated, the proposed transaction would substantially lessen competition, creating a firm that is dominant on the national level, and possesses substantial market power in 32 local markets across the country.  Under this Circuit's standard, the merger presumptively violates Section 7 of the Clayton Act given the overwhelming market share Sysco would attain.

While market shares and concentration levels alone suffice to establish the Commission's *prima facie* case, there is voluminous additional compelling evidence that the merger likely would reduce competition substantially.  Documents, testimony, and empirical evidence unequivocally demonstrate that Defendants are each other's closest competitor, and the first and second choices, for a significant number of customers, both national and local.  The evidence shows that the intense head-to-head competition between Sysco and US Foods has resulted in palpable benefits to customers—in the form of lower prices, better quality products, and better service terms.  Customers could not turn to regional consortia or ad hoc networks to discipline a combined Sysco/US Foods and achieve the same benefits of competition between Defendants.

Recognizing the anticompetitive nature of the merger, Defendants executed an agreement dated February 2, 2015, with regional broadline distributor, Performance Food Group (PFG), to divest 11 of US Foods' 61 distribution centers to PFG, contingent upon the closing of the merger.  This divestiture proposal, however, fails to address the merger's likely anticompetitive harm.  For National Customers, Sysco and US Foods today are closely matched on every metric that affects competitive significance—market share, number and locations of distribution centers, warehouse capacity, product breadth, and size of sales forces and truck fleets.  Even with the

5

proposed divestiture package, PFG would still pale in comparison to both the current US Foods

and the merged Sysco/US Foods on all of these metrics.  For example, even with the divestiture,

PFG would have less than one third of US Foods' current national market share and

approximately half as many distribution centers.

 A number of additional factors cast serious doubt on PFG's ability to replicate the

competition for National Customers that the merger eliminates.  For example, PFG would have

significant geographic gaps in its distribution network, suffer from longer delivery distances than

the current US Foods, offer less product breadth, and face capacity constraints in its existing

facilities.  As PFG's CEO stressed to the Commission, "███████████████████

███████████████████████████████████████████

███████████████████████"[18]  Under the proposed divestiture,

US Foods' National Customers would be forced to "split" their business—*i.e.*, use PFG in

certain parts of the country and the merged entity in other parts for the duration of their contracts

— despite having explicitly bargained for a single national broadliner along with all its

benefits.[19]  Moreover, the proposed divestiture to PFG would do nothing to prevent the merger's

likely anticompetitive harm in a number of local markets.

 Entry or expansion by other competitors is even less likely to counteract the merger's

anticompetitive harm for either National Customers or local customers.  Defendants are the only

two national broadline distributors in the history of the industry, with no firm or consortia of

firms capable of expanding to replicate the competitive constraint on Sysco that US Foods poses.

New entry or expansion is risky and can take years, both in local markets and especially across

---

[18] PX09045-034 (emphasis added).
[19] The only practical alternative for these customers is to terminate their contracts with US Foods and shift to the merged entity.  *See* PX00474 (████ Supp. Decl.) ¶ 5; PX00475 (████ Supp. Decl.) ¶ 13; PX00480 (████ Supp. Decl.) ¶ 12.

regions.  The significant time, costs, and risks associated with building a distribution center, filling it with unspoken-for perishable products, and hiring a local sales force are high hurdles for any firm pondering entry or expansion.

Nor can Defendants' purported efficiencies rescue this anticompetitive merger. Defendants' claimed efficiencies are unsubstantiated, largely not merger specific, and most would not be passed through to customers.  Indeed, Sysco is already developing strategies to avoid ██████ that merger efficiencies would flow to customers—what it terms " ████████ ████████ "—and has assembled " ██████████████████████████ ,"[20]

The equities also decidedly favor the issuance of a preliminary injunction.  The paramount equitable consideration before the Court is the public interest in enforcement of the antitrust laws, which favors maintenance of the status quo to preserve the availability of effective relief pending the outcome of the Commission's administrative proceeding.  Absent preliminary relief, as of March 3, 2015, Sysco would acquire and begin integrating US Foods; PFG would do the same with respect to the 11 US Foods distribution centers and associated assets; and customers would pay the price of the interim harm to competition.  If the merger is ultimately found unlawful after a merits proceeding, the Commission would be left without an effective remedy to fully restore competition.  Accordingly, preliminary relief is justified and necessary here.

## **ARGUMENT**

Having found reason to believe that the proposed acquisition violates Section 7 of the Clayton Act and Section 5 of the FTC Act, the Commission seeks a preliminary injunction in this Court under Section 13(b) of the FTC Act.  15 U.S.C. § 53(b).  Preliminary relief will preserve the status quo and stave off consumer harm until the FTC has exercised its congressionally

---

[20] PX06126-001-002.

vested authority to hold an administrative proceeding and determine, upon a full evidentiary

record, the merger's legality. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713-14 (D.C. Cir. 2001);

*FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 35 (D.D.C. 2009).

Under Section 13(b), a preliminary injunction should issue when "such action would be

in the public interest—as determined by a weighing of the equities and a consideration of the

Commission's likelihood of success on the merits." *Heinz*, 246 F.3d at 714.  First, to evaluate

the "likelihood of success on the merits" under Section 13(b), this Court must "measure the

probability that, after an administrative hearing on the merits, the Commission will succeed in

proving that the effect of the [proposed] merger '*may be* substantially to lessen competition, or to

*tend to* create a monopoly' in violation of section 7 of the Clayton Act." *Heinz*, 246 F.3d at 714

(quoting 15 U.S.C. § 18) (emphasis added).  To establish likelihood of success on the merits at

this preliminary injunction stage, the Commission—like the Department of Justice in analogous

circumstances—"is not required to *establish* that the proposed merger would in fact violate

Section 7 of the Clayton Act." *Heinz*, 246 F.3d at 714 (emphasis in original).  Nor is it "the

district court's task 'to determine whether the antitrust laws have been or are about to be

violated.  That adjudicatory function is vested in the FTC in the first instance.'" *CCC Holdings*,

605 F. Supp. 2d at 67 (quoting *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1042 (D.C. Cir.

2008) (Tatel, J., concurring)); *accord, FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1071 (D.D.C.

1997).

Here, the high market share and concentration levels establish a presumption that the

merger is illegal.  The direct evidence of fierce head-to-head competition between Defendants

bolsters the Commission's likelihood of success on the merits.  *See United States v. Phila. Nat'l

Bank*, 374 U.S. 321, 363 (1963); *see also Whole Foods,* 548 F.3d at 1035.

The second prong of Section 13(b) requires the Court to "weigh the equities" to determine whether a preliminary injunction is in the public interest. *Heinz*, 246 F.3d at 726. "The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws." *Id.* Without a preliminary injunction, Defendants can "scramble the eggs"—that is, merge their operations and make it extremely difficult, if not impossible, for competition to be restored to its previous state if the merger is subsequently found to be illegal. *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1085- 86 n.31 (D.C. Cir. 1981). Private equities are "subordinate to public interests and cannot alone support the denial of preliminary relief." *FTC v. Illinois Cereal Mills, Inc.*, 691 F. Supp. 1131, 1146 (N. D. Ill. 1988) (citing *Weyerhaeuser*, 665 F.2d at 1083). Defendants cannot offer any equities that override the strong public equities favoring preliminary relief.

## I.   The FTC Is Likely To Succeed On The Merits

Section 7 of the Clayton Act is intended to arrest anticompetitive mergers "in their incipiency" and, accordingly, requires a prediction of the merger's likely impact on future competition. *Phila. Nat'l Bank*, 374 U.S. at 362 (internal quotation marks omitted). "Congress used the words '*may* be substantially to lessen competition'… to indicate that its concern was with probabilities, not certainties"—even on the ultimate merits. *Heinz*, 246 F.3d at 713 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962) (emphasis in original)). Thus, in what is inherently a forward-looking analysis, "certainty, even a high probability, need not be shown," even at the merits stage, and "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989); *Brown Shoe*, 370 U.S. at 323.

In *Philadelphia National Bank*, the Supreme Court held that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition

substantially that it must be enjoined in the absence of evidence clearly showing that the merger

is not likely to have such anticompetitive effects." 374 U.S. at 363.  Under this long-standing

tenet, courts assess whether a merger violates Section 7 by determining: (1) the "line of

commerce," or relevant product market; (2) the "section of the country," or relevant geographic

market; and (3) the merger's probable effect on competition in the relevant product and

geographic markets. *United States v. Marine Bancorp.*, 418 U.S. 602, 618-23 (1974); *Chicago*

*Bridge & Iron Co. v. FTC*, 534 F.3d 410, 422-23 (5th Cir. 2008).  "By showing that the proposed

transaction . . . will lead to undue concentration [for a particular product in a particular

geography], the Commission establishes a presumption that the transaction will substantially

lessen competition." *Staples*, 970 F. Supp. at 1083; *see Heinz*, 246 F.3d at 715.  Once the

presumption is established, the burden of rebutting the *prima facie* case shifts to Defendants.  *See*

*Marine Bancorp.*, 418 U.S. at 631; *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 167 (D.D.C.

2000).

      Under this Section 7 burden-shifting framework, Sysco's proposed acquisition of US

Foods triggers a strong presumption of illegality—both in the merits proceeding and certainly

here—as it creates undue concentration in numerous relevant markets.  Defendants cannot rebut

the presumption of illegality stemming from the FTC's *prima facie* case; to the contrary, the

evidence confirms the merger's likely anticompetitive effects.

      **A.  The Acquisition Is Presumptively Unlawful**

      "The Government may introduce evidence which shows that as a result of a merger

competition may be substantially lessened throughout the country, or on the other hand it may

prove that competition may be substantially lessened only in one or more sections of the country.

In either event a violation of [Section] 7 would be proved." *United States v. Pabst Brewing Co.*,

384 U.S. 546, 549 (1966).  Here, the proposed merger would substantially lessen competition

both in the provision of broadline distribution to National Customers and to local customers in at

least each of the 32 local geographic markets listed in Appendix A.

### 1.   The Relevant Product Market Is Broadline Distribution

"A 'relevant product market' is a term of art in antitrust analysis." *United States v. H&R*

*Block, Inc.*, 833 F. Supp. 2d 36, 50 (D.D.C. 2011).  The Supreme Court explained that, "[t]he

outer boundaries of a product market are determined by the reasonable interchangeability of use

or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*,

370 U.S. at 325.  That is, "courts look at 'whether two products can be used for the same

purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the

other.'" *H&R Block*, 833 F. Supp. 2d at 51 (citation omitted).  When conducting this analysis,

courts are to construe product market "narrowly to exclude any other product to which, within

reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune*

*Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

In *Brown Shoe*, the Supreme Court set forth a series of factors, or "practical indicia," for

defining a relevant product market.  370 U.S. at 325.  Such factors, as described in *Brown Shoe*

and its progeny, include "the product's peculiar characteristics and uses, unique production

facilities, distinct customers, distinct prices," the existence of special classes of customers who

desire particular products and services, "industry or public recognition" of a separate market, and

how the defendants' own materials portray the "business reality" of the market. *Brown Shoe*,

370 U.S. at 325; *United States v. Grinnell Corp.,* 384 U.S. 563, 572 (1966); *FTC v. Coca-Cola*

*Co.*, 641 F. Supp. 1128, 1132 (D.D.C. 1986), *vacated as moot*, 829 F.2d 191 (D.C. Cir. 1987);

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 n.4 (D.C. Cir. 1986).

Courts also rely on the hypothetical monopolist test to define a product market. *H&R*

*Block*, 833 F. Supp. 2d at 51-52.  This test asks whether a hypothetical monopolist could

profitably impose "a small but significant and nontransitory increase in price" (SSNIP), typically five percent, over particular products or services (if so, that is a relevant market), or whether customers switching to alternative products or services would make such a price increase unprofitable (meaning the purported market is too narrow). *See* PX06059 (*U.S. Dep't of Justice & Fed. Trade Comm'n Horizontal Merger Guidelines* (2010) (*Merger Guidelines*)) §§ 4.1.1-4.1.3.[21]

### a. Broadline Distribution Is A Distinct Bundle Of Products And Services[22]

Broadline distribution is the warehousing, sale, and distribution of a broad range of national brand and private label food and food-related products to customers in the foodservice industry. Broadliners offer, and customers of broadline distribution demand, a distinct combination of products and services that are not available through other distribution channels, including a wide array of stock keeping units (SKUs); a broad selection of private label (*i.e.*, distributor-brand) products; a frequent and flexible ordering and delivery schedule (including next-day and emergency delivery); and value-added services, such as order tracking, menu planning, and nutritional analytics.[23]

Under *Brown Shoe's* practical indicia, broadline distribution is a distinct product market. Broadline customers require a broadline distributor and are unwilling or unable to replace their broadliner with an alternative form of distribution.[24] Specifically, customers attest that they

---

[21] Although not binding, courts often rely on the *Merger Guidelines* as persuasive authority in antitrust cases. *See, e.g., H&R Block*, 833 F. Supp. 2d at 52 n.10; *Staples*, 970 F. Supp. at 1082.
[22] A form of distribution may be a relevant product market. *See, e.g., FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d. 34, 45-46 (D.D.C. 1998) ("wholesale distribution of prescription drugs"); *Staples*, 970 F. Supp. at 1074-80 (sale of office supplies by office supply superstores).
[23] PX00431 (⬛ Decl.) ¶ 3; PX00406 (⬛ Decl.) ¶ 4; PX00425 (⬛ Decl.) ¶ 3; PX00447 (⬛ Decl.) ¶ 8; PX00440 (⬛ Decl.) ¶ 4; PX00466 (⬛ Decl.) ¶ 7; PX00402 (⬛ Decl.) ¶ 9.
[24] PX00401 (⬛ Decl.) ¶¶ 4-5; PX00402 (⬛ Decl.) ¶ 8; PX00403 (⬛ Decl.) ¶¶ 5-6; PX00404 (⬛ Decl.) ¶ 4; PX00405 (⬛ Decl.) ¶ 5; PX00406 (⬛ Decl.) ¶ 5; PX00407

could not do without the range of products, frequent delivery, ordering flexibility, and value-added services that broadliners alone provide.  Indeed, broadline customers routinely seek bids only from broadline distributors, to the exclusion of all other forms of distribution.[25]  They confirm that they could not credibly threaten to switch their business—in totality or in meaningful part—to a non-broadline distributor to discipline broadline prices.[26]  Because customers prize broadline distribution's distinct attributes and would not switch to another form of distribution if faced with a SSNIP for broadline services, the hypothetical monopolist test indicates that broadline distribution is a relevant product market.

Consistent with customer demand, the foodservice industry recognizes and treats broadline distribution as a distinct market.  Distributors regard broadline distribution as separate from, and not substitutable with, other types of distribution, and run their broadline operations accordingly.[27]  Broadline distributors focus primarily, if not almost exclusively, on competition with other broadliners, principally target known broadline customers, employ sales forces that focus exclusively on broadline business, and often maintain separate broadline facilities.[28]  Importantly, broadliners, including Defendants, determine their pricing for broadline services based on *competition from other broadline distributors.*[29]  *See H&R Block*, 833 F. Supp. 2d at 53 (development of "pricing and business strategy with [a particular] market and those competitors in mind" is "strong evidence [of] the relevant product market").



(_____ Decl.) ¶ 4; PX00427 (_____ Decl.) ¶ 3; PX00431 (_____ Decl.) ¶ 13; PX00439 (_____ Decl.) ¶ 12; PX00441 (_____ Decl.) ¶ 4.

[25] PX00402 (_____ Decl.) ¶ 8 (noting that _____ sent its RFP only to broadliners); PX00432 (_____ Decl.) ¶ 13; PX00436 (_____ Decl.) ¶ 4.

[26] PX00401 (_____ Decl.) ¶ 16; PX00402 (_____ Decl.) ¶ 11; PX00437 (_____ Decl.) ¶¶ 5-6.

[27] PX00444 (_____ Decl.) ¶¶ 5-6; PX00412 (_____ Decl.) ¶ 3; PX00414 (_____ Decl.) ¶ 3; PX00415 (_____ Decl.) ¶¶ 4-5; PX00416 (_____ Decl.) ¶ 4; PX00429 (_____ Decl.) ¶ 7.

[28] PX00415 (_____ Decl.) ¶¶ 8, 13; PX00429 (_____ Decl.) ¶ 4; PX00443 (_____ Decl.) ¶ 2; PX00444 (_____ Decl.) ¶¶ 6, 9; PX00417 (_____ Decl.) ¶ 4, 7.

[29] *See, e.g.*, PX00300-001; PX01032-001; PX03084; PX00277-001; PX01022; PX01066; PX03035-003; PX03010-001; PX00064; PX03068-002; PX00466 (_____ Decl.) ¶ 7; PX00415 (_____ Decl.) ¶ 13; PX00451 (_____ Decl.) ¶ 19; PX00429 (_____ Decl.) ¶ 12. *See also* PX09062 (Israel Decl.) § IV(A)(2)(B).

Defendants themselves recognize a distinct broadline distribution market.[30]  Internally, US Foods defines itself as "1 of 2 national broadline distributors" and conducts its "competitive assessments" by comparing itself to other broadliners, mainly Sysco.[31]  US Foods' owners characterize broadline distribution as a "███████████████" that "███████████████ ███████████████████████████████████████████████████████████████ ███████████████."[32]  US Foods recognizes that broadline distribution is appropriate for particular types of customers: "███████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████."[33]  Likewise, Sysco distinguishes between broadline and other types of distribution, both inside the company, when doing competitive analyses and reporting profitability,[34] and externally, when publicly reporting to investors and marketing to customers.[35]

Within the market for broadline distribution, it is appropriate to analyze the merger separately for its effects on National Customers.  Because the analysis of the merger's effect in the relevant market of broadline distribution sold to National Customers is necessarily intertwined, and overlapping, with the issue of geographic market definition, it is addressed below in Section I(A)(2).

### b.  Other Channels Are Not In The Product Market

Alternative distribution channels are not reasonably interchangeable with broadline distribution.  *Brown Shoe* instructs that a "product's peculiar characteristics and uses" may

---

[30] *See, e.g.*, PX03121-009; PX03073-013-031; PX01006-011 (Sysco brand awareness study evaluating  broadliners only); PX03015 ███████████████████████████████████████████████████████████████ ███████████████████████); PX00500 (DeLaney (Sysco) IH Tr. at 37-38).
     PX03034-006, 011-022; PX03118-005-009 (US Foods, "Market Summary," Feb. 2011) (showing USF's market shares compared to Sysco and other broadliners); PX03001-002; PX00305; PX03061; PX03121-009; PX00281-006.
[32] PX03007-004.
[33] PX00283-008.
[34] PX00500 (DeLaney (Sysco) IH Tr. at 37-39); PX00040-013.
[35] PX00023-032-035; PX01062-005-009; PX01006-001.

14

distinguish a relevant market.  370 U.S. at 325.  Here, the unique attributes of broadline distribution contrast significantly with the characteristics and uses of other types of distribution.

### i.    Systems Distribution Is Not A Substitute

Systems, or "customized," distribution is not a substitute for broadline distribution. Systems distributors provide a more limited array of products, to a more limited set of customers, under a different pricing scheme, with no street sales force,[36] and often from different facilities than broadline distribution centers.  All of these factors demonstrate that systems distribution is outside the relevant product market.  *See Staples*, 970 F. Supp. at 1078 (treating differences in suppliers' SKU counts and customer bases as evidence they are not in the same product market); *Brown Shoe*, 370 U.S. at 325 ("unique production facilities" are "practical indicia" that may distinguish a product market).  Specifically, systems distributors make large, limited-SKU deliveries on a fixed schedule and provide no significant value-added services.[37]  Further, customers cannot purchase products for which they have not previously contracted with the manufacturer.  In essence, systems distribution amounts to drayage (warehousing and delivery alone), with no significant value-added services.

Based on their limited service, high volume delivery minimums, and relatively inflexible approach to stocking SKUs, systems distributors primarily serve fast food and some casual dining restaurant chains (*e.g.*, Burger King, Potbelly Sandwich Works).[38]  Systems customers generally develop and contract for their high-volume proprietary products directly with food manufacturers.[39]  Systems distribution is incompatible with the requirements of most customers of broadline distribution, which tend to have broader, more variable menus than quick service

---

[36] PX00491 (          Decl.) ¶¶ 4-5; PX00455 (      Decl.) ¶ 5.
[37] PX00283-008; PX00500 (DeLaney (Sysco) IH Tr. at 39); PX00415 (          Decl.) ¶ 4; PX00427 (          Decl.) ¶ 3; PX00441 (          Decl.) ¶ 4; PX00446 (          Decl.) ¶ 4.
[38] PX00510 (Schreibman (US Foods) IH Tr. at 32); PX00406 (      Decl.) ¶ 4; PX00441 (      Decl.) ¶ 4; PX00404 (          Decl.) ¶ 6; PX00415 (      Decl.) ¶ 6.
[39] PX00491 (      Decl.) ¶ 4.

restaurants, smaller "drop sizes" per delivery, require next-day delivery, and often demand

value-added services.  In fact, systems distributors typically refuse to serve customers (expressly,

or effectively by way of financial penalties) that require too many SKUs, do not have sufficiently

dense and numerous locations, require frequent delivery, or do not purchase sufficiently large

product volumes.[40]

In *H&R Block*, the court found that the defendants' operation and marketing of two

products through "separate business units" supported the finding that the two products were in

separate relevant markets.  833 F. Supp. 2d at 56.  Similarly, here, Sysco manages its broadline

and systems distribution (the latter known as SYGMA) as separate business units, run by

separate executives and operating largely from separate facilities.[41]  Defendants' executives

agree that systems distributors do not compete for broadline distribution contract business.[42]

### ii.    Specialty Distribution Is Not A Substitute

Likewise, specialty distribution is not a reasonable alternative to broadline distribution

and is outside the relevant product market.  In contrast to the wide array of products broadliners

offer, specialty distributors carry limited, specialized items—often higher quality and higher

price—in a narrow product category (*e.g.*, seafood, dairy).[43]  These product limitations prevent

specialty distributors from serving as a comprehensive option for customers.[44]  For these reasons,

specialty distribution serves as a *complement* to, not a substitute for, broadline distribution, by

providing service that supplements the broadline service that customers rely on for the bulk of

their food supplies.[45]  Tellingly, Sysco acknowledges that it positions its own specialty

---

[40] PX00491 (        Decl.) ¶ 6; PX00403 (          Decl.) ¶ 5; PX00406 (      Decl.) ¶ 4; PX00445 (
Decl.) ¶ 7; PX00404 (          Decl.) ¶ 6; PX00431 (      Decl.) ¶ 13.
[41] *See also* PX00023-032-035; PX00500 (Delaney (Sysco) IH Tr. at 37-39).
[42] *See, e.g.*, PX00506 (Humphreys (US Foods) IH Tr. at 118).
[43] PX00424 (        Decl.) ¶ 4; PX00462 (      Decl.) ¶3; PX00454 (      Decl.) ¶ 6.
[44] PX00402 (            Decl.) ¶ 11; PX00432 (        Decl.) ¶ 5.
[45] PX00514 (                      (           ) IH Tr. at 49).

distribution businesses (*e.g.*, specialty produce company, FreshPoint) as a complement to its broadline business—under different brands, in different business units—intended to fill gaps in its broadline offerings.[46]

Indeed, customers do not regard specialty distribution as interchangeable with, or a substitute for, broadline distribution and declare that they could not economically use a network of specialty distributors to replace or price-constrain their broadliner.[47]  Managing such a network would be "██████████,"[48] and "█████,"[49] if not "██████████████,"[50]

### iii.    Cash-and-Carry Stores Are Not Substitutes

Cash-and-carry stores, such as Costco and Restaurant Depot, are not reasonably interchangeable with broadline distribution and thus are not in the relevant product market. Cash-and-carry stores are warehouse stores that sell food, equipment, and supplies to members. They lack the full breadth of items that many customers need,[51] contracted and centralized purchasing,[52] and consistent products across all facilities.[53]  Crucially, with very rare exceptions, they do not provide delivery services.  To the extent they use cash-and-carry stores, broadline customers generally use such stores only for limited purposes, such as filling a temporary item shortage.[54]

In effect, cash-and-carry stores require a foodservice operator to self-distribute, transferring an onerous burden to customers.  *H&R Block* recognized that, "courts in antitrust

---

[46] PX00500 (DeLaney (Sysco) IH Tr. at 38-39).
[47] PX00419 (████ Decl.) ¶ 4; PX00437 (████ Decl.) ¶ 5.
[48] PX00405 (████████ Decl.) ¶ 7; *see also* PX00403 (████████ Decl.) ¶ 6.
[49] PX00411 (██████ Decl.) ¶ 10; *see also* PX00464 (████████ Decl.) ¶ 12.
[50] PX00401 (████ Decl.) ¶ 5.
[51] PX00405 (██████ Decl.) ¶ 8; PX00410 (██████ Decl.) ¶ 13; PX00411 (██████ Decl.) ¶ 8; PX00426 (████ Decl.) ¶ 10; *see also* PX00428 (████ Decl.) ¶ 6; PX00498 (████ Decl.) ¶ 8.
[52] PX00402 (████ Decl.) ¶ 12; PX00403 (████ Decl.) ¶ 7; PX00405 (████ Decl.) ¶ 8.
[53] PX00403 (██████ Decl.) ¶ 7; PX00405 (██████ Decl.) ¶ 8; PX00436 (████ Decl.) ¶ 5; PX00445 (████ Decl.) ¶ 8; PX00450 (████ Decl.) ¶ 11.
[54] PX00404 (████ Decl.) ¶ 4; PX00432 (████ Decl.) ¶ 6; PX00445 (████ Decl.) ¶ 8; PX00465 (████ Decl.) ¶ 10; PX00496 (████ Decl.) ¶ 8.

cases frequently exclude similar 'self-supply' substitutes from relevant product markets."  833 F. Supp. 2d at 57-58; *accord CCC Holdings*, 605 F. Supp. 2d at 41-42.  *H&R Block* reasoned that the self-supply alternative in controversy—manual tax preparation—was "not a 'product' at all" but was instead a "task" not included within the relevant market.  833 F. Supp. 2d at 57.  On this basis, the court found that customers would be unlikely to switch to the task if confronted with a SSNIP for the product.  *Id.*  The same is true here.  Rather than receiving delivery from a broadliner, a cash-and-carry customer must obtain a refrigerated truck in most cases, travel to the store, select their own products, and transport the products back to their establishment(s).[55]  Self-procurement of food from a cash-and-carry store does not resemble the relevant service—broadline distribution—but instead requires customers to manually perform the distribution component of broadline distribution and forego value-added services.[56]

As a result, neither cash-and-carry stores[57] nor broadline distributors recognize the other as a reasonably interchangeable alternative.[58]  A US Foods document regarding its own cash-and-carry operation, CHEF'STORE, sums up the point: "███████████████████████████ ████████████████████████████████████████████████████ ████████████████,"[59]

### 2.  The United States Is A Relevant Geographic Market

"The 'relevant geographic market' identifies the geographic area in which the defendants compete in marketing their products or services."  *H&R Block*, 833 F. Supp. 2d at 50 n.7 (quoting *CCC Holdings*, 605 F. Supp. 2d at 37); *see also FTC v. Cardinal Health*, 12 F. Supp. 2d

---

[55] PX00500 (DeLaney (Sysco) IH Tr. at 62-63); PX00403 (████████ Decl.) ¶ 7; PX00408 (████████ Decl.) ¶ 11; PX00411 (████████ Decl.) ¶ 8; PX00485 (████████ Decl.) ¶ 11.
[56] PX00445 (████ Decl.) ¶ 8; PX00408 (████████ Decl.) ¶ 11; PX00494 (████████ Decl.) ¶ 10.
[57] PX00400 (████████ Decl.) ¶ 7; PX00427 (████ Decl.) ¶ 6; PX00433 (████████ Decl.) ¶ 7; *see also* PX00477 (████ Decl.) ¶¶ 4-5.
[58] PX00429 (████ Decl.) ¶ 13.
[59] PX03114-003-004; *see also* PX00444 (████ Decl.) ¶ 20; PX00510 (Schreibman (US Foods) IH Tr. at 58).

34, 49 (D.D.C. 1998); PX06059 (*Merger Guidelines*) § 4.2.  *Brown Shoe* declared that the relevant geographic market must "correspond to the commercial realities of the industry" as determined by a "pragmatic, factual approach" to assessing the industry.  370 U.S. at 336. While relevant geographic markets "need not . . . be defined with scientific precision," *United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 669 (1974), or by precise "metes and bounds," *Pabst Brewing*, 384 U.S. at 549, the court must understand "in which part of the country competition is threatened."  *Cardinal Health*, 12 F. Supp. 2d at 49.

As described above, this merger would harm competition for two types of customers: National Customers, with numerous facilities geographically dispersed nationwide or across multiple regions of the United States; and local customers, whose distribution needs are limited to a local or regional area.  For National Customers, the relevant geographic market in which to assess the merger's effects is the United States.  This national market corresponds with "commercial realities," *i.e.*, the way National Customers demand service, the way prices and terms for National Customers are negotiated and applied, and the way Defendants and other broadline distributors analyze the market.  *See Grinnell*, 384 U.S. at 575-576; *Cardinal Health*, 12 F. Supp. 2d at 50.

Broadline distributors compete to serve four main classes of National Customers: (1) hospitality chains and GPOs; (2) healthcare GPOs; (3) foodservice management companies (sometimes referred to as "contract feeders"); and (4) restaurant chains.  In each of these classes, National Customers require broadline distribution at numerous locations dispersed nationally or across multiple regions of the United States.[60]  They enter into contracts with broadline distributors that, as in *Grinnell*, "cover[] activities in many States."  384 U.S. at 576.

---

[60] *See* PX09010-007 (████████████████████████████████████████
████████████████████████████████████████).

Importantly, National Customers negotiate contracts, including with Defendants, that require broadliners to apply the same price schedules and other terms to their locations or members throughout the country.[61]  *See id.* at 575 (finding a national geographic market where defendants had "a national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions"); *Cardinal Health*, 12 F. Supp. 2d at 50 (finding a national market where "evidence showed that many GPOs negotiate contracts with several wholesalers, making the same prices available throughout the country to all members . . . .").

Likewise, the way in which Defendants built and conduct their businesses reflect the reality of a national market.  *See Grinnell*, 384 U.S. at 576.  Defendants engage in national planning for National Customers, maintain "national account" teams dedicated to servicing National Customers,[62] negotiate contracts at the national level, offer incentives at the national level,[63] and set nationwide pricing and terms for National Customers.[64]  The very existence of Distribution Market Advantage (DMA), a consortium of regional distributors specifically formed to try to compete for national accounts,[65] confirms that, for National Customers, the area of effective competition is national.

As evidenced by Defendants' combined dominant market share,[66] National Customers choose—and in many cases, require the ability—to centrally contract with a broadline distributor with national distribution capabilities, for reasons of efficiency, product and service consistency,

---

[61] PX00509 (Lynch (US Foods) IH Tr. at 117-18).
[62] PX00507 (Kimball (US Foods) IH Tr. at 226-27); PX00509 (Lynch (US Foods) IH Tr. at 46-47); PX01064-001; *see also* PX09010-004.
[63] *See, e.g.*, PX01086-040.
[64] *See, e.g.*, PX00287-008; PX01084.
[65] PX00412 ( ▓▓▓▓ Decl.) ¶ 3.
[66] *See* Section I(4)(A) *infra*.

and cost.[67]  Many National Customers would not—and could not without great difficulty—reasonably substitute distributors with only a local or regional presence for national broadline distribution.[68]  Even those National Customers that contract with more than one distributor, including regional broadliners, often require a single national distributor as their anchor.[69]  It is common in the industry for large customers to conduct a bid process in which national geographic coverage is a threshold qualification for hopeful bidders.[70]  As a result, while regional distributors participate in the market for National Customers at the fringe, they uniformly testify that they cannot meaningfully compete for National Customers because of their limited geographic reach—a reality borne out by their collectively insignificant market share (*see* Section I(4)(a) *infra*).[71]  Indeed, regional distributors' efforts to compete through DMA show that they cannot effectively compete for National Customers on their own.[72]

Beyond maintaining national sales operations to serve National Customers,[73] Defendants recognize the existence of a national market in other ways as well.  US Foods describes itself as "1 of 2 *National* Broadline Distributors in the U.S.,"[74] with the "[a]bility to leverage our national scale to cost effectively service customers nationally."[75]  Sysco similarly markets itself to

---

[67] PX00401 (⬛⬛⬛⬛⬛⬛ Decl.) ¶ 12; PX00402 (⬛⬛⬛⬛ Decl.) ¶ 6; PX00404 (⬛⬛⬛ Decl.) ¶ 9; PX00418 (⬛⬛⬛⬛⬛ Decl.) ¶ 8; PX00432 (⬛⬛⬛⬛ Decl.) ¶ 10; PX00436 (⬛⬛⬛ Decl.) ¶ 9; PX00439 (⬛⬛⬛⬛⬛ Decl.) ¶ 7; PX00441 (⬛⬛⬛ Decl.) ¶ 8; PX00445 (⬛⬛⬛ Decl.) ¶ 9.
[68] PX00437 (⬛⬛⬛⬛ Decl.) ¶ 13; PX00448 (⬛⬛⬛ Decl.) ¶ 14; PX00445 (⬛⬛ Decl.) ¶ 17.
[69] PX00436 (⬛⬛⬛ Decl.) ¶ 19; PX00437 (⬛⬛⬛ Decl.) ¶ 8.
[70] PX09036-001; PX09037-001; PX09038-002; PX00432 (⬛⬛⬛ Decl.) ¶ 13; PX00436 (⬛⬛ Decl.) ¶ 11.
[71] PX00429 (⬛ Decl.) ¶ 17; PX00415 (⬛⬛ Decl.) ¶ 12; PX00458 (⬛⬛ Decl.) ¶ 12; PX00460 (⬛⬛⬛ Decl.) ¶ 6.
[72] PX00412 (⬛ Decl.) ¶ 3.
[73] PX00507 (Kimball (US Foods) IH Tr. at 226-27); PX00509 (Lynch (US Foods) IH Tr. at 46-47); PX01064-001; *see also* PX09010-004.
[74] PX00228-017 (emphasis added).
[75] PX03000-014.

customers as a "████████████████████"[76] and assesses "████████████████████
████████████████████████████████".[77]

### 3. Numerous Local Areas Are Relevant Geographic Markets

Commercial realities also indicate that, for local customers, local areas across the United States are the relevant geographic markets in which to assess the transaction's competitive effects. Relevant local markets are defined as the overlapping trade areas of the Defendants' distribution centers—*i.e.*, the locations of the local customers that both Defendants' distribution centers could serve.[78] *See* PX06059 (*Merger Guidelines*) § 4.2.2 (when suppliers deliver geographic markets may be most appropriately based on customer locations). These are relevant geographic markets because they are the areas of competition for local customers most affected by the merger. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (geographic market analysis strives to locate "the area of effective competition").[79]

Broadline distribution competition occurs on a local level for those customers whose distribution needs are limited in scope to a local or regional area. Practically speaking, local customers turn only to broadline distributors located within approximately 150 miles of their foodservice location, and sometimes much closer in dense metropolitan areas.[80] Broadline distributors typically generate the majority of their local business from customers located within

---

[76] PX01054-005.

[77] PX03101-020.

[78] *See* PX09062 (Israel Decl.) § IV(A)(1).

[79] For example, the overlapping trade area of Sysco and US Foods distribution centers near Memphis, Tennessee constitutes a relevant local geographic market for purposes of analyzing the effects of the proposed transaction. Sysco and US Foods both have distribution centers, sales representatives, and support infrastructure in Memphis. The parties can discriminate against customers in Memphis because the customers' distribution alternatives to a price increase are limited to the set of broadline distributors that could serve Memphis. The geographic market is the overlapping trade area of the Defendants, although broadline foodservice distributors located both inside and outside the boundary are counted as market participants to the extent they could provide distribution services to the overlapping trade area. *See also* Section I(4)(b) *infra*.

[80] *See* PX00425 (████████ Decl.) ¶ 12; PX00461 (████████ Decl.) ¶ 5; PX00458 (████████ Decl.) ¶ 14; PX00476 (████████ Decl.) ¶¶ 5, 8; PX00422 (████████ Decl.) ¶ 8; PX00463 (████████ Decl.) ¶ 5.

a radius of approximately 100 miles of their distribution centers.[81]  A distribution center's proximity to its customers impacts the distributor's ability to provide next-day delivery, fill emergency or last minute orders and ensure on-time delivery.[82]  Proximity also affects a distributor's cost to serve, with farther deliveries costing more.[83]  Notably, industry participants, including Defendants, track and assess local markets using similar metropolitan areas and regions in the ordinary course of business.[84]  Appendix A identifies the metropolitan areas and local regions that are relevant geographic markets in which to assess the merger's competitive effects on local customers.

### 4. The Merger Would Create Extraordinarily High Market Shares And Concentration In Each Relevant Market

The proposed merger presumptively violates Section 7 of the Clayton Act and Section 5 of the FTC Act, resulting in dominant market shares and substantially increasing concentration in already concentrated relevant markets.  A showing that a firm will control an "undue percentage share of the relevant market" triggers a "presumption that the merger will substantially lessen competition." *Heinz*, 246 F.3d at 715.  Such mergers are considered presumptively invalid and must be "enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363; *see also Cardinal Health,* 12 F. Supp. 2d at 52; *FTC v. PPG Industries*, 798 F.2d 1500, 1502-3 (D.C. Cir. 1986).

Traditionally, courts employ a statistical measure called the Herfindahl-Hirshman Index (HHI) to measure market concentration.  This index calculates market concentration by summing

---

[81] *See* PX00414 (███ Decl.) ¶ 5; PX00424 (███ Decl.) ¶ 6; PX00429 (███ Decl.) ¶ 10; PX09062 (Israel Decl.) § IV(A) Table 29 (providing weighted average delivery distances for each Sysco and US Foods broadline distribution center);  *see also* PX00500 (DeLaney (Sysco) IH Tr. at 16).
[82] *See* PX00456 (███ Decl.) ¶ 8; PX00461 (███ Decl.) ¶ 5; PX00469 (███ Decl.) ¶ 6; PX00470 (███ Decl.) ¶ 7 PX00473 (███ Decl.) ¶ 4.
[83] PX09007-035; PX00506 (Humphreys (US Foods) IH Tr. at 20-21).
[84] *See* PX01065-020, 035, 077; PX03125-016; PX03073-015; PX01008-077; PX00414 (███ Decl.) ¶ 5 ("Nearly 100% of ███ sales are to customers in the ███ area."); PX00417 (███ Decl.) ¶ 3.

the squares of the individual market share of each market participant. *See Cardinal Health,* 12 F. Supp. 2d at 67. Under the *Merger Guidelines*, a merger is presumptively anticompetitive if it increases the HHI by more than 200 points and results in a post-merger HHI exceeding 2,500. PX06059 (*Merger Guidelines*) § 5.3; *accord H&R Block*, 833 F. Supp. 2d at 71-72; *Heinz*, 246 F.3d at 716. Here, the increases in market concentration and the post-merger HHIs in each relevant market far exceed the established thresholds and trigger a strong presumption of anticompetitive harm.

### a. Market Concentration—Sales To National Customers

The proposed merger would combine the only two truly national broadline distributors, which together possess a dominant share of the market. Even accounting for the minimal sales that regional broadline distributors collectively garner from National Customers, the combined firm would enjoy a 75% market share post-merger, with the next largest competitor, DMA, having only 11%.[85] The post-merger HHI would reach 5,836, an increase of 2,800 points from the already highly concentrated pre-merger level. This increase in concentration is *fourteen times* the threshold that triggers the presumption in highly concentrated markets such as here.

| | 2013 Sales to National Customers ($B) | Share | Pre-Merger HHI | Post-Merger HHI |
|---|---|---|---|---|
| Sysco | $█ | 40% | 1,600 | |
| US Foods | $█ | 35% | 1,225 | |
| **Combined Firm Post-Merger** | $█ | **75%** | | **5,625** |
| DMA | $█ | 11% | 121 | 121 |
| PFG | $█ | 5% | 25 | 25 |
| Unipro/MUG | $█ | 1% | 1 | 1 |
| Other (Regionals) | $█ | 8% | 64 | 64 |
| **Total Market** | $█ | | **3,036** | **5,836** |

---

[85] *See* PX09062 (Israel Decl.) § III(C) n.183.

Moreover, according to Defendants' own documents, the merged firm would enjoy an even more dominant share in certain classes of National Customers.  For example, internal documents suggest that the merged firm would enjoy a virtual monopoly in the sale of broadline distribution to National Customers in the healthcare segment.[86]

The combined market share, market concentration, and increases in concentration here exceed the levels that have created a presumption of illegality and warranted injunctions in past merger cases.

| Case | Combined Share | HHI Increase | Post-Merger HHI | Holding |
|---|---|---|---|---|
| *Phila. Nat'l Bank* (Supreme Court 1963) | 30% | N/A | N/A | Enjoined |
| *Cardinal Health* (D.D.C. 1998) | 37.2% 39.9% | 1,431 | 3,079 | Enjoined |
| *Swedish Match* (D.D.C. 2000) | 60% | 1,514 | 4,733 | Enjoined |
| *Heinz* (D.C. Cir. 2001) | 32.8% | 510 | 5,285 | Enjoined |
| *CCC Holdings* (D.D.C. 2009) | 70% 65% | 2,035 545 | 5,685 5,460 | Enjoined |
| *H&R Block* (D.D.C. 2011) | 28.4% | 400 | 4,691 | Enjoined |
| **Combined Sysco/US Foods (National Broadline Market)** | **75%** | **2,800** | **5,836** | **TBD** |

### b.  Market Concentration—Sales To Local Customers

Separate from harm to National Customers, the proposed merger threatens anticompetitive harm in 32 local markets, as detailed in Appendix A.  In each of these markets, Defendants' combined market share, the HHI, and the increase in concentration triggers a presumption of illegality under Supreme Court precedent and the *Merger Guidelines*.  Regardless of the precise delineation, many local markets would be highly concentrated as a

---

[86] *See, e.g.*, PX03103-002 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛);
PX01008-033 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

result of the transaction.[87]  The competitors in each local market are the firms to which customers could practicably turn for broadline foodservice distribution.  Thus, firms that compete in the local market may be located outside the boundaries of the geographic market, provided that they deliver or could deliver into the specified locality.  Even so, Defendants' market shares, the HHIs, and the increases in concentration in the relevant geographic markets are staggering.

The market shares that Defendants calculate in the ordinary course of business are consistent with these extremely high shares and, in some areas, paint an even bleaker picture for customers.  For example, a US Foods internal M&A Strategy document reports shares for US Foods and Sysco, respectively, in Columbia, South Carolina (██████); in Raleigh, North Carolina (█████); and in Roanoke, Virginia (█████).[88]  In fact, Defendants themselves recognize that they are the top two distributors in nearly every local market.[89]

## B.  Defendants Cannot Rebut The Strong Presumption Of Illegality

With the presumption of illegality established, the burden shifts to Defendants to rebut the presumption by "produc[ing] evidence that 'show[s] that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition' in the relevant market." *Heinz*, 246 F.3d at 715 (quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975)).  Here, Defendants bear a particularly heavy burden based on the strength of the *prima facie* case.  *See H&R Block*, 833 F. Supp. 2d at 72 (the stronger the *prima facie* case, the more evidence defendants must present to rebut the presumption).  Defendants cannot meet their

---

[87]Dr. Israel has calculated market shares using several alternative metrics, each of which confirms the commanding position occupied by Defendants.  *See United States v. Bazaarvoice, Inc.*, 2014 U.S. Dist. LEXIS 3284 *70 (N.D. Cal. 2014) (finding a *prima facie* Section 7 violation because various market share metrics "each…reveals the same basic market structure: that [defendants] are the two dominant providers and they have a combined market share in excess of 50 percent").  For detailed methodology, *see* PX09062 (Israel Decl.) § IV(A)(1).
[88] PX03073-025.
[89] PX00508 (Lederer (US Foods) IH Tr. at 226-27); PX03118-005.

burden.  Even if they could come forward with evidence to rebut the presumption, the

Commission has assembled evidence—including evidence of likely unilateral effects—that

easily meets its "ultimate burden of persuasion" that the proposed merger is likely to

substantially lessen competition.  *Id.* at 50.

### 1.  The Merger Would Eliminate Critical Head-To-Head Competition

Voluminous evidence of likely anticompetitive effects reinforces the Commission's

likelihood of success on the merits.  Where, as here, two merging parties are close competitors

for the business of National Customers and in numerous local markets, the merger is of particular

concern because elimination of close competition is likely to result in unilateral anticompetitive

effects.  *See* PX06059 (*Merger Guidelines*) § 6.1.  "A merger is likely to have unilateral

anticompetitive effects if the acquiring firm will have the incentive to raise prices or reduce

quality after the acquisition, independent of competitive responses from other firms."  *H&R*

*Block*, 833 F. Supp. 2d at 81.  When analyzing unilateral effects, "'[t]he extent of direct

competition between the products sold by the merging parties is central,'" as the inquiry is

focused on the effect of eliminating the direct competition between the merging firms.  *Id.*

(quoting *Merger Guidelines* § 6.1).

Facing similar mergers, courts in this Circuit have found that eliminating a significant

competitor makes it highly likely that the merged entity can charge supracompetitive prices.  *See*

*Swedish Match*, 131 F. Supp. 2d at 169 ("[A] unilateral price increase . . . is likely after the

acquisition because it will eliminate one of Swedish Match's primary direct competitors."); *H&R*

*Block*, 833 F. Supp. 2d at 88-89 (finding unilateral effects likely in a merger between the second

and third largest firms in the relevant market); *Staples*, 970 F. Supp. at 1083 (finding unilateral

anticompetitive effects where the transaction "would eliminate significant head-to-head

competition" between the merging parties).  The substantial evidence of head-to-head

competition between Defendants, including expert economist Dr. Israel's empirical analysis,[90] demonstrate that the merger would cause significant anticompetitive harm and should be enjoined consistent with the relevant case law.

### a. The Merger Would Substantially Lessen Competition In The National Market

For National Customers, Sysco and US Foods are unquestionably each other's closest competitor.[91]  To take one of many examples, a US Foods document states that "U.S. Foods is . . . one of only two national broadline foodservice distributors . . ." and discusses "[US Foods'] margins . . . vs. Sysco (closest competitor with similar business mix)."[92]  Defendants have competitive attributes that are unmatched by other distributors in the industry.  For example, they are the largest broadline distributors with the broadest and deepest selection of products. Additionally, they are the only single-firm broadline distributors with nationwide reach and the ability to offer consistent products and uniform pricing throughout the United States.[93]  These are among the very attributes that make Defendants the top choices for many National Customers.

Defendants' rivalry is intense.  In both competitive requests for proposals (RFPs) and contract negotiations with customers, Defendants frequently discount prices, offer incentives, and improve service terms to keep and take business from each other.[94]  Customer testimony[95]

---

[90] *See* PX09062 (Israel Decl.) § III(C).
[91] PX00404 (      Decl.) ¶ 4; PX00406 (      Decl.) ¶ 7; PX00403 (      Decl.) ¶ 14; PX00402 (      Decl.) ¶ 13; PX00418 (      Decl.) ¶ 19; PX00419 (      Decl.) ¶ 10; PX00421 (      Decl.) ¶ 18; PX00431 (      Decl.) ¶ 12; PX00432 (      Decl.) ¶ 18; PX00436 (      Decl.) ¶ 15; PX00437 (      Decl.) ¶ 12; PX00439 (      Decl.) ¶ 11; PX00441 (      Decl.) ¶ 10; PX00445 (      Decl.) ¶ 16.
[92] PX03004-001; *see also* PX03001-002 (      ) (emphasis added).
[93] *See* PX03032-042 ("Minimal differentiation between USF and our major rival; 'US Foodservice and Sysco are interchangeable.'"); PX01047-026.
[94] PX00404 (      Decl.) ¶ 5; PX00406 (      Decl.) ¶ 7; PX00403 (      Decl.) ¶ 14; PX00402 (      Decl.) ¶ 13; PX00418 (      Decl.) ¶ 19; PX00419 (      Decl.) ¶ 10; PX00421 (      Decl.) ¶ 17; PX00431 (      Decl.) ¶ 14; PX00432 (      Decl.) ¶ 18; PX00436 (      Decl.) ¶ 15; PX00437 (      Decl.) ¶ 12; PX00439 (      Decl.) ¶ 11; PX00441 (      Decl.) ¶ 10; PX00445 (      Decl.) ¶ 16.

and Defendants' documents[96] are rife with examples of this intense competition resulting in significant benefits to customers, including lower prices[97] and upfront incentive payments.[98]

Additionally, Defendants compete to win customers in "███████████,"[99] or on non-price factors, such as ordering platforms and other customer-facing technology, timeliness of deliveries, fill rates (*i.e.*, product compliance), value-added services such as menu planning applications, and more.[100]  The vigorous competition on service is highlighted by Sysco's █████ ████████████████████████████, which, after noting the latter's service innovations, asked "███████████████████████████████████████████"[101]

Economic expert Dr. Israel's empirical study of Defendants' bidding history shows that Sysco and US Foods are overwhelmingly the top two choices for National Customers.[102]  Each Defendant is most often the runner-up when the other wins, with other distributors appearing as bidders only intermittently.[103]  Sysco's data on RFP wins indicate that Sysco loses to US Foods approximately *two and a half times* as often as the next-closest competitor (DMA), and reports US Foods as the winner more often than all other competitors combined.[104]  Likewise, US Foods' RFP win data reports Sysco as the winner more often than all other competitors combined.[105]

---

[95] PX00436 (██████ Decl.) ¶ 15; PX00437 (████████ Decl.) ¶ 12; PX00439 (█████████ Decl.) ¶ 7; PX00441 (████████ Decl.) ¶ 10.
[96] *See, e.g.,* PX00286-002; PX01061-001; PX03064-001; PX03086-002.
[96] *See, e.g.,* PX03084-001; PX00300-001; PX01032-001; PX03103-011; PX00277-001.
[97] *See, e.g.,* PX00404 (████████ Decl.) ¶ 5; PX00402 (████████ Decl.) ¶ 9.
[98] *See, e.g.,* PX01066-001-002.
[99] PX03103-003.
[100] *See, e.g.,* PX01010-007, 021-022; PX00281-012.
[101] PX01010-015.
[102] *See* PX09062 (Israel Decl.) § III(C).
[103] *Id.*
[104] *Id.*
[105] *Id.*

Consequently, Defendants are the key, if not only, constraints on each other's prices in most instances, as National Customers testify.[106] ███████████████████████

████████████████████████████████████████████████████████████

██████████████████████.[107]  Only Defendants consistently meet those requirements.

Even outside an RFP, in bilateral contract renegotiations, the threat alone that a customer will pit Defendants against each other has yielded huge concessions.[108] ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████  Consequently, National Customers across all classes, including hospitality, foodservice management companies, healthcare, and restaurants, state that the merger will likely have anticompetitive effects.[110]

### b. The Merger Would Substantially Lessen Competition In Numerous Local Markets

Similarly, the merger would substantially lessen competition and thereby decrease Sysco's need or incentive to compete aggressively in the relevant local geographic markets. Currently, Defendants' sales representatives compete fiercely with each other on a daily basis in each relevant market.  Among other things, they cut prices, sweeten terms, and offer upfront financial incentives to win business from each other.[111]  Typical of this rivalry, Sysco internally



---

[106] *See, e.g.*, PX00404 (████ Decl.) ¶ 13; PX00407 (████ Decl.) ¶ 13; PX00419 (████ Decl.) ¶ 11; PX00431 (████ Decl.) ¶ 12.
[107] PX00432 (████ Decl.) ¶ 13; PX00436 (████ Decl.) ¶ 11; PX00437 (████ Decl.) ¶ 9; PX00441 (████ Decl.) ¶ 8.
[108] *See, e.g.*, PX03084-001.
[109] PX00404 (████ Decl.) ¶ 5.
[110] *See, e.g.*, PX00437 (████ Decl.) ¶ 12; PX00436 (████ Decl.) ¶ 15; PX00401 (████ Decl.) ¶ 15; PX00402 (████ Decl.) ¶ 14; PX00403 (████ Decl.) ¶ 14; PX00406 (████ Decl.) ¶¶ 10-11; PX00407 (████ Decl.) ¶ 13.
[111] *See, e.g.*, PX01042-001; PX03036-002; PX01012; PX03022-023, 025.

observed ███████████████████████████████████████████████████████

██████████████████████████████████████,"[112]  The Sysco Regional

President's response was "█████████████████████████████,"[113]

  While one or more other broadline distributors are present in the local geographic

markets, Sysco and US Foods are the strongest distributors and closest competitors across a

range of competitively significant attributes.  For example, Defendants have greater product

breadth,[114] broader private label product portfolios,[115] and more value-added services[116] than

local and regional broadline distributors.  Defendants also generally have larger distribution

centers, more sales representatives, and more trucks than local broadline distributors.[117]

  The following are just three examples of the many local geographic markets in which the

merger would substantially reduce competition.

### i. Columbia/Charleston, SC Market

  Defendants are, by far, the two most significant broadline distribution options for

foodservice customers in Columbia/Charleston, South Carolina.  Post-merger, Defendants would

have a combined market share of 72% and the HHI would increase 2,264 points to 5,731.[118]

Defendants' business documents and customer testimony evince the direct, head-to head

competition between Sysco and US Foods that the merger would eliminate.  Sysco's documents

repeatedly identify US Foods as Sysco's largest and most formidable competitor in the

Columbia/Charleston market, specifying that US Foods' competitive tactics include aggressive

---

[112] PX01033-001.

[113] PX01033-001.

[114] *See, e.g.,* PX00411 (████████ Decl.) ¶ 6; PX00420 (██████████ Decl.) ¶¶ 7, 11; PX00459 (██ ████████ Decl.) ¶ 7; PX00489 (████ Decl.) ¶ 9.

[115] *See, e.g.,* PX00414 (████ Decl.) ¶ 4; PX00417 (████ Decl.) ¶ 4; PX00449 (████ Decl.) ¶ 9.

[116] *See, e.g.,* PX00409 (████ Decl.) ¶ 6; PX00472 (██████████ Decl.) ¶ 4.

[117] *Compare, e.g.,* PX00414 (████ Decl.) ¶¶ 5, 7-8, *with* PX03149_native; PX03148_native; PX03150_native *and* PX01093_native; PX01092_native; PX01097_native.

[118] *See* PX09062 (Israel Decl.) § VI(A) Table 34.

pricing through "█████████████████████████████████████".[119]  US Foods describes itself as

████████████████████████████████████████████████████████████████████

████████████████████████[120]  Sysco consistently catches US Foods' attention by being

aggressive on price.[121]  Defendants dismiss the next-largest competitor in the market, PFG, as

"███████████████████████████████████████████████████████████████████

████████████.[122]  Area customers share this view of PFG.[123]

Customers credit the "█████████████████████████████████████████████████

████████████████"[124]  Given the lack of viable alternatives to constrain a dominant

Sysco post-merger, customers in this market understandably fear higher prices and reduced

service levels if the proposed merger occurs.[125]  As one local independent restaurant owner

explained: "█████ ████████████████████████████████████████████████"[126]  These

concerns about the merger are hardly speculative:  since the merger's announcement, Sysco's

sales representatives have threatened customers that do not immediately sign contracts with

Sysco with reduced service levels after the merger occurs.[127]

### ii.   Omaha/Council-Bluffs, NE/IA Market

Likewise, Defendants are customers' top choices for broadline distribution in the

Omaha/Council-Bluffs ("Omaha") market.  Customers' overwhelming preference for

Defendants, in contrast to any other local distributors, is evident from Defendants' combined

[119] PX01065-077; *see also* PX01008-077; PX01085-001-004.
[120] PX03073-015, 025; *accord* PX00416 (████████ Decl.) ¶¶ 12-13.
[121] *See, e.g.*, PX03135-001-002.
[122] PX01065-077.
[123] PX00426 (██████████ Decl.) ¶ 9; PX00452 (██████████ Decl.) ¶ 6; PX00471 (██████████ Decl.) ¶ 7.
[124] PX00452 (██████████ Decl.) ¶ 3; *see also* PX00471 (██████████ Decl.) ¶ 9; PX00423 (████████ Decl.) ¶ 10; PX00481 (████████ Decl.) ¶ 9; PX00483 (████████ Decl.) ¶¶ 8-9. PX00481 (████████ Decl.) ¶ 10; PX00483 (████████ Decl.) ¶ 10; PX00482 (████████ Decl.) ¶ 9; PX00497 (████ Declaration) ¶ 10.
PX00423 (████████ Decl.) ¶ 10.
[127] PX00452 (██████████ Decl.) ¶ 12; PX00482 (██████████ Decl.) ¶ 14.

market share of 90%, as well as Defendants' documents and customers' declarations.[128]  The merger would increase market concentration by 1,475 points to 8,224.[129]  Defendants' internal business materials reveal their intense rivalry for customers in Omaha.  US Foods internally recognizes "pricing pressure from Sysco . . ."[130] and that Sysco is "attacking our biz."[131] █████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ [132]

Omaha customers testify that their ability to switch, or threaten to switch, between Sysco and US Foods has yielded lower prices, better product quality, and better service.[133]  The next-largest broadline distributor serving the area, Cash-Wa, is significantly smaller than Defendants, both in sales and in product offerings.[134]  Cash-Wa's nearest distribution center is located 180 miles from Omaha, putting it at a significantly greater distance from customers than Defendants, which is a meaningful competitive disadvantage.[135]

### iii.   Raleigh/Durham, NC Market

Defendants are also the most significant broadline distribution options in the Raleigh/Durham market, with a combined share of 74%.[136]  US Foods internally assesses itself

███████████████████████████████████████████████████████ [137]

Defendants' own documents show that their local rivalry has produced a host of benefits to area customers, including hefty signing incentives[138] and the elimination of fuel surcharges.[139]

---

[128] *See* PX09062 (Israel Decl.) § VI(A) Table 34.
[129] *Id.*
[130] PX03022-025.
[131] PX03035-002.
[132] PX03035-003.
[133] PX00468 (████ Decl.) ¶ 7; PX00469 (████ Decl.) ¶ 5; PX00467 (████████ Decl.) ¶ 8; PX00473 (████████ Decl.) ¶ 6; PX00472 (████████ Decl.) ¶ 7; PX00484 (████████ Decl.) ¶ 5; PX00486 (████ Decl.) ¶ 12.
[134] PX00469 (████ Decl.) ¶ 3; PX00467 (████████ Decl.) ¶ 5; PX00468 (████ Decl.) ¶ 8; PX00476 (████ Decl.) ¶ 8; PX00484 (████████ Decl.) ¶ 7.
[135] PX00468 (████ Decl.) ¶ 8; PX00473 (████ Decl.) ¶ 4.
[136] *See* PX09062 (Israel Decl.) § VI(A) Table 34.
[137] PX03118-007.

As one local restaurant owner attests, " 

,,140

Customers describe the limited alternative distributors in the area as higher priced and generally inferior to Defendants across product and service dimensions.[141]  Unsurprisingly, customers in the Raleigh/Durham market are concerned that the merger will lead to higher prices and inferior service.[142]  According to

,,143

### 2. Sysco's Proposed Expansion of PFG Through Divestiture Does Not Address The Merger's Anticompetitive Harm

Defendants' February 2, 2015 agreement to divest 11 of US Foods' 61 distribution centers to PFG (the "proposed divestiture") would not remedy the merger's anticompetitive harm, either for National Customers or in a number of local markets.[144]  Even with 11 more distribution centers, PFG would still be less than *one-third* the size of the pre-merger US Foods in terms of sales to National Customers, and approximately *half* the size of the current US Foods on other key metrics that affect competitive might.  The gulf between PFG and the merged Sysco/US Foods would be even greater.

---

[138] PX01142; PX01143.
[139] PX01043.
[140] PX00411 (                    Decl.) ¶ 11; *see also* PX00457 (                    Decl.) ¶ 7.
[141] PX00461 (                    Decl.) ¶¶ 10-11; PX00457 (                    Decl.) ¶ 7; PX00479 (            Decl.) ¶ 9.
[142] PX00479 (                    Decl.) ¶ 12; PX00457 (                    Decl.) ¶ 10; PX00487 (        Decl.) ¶ 15.
[143] PX00440 (            Decl.) ¶ 8.
[144] The US Foods distribution centers proposed for divestiture are Cleveland, OH; Corona, CA; Denver, CO; Kansas City, KS; Las Vegas, NV; Minneapolis, MN; Phoenix, AZ; Salt Lake City, UT; San Diego, CA; San Francisco, CA; and Seattle, WA.

| Distributor | National BL Sales ($B) | Total BL Sales ($B) | BL DCs | BL Sq. Ft. | Total Salesforce | Total Trailers |
|---|---|---|---|---|---|---|
| PFG + divestiture | $▇ | $▇ | 35 | ▇ | ▇ | ▇ |
| US Foods pre-merger | $▇ | $22.3 | 61 | 16,704,015 | 5,000 | 6,000 |
| Combined Sysco/US Foods minus divestiture | $▇ | $48.2 | 122 | ▇ | ▇ | ▇ |

Notwithstanding the proposed divestiture, Defendants' combined national market share of 70% and the post-merger HHI of 5,000 (a 2,000 point increase) would still warrant a strong presumption that the merger is illegal.[145]  Importantly, even with 11 additional distribution centers, PFG's geographic network would have significant gaps, making PFG a significantly less attractive alternative for the business of National Customers than US Foods is today, as customers attest.[146]  Currently, US Foods competes with a network of 61 distribution centers that, as it describes when competing for National Customers, are "strategically located across the country."[147]  With the divestiture, however, PFG would have only 35 distribution centers, leaving it with significant coverage gaps in, among other areas, western and central New York; Detroit and other parts of Michigan; Indianapolis; West Virginia; western and central Pennsylvania; Albuquerque; Iowa; Oklahoma City; Omaha and other parts of Nebraska; and West Texas[148]—all areas served today by one or more nearby US Foods (and Sysco) distribution centers.

PFG's sparser network would require it to travel greater distances than US Foods does today to serve many National Customer locations, thereby increasing its transportation costs to

---

[145] *See* PX09062 (Israel Decl.) § VI(C)(3) n.457.
[146] PX00474 (▇ Supp. Decl.) ¶ 3; PX00480 (▇ Supp. Decl.) ¶ 9; PX00475 (▇ Supp. Decl.) ¶¶ 7-12.
[147] PX00228-004; *see also* PX00640-004; PX09062 (Israel Decl.) §VI(B).
[148] PX00488 (▇ Supp. Decl.) ¶ 12; PX00492 (▇ Supp. Decl.) ¶ 3; PX00478 (▇ Supp. Decl.) ¶ 6; PX00514 (▇ ▇) IH Tr. at 260-61); PX00493 (▇ Supp. Decl.) ¶ 9.

serve customers relative to US Foods.[149]  Specifically, labor costs, fuel costs, and maintenance

costs increase as a distributor travels greater distances.[150]  Customers confirm this[151] and attest

that PFG's need to deliver from greater distances heightens their concerns about PFG's ability to

bid as aggressively as, and to serve as a cost-competitive replacement for, US Foods.[152]  In

addition to higher delivery costs, PFG would also likely face higher product costs from suppliers

than US Foods does today because of PFG's smaller purchasing volume.[153]  Thus, it is unlikely

that PFG would be cost competitive compared to the pre-merger US Foods.  *See FTC v. Libbey,*

*Inc.,* 211 F. Supp. 2d 34, 46-48 (D.D.C. 2002) (enjoining merger, and finding that the proposed

divestiture buyer likely would face higher costs than the acquired company).

Distribution over greater distances would also impede PFG's ability to provide service

levels comparable to what US Foods currently provides to National Customers.  Next-day

delivery, on-time delivery, and timely responses to missing orders or other customer emergencies

are extremely important to broadline customers.  Delivering over relatively greater distances

would compromise PFG's ability to provide these services as effectively as US Foods.[154]



---

[149] PX00495 (_____ Supp. Decl.) ¶¶ 2-3; PX00475 (_____ Supp. Decl.) ¶ 8; PX00480 (_____ Supp. Decl.)
¶ 9; PX00474 (_____ Supp. Decl.) ¶ 3.
[150] PX00506 (Humphreys (US Foods) IH Tr. at 20-21); *see also* PX00458 (_____ Decl.) ¶ 10; PX00495 (____
Supp. Decl.) ¶ 3.
[151] *See* PX09007-035; PX00514 (_____ (_____) IH Tr. at 78-80); PX00403 (_____ Decl.) ¶ 10.
[152] *See* PX00474 (_____ Supp. Decl.) ¶ 3; PX00475 (_____ Supp. Decl.) ¶¶ 8, 12; PX00480 (_____ Supp. Decl.)
¶ 5.
[153] *See* PX00460 (_____ Decl.) ¶ 13; PX00449 (_____ Decl.) ¶¶ 9-10; PX00493 (_____ Supp. Decl.) ¶ 8.
[154] PX00502 (Jarosh (Sysco) IH Tr. at 100-101); PX00488 (_____ Supp. Decl.) ¶¶ 9, 12; PX00474 (____ Supp.
Decl.) ¶ 3; PX00480 (_____ Supp. Decl.) ¶ 9; PX00475 (_____ Supp. Decl.) ¶¶ 8-9; PX00488 (____ Supp.
Decl.) ¶ 4; PX00461 (_____ Decl.) ¶ 11; PX00495 (_____ Supp. Decl.) ¶ 4.



[156]

PFG also falls far short of US Foods in terms of the depth and breadth of its product offerings, ██████████████████████████████[157]  According to customers, PFG's more limited product portfolio renders it inferior to US Foods and, ████ ██████████████████████████████████,,[158]

PFG is also unable to match the value-added services that US Foods offers to National Customers, especially in the healthcare segment, where today US Foods offers highly sophisticated menu planning, nutritional analytics, and financial reporting tools, and has representatives with healthcare expertise who are available to offer guidance.[159]  Defendants' plan to address this PFG expertise deficit by encouraging a fraction of US Foods' national account employees to transfer to PFG is woefully inadequate.

Finally, on top of these challenges, the divestiture carries enormous execution risk.  PFG has never acquired more than two distribution centers at once.  Under the proposed divestiture, it will attempt to integrate more than five times that number while, at the same time, ████████ ██████████████████████████████████.  Meanwhile, PFG will try

[155] *See* PX09061; *see also* PX09062 (Israel Decl.) § VI(C)(3)(a).
[156] █████████████████████████████████████████████████████████████.
        ████████  PX09060-004, 006.
PX09062 (Israel Decl.) § III(C).
[157] While US Foods offers 350,000 SKUs across its network (30,000 of which are private label SKUs), PFG offers █████████████████████████████████.  PX06055-004; PX09507-007, 013.  *See also* PX00488 (████  Supp. Decl.) ¶ 5.
[158] PX00475 (████  Decl.) ¶ 10; PX00441 (████  Decl.) ¶ 7; PX00461 (████████  Decl.) ¶ 11; PX09045-034.
[159] PX00466 (████  Decl.) ¶ 5; PX00514 (████  (████████) IH Tr. at 100); PX00474 (██  Supp. Decl.) ¶ 3; PX00475 (████  Supp. Decl.) ¶ 6.

to enter a market (national broadline distribution) that it has never meaningfully competed in; attempt to recruit US Foods employees; manage and ultimately transition a complex IT interface; license US Foods' private label products while also trying to convert customers to its own private label products; significantly expand its private label product line to fill segment-specific gaps and compete with the merged firm; and seek to retain US Foods customers, among many other transition issues.  These stumbling blocks have the potential to jeopardize PFG's inherited customer relationships and also undermine its ability to secure future National Customers.

In isolation, any one of the issues described above could stifle PFG's ability to fill the competitive void left by US Foods.  Cumulatively, these obstacles appear insurmountable.  If the divestiture fails or falls short, countless customers will be harmed.  And in any event, the proposed divestiture does nothing to address the merger's likely anticompetitive effects in a number of local markets, including Omaha, Raleigh/Durham, Columbia/Charleston, and Southwest Virginia.

### 3.  Remaining Competitors Cannot Constrain The Merged Firm

Neither a regional consortium, such as DMA, nor an ad hoc network of regional distributors could discipline the merged firm's pricing and services to National Customers.  Post-merger, DMA—a cooperative of regional distributors—would be the only other player with non-trivial sales to National Customers.  Despite its best efforts, DMA remains unattractive to many National Customers.  An ad hoc regional network is even more disjointed and less attractive.  Indeed, National Customers identify significant disadvantages to using consortia or ad hoc regional networks, and a substantial number of customers do not find them to be close substitutes to—or interchangeable at all with—Sysco and US Foods.[160]  Deficiencies include gaps in

---

[160] *See* PX00401 (          Decl.) ¶ 15; PX00403 (            Decl.) ¶ 14; PX00404 (        Decl.) ¶ 11; PX00406 (      Decl.) ¶ 5; PX00407 (        Decl.) ¶ 10; PX00418 (        Decl.) ¶ 20; PX00419

geographic coverage, a lack of coordination among members, product inconsistency, and higher costs.[161] 

Empirical analysis of Defendants' bidding records aligns with this assessment of DMA's competitive viability, showing that many customers exclude consortia from RFPs. Even in those instances when consortia participate, they win few National Customer accounts.[163]

Critically, customers state that even if Sysco raised prices (*e.g.*, lessened discounts or discontinued financial incentives) post-merger, they would accept higher prices rather than turn to a regional network.[164] This is not surprising because many National Customers contract with Defendants specifically to obtain the advantages offered by a single national distributor. Splitting off geographies or product lines in response to a price increase would necessarily strip a customer of the benefits it deliberately bargained for, generating product and service inconsistencies, disrupting a single point of contact, and undermining other efficiencies.[165]

Even National Customers that use one or more regional distributors for some fraction of their business state that their network must be anchored by a fully national distributor, making

---

Decl.) ¶ 9; PX00431 ( Decl.) ¶ 15; PX00432 ( Decl.) ¶ 14; PX00442 ( Decl.) ¶ 15; PX00445 ( Decl.) ¶¶ 16-17.
[161] *Id.*
[162] PX00412 ( Decl.) ¶¶ 7, 11.
[163] *See* PX09062 (Israel Decl.) § III(C) (Sysco/US Foods Win Loss Report (compiled from Sysco and US Foods internal documents and testimony)).
[164] *See, e.g.*, PX00431 ( Decl.) ¶ 15; PX00437 ( Decl.) ¶ 13; PX00441 ( Decl.) ¶ 11; PX00445 ( Decl.) ¶ 17.
[165] PX00480 ( Supp. Decl.) ¶ 11; PX00488 ( Supp. Decl.) ¶ 10; PX00466 ( Decl.) ¶ 6 PX00403 ( Decl.) ¶¶ 8-9; PX00405 ( Decl.) ¶¶ 7, 12.

Defendants a "must have" for these customers, too.[166]  For example, before the merger, ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████"[167]  The fact that, post-merger, Sysco would be able

to target National Customers that require, or are most effectively served by, a national distributor

rather than a network of regional distributors makes a reduction in competition for such

customers especially harmful.  Defendants are familiar with these customers' purchasing

requirements from years of providing service or competing for their business (not to mention

explicit RFP requirements for national coverage), positioning them to home in on such customers

and negotiate customer-specific prices (that is, price discriminate) accordingly.[168]  *See* PX06059

(*Merger Guidelines*) § 8 ("[n]ormally, a merger that eliminates a supplier whose presence

contributed significantly to a buyer's negotiating leverage will harm that buyer.").

National Customers would also face financial penalties if they "carved off" regions or

product lines.  They would lose significant discounts associated with their overall purchasing

volume[169] and face reduced service if their overall purchases from a given distributor no longer

warranted frequent deliveries.[170]  National Customers state that Defendants know the detriments

of splitting business among distributors and would consider any threat to do so an empty one.[171]

Consequently, most customers cannot constrain Defendants with such threats today and would

remain unable to do so after the merger.[172]  Likewise, for local customers, the very same

---

[166] PX00436 (█████ Decl.) ¶ 19; PX00437 (█████ Decl.) ¶ 8.
[167] PX03106-002.
[168] *See, e.g.,* PX03010-001; *see also* PX03103-004, 011; PX09036; PX09037; PX09038-002.
[169] PX00466 (████ Decl.) ¶ 6; PX00445 (████ Decl.) ¶ 11; PX00404 (████ Decl.) ¶ 10; PX00406 (███ Decl.) ¶ 6; PX00405 (████ Decl.) ¶ 7; PX00419 (████ Decl.) ¶ 8.
[170] PX00480 (████ Supp. Decl.) ¶ 11; PX00466 (████ Decl.) ¶ 6.
[171] PX00437 (████ Decl.) ¶ 5; PX00480 (████ Supp. Decl.) ¶ 11; PX00466 (████ Decl.) ¶ 6.
[172] PX00480 (████ Supp. Decl.) ¶ 11; PX00466 (████ Decl.) ¶ 6; PX00405 (████ Decl.) ¶ 7; PX00402 (████ Decl.) ¶ 11; PX00401 (████ Decl.) ¶ 16.

limitations that have relegated many regional distributors to a minor presence today would render them incapable of constraining Sysco post-merger—when it is larger and more dominant.

### 4.   Entry And Expansion Would Not Be Timely, Likely, Or Sufficient

Defendants bear the burden of proving that "'entry into the . . . market[s] would likely avert [the proposed transaction's] anticompetitive effects.'" *Staples*, 970 F. Supp. at 1086 (quoting *United States v. Baker Hughes Inc.*, 908 F.2d 981, 989 (D.C. Cir. 1990)).  Speculative entry or expansion will not suffice.  To meet their burden, Defendants must show at least a "reasonable probability" of sufficient entry.  *Chicago Bridge*, 534 F.3d at 430 n.10.  Entry must be "'timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern.'"  *H&R Block*, 833 F. Supp. 2d at 73 (quoting *Merger Guidelines* § 9); *see also CCC Holdings*, 605 F. Supp. at 47.  Defendants cannot satisfy this high standard.

Market participants recognize the difficulty of successful entry.  ███████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████"[173]  They recognize

that these requirements amount to "high barriers to entry for scale players."[174]  Broadline distributors confirm that it would be time-consuming and difficult to achieve the national geographic coverage necessary to compete effectively; ██████████████████████████

██████████████████████████████████████████████████████████[175]

The history of entry—or lack thereof—into the national market speaks volumes.  *See Cardinal Health,* 12 F. Supp. 2d. at 57 ("the history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future.").  For more than a decade, Defendants alone have dominated the national broadline distribution market.  Despite some efforts by

---

[173] PX03007-005.
[174] PX03003-005.
[175] PX00415 (███████ Decl.) ¶ 18; PX00444 (███████ Decl.) ¶¶ 12-14; PX00429 (███ Decl.) ¶ 29.

regional distributors to band together in consortiums to compete for National Customers, a truly significant third national player has failed to materialize.

Similarly, expansion and entry into local markets is fraught with obstacles and would not be timely, likely, or sufficient to counteract the anticompetitive effects the merger would inflict in the relevant local geographic markets.  Expansion by either fold-out construction (*i.e.*, building a distribution center in an area adjacent to a current service area) or "greenfield" entry (*i.e.*, building a new distribution center in a new area) would be financially risky, expensive, time consuming, and logistically challenging.  Further, both greenfield and fold-out entry require a distributor to undertake the time-consuming steps to establish a knowledgeable local sales force, develop a customer base, and progressively build warehouse capacity, so as not to waste millions of dollars, including on perishable inventory for which there is not yet customer demand.[176] Even after a new distribution center is operational, it takes many years to achieve sales volume similar to established broadliners.[177]  Defendants' documents and testimony from regional distributors explain that it can take years for a distributor to hone its local reputation and customer relationships, optimize its warehouse capacity, and achieve profitability.[178]

Again, the history of entry is instructive.  For example, ███████████████████ ████████████████████████████████ ███[179]  Since its opening, this distribution center has struggled to win business and establish itself as a competitive threat.[180] ████████████

████████████████████████████████████████████████

---

[176] *See, e.g.*, PX00415 (███████) Decl.) ¶ 20; PX00416 (███████ Decl.) ¶ 11; PX00417 (███████ Decl.) ¶ 12; PX00429 (███ Decl.) ¶ 25; PX00434 (███ Decl.) ¶ 10.
[177] PX00495 (███████ Supp. Decl.) ¶ 7.
[178] PX00415 (███████ Decl.) ¶ 20; PX00207-001; PX00424 (███████ Decl.) ¶ 7; PX00429 (███████ Decl.) ¶ 27.
[179] PX00460 (███████ Decl.) ¶ 7.
[180] PX00460 (███████ Decl.) ¶¶ 8-9.



### 5. Defendants' Efficiencies Defense Fails

No court has ever relied on efficiencies to rescue an otherwise unlawful transaction, let alone a transaction such as this, which threatens serious competitive harm in numerous geographic markets.  *See CCC Holdings*, 605 F. Supp. 2d at 73; *Heinz,* 246 F.3d at 720-21 (relying on the *Merger Guidelines'* statement that "efficiencies almost never justify a merger to monopoly or near-monopoly" and holding that defendants failed to put forth "proof of extraordinary efficiencies" to save the merger).  Here, any efficiencies defense that Defendants might advance cannot save this anticompetitive transaction.

Defendants bear a heavy burden to substantiate their efficiencies claims such that an independent party can "verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firm's ability and incentive to compete, and why each would be merger-specific."  *H&R Block*, 833 F. Supp. 2d at 89 (quoting *Merger Guidelines* § 10); *see also Staples*, 970 F. Supp. at 1089-90.  As described in the Declaration of efficiencies expert Rajiv B. Gokhale, Defendants have failed to provide substantiation that would allow for independent verification of their claimed efficiencies.[184]  Moreover, Defendants could achieve substantial portions of the alleged efficiencies independently, without this merger, and thus these

---

[181] PX03096-001; *see also* PX03053-003; PX03054-003 ("█████████████████████████████████"); PX01072-001.
[182] PX00416 (████ Decl.) ¶ 13.
[183] *Id.* ¶ 12.
[184] *See* PX09063 (Gokhale Decl.) ¶ 13.

efficiencies are not merger specific.[185] In fact, many of Defendants' alleged efficiencies are cost-cutting initiatives that Defendants are already implementing independently today, and could continue absent the merger, rendering these projected savings not merger specific, and thus not cognizable. *See H&R Block*, 833 F. Supp 2d at 90 ("If a company could achieve certain cost savings without any merger at all, then those stand-alone cost savings cannot be credited . . . ."). As such, the great majority of Defendants' claimed efficiencies will not be cognizable.

Defendants' efficiencies defense also fails because they cannot show that the merged firm would pass savings on to customers. *See, e.g., Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, No. 14-35173, 2015 WL 525540, at **9-11 (9th Cir. Feb. 10, 2015); *FTC v. University Health*, 938 F.2d 1206, 1223 (11th Cir. 1991); *CCC Holdings*, 605 F. Supp. 2d at 74. To the contrary, Sysco is already developing strategies to avoid ▮▮▮▮ of post-merger "▮▮▮▮▮▮▮▮" and has assembled "▮▮▮▮▮▮▮ ▮▮▮▮."[186] Thus, even assuming for the sake of argument that Defendants' purported efficiencies are merger-specific and achievable, most customers would not benefit from those savings. Rather, Sysco's economic incentive post-merger would be to price less aggressively than it would without the merger, as it faces reduced competition in numerous markets.[187]

## II. The Equities Heavily Favor A Preliminary Injunction

"No court has denied relief to the FTC in a [Section] 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits." *FTC v. ProMedica Health System, Inc.*, 2011 WL 1219281 at *60 (N.D. Ohio 2011); *see also PPG*, 798 F.2d at 1508 (establishment of a likelihood of success "weighs heavily in favor of a preliminary injunction . . . .") (quoting *Weyerhaeuser*, 665 F.2d at 1085). "Only 'public equities' that benefit consumers" can trump

---

[185] *See* PX09063 (Gokhale Decl.) ¶ 13(a).
[186] PX06126-001-002.
[187] *See* PX09062 (Israel Decl.) § V(C).

the Commission's showing of likely success on the merits. *CCC Holdings*, 605 F. Supp. 2d at 75-76 (citing *Whole Foods*, 548 F.3d at 1041 (Brown, J.)).

The paramount public equity favoring injunctive relief is the "public interest in effective enforcement of the antitrust laws," *Heinz*, 246 F.3d at 726, as Congressional concern for antitrust enforcement was the genesis of Section 13(b). *Whole Foods*, 548 F.3d at 1035 (Brown, J.) (*citing Heinz* 246 F.3d at 726). The inherent difficulties of divesting integrated assets after a merger has been consummated also weighs in favor of injunctive relief. *Id.*; *accord FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966).

Allowing this merger to close before the merits proceeding is completed would irreparably harm the public interest. Sysco would be free to "scramble the eggs" by immediately beginning to integrate US Foods, accessing US Foods' sensitive trade secrets and business information, closing distribution centers, eliminating products, laying off sales people, and approaching customers as a unified dominant supplier. If Sysco is permitted to alter the landscape in this way, it would likely be impossible to undo the transaction and fully restore the lost competition. Any harm that customers suffer in the interim would be irreversible.

In contrast, Defendants can claim only private harm from delaying consummation of the merger. But courts have been clear that a "'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction." *Whole Foods*, 548 F.3d at 1041 (citing *Heinz*, 246 F.3d at 726). Accordingly, to protect interim competition and preserve the Commission's ultimate ability to order effective relief, the equities strongly favor preliminary relief.

## **CONCLUSION**

For the reasons described above, the Commission respectfully requests that the Court grant a temporary restraining order and preliminary injunction.

Dated:  February 19, 2015

Of counsel:

DEBORAH FEINSTEIN (D.C. Bar 412109)
Director
Federal Trade Commission
Bureau of Competition

JONATHAN NUECHTERLEIN (D.C. Bar 442470)
General Counsel
Federal Trade Commission

ALEXIS GILMAN (D.C. Bar 483229)
Assistant Director

MARK D. SEIDMAN (D.C. Bar 980662)
Deputy Assistant Director

MELISSA L. DAVENPORT (D.C. Bar 990479)
CHRISTOPHER J. ABBOTT (D.C. Bar 1014487)
THOMAS H. BROCK (D.C. Bar 939207)
KRISHA A. CERILLI (D.C. Bar 983281)
MICHAEL B. DERITA
DAVID J. LAING (D.C. Bar 418597)
MATTHEW MCDONALD
STEPHEN A. MOHR (D.C. Bar 982570)
JEANNE LIU NICHOLS
RYAN K. QUILLIAN (D.C. Bar 994846)
KRISTIAN ROGERS
CATHERINE M. SANCHEZ
SOPHIA VANDERGRIFT (D.C. Bar 1005319)

Attorneys
Federal Trade Commission
Bureau of Competition
Mergers IV Division

Respectfully Submitted,

_____

STEPHEN WEISSMAN
(D.C. Bar 451063)
Deputy Director
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Ave., NW
Washington, DC 20580
Telephone: (202) 326-2030
Email: sweissman@ftc.gov

*Attorney for Plaintiff Federal Trade
Commission*

### Appendix A:  Local Market Share and Concentration Information

| Local Market | Defendants' Post-Merger Share | Δ HHI | Post-Merger HHI |
|---|---|---|---|
| *San Diego, CA | 100% | 3,537 | 10,000 |
| *Las Vegas, NV | 93% | 3,695 | 8,635 |
| Omaha/Council Bluffs, NE/IA | 90% | 1,475 | 8,224 |
| *Kansas City, MO/KS | 86% | 3,619 | 7,582 |
| Philadelphia, PA | 84% | 3,114 | 7,113 |
| Chicago, IL | 83% | 3,164 | 6,991 |
| Memphis, TN | 81% | 3,086 | 6,905 |
| Washington/Baltimore, DC/MD | 80% | 2,874 | 6,477 |
| Bloomington, IL | 77% | 2,917 | 6,244 |
| Pensacola, FL | 77% | 2,817 | 6,150 |
| *Los Angeles, CA | 76% | 2,900 | 5,886 |
| *Minneapolis, MN | 76% | 2,880 | 6,106 |
| *San Francisco Bay Area, CA | 76% | 2,684 | 5,929 |
| Raleigh/Durham, NC | 74% | 2,563 | 5,634 |
| Central Pennsylvania | 72% | 2,537 | 5,448 |
| Columbia/Charleston, SC | 72% | 2,264 | 5,731 |
| Tampa, FL | 69% | 2,254 | 5,088 |
| Orlando, FL | 68% | 2,265 | 4,979 |
| Fargo, ND | 67% | 2,216 | 4,828 |
| *Cleveland, OH | 66% | 1,698 | 4,506 |
| Birmingham, AL | 64% | 2,009 | 4,290 |
| Pittsburgh, PA | 64% | 1,816 | 4,597 |
| Atlanta, GA | 63% | 1,959 | 4,931 |
| *Salt Lake City, UT | 63% | 1,951 | 4,815 |
| St. Louis, MO | 63% | 1,936 | 4,428 |
| Jackson, MS | 63% | 1,903 | 4,754 |
| Southwest Virginia | 62% | 1,931 | 4,260 |
| Charlotte, NC | 62% | 1,696 | 4,555 |
| Rochester, NY | 57% | 1,591 | 3,492 |
| Lubbock, TX | 56% | 1,470 | 3,702 |
| Milwaukee, WI | 53% | 1,053 | 3,498 |
| Albany, NY | 51% | 1,054 | 2,997 |

* Asterisks denote markets where a divestiture has been proposed.