**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Federal Trade Commission, *et al*.,**

**Plaintiffs,**

**v.**

**Sysco Corporation, *et al*.,**

**Defendants.**

**Civil No. 1:15-cv-00256 (APM)**

**MEMORANDUM OPINION AND ORDER**

One of the key features of our civil justice system is that parties to a lawsuit are required to exchange information relevant to their dispute before a trial. The reason for this practice is relatively simple—resolving conflicts in a court of law is not a game of "blind man's bluff," but "a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682-683 (1958). An open exchange of information prevents trial by ambush. Each side must have the opportunity to fully present its case and to test the other side's evidence through cross-examination of witnesses and presentation of contrary evidence. Such transparency also aids the judge or jury tasked with deciding a case. If the parties are better informed, so too will be the judge or jury who bears the responsibility of deciding which side will prevail.

The importance of transparency is heightened in cases in which the government seeks to block or sanction private behavior. For any private actor, whether an individual or a large corporation, to be named a defendant in a lawsuit brought by the government is no small matter. The stakes in such lawsuits are often of great consequence. Money—sometimes vast amounts of

it—is on the line. So, too, are personal and institutional reputations. And then there is the fundamental question at the heart of each such lawsuit: whether a private actor's behavior violated the law or, as in this case, whether its proposed behavior will exceed what the law allows. Because the stakes are so high and the consequences so profound when the government is the plaintiff, the rules that require a transparent exchange of information take on particular importance in promoting and ensuring a fair process.

One of the key pieces of information that parties exchange in every case is the identity of witnesses. In fact, the Federal Rules of Civil Procedure—the rules that apply to all civil lawsuits filed in federal courts—require the parties to exchange "the name and, if known, the address and telephone number of each individual likely to have discoverable information." Fed. R. Civ. P. 26(a)(1)(A)(i). It was not always this way. "[T]he traditional view had been that a party could not be required to disclose the names of its witnesses in order that there should be no opportunity to tamper with them." 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2013 (3d ed. 2010). Today, however, the rule requiring the disclosure of witnesses is "based on the principle that persons having knowledge of relevant facts are not necessarily the witnesses of any particular party." *Id.* (footnote omitted). Such disclosure serves two primary purposes. First, it enables a party directly to interview or depose the witness or collect evidence from the witness to test his or her statements. And, second, it allows a party to develop its own evidence through available sources, such as its own employees, to rebut the witness's statements. This tug-of-war of obtaining witness testimony to support one side's position, and the corresponding effort by the opposing side to rebut that same witness, is foundational to our adversarial system.

**A. *The Motions for a Protective Order***

It is against this backdrop that the court has considered the 24 motions for a protective order that it received from various competitors and customers of Defendants Sysco Corp., USF Holding Corp., and US Foods, Inc., who provided declarations to the Plaintiff Federal Trade Commission ("FTC") during its investigation. Before March 18, 2015, when the court issued its Memorandum Opinion and Order ("March 18th Opinion"), the declarants' identities were available only to outside counsel and a limited number of in-house lawyers at each Defendant company. ECF No. 92 at 1. In the March 18th Opinion, the court permitted Defendants to disclose the declarants' identities to their employees for the limited purpose of preparing their defense. *Id.* at 2. The March 18th Opinion prohibited Defendants from disclosing to their employees a declarant's trade secrets, competitive intelligence or similar information designated as "Confidential Material" under the Protective Order. *Id.*

Before Defendants could disclose declarants' identities, the court permitted the declarants to seek protective orders under Rule 26(c) to maintain the secrecy of their identities. *Id.* at 6. The court initially allowed any declarant wishing to file a motion for protective order to do so within 24 hours of Defendants providing notice to the FTC of their intent to disclose a declarant's identity. *Id.* The court modified the 24-hour time period during a telephone conference on March 19, 2015, after learning that Defendants had indicated their intent to disclose the identities of every declarant. The court gave the FTC additional time to notify all of the declarants about the Defendants' intention to disclose, and ordered the FTC to provide to Defendants by noon on March 20, 2015, the names of any declarants who objected to disclosure. Minute Order, Mar. 19, 2015. The court further ordered that any objecting declarant who wished to seek a protective order would have until noon on March 24, 2015, to do so. *Id.* Recognizing that objecting declarants might have

difficulty retaining local counsel in such a short period of time, the court permitted the FTC to file on the declarants' behalf. *Id.*

On March 24, 2015, the court received requests for a protective order from 24 declarants. ECF Nos. 98-101. The requests came in various forms—emails, letters, and formal pleadings. Whatever their form, the court treats them all as "motions" under Rule 26(c). The motions were properly filed under seal, because the declarants' identities are not presently on the public record. Consequently, the court will refer to declarants in this Memorandum as "Declarant A," "Declarant B," etc., except for the declarant for Third-Party Intervener Shamrock Foods Company, who shall be referred to as "Shamrock Foods Executive." Filed under seal as Exhibit A to this Memorandum is a list of the moving declarants, their respective letter designations, and the electronic docketing numbers of their respective motions.

The declarants generally asked the court to deny Defendants' employees access to their identities. A few asked the court to modify the Protective Order to add certain procedural safeguards to Defendants' disclosure and use of a declarant's name. *See, e.g.*, ECF Nos. 100-11, 100-13, 101. Defendants opposed the motions, reiterating their need for disclosure of declarants' identities and arguing that none of the declarants had met its burden to justify a protective order. Defs.' Opp'n, ECF No. 102.

**B. *The Applicable Standard***

The court starts by reiterating what it said in its March 18th Opinion. The Federal Rules of Civil Procedure were devised to provide for "liberal" pretrial discovery. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). The liberality of the Rules applies to discovery sought from third parties, which as the Supreme Court observed in *Seattle Times Co.* "often allow[s] extensive intrusion into the affairs of both litigants and third parties." *Id.* at 30. However, a party's right to

discovery from a third party is not without limits. Because "[l]iberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes . . . it is necessary for the trial court to have the authority to issue protective orders conferred by Rule 26(c)." *Id.* at 34.

Rule 26(c) allows a court for "good cause" to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Although Rule 26(c) does not speak explicitly to a person's privacy rights or interests, "such matters are implicit in the broad purpose and language of the Rule." *Seattle Times Co.*, 467 U.S. at 35, n. 21. A person seeking a protective order "must make a *specific demonstration of facts* in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one." *Huthnance v. District of Columbia*, 255 F.R.D. 285, 296 (D.D.C. 2008) (emphasis added) (citation omitted) (internal quotation marks omitted). "Accordingly, courts apply a balancing test, weighing the movant's proffer of harm against the adversary's significant interest in preparing for trial." *Id.* (citation omitted) (internal quotation marks omitted). This test reflects the Rules' preference for a liberal exchange of information to settle disputes, except where a party is using the tools of discovery in an abusive manner. *See Seattle Times Co.*, 467 U.S. at 34-35.

**C. *The Customer Declarants***

Eighteen of the 24 motions were filed by customers of either Sysco or US Foods (collectively "Customer Declarants"). ECF Nos. 100-01-03, 100-05, 100-07-10, 100-12, 100-14, 100-15-22. Although each Customer Declarant expressed concerns unique to his or her own circumstances, the prevailing theme among them was the fear that Defendants would retaliate against them for providing information to the FTC. The Customer Declarants expressed worry

that, if their identities became known to Defendants' employees, they would be subjected to increased pricing,[1] reduced service[2] or a complete boycott of service.[3]

The court does not doubt that the declarants' worries are genuinely held. But none of them has provided a "specific demonstration of facts" that leads the court to conclude that the mere possibility of retaliation outweighs the "significant interest" articulated by Defendants for disclosure of their identities. *Huthnance*, 255 F.R.D. at 296. Some declarants made general pronouncements about Defendants' market power, but did not state specific facts showing that Defendants are likely to engage in sharp-elbowed tactics.[4] Others stated in conclusory fashion that they would be targeted for retaliation.[5] And others asked the court not to disclose their names

---

[1] *See, e.g.*, Declarants A & B ("Declarants are concerned . . . that Defendants can retaliate against them by discriminating against them in price and services."); Declarant N ("If my identity is disclosed, I am very concerned that US Foods will retaliate with higher pricing."); Declarant P (expressing concern over "revenge price-hiking" or "orders show[ing] up late, or incomplete, or not at all"); Declarant R ("[Declarant R] believe[s] that [it] will pay significantly more in food costs if Sysco and/or US FOODS Sales Representatives knew of [its executive's] identity and participation in the FTC's investigation.");

[2] *See, e.g.*, Declarant H ("There is a very strong possibility that a merged Sysco/USF company will retaliate against my organization by increased pricing, reduction in service, or both."); Declarant J ("The fear of retaliation could lead to poor service, no interest in my compan[y's] individual needs, and out of stock items, and of course unfavorable pricing."); Declarant V ("My fear stems from the potential retaliation by the distributor in terms of pricing and product delivery and availability.").

[3] *See, e.g.*, Declarant C ("It is clear and unquestionable that when any US Foods or Sysco employees learn of my testimony, my associates and I will immediately be blacklisted."); Declarant L ("I could be financially burdened because someone who has nothing to do with this merger can decide to boycott my business.").

[4] *See, e.g.*, Declarants A & B ("Defendants are their only practical sources for broadline foodservice distribution" and "have considerable market power"); Declarant N ("US Foods and Sysco wield significant power over my business."); Declarant P (stating there is "already [a] small pool of foodservice purveyors" in his market and he "must assume that [Defendants] would use every method at their disposal to 'change the minds' of anti-merger declarants"); Declarant T ("With the only two broad line distributors available for Declarant's business operations proposing to merge, Declarant's business is at particular risk of retaliation and other potential economic harm.").

[5] *See, e.g.*, Declarant C ("It is clear and unquestionable that when any US Foods or Sysco employees learn of my testimony, my associates and I will immediately be blacklisted."); Declarant E ("I feel that there is a much greater likelihood of us experiencing adverse repercussions by our current broad line distributor . . . if this information was received by them."); Declarant G ("I feel like the potential for prejudice against me, my business and even my business partners is significantly magnified."); Declarant H (stating that there "is a very strong possibility that a merged Sysco/USF company will retaliate against my organization"); Declarant I (stating that disclosure "could lead to disruption in business relations"); Declarant J ("My fears are that I can be easily dismissed as just one more little guy that will not matter to a larger merged company."); Declarant O ("I believe that our price structure with these companies could be in jeopardy if my identity was known."); Declarant R (stating that retaliation is not "speculative, but real, and would be felt immediately and with potentially disastrous consequences" without offering specific facts to suggest that such retaliation would occur); Declarant S ("Disclosure of this information to Sysco and USF may

simply because they wished to remain confidential.[6] Only one customer provided any concrete facts to support his claim that he would be targeted for retaliation, citing a conversation with a Sysco employee who told him that, if the entities merged, "the only name that would be honored would be Sysco's."[7] This statement is far too ambiguous to be interpreted as a threat of retaliation or some other improper use of market power.

The court disagrees with those Customer Declarants who argued that Defendants have not articulated a need to disclose their identities to Defendants' employees.[8] Many of the Customer Declarants have expressed the view that a merged Sysco-US Foods entity would concentrate too much market power in the hands of one company. Those views are premised on the declarants' first-hand experiences with Defendants and their employees. Defendants have the right to rebut those assertions. One way they can do so is to ask their own employees, who know these declarants, their businesses, and their markets, about the accuracy or reliability of the Customer Declarants' statements. Depending on what they learn, Defendants may choose to offer their employees' testimony or declarations to refute the Customer Declarants or some other form of evidence. Defendants thus have articulated a "significant interest" in testing the Customer Declarants' statements that outweighs the Customer Declarants' stated concerns.

### D. *The Competitor Declarants*

The court's conclusion with respect to the five competitor declarants (collectively "Competitor Declarants")—excluding the Shamrock Foods Executive, whose request is addressed

---

cause Sysco and/or USF to provide less competitive bids or even elect to not participate."); Declarant U ("US Foods may decide to alter the rebate program we currently take part in").

[6] *See, e.g.*, Declarant Q ("I do not want my information nor information about my business made public.").

[7] Declarant V.

[8] *See, e.g.*, Declarant E (I "do not feel that the information garnered from individual businesses such as mine is very useful in determining a fair decision on the proper merger plans"); Declarant G (stating that "there does not appear to be any real reason for" disclosure of declarant's identity); Declarant H ("My anonymity does not hinder the Sysco/USF case.").

below—is the same. Some of the Competitor Declarants' motions focused primarily on the impact of disclosing their confidential business information, which is not at issue here.[9] Others hypothesized about the harm that would occur if their identities were disclosed, but did not offer a specific demonstration of facts to support their concerns.[10] Again, the court does not doubt the sincerity of the Competitor Declarants' beliefs. But the court will not issue a protective order without a factual showing.

***

In denying the Customer and Competitor Declarants' motions, the court pauses to re-emphasize its previous ruling that the disclosure of a declarant's name to a Defendants' employee does not open the door to divulging to Defendants' employees what has been declared "Confidential Material" under the Protective Order. Confidential trade secrets, competitive intelligence or other such proprietary information contained in the declarations is accessible only to Defendants' outside counsel and two designated in-house lawyers for each Defendant.

### E. *The Shamrock Foods Executive*

The Shamrock Foods Executive seeks a protective order for a different reason—"[d]isclosure of the name and/or identity of the Shamrock Declarant will inevitably jeopardize the Shamrock Declarant's future employment prospects and opportunities for advancement in both the broadline foodservice distribution and foodservice supplier industries." ECF No. 98 at 3. The problem with issuing a protective order on that basis is that the Shamrock Foods Executive is "not currently seeking employment elsewhere" but only "anticipate[s] that in the future [he or she] may

---

[9] Declarant F ("Such disclosure would also create a substantial risk of inadvertent disclosure and use by Defendants and others of [declarant's] confidential, non-public, and competitively sensitive operational business information."); Declarant K ("There is no need for employees to have access to the Declarations themselves . . .").

[10] *See, e.g.*, Declarant D (stating there were "numerous ways" in which Defendants might retaliate or cause harm, but not identifying any supporting facts); Declarant M (stating in conclusory fashion that "the various employees of Defendants will misuse this role and target [declarants] in the marketplace"); Declarant W (stating Defendants could "'send a message' or otherwise penalize [declarant] for cooperating with the FTC" without supporting facts).

choose or need to do so." ECF No. 99-2 ¶ 7. The court declines to enter a protective order where the stated concern about the disclosure's impact is so remote and uncertain.

**F. *Assurances of Confidentiality***

Some of the Customer and Competitor declarants argued that the FTC provided them with assurances that their identities would remain confidential and, for that reason, their names should not be revealed to Defendants' employees.[11] The court is unaware of what precisely the FTC represented to the various declarants about confidentiality. Whatever was said, the FTC could not have assured anonymity once it decided to file this suit to block Defendants' proposed merger. When the FTC concluded its investigation and filed this lawsuit, the decision whether to disclose declarants' identities shifted from the FTC to the court. The factors the court must weigh, as discussed, are different from those present during an agency's investigation. The court has been guided by those factors here, and not by assurances that the agency might have given to declarants during its investigation.

**G. *Modification of the Protective Order***

Competitor Declarants K, M, and W have asked the Court to modify the Protective Order to place additional requirements on disclosing their identities to Defendants' employees.[12] The court has considered those requests. The court, however, declines to limit the number of

[11] *See, e.g.*, Declarants A & B (stating they "gave information to the FTC with the understanding that the identities of the sources of the information would remain confidential"); Declarant H (stating that he had a "strong expectation of confidentiality, not a guarantee, which I made my declaration to the FTC"); Declarant R (stating that non-disclosure was a "condition precedent to signing the declaration in support of the FTC's investigation").

[12] *See* Declarant K (requesting that a limit be placed on the number of Defendants' employees to whom disclosure can be made and that those employees be identified to the court); Declarant M (requesting that Defendants disclose the names of their employees who receive access to declarant's identity and that the employees be subject to "the contempt burdens of the Protective Order"); Declarant W (requesting that Defendants disclose the names of their employees who receive access to declarant's identity and that the employees sign a confidentiality agreement that specifies penalties for breach).

employees to whom disclosure can be made; nor will the court compel Defendants to disclose its employees' names to the declarant or to the court.

The court also will not require Defendants' employees to sign a confidentiality agreement. Under the Protective Order, as modified by the March 18th Opinion, defense counsel is required to instruct any employee to whom disclosure of a declarant's identity is made that "(1) the disclosure is for the limited purpose of preparing the defense and (2) the submitter's identity and the fact that the submitter provided evidence in the investigation shall not be further disclosed or used for any purpose other than aiding counsel." March 18th Opinion at 6. The court added this requirement to the Protective Order to emphasize the limited nature of the disclosure and to protect declarants' interests. The request that Defendants' employees sign a confidentiality agreement would serve the same purposes and therefore is unnecessary.

### H. *Conclusion and Order*

For the reasons stated herein, the declarants' motions for a protective order are denied. The declarants' identities shall remain non-public, unless and until the court orders their disclosure.

Dated: March 31, 2015

Amit P. Mehta
United States District Judge