IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION, *et al.*,

        Plaintiffs,

        v.

SYSCO CORPORATION,

and

USF HOLDING CORP.,

and

US FOODS, INC.,

        Defendants.

Civil Action No. 1:15-cv-00256-APM

FILED UNDER SEAL
**(PUBLIC VERSION)**

**AMICUS BRIEF OF**
**PERFORMANCE FOOD GROUP, INC.**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM, LLP

John M. Nannes (DC Bar No. 195966)
John R. Seward (DC Bar No. 469820)
Anjali B. Patel (DC Bar No. 992095)
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7000
Facsimile: (202) 661-9191

James A. Keyte
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 777-2583

*Counsel for Performance Food Group, Inc.*

April 21, 2015

PUBLIC VERSION

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

I.    BACKGROUND ................................................................................................3

      A.    Who Is PFG?.............................................................................................3

            1.    PFG Is A Well-Established Food Distribution Company
                  That Competes Successfully Against Sysco and US Foods
                  Today ..............................................................................................3

            2.    PFG Has Substantial Managerial Experience And Expertise ......5

            3.    PFG Is Experienced In Expanding Capacity ................................7

            4.    PFG Is Experienced In Making Acquisitions That Have
                  Been Successfully Integrated Into Its Network ...........................9

      B.    The Proposed Divestiture Transaction ...................................................10

            1.    The Bidding Process ....................................................................10

            2.    The Transaction ...........................................................................11

            3.    The PFG Business Plan................................................................16

            4.    PFG Has The Financial Resources To Make The
                  Acquisition And The Capital Expenditures Set Out In The
                  Business Plan ...............................................................................17

II.   DISCUSSION...................................................................................................18

      A.    The Law Applicable To Evaluating This Three-Way Transaction........18

      B.    Under The Proper Standard, Plaintiffs' Criticisms Of The
            Divestiture Proposal Are Misplaced ......................................................20

            1.    The Fallacy Of Plaintiffs' "Size" Theory ..................................22

            2.    PFG Will Be Cost Competitive....................................................25

            3.    Execution Risks Have Been Addressed .......................................30

III.  CONCLUSION.................................................................................................31

PUBLIC VERSION


TABLE OF AUTHORITIES*


**CASES**                                                       **PAGE(S)**

*FTC v. Arch Coal, Inc.*,

    Mem. Op., No. 04-civ-0534 (D.D.C. July 7, 2004)................................................18

*FTC v. Libbey, Inc.*,

    211 F.Supp. 2d 34 (D.D.C. 2002)........................................................................18

*United States v. El Paso Natural Gas Co.*,

    376 U.S. 651 (1964)..........................................................................................21

*United States v. General Dynamics Corp.*,

    415 U.S. 486 (1974)..........................................................................................21


**STATUTES**

15 U.S.C. § 18...............................................................................................18


**OTHER AUTHORITIES**

*Antitrust Division Policy Guide to Merger Remedies*,

    U.S. Dep't of Justice (Oct. 2004),

        http://www.justice.gov/atr/public/guidelines/205108.pdf ....................................19

*Antitrust Division Policy Guide to Merger Remedies*,

    U.S. Dep't of Justice (June 2011),

        http://www.justice.gov/atr/public/guidelines/272350.pdf ....................................19

*Statement of the Bureau of Competition of the Federal Trade Commission, Negotiating*

    *Merger Remedies*, Fed. Trade Comm'n (Jan. 2012),

    https://www.ftc.gov/system/files/attachments/negotiating-merger-

    remedies/merger-remediesstmt.pdf.........................................................................19


\* Corrected format

PUBLIC VERSION

PRELIMINARY STATEMENT

Defendants in this proceeding have agreed to divest 11 US Foods distribution

centers to Performance Food Group, Inc., ("PFG").  PFG respectfully submits this *amicus*

brief to assist the Court in evaluating the proposed divestiture.

Plaintiffs have filed suit to challenge the proposed merger between Sysco and US

Foods, primarily on the grounds that the merger would substantially lessen competition in

a purported market for broadline food distribution services provided to what the Plaintiffs

call "national customers."[1]  In response to concerns expressed by Plaintiffs during their

review of the merger, Sysco and US Foods entered into a binding agreement to divest 11

US Foods distribution centers to PFG.[2]  Plaintiffs contend, however, that the divestiture

does not address their competitive concerns because PFG would not match US Foods in

---

[1] On the face of the Complaint, Plaintiffs seem to be defining "national customer" as a customer with numerous facilities dispersed nationally or across multiple regions of the United States that has elected to buy all or virtually all of its food and food-related products from a single foodservice distribution company.  Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act, ECF 11-1 at ¶¶ 4-5, 41-44 (hereinafter "Complaint").  PFG does not believe that there is a commonly-accepted definition of "national customer" within the food service distribution industry.  Nevertheless, solely for purposes of addressing the proposed divestiture in this brief, PFG will use the term "national customer" in the way that Plaintiffs do, since what constitutes a relevant market within the meaning of the antitrust laws is being addressed by the parties.

[2] PFG and US Foods use different terminology to describe their facilities.  PFG uses the terms "Operating Company" or "OpCo," and US Foods uses the term "Divisions."  PFG has used its own terms in internal documents and in submissions to Plaintiffs that are referenced herein, but PFG uses the term "distribution centers" in this brief since Plaintiffs have used that term in their Complaint and their submissions to the Court.

PUBLIC VERSION

terms of various size "metrics"[3] and therefore purportedly would be an "inferior" competitor.[4]

This *amicus* brief addresses both the law and the facts regarding the proposed divestiture that will be before the Court in these proceedings.  As to the law, it is well settled that a divestiture need not create the mirror image of the acquired entity, let alone the mirror image of the merged entity.  It is enough that the purchaser of the divested assets will be likely to provide the same kind of competitive constraint that the acquired entity provided, pre-merger – namely, by offering customers a meaningful competitive alternative.  Thus, the proper standard is not whether PFG will be as large as the pre-merger US Foods or the combined Sysco-US Foods, but rather whether PFG will be in a position to compete meaningfully and thus provide customers with an alternative to Sysco – as US Foods does today.

As for the facts, Plaintiffs badly misportray PFG, both with respect to its present operations and with respect to its competitive profile if it were to acquire the 11 US Foods distribution centers.  PFG is not some creation conjured up by Sysco and US Foods at the eleventh hour to head off an antitrust challenge.  To the contrary, PFG's Performance Foodservice division today is the third-largest broadline food distribution company in the United States and has been competing successfully against both Sysco and US Foods throughout the Eastern half of the United States.  PFG is well-run, well-financed, well-regarded in the marketplace, and extremely well-positioned to be a

---

[3]  Memorandum in Support of Plaintiff Federal Trade Commission's Motion for Temporary Restraining Order and Preliminary Injunction Motion, ECF 49-1 at 5 (hereinafter "FTC Memo").

[4]  Compl. ¶ 84.

PUBLIC VERSION

supplier of food distribution services to all types of customers nationwide.  PFG is already a supplier of foodservice distribution services to many multi-unit customers, and the divestiture will allow PFG to serve even more.  In fact, PFG negotiated the divestiture package precisely so that it would be in a position to compete nationwide on "Day One" and to expand as it succeeds in the marketplace.  There is no one – certainly not the Plaintiffs and not even the Defendants – who can better explain what PFG will be able to do with the 11 US Foods distribution centers than PFG itself.

I.   BACKGROUND

A.   Who Is PFG?

1.   PFG Is A Well-Established Food Distribution Company That Competes Successfully Against Sysco and US Foods Today

PFG's Performance Foodservice division is the third-largest broadline food distribution company in the United States today.[5]  It operates 24 broadline distribution centers located primarily east of the Mississippi.  PFG's Performance Foodservice division generated $8.1 billion in broadline and specialty net sales in fiscal 2014 and serves over 85,000 customers.[6]  It has a broad customer base that includes multi-unit

---

[5]   PFG is privately owned today.  *See infra* Part I.B.4.  Prior to its agreement with Sysco-US Foods, PFG had filed a Form S-1 Registration Statement with the SEC to undertake a public offering of PFG's equity securities, but PFG has decided to delay the public offering in order to pursue the acquisition of the US Foods distribution centers.  The S-1 contains substantial information about PFG, its businesses and operations, and its financial history.  The S-1 is Exhibit 1 to the supporting Declaration of John R. Seward.  Unless otherwise indicated, a cite to an exhibit means an exhibit to the Seward Declaration.

[6]   The Performance Foodservice division provides broadline services and, under the name "Roma," provides specialty food and related products primarily to pizzerias and Italian restaurants.  PFG also operates two additional lines of business:  its Customized division, which provides food and related products primarily to family

*(cont'd)*

PUBLIC VERSION

customers such as restaurants, hotels, healthcare facilities, and institutional customers that often operate in multiple states (sometimes called "chains"), and independent restaurants known as "street customers."  Sales to multi-unit customers currently predominate, accounting for 57 percent of PFG's revenues in fiscal 2014.  Ex. 1, at 2, 70.

Just as Sysco and US Foods do today, PFG provides a broad array of food and food-related products, ranging from "center-of-the-plate" items (such as beef, pork, poultry, and seafood) to frozen foods, refrigerated products, dry goods, disposables, cleaning and kitchen supplies, and related products.  Altogether, PFG offers more than 125,000 food and food-related products.  These products include a broad array of PFG's proprietary branded products ("private brands") that accounted for 39 percent of its case volume sold to street customers in fiscal 2014.  In addition, PFG offers "value-added" services that include product selection/procurement/menu assistance for street customers and nutritional/menu variations for chain customers such as healthcare facilities and retirement and assisted living facilities.  Ex. 1, at 2-3, 70.

PFG is highly regarded by customers.  In a study conducted in 2014 by ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

*(cont'd from previous page)*
and casual dining restaurant chains that generally have more set menus, and its Vistar division, which distributes candy, snacks, and beverages principally to vending distributors, retailers and theaters.  Throughout the remainder of this brief, the term "PFG" will be used to refer just to the business it conducts out of its broadline distribution centers, unless the context indicates otherwise.

PUBLIC VERSION



Today, PFG regularly competes successfully against Sysco and US Foods in the East.  PFG's success is shown by comparative growth rates.  In the past four years, it has grown its sales at an annual rate of ███████ compared to 5.6 percent for Sysco and 4.5 percent for US Foods,[9] compelling evidence that PFG is an effective competitor to Sysco and US Foods even with a relatively smaller footprint.

   2.   PFG Has Substantial Managerial Experience And Expertise

PFG has a senior management team with substantial experience and expertise in the industry.

George Holm is the President and Chief Executive Officer of PFG.  He has more than 37 years of experience in the industry and held senior executive positions with Sysco, US Foods, and Alliant Foodservice before joining Vistar in 2002, which acquired PFG in 2008.  He is well-known throughout the industry and has extensive business relationships with companies in virtually every segment of the food distribution business,

---

[7]   Ex. 2, Confidential Submission by PFG to the FTC (Dec. 24, 2014), attaching ████ ██████████████████████████████████████████████████████ ████████████

[8]   Ex. 3, at PFG-01-000029302-29303.

[9]   Ex. 4, Confidential Submission by PFG to the FTC at 16 (Jan. 30, 2015) (2015-2019 Business Plan & National Broadline Strategy).

PUBLIC VERSION

from suppliers to customers of all kinds:  restaurants, hospitality, healthcare, contract feeders, etc.  He is even personally familiar with the distribution centers and market conditions specifically at issue in this case:  of the 11 distribution centers that PFG has agreed to acquire, 9 were owned and operated by Alliant Foodservice during the time that Mr. Holm was President and CEO of that company.

James (Jim) Hope is Executive Vice President of Operations.  He joined PFG in July 2014.  Previously, he worked at Sysco for 26 years in a variety of positions, including as Senior Vice President Sales and Marketing.  In that capacity, he was responsible for dealing directly with customers that operated nationally, an experience that will be invaluable to PFG as it expands its geographic footprint to further serve those customers.  He also served as CEO and President of Sysco's distribution center in Kansas City, Kansas, where he oversaw operations, including an extensive network of shuttle sites servicing customers in Kansas and Missouri.  Mr. Hope will oversee the 11 distribution centers that PFG acquires from US Foods and will be personally responsible for integrating them into PFG's network and expanding PFG's broadline business nationwide.

A number of other members of the PFG leadership team have substantial experience working for other food distribution companies, suppliers to food distribution companies, and customers of food distribution companies before joining PFG, including:

- Chief Financial Officer, Bob Evans, who formerly worked at Kellogg's and Frito Lay;

- Senior Vice President for Procurement, Jim Spatola, who formerly worked at Aramark;

- Senior Vice President for Operations, Jeff Williamson, who formerly worked for US Foods and Alliant;

6

PUBLIC VERSION

- Senior Vice President, Chief Information Officer, Terry West, who formerly worked for ConAgra;

- Senior Vice President, Chief Human Relations Officer, Carol Price, who formerly worked at Aramark; and

- Senior Vice President, Business Development, Kent Berke, who formerly worked at Sysco.

Ex. 1, at 85-86.  In addition, PFG recently hired David Flitman to serve as President and CEO of its Performance Foodservice division.  Mr. Flitman has held a variety of senior leadership positions at various companies and most recently was the head of North American operations of the largest distributor of chemicals in the United States.

PFG's recent growth and profitability attest to the quality of its work force.  Of course, the acquisition of 11 US Foods distribution centers will necessitate expanding that work force.  But, as noted, *infra*, PFG has made sure that it will have the necessary human capital to complement the hard assets being acquired from US Foods through specific provisions in its agreements with Sysco and US Foods to hire US Foods employees at the national and local levels.

3.    PFG Is Experienced In Expanding Capacity

PFG has substantial experience in expanding capacity to service the growth in its broadline business and does so regularly in the ordinary course of business.  In this industry, capacity expansion can take various forms.

First, capacity of existing facilities can be expanded through a variety of inventory and "capacity management techniques" that include, among others, re-organizing how products are stored and unloaded and utilizing on-site storage trailers and outside storage.  The FTC asked about capacity utilization at PFG's current facilities.

7

PUBLIC VERSION

PFG explained that it had sufficient excess capacity to handle a ████████ increase in sales without any changes and that employment of these capacity management techniques would allow it to expand sales by an additional ████████[10]

Second, existing facilities can be expanded by physically adding onto them. PFG routinely evaluates and projects its capacity needs and has successfully completed ████████ capacity expansion projects per year for its various divisions, including broadline, in recent years. The nature of the planning and construction process for expanding warehouses is not unduly complicated, and PFG has a dedicated Director of Facilities & Construction to oversee these projects. PFG routinely completes these kinds of projects in less than a year and can accelerate that process to meet the needs of multi-unit customers with locations nationwide.

Finally, there is the option of building a completely new distribution center, either to expand into a new geographic area (a "fold-out" facility) or to replace an existing distribution center. Mr. Holm and Mr. Hope both had experience at Sysco building fold-out facilities, and PFG completely replaced its broadline facilities in Cairo, Georgia, and Springfield, Massachusetts, in 2008 and 2007. These PFG facilities were constructed within ██ and ██ months respectively.

---

[10]   Ex. 5, Confidential Submission by PFG to the FTC (Dec. 19, 2014), attaching "Broadline Facilities Capacity" document, at 3.

PUBLIC VERSION

4.   PFG Is Experienced In Making Acquisitions That Have Been
Successfully Integrated Into Its Network

Over the last six years, PFG has made 12 acquisitions, four of which were

broadline suppliers.  Those four acquisitions expanded PFG's broadline footprint in the

Carolinas, the Midwest, and northern coastal California.

The largest broadline acquisition during this period was the acquisition of IFH in

June 2012, which involved two large distribution centers in the Carolinas.  The

integration of these distribution centers into the PFG network went smoothly and

successfully; ███████████████████████████████████████████████

███████████████████████████████[11]

During the investigation, the FTC asked PFG about two aspects of the IFH

acquisition:  how successful was PFG in retaining IFH's multi-unit customers and how

successful was PFG in converting IFH customers from IFH's private brands to PFG's

private brands?  The data are compelling.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

---

[11]   Ex. 6, Confidential Submission by PFG to the FTC at 18-19 (Dec. 22, 2014).

[12]   Ex. 7, Confidential Submission by PFG to the FTC (Dec. 31, 2014).

PUBLIC VERSION

███████████████████████████████████████████████
████████████████[13]

B.   The Proposed Divestiture Transaction

The proposed divestiture transaction is the product of intense and protracted arm's length negotiations between Sysco, US Foods, and PFG.  The process culminated in a definitive Asset Purchase Agreement that was executed on February 2, 2015,[14] and a comprehensive Transition Services Agreement to provide for an orderly and seamless implementation.[15]

1.   The Bidding Process

PFG began following the proposed Sysco-US Foods merger virtually from the day it was announced in December 2013.  ████████████████████████████
██████████████████████████████████████████████
████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████████

---

[13]   Ex. 8, Confidential Submission by PFG to the FTC at Attachment 1 (Apr. 8, 2015).

[14]   Ex. 9, Asset Purchase Agreement (Feb. 2, 2015).

[15]   Ex. 10, Transition Services Agreement.

PUBLIC VERSION



PFG carefully examined the 11 distribution centers and concluded that they would be sufficient to give PFG nationwide reach, especially with the backing of PFG's owners to fund additional capacity expansion and fold-out facilities. By combining its 24 existing distribution centers, which are mostly in the Eastern United States, with the 11 US Foods distribution centers, which are mostly in the Western United States, PFG would be a broadline distribution company capable of competing for the business of broadline customers that want a contract covering their locations nationwide. PFG submitted a bid for the 11 distribution centers on November 10, and Sysco accepted PFG's bid, subject to the negotiation of definitive agreements.

   2.  The Transaction

   The negotiation of the definitive agreements involved two separate but related documents: the Asset Purchase Agreement ("APA") and the Transition Services Agreement ("TSA"). Both were essential to PFG's objectives: to acquire the 11 US Foods distribution centers and related assets necessary to operate on a nationwide basis

11

PUBLIC VERSION

and to assure a transition that would be seamless for the customers that PFG would serve from the distribution centers being acquired.

### a.    The Due Diligence Process

The due diligence process, which began during the bidding process and continued until execution of the APA on February 2, 2015, was comprehensive and thorough.  The PFG team, overseen by its President and CEO, George Holm, was led by its Executive Vice President, Jim Hope, and included senior PFG personnel from every function of the business – finance, procurement, operations, information technology ("IT"), marketing, and human relations – as well as consultants.  They met with representatives of Sysco and US Foods – monitored by counsel – more than a dozen times over a four-month period, in sessions attended by literally dozens of representatives, to discuss the components of a transaction that would allow PFG to offer the customers served out of the 11 distribution centers a seamless transition from US Foods to PFG.

Sysco-US Foods set up an electronic data room that contained detailed information – profit-and-loss statements for the 11 distribution centers, data on cost of goods, real and personal property information, and much more – necessary for PFG to conduct comprehensive due diligence.  PFG representatives reviewed those materials. US Foods personnel answered numerous follow-up questions and provided supplemental information.

PFG carefully identified the business risks associated with the transaction and determined how to address them.  PFG was not buying a standalone business; it was buying a portion of US Foods' business.  Thus, it was necessary to identify exactly what assets it needed and be sure they were included.  Some customers that were being served

PUBLIC VERSION

nationally by US Foods would find themselves dealing with the combined Sysco-US Foods in the East but with PFG in the West, so PFG had to be sure that those customers would receive exactly the same products and service that they had received from US Foods. PFG also knew that the food distribution business relies, in part, upon personal relationships not only at the distribution center level but also at the corporate level and therefore needed to ensure that the US Foods employees who served the customers that PFG would be inheriting would come to work at PFG. PFG recognized these risks – what Plaintiffs call "execution risks" – from the very beginning, and they are reflected in PFG's deliberative documents.

The FTC has suggested that these documents cast doubt on PFG's ability to be a nationwide broadline food service distributor, but, in fact, they show the opposite: PFG carefully analyzed and determined precisely what it needed to manage the execution risks and then went out and obtained through negotiations with Sysco-US Foods everything that it needed.

### b. The Asset Purchase Agreement

The parties negotiated a comprehensive APA that was the product of intense negotiations over the course of almost four months. Under the APA, PFG will purchase 11 US Foods distribution centers for $850 million (subject to closing adjustments) upon the closing of Sysco's acquisition of US Foods. Ex. 9, § 2.2. The 11 distribution centers are located in Seattle, San Francisco, Corona (near Los Angeles), San Diego, Salt Lake City, Las Vegas, Phoenix, Denver, Kansas City (KS), Minneapolis, and Cleveland. Included in the sale of the 11 distribution centers are all of the assets required to carry on

PUBLIC VERSION

the business conducted at those centers, including owned and leased real property,

warehouses, equipment, trucks and other vehicles, and inventories.  Ex. 9, § 2.4.

Under the APA, PFG will hire all of the US Foods employees who work at those

11 distribution centers.  The APA prevents Sysco from recruiting or hiring these

employees for a period of one year following the closing.  Ex. 9, § 5.16.  In addition, PFG

will be able to hire ███ "seed personnel" from the US Foods organization.  These seed

personnel will include regional management for the 11 distribution centers, as well as

personnel at the national level, US Foods' IT and shared services systems, and

merchandizing.  Ex. 9, § 5.6(o).

Moreover, the APA establishes a "honeymoon" period during which PFG and

customers of the 11 distribution centers will be able to familiarize themselves with each

other without interference from Sysco.  Sysco may not solicit National Contract

Customers[16] for the longer of one year following the closing and the current term of the

customer's contract.  Ex. 9,  § 5.15(a).  For each Multi-Unit Local Contract Customer,[17]

Sysco may not attempt to have the customer reduce its purchases from any of the 11

distribution centers for the shorter of one year following the closing and the current term

of the customer's contract.  Ex. 9, § 5.15(b).

---

[16]   Under the APA, "National Contract Customer" means a counterparty to a National
Customer Contract, which are listed in Section 1.1(e) of the Seller Disclosure
Schedules.  Ex. 9, § 1.1 (Definitions).

[17]   The APA defines "Multi-Unit Local Contract Customer" as "a counterparty to a
Multi-Unit Local Customer Contract."  The APA defines "Multi-Unit Local
Customer Contract" as "a contract with any Person that is a contract customer of the
Business as of the Closing Date that (a) as of the Closing Date, has five (5) or more
locations that are locally managed and serviced by the Business; and (b) represented
at least $650,000 in Business revenue during fiscal year 2014."  Ex. 9, § 1.1
(Definitions).

PUBLIC VERSION

### c.   The Transition Services Agreement

The parties also negotiated a comprehensive TSA.  The purpose of the TSA is to ensure a seamless transition of the business so that service to all customers served out of the 11 US Foods distribution centers will not be disrupted, and so that PFG has all the tools necessary to retain those customers and has the capability to bid for additional broadline business on a nationwide basis.  The TSA covers all aspects of the transition from US Foods to PFG, including information technology systems, shared services, merchandizing, supply chain, and human resources.  Specifically:



PUBLIC VERSION



Under the terms of the APA and the TSA, PFG will operate the same facilities, with the same personnel, offering the same products, at the same cost, and using the same trucks delivering products on the same schedules, to the same customers that US Foods serves today from the 11 distribution centers.

### 3.   The PFG Business Plan

PFG also developed a comprehensive five-year business plan that was presented to the FTC on January 30, 2015. *See* Ex. 4.  That plan explains how, as a result of the acquisition of the 11 distribution centers from US Foods, PFG will be a competitor for customers wanting a single contract covering all their locations nationwide.  It also includes a sales and marketing plan that explains how PFG will be able to bid for new business from Day One.  It details why PFG is confident that it will be able to retain the customers that it will be serving from the 11 acquired distribution centers and to use those relationships as a springboard for expanding PFG's business with those customers when those customers' contracts come up for renewal.  Ex. 4, at 6-9.

The business plan describes how PFG will grow its already highly successful private brand portfolio – which has been growing in case volume at an annual rate of ▮ ▮ over the past five years – and transition customers to its private brands.  Ex. 4, at 10-11.  Finally, it details PFG's capacity expansion strategy.  In anticipation of growing its national business, the plan identifies ▮▮▮▮ in specific expansion projects at the

16

PUBLIC VERSION

distribution centers PFG presently owns and will acquire from US Foods, and an

additional ▮▮▮▮▮▮ for construction of new "fold-out" facilities. Ex. 4, at 13-14.

The business plan thus provides a blueprint for how PFG will be able to provide

broadline food distribution services to customers that prefer a contract that covers their

locations nationwide.  With the 11 US Foods distribution centers added to those it

presently owns, PFG will be ready, willing, able, and fully incentivized to bid for – and to

win – new national broadline business.

> 4.   PFG Has The Financial Resources To Make The Acquisition And
>        The Capital Expenditures Set Out In The Business Plan

Finally, PFG has a strong balance sheet and the backing of its owners that insures

it will have the resources to successfully provide broadline food distribution services

nationwide.  A private equity fund managed by The Blackstone Group ("Blackstone")

owns 72.5 percent of PFG.  Blackstone is one of the world's leading global investment

and advisory firms.  A private equity fund managed by Wellspring Capital Management

("Wellspring") owns 19.3 percent of PFG.  Wellspring is a leading middle-market private

equity fund manager.  Collectively, they have over $280 billion in private equity capital

under management.  Ex. 1, at 10.

In addition to this financial interest in PFG, Blackstone and Wellspring provide

advisory and management services to PFG.  Representatives of the two firms sit on the

PFG board.  These firms have fully supported PFG's agreement to pay $850 million for

the 11 distribution centers and its plans to invest an additional ▮▮▮▮▮▮ for expansion

of capacity at current PFG distribution centers and for construction of new fold-out

distribution centers.  Firms like Blackstone and Wellspring would not have done this

PUBLIC VERSION

unless they were confident that PFG would be a successful nationwide broadline

distribution supplier.

II.   <u>DISCUSSION</u>

A.   <u>The Law Applicable To Evaluating This Three-Way Transaction</u>

Section 7 of the Clayton Act prohibits mergers that may tend to substantially

lessen competition.  15 U.S.C. § 18.  Here, the matter before the Court involves both the

proposed merger between Sysco and US Foods as well as the proposed divestiture to PFG

of 11 US Foods distribution centers.  While there was a time when the FTC tried to

prevent courts from even considering a proposed divestiture when the FTC challenged

the underlying merger, courts rejected those efforts, finding that a proposed divestiture

should be considered as part of the overall transaction in determining whether an

injunction is warranted.  *See FTC v. Arch Coal, Inc.*, Mem. Op., Civ. No. 04-0534 (JDB)

(D.D.C. July 7, 2004); *FTC v. Libbey, Inc.,*, 211 F. Supp. 2d 34 (D.D.C. 2002).  Plaintiffs

do not seem to be contending otherwise.

Where the parties appear to depart on the law, however, is the extent to which

PFG must replicate US Foods – or even the post-merger entity, according to the FTC.

*See* Compl. ¶¶ 83-84.  Plaintiffs appear to take the position that PFG must precisely

match US Foods in terms of various size "metrics" and other indicia of so-called

"competitive might."  *See* FTC Memo at 34-38.  There is no requirement, however, that a

divestiture create a competitor that is an identical twin of US Foods, let alone of the

merged Sysco-US Foods.  Plaintiffs' theory of competitive harm is that the Sysco-US

Foods merger will reduce the number of companies able to bid for the business of what it

calls national customers from "2-to-1."  But even accepting that as true, the proper

18

PUBLIC VERSION

inquiry is whether PFG will be able to provide broadline food distribution services to those customers such that they will have a competitive alternative to Sysco, as they do with US Foods today.  Thus, the issue is whether PFG will be considered a credible competitor, not whether it will replicate US Foods in every respect.

PFG's position reflects a standard long applied by the antitrust agencies themselves.  More than 10 years ago, the Antitrust Division explained that a remedy should look to "replacing the competitive intensity lost as a result of the merger rather than focusing narrowly on returning to premerger HHI [market share] levels."[18]  That remains the "touchstone principal," – i.e., "a successful merger remedy must effectively preserve competition in the relevant market."[19]  And even more recently, the FTC explained that the standard is whether "the proposed divestiture will enable the buyer to maintain or restore competition in the market."[20]

Thus, the proper question before the Court is not whether PFG will have the same number of distribution centers as US Foods (or the merged entity) or the same market share as US Foods (or the merged entity), but whether PFG will be an effective competitor against Sysco, as US Foods is today.

---

[18]   *Antitrust Division Policy Guide to Merger Remedies*, U.S. Dep't of Just. 5 (Oct. 2004), http://www.justice.gov/atr/public/guidelines/205108.pdf (emphasis added).

[19]   *Antitrust Division Policy Guide to Merger Remedies*, U.S. Dep't of Just. 1 (June 2011), http://www.justice.gov/atr/public/guidelines/272350.pdf (footnote omitted).

[20]   *Negotiating Merger Remedies:  Statement of the Bureau of Competition of the Federal Trade Commission, *, Fed. Trade Comm'n 6 (Jan. 2012), https://www.ftc.gov/system/files/attachments/negotiating-merger-remedies/merger-remediesstmt.pdf.

PUBLIC VERSION

> B.  Under The Proper Standard, Plaintiffs' Criticisms Of The Divestiture
> Proposal Are Misplaced

PFG will indeed be a meaningful competitor for the business of national

customers.  Today, PFG competes effectively against Sysco and US Foods in Eastern

states.  PFG is acquiring nearly all of US Foods' competitive operations in Western

states.  The combination of the two will give PFG a nationwide footprint.

Furthermore, PFG will be able to exert a competitive effect on the marketplace

from Day One because of the way large contracts are negotiated.  When a customer is

ready to consider switching suppliers,[21] they can take many different approaches.

Sometimes, they employ a multi-step bidding process that starts with a request for

proposal ("RFP") long before the expiration of the customer's current contract, includes

lengthy negotiations about potential terms that lead to an award of the contract, and

allows for additional time to hammer out the final contract terms before transitioning to

the new supplier.  Other times, they may engage in one-to-one discussions with a

prospective new distributor without engaging in a formal bidding process.  Discussions

with a prospective new distributor can play out over several months or more before a

decision to award the business is made and contract discussions begin.  Regardless of the

approach, the customer builds in substantial time to transition from the incumbent to the

new supplier.  Indeed, it is even customary for the incumbent who has lost the business to

---

[21]  Sometimes, customers engage in one-on-one discussions with their incumbent
foodservice distribution supplier and renew their agreements without going to the
market.

PUBLIC VERSION

provide interim contract extensions so that the customer does not face an interruption in service.[22]

Thus, there can be a substantial lag-time between initiation of the search for a new distributor and the date on which a new broadline distribution company that gets the contract has to begin providing the service.  Ex. 11 at 3.  Customers often work with distribution companies during the process because they want to encourage them and make it possible for them to compete.  There are many ways to do this, from negotiating one- or two-year extensions of contracts with the incumbent distributor (as a number of companies have reportedly done in recent months in anticipation of the Sysco-US Foods merger and the divestiture of distribution centers to PFG), to providing potential bidders with advance notice before RFPs are issued, and to working proactively with potential bidders so they have time to arrange to carry the products desired by the customer and design warehouse and delivery configurations that meet the customer's needs.[23]

As a result, a company can be an effective bidder as long as it will be able to fulfill its obligations under the contract.  Competition thus occurs when the bidding takes place; the test is not whether a company actually wins the bid but rather whether the buyer has a competitive choice.  *See United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 661 (1964);  *cf. United States v. Gen. Dynamics Corp*, 415 U.S. 486, 501 (1974)

---

[22]  Though it may seem counterintuitive for an incumbent who has lost the bidding to facilitate an orderly transfer of the account by extending the old contract, the incumbent really has little choice.  If it leaves the customer in the lurch, that is the surest way to make sure that the customer never comes back.  And if a distributor develops a reputation for such shortsighted behavior, that word is sure to get around the industry.

[23]  Ex. 11, Confidential Submission by PFG to Commissioners of the FTC at 3 (Feb. 11-12, 2015).

PUBLIC VERSION

("The focus of competition in a given time frame is . . . on the procurement of new . . . contracts."). PFG will be able to compete for national business on Day One following consummation of its acquisition of 11 US Foods distribution centers, because it will have a national footprint, managerial expertise, financial resources, and every incentive to bid. PFG thus will be a competitive alternative to Sysco, just as US Foods is today. That is what the law requires, and PFG meets that test.

Before this Court, however, Plaintiffs contend that the proposed divestiture is insufficient because PFG will be an "inferior" competitor. Their criticisms basically boil down to one: that PFG will not be able to be an effective competitor because it will not replicate the size and scope of US Foods. But this notion – that a company in this industry can compete only if it is as large as US Foods – is based on a misconception of the competitive processes and economics of the broadline business.

### 1. The Fallacy Of Plaintiffs' "Size" Theory

Plaintiffs assume that the more distribution centers a broadline supplier operates the more competitive it will be. Under this reasoning, more is always better, and a PFG with 35 distribution centers cannot replace the competition that US Foods provided with its 61 distribution centers. A broadline food distributor needs to operate nationwide in order to compete for the business of national customers that want to contract with a single supplier, but that does not mean that it must have distribution centers in every city or even everywhere its competitor has distribution centers. As PFG's success competing against Sysco and US Foods in the East demonstrates, there are different ways to organize an efficient distribution network, and that is especially true in this industry

22

PUBLIC VERSION

where an increasing number of customers actually prefer to be served from fewer rather than more distribution centers in order to lower their costs.

Most broadline multi-unit customers – and especially the largest ones – contract with distributors on a cost-plus basis. Thus, those customers care deeply about the costs that distributors incur in serving their accounts. Those costs include "inbound" delivery costs – the cost of transporting products from food suppliers to the distributor's warehouses – and "outbound" delivery costs – the costs of transporting products from the distributor's warehouses to the customer's various locations. Inbound transportation costs vary significantly depending on whether products can be delivered in truckload quantities at a lower cost per case or pound or in less-than-truckload ("LTL") quantities at a higher cost per case or pound.[24] Thus, a broadline food distribution company can reduce a customer's <u>overall</u> cost by increasing the use of full truckload deliveries to its warehouses, even if that means the distribution company has to drive more miles from the warehouse to deliver products to the customer's various locations.[25]

---

[24] The cost of driving a truck from point A to point B does not change materially whether the truck is completely full or partially empty, but the cost to the customer per pound or per case of the products can vary enormously. For example, the cost per pound or per case of a truckload shipment from the manufacturer to a distribution center can be half the cost of a LTL delivery of a truck that delivers half a truckload.

[25] For example, PFG has a significant multi-unit customer with ▮ locations serviced by its broadline business that are dispersed across ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ PFG must stock hundreds of SKUs to meet this customer's particular needs. PFG delivers to this customer's locations from five distribution centers in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ rather than from all 11 of its broadline distribution centers located in the ▮▮▮▮▮▮▮▮▮ some of which are closer to the customer's locations, because it is more economical to concentrate truckload deliveries into fewer distribution centers and drive the additional miles from the distribution centers to the customer's various locations.

PUBLIC VERSION

These delivery economics completely undermine Plaintiffs' "bigger is necessarily better" theory: it will often be more economic for a customer if the distribution company can serve the customer from fewer distribution centers – not more – because the savings in inbound delivery costs of products from the manufacturer to the warehouse exceed the incremental costs of delivery to the customer from fewer warehouses. Further, because customers routinely deal directly with distribution centers to arrange orders and delivery schedules, there can be advantage to customers – even "national customers" – in dealing with fewer, rather than more, distribution centers. For all these reasons – cost and convenience – many customers these days prefer to be served from fewer, not more, distribution centers.

Thus, the issue is overall network efficiency – which includes both inbound and outbound delivery costs – and not simply the number of distribution centers that a company operates. That this is not just theory but a matter of fact that can be proven by looking at how PFG, Sysco, and US Foods perform today in those areas in which they compete.

Today, PFG offers broadline food distribution services in the Eastern half of the United States from 23 distribution centers. Sysco competes in the East from 41 distribution centers, and US Foods from 37 distribution centers. As a result, today PFG has to "drive more miles" to deliver products to its customers on average than either Sysco or US Foods does. Under Plaintiffs' theory, PFG should be at an insurmountable competitive disadvantage because it is smaller than its competitors. But the available evidence thoroughly refutes Plaintiffs' theory. In the past four years, PFG has grown sales at a faster clip than Sysco and US Foods, in effect taking market share away from

PUBLIC VERSION

them. And when it comes to operating costs – costs that include outbound delivery costs

– ██████████████████████████████████████████

████ *See* Ex. 4, at 16. Clearly, the fact that Sysco and US Foods have more distribution

centers than PFG in the Eastern United States has not prevented PFG from being an

effective broadline competitor.

In sum, PFG's operational efficiency and success against Sysco and US Foods in

the Eastern United States is a classical "natural experiment" for predicting how it will

perform against Sysco post-transaction, even with the relatively smaller metrics that the

FTC highlights. Under Plaintiffs' theory, PFG should be at a severe disadvantage: after

all, it has fewer distribution centers, so it must drive more miles to reach customers, and

it purchases less product from suppliers, so it must have a higher costs of goods. But,

PFG's proven record as a broadline competitor to Sysco and US Foods today in the

Eastern United States confirms that it is not size and footprint that matter, but rather

overall network efficiency, which is where PFG excels.

2.     PFG Will Be Cost Competitive

Plaintiffs also contend that PFG will not be cost competitive in two respects.

First, they contend that PFG will not be cost competitive because it will have to use

shuttle service to reach certain cities that US Foods formerly served directly. Second,

they contend that PFG's cost of goods will not be competitive, presumably because the

larger merged entity may be able to negotiate lower prices from suppliers. They are

mistaken on both counts.

PUBLIC VERSION

          a.     Shuttle service is a common and economical way to reach customers

Plaintiffs reason that PFG will have to employ shuttle service to reach some customer locations that the merged entity will be able to serve directly, and they contend that this will render PFG uncompetitive. The suggestion that shuttle service is inefficient or uneconomic is belied by its common use today by broadline food distribution companies – including Sysco, US Foods, Gordon Food Service, Reinhart, and others – and the use of shuttle service will not impose a significant incremental cost on PFG.

Deliveries from distribution centers are made by truck to customer locations. The time that a driver can spend on the road is limited by federal safety regulations. Thus, the distance that a driver can cover in a day depends on the density of the area and the number of stops on the route. For example, a driver can cover more miles in less dense areas (such as in much of the West) and when large deliveries are being made to a few customers.

For long distances (or for routes that are more dense or involve more customer stops), a broadline food distributor may employ shuttle service. With shuttle service, the driver leaving the warehouse usually hooks up a loaded trailer or a tandem of two loaded trailers and drives to a shuttle site where the driver hands off the loaded trailers to other drivers, hooks up one or two empty trailers, and returns to the warehouse the same day. The driver at the shuttle yard takes the loaded trailers, makes deliveries to customers, and returns to the shuttle yard with the empty trailers, and the process repeats itself.

Since no broadline food distribution company is close to all its customers' locations, all of them do some shuttling, and shuttling is common. For example, of the 161 largest MSAs that PFG serves today, ▉ are served by shuttle, and PFG delivers

**PUBLIC VERSION**

approximately ████████ of its cases via shuttle.  Ex. 6, at 9.  Customers are relatively

indifferent as to whether they receive direct or shuttle service:  what they care about is

whether they get their orders filled correctly and delivered on time.  In some respects,

PFG customers served by shuttle service actually get special treatment to assure a high

level of service.  Because it takes more time to get from warehouse to customer via

shuttle service, PFG loads trailers for shuttle delivery first, which means that shuttle

customers get "first call" on inventory and are more likely to get their orders filled.

Because it is more costly to correct errors (*e.g.*, products delivered to the customer that

were not ordered or products not delivered that were ordered) for shuttle customers, PFG

"checkers" make sure that orders for shuttle customers are correctly filled.  Ex. 6, at 10.

Indeed, from PFG's perspective, shuttle service is such a common – and unremarkable –

element of the business that it does not separately record, monitor, or classify customers

by whether they are served directly or by shuttle.

Shuttle costs for PFG also are not economically significant.  PFG estimated for

the FTC that shuttle costs add only about ██████ to the cost of an average case of

goods delivered to its customers today.  Ex. 6, at 9.  In order to compete nationwide, PFG

reasoned that it would have to be able to serve all 200 of the largest MSAs in the

continental United States.  Certain of those MSAs would be served from the 11 US Food

distribution centers by shuttle, as US Foods does today.  Insofar as additional shuttling

would be necessary, PFG estimated in its Business Plan that the incremental cost of

shuttle service would be approximately ███████████████████████████

███████████████  Ex. 4, at 18.  Under no scenario, however, would those costs

PUBLIC VERSION

make PFG unable to be a cost-competitive broadline supplier to customers with locations nationwide.

        b.      PFG will not be at a significant disadvantage for cost of goods

Plaintiffs' second cost concern involves the cost of goods ("COGs"). The theory goes that the merged entity will be able to negotiate lower COGs from suppliers because of its increased purchasing power, so PFG will be at a cost disadvantage. Here, however, the facts on the ground demonstrate that there is little basis for such apprehension.

First, Plaintiffs' argument ignores the fact that large national broadline customers – the group of customers apparently of most concern to Plaintiffs – frequently negotiate directly with suppliers and enter into contracts that set the price that the foodservice distributors will pay the manufacturers, particularly for national brand products. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ It does not matter which broadline distribution supplier the customer uses; the price paid will be the same. Thus, for example, if a national broadline customer contracts with Tyson Foods for a certain dollar amount per case for chicken breasts, that is the product cost that will be charged to the broadline distribution supplier, whether that supplier is the merged entity or PFG. That takes a good portion of the COGs issue out of play.

Second, with respect to private brands, PFG negotiated provisions in the APA/TSA to assure comparable COGs. Broadline food distribution companies have incentives to develop their own private brands to offer customers as alternatives to national brands; the gross margins on private brands tend to be higher. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28

PUBLIC VERSION

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ That takes another sizable portion of the COGs

issue out of play.

Third, PFG has its own private brands and a strategy for transitioning customers

from US Foods private brands to its own.  PFG offers 40 different private brand families,

in 12 broad foodservice categories, exceeding 10,000 SKUs.  It has been growing its own

private brand sales at a compound annual growth rate of ████████ over the past four

years, and private brand sales now account for 39 percent of PFG's case volume sold to

street customers.  Ex. 1, at 3, 70.  The provisions in the APA/TSA for use of US Foods

brands provides maximum protection, not a minimum requirement.  PFG has every

incentive to wean customers from US Foods private brands to PFG private brands as soon

as possible, both because it is in PFG's economic interest to grow its private brand

business and because providing those customers with high-quality PFG private brand

products will make it easier for PFG to retain those customers when their contracts come

up for renewal.

Finally, PFG is confident that it will have competitive COGs because suppliers

will be motivated to work with PFG and will want PFG to succeed.  For some suppliers,

the combination of Sysco and US Foods will incentivize them to consider alternatives.  It

is marketing 101 for suppliers to want a diverse customer base, so suppliers may well

seek out PFG.  Also, to the extent that the merged entity consolidates its purchasing and

PUBLIC VERSION

reduces the number of its suppliers, those suppliers no longer doing business with Sysco will have strong incentives to offer PFG favorable prices in order to earn its business.

### 3. Execution Risks Have Been Addressed

Plaintiffs ultimately are left with the argument that there can be no assurance that PFG will succeed because there are numerous "execution risks" associated with the divestiture.  But, PFG and its owners have been mindful of execution risks from the very outset and have fully addressed them.  PFG comprehensively catalogued those risks and developed an action plan to address them so that when it came time to sit down with Sysco and US Foods to discuss a potential divestiture, nothing would be overlooked.[26] PFG tasked its Executive Vice President with overseeing and directly participating in the negotiation of these issues.  He was also given the assignment to manage the 11 distribution centers and, as he told the FTC during the investigation, he made it his job to get what PFG needed because he knew it was going to be his responsibility to make sure it all worked.  The resulting TSA was the product of lengthy and detailed meetings that included senior officials of the companies over the course of almost four months.

PFG's execution risk mitigation strategy addressed key elements of the divestiture.  Importantly, the transition would have to be "seamless" in the eyes of the customer; the customer should see as little change as possible.  Those customers would use the same processes to order the same products, deal with the same distribution centers, and get deliveries by the same drivers, on the same trucks, at the same day and times, and under the same contractual terms, as they had enjoyed from US Foods.  Ex. 5,

---

[26]   Ex. 5, Confidential Submission by PFG to FTC (Dec. 19, 2014), attaching "Project Purple" document as Attachment 1, at 13-15.

Attachment 1, at 12.  The APA and TSA provide that PFG will get the hard assets

necessary to perform those functions, the IT and other systems to support them, key

national and local US Foods employees, ████████████████████ and customers

served out of the 11 US Foods distribution centers.  Only when all of these provisions

had been satisfactorily negotiated and embodied in the APA and the TSA did PFG

execute the APA.  PFG is confident that it has managed execution risk.

## III.   CONCLUSION

PFG is a successful, well run, well capitalized, and competitive broadline food

service distribution company today.  With the addition of the 11 US Foods distribution

centers that it seeks to acquire and with its fully executable business plan, PFG will be a

robust and effective competitor for what Plaintiffs have identified as national broadline

customers.  Accordingly, PFG respectfully submits that Plaintiffs' motion for a

preliminary injunction should be denied.

**PUBLIC VERSION**

Dated: April 21, 2015

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM, LLP

  /s/ *John M. Nannes*
John M. Nannes (DC Bar No. 195966)
John R. Seward (DC Bar No. 469820)
Anjali B. Patel (DC Bar No. 992095)
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 661-9191
Email:  john.nannes@skadden.com
Email:  john.seward@skadden.com
Email:  anjali.patel@skadden.com


James A. Keyte
Four Times Square
New York, New York  10036
Telephone:  (212) 735-2583
Facsimile:  (212) 777-2583
Email: james.keyte@skadden.com

*Counsel for Performance Food Group, Inc.*