**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION**, *et. al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 15-cv-00256 (APM) |
| **SYSCO CORPORATION**, **USF HOLDING CORP.**, and **US FOODS, INC.** | **FILED UNDER SEAL** |
| Defendants. | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................3

I.   Plaintiffs Are Likely to Succeed on the Merits.......................................................... 3

A.   The Evidence Shows That the Acquisition Is Presumptively Illegal............................4

1.   Broadline Distribution Is a Relevant Product Market....................................4

a.   *Brown Shoe* and Its Progeny Support Plaintiffs' Product Market
Definition ................................................................................................4

b.   Dr. Israel's Opinion Confirms Plaintiffs' Market Definition................................7

c.   Systems, Specialty, and Cash and Carry Are Not Reasonable Substitutes
for Broadline ................................................................................................7

d.   National Customers and Local Customers Are Distinct ......................................11

2.   For National Customers, the Relevant Geographic Market Is National ...................13

3.   For Local Customers, Numerous Local Areas Are Relevant Geographic
Markets ................................................................................................14

4.   The Merger Is Presumptively Illegal in the Relevant Markets ................................16

B.   Defendants Have Not Rebutted the Strong Presumption of Illegality or
Plaintiffs' Showing of Likely Competitive Harm................................................18

1.   Plaintiffs' Unilateral Effect Theory Is Consistent with the Merger Guidelines
and the Case Law ................................................................................................18

2.   The PFG Expansion Does Not Counteract the Merger's Anticompetitive
Effects ................................................................................................20

3.   The Remaining Competitors Cannot Constrain the Merged Firm............................22

4.   New Entry Will Not Counteract the Likely Anticompetitive Effects......................23

5.   Powerful Buyers Cannot Protect Themselves in the Absence of Meaningful
Alternatives ................................................................................................24

6.   Defendants Fail to Show that Efficiencies Counteract the Likely
Anticompetitive Effects of the Merger ................................................................25

II.   The Equities Heavily Favor a Preliminary Injunction ....................................... 25

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) ................................ 17

*\*Brown Shoe Co. v. U.S.*, 370 U.S. 294 (1962) ..................................................................... passim

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ..................................... 24

*\*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ......................................... passim

*\*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ............................... 3, 18, 21, 25

*\*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .................................................... 3, 18, 25

*FTC v. PPG Indus., Inc.*, 628 F. Supp. 881 (D.D.C. 1986) ......................................................... 17

*\*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ................................................. 4, 5, 6, 23

*\*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000).................................................. 4, 19

*\*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ..................................... 4, 6, 25

*In re Air Passenger Computer Reservations Sys. Antitrust Litig.*,
   694 F. Supp. 1443 (C.D. Cal. 1988) ....................................................................................... 17

*U.S. v. Bazaarvoice, Inc.*, No. 13-cv-133, 2014 WL 203966, at \*69 (N.D. Cal. Jan. 8, 2014) .... 17

*U.S. v. Cont'l Can Co.*, 378 U.S. 441 (1964)............................................................................... 17

*\*U.S. v. Grinnell*, 384 U.S. 563 (1966)........................................................................ 3, 9, 13, 14

*\*U.S. v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011)............................................ passim

## STATUTES

15 U.S.C. § 18.......................................................................................................................... 3, 18

15 U.S.C. § 53(b) .......................................................................................................................... 1

## OTHER AUTHORITIES

Antitrust Division, U.S. Dep't of Justice, *Policy Guide to Merger Remedies* (Oct. 2004) .......... 20

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) .......... passim

## INTRODUCTION

The critical facts in this case are clear and uncontroverted.  Sysco and US Foods are *by far* the two largest broadline distributors both nationally—no competitor comes close—and in dozens of local markets.  They have:  the most distribution centers, the largest field sales forces, the largest truck fleets, and the broadest selections of products, including private label products.  Their broadline distribution service revenues and market shares—whether national or in numerous local markets—dwarf other broadline distributors.  Every day, Defendants engage in a cutthroat battle with each other for business.  The result is significantly lower prices and better service for customers.  This merger would eliminate that competition and those benefits.

Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction ("Br.") explained in detail why, under precedents of this Circuit, the Commission has established that a preliminary injunction should issue under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).  Plaintiffs' case is supported by voluminous evidence from Defendants' own documents and testimony, third-party documents and testimony, and substantial expert evidence.

The discovery that has occurred since the filing of the complaint only strengthens Plaintiffs' case for a preliminary injunction, with much of the support coming from Defendants' own identified hearing witnesses.  For example, Defendants contend that there is no national geographic market for broadline customers with locations dispersed nationwide or across multiple regions ("National Customers").  *See* Opp. at 25-26.  Yet, Defendants' economic expert readily acknowledged that ███████████████████████████████████████████

████████████████████████████████████████████████[1]  Likewise,

Defendants' argument that Sysco and US Foods are not particularly close competitors (*see* Opp.

---

[1] Hausman Tr. at 133 (emphasis added).  Dr. Hausman ████████████████████████
████████████ and the supposedly ████████████████
████████ Hausman Report ¶ 30.

at 36-37), is directly belied by the record, including by the testimony of others identified on

Defendants' Witness List, dated April 10, 2015.  Defense witness █████████████

████████████████████████████████, for example, testified that Sysco and

US Foods are each other's "closest competitors" for larger accounts with geographically

dispersed footprints, directly refuting Defendants' claims to the contrary.[2]  This testimony, and

virtually identical testimony of other defense witnesses,[3] is fully consistent with other parts of

the record, including Sysco's internal documents, which conclude that, in the case of ████████

████████████████████ for example, █████████████████████████

████████████████████████████[4]  And, contrary to

Defendants' arguments that the merging parties are but two of many strong competitors across

all local markets (*see* Opp. at 30-35), ████████████ confirmed what the market shares vividly

show:  Sysco and US Foods are the two "dominant" distributors in local markets that include

Southwest Virginia; Columbia, South Carolina; and Raleigh, North Carolina, among others.[5]

Defendants' opposition brief fails to rebut either Plaintiffs' *prima facie* case or the

extensive direct evidence that the proposed merger would harm competition by eliminating the

head-to-head rivalry between Sysco and US Foods for both National Customers and local

customers.  Significantly, Defendants eschew any attempt to address the Supreme Court's market

definition criteria, *see Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962), described extensively

by Plaintiffs.  Defendants first argue instead that Plaintiffs' definition of the relevant markets is

unsupported by economic analysis and, therefore, flawed.  Defendants then ignore precedents in

this Circuit by arguing that, because some foodservice customers purchase certain products from

---

[2] █████████ Dep. at 124-25.  *See also* █████████████████ Dep. at 143-45 (Sysco and US Foods are close as competitors on every dimension, including their ability to service customers across multiple regions or nationally).
[3] *See, e.g.,* █████████████ Dep. at 143-45.
[4] PX01388 at 004 (emphasis added).  *See also* Br. at 25, 28-30 & nn. 86, 91-101.
[5] █████████ Dep. at 169-70.

other foodservice channels, broadline foodservice distribution cannot be a relevant product market.  As to geographic market definition, Defendants deny the existence of a national market—despite the controlling force of *U.S. v. Grinnell*, 384 U.S. 563 (1966), and their own expert's opinion (see above)—and further claim that Plaintiffs have defined relevant local markets incorrectly, without offering any definitions of their own.  And they conclude their Opposition by arguing that several factors, such as the divestiture of 11 US Foods distribution centers to Performance Food Group ("PFG"), will constrain the merged entity.  None of these arguments has merit.

## ARGUMENT

The standard for preliminary injunctions under Section 13(b) in this Circuit is well-settled.  *See*, *e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714-15 (D.C. Cir. 2001); *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 35-36 (D.D.C. 2009).  As the *Heinz* Court stressed, Defendants cannot elevate the Commission's burden here by asserting that they will not proceed with the administrative trial on the merits if a preliminary injunction issues (*see* Opp. at 6-7). *See Heinz*, 246 F.3d at 382-83 ("[T]hat is at best a 'private' equity which does not affect our analysis . . . .").  Here, the public interest warrants a preliminary injunction.

### I.  Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed in proving at the administrative trial that the merger between Sysco and US Foods violates Section 7 of the Clayton Act, 15 U.S.C. § 18.  While Defendants' high combined market share alone establishes a presumption of illegality, there is also extensive direct evidence that the proposed merger would harm competition by eliminating the head-to-head rivalry between Sysco and US Foods for both National Customers and local customers.

### A.  The Evidence Shows That the Acquisition Is Presumptively Illegal

#### 1.  Broadline Distribution Is a Relevant Product Market

Defendants' challenge to Plaintiffs' market definition of broadline foodservice distribution is based almost entirely on their claim that Plaintiffs' economic expert, Dr. Israel, failed to apply the "hypothetical monopolist test" embodied in the *Merger Guidelines*.  *See* Opp. at 17-20.  Not only are Defendants wrong about Dr. Israel's analysis, they ignore Plaintiffs' reliance on *Brown Shoe* and its progeny to establish market definition.

#### a.  *Brown Shoe* and Its Progeny Support Plaintiffs' Product Market Definition

In determining the relevant product market, Courts in this Circuit have consistently applied the "reasonable interchangeability" test, including the "practical indicia," enumerated in the Supreme Court's *Brown Shoe* decision.  *See*, *e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037-38 (D.C. Cir. 2008) (discussing the "practical indicia" in *Brown Shoe*); *U.S. v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) (same); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 159-60 (D.D.C. 2000) (same); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46-47 (D.D.C. 1998) (same); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075-76 (D.D.C. 1997) (same).

Here, Plaintiffs expressly relied on the *Brown Shoe* factors and showed why they compel the conclusion that broadline distribution is a distinct product market.  Br. at 11-18.  These factors include broadline distribution's distinct characteristics and uses, specialized facilities, distinct customers, and distinct pricing.  That Defendants and other industry participants recognize the existence of a market for broadline distribution services only fortifies this conclusion.  *See* Br. at 11-14.  So, too, does the evidence that broadliners, including Defendants, determine their pricing based on competition from other broadline distributors.  *Id*. at 13 (citing *H&R Block*, 833 F. Supp. 2d at 53).  Numerous industry executives ***identified as hearing***

4

*witnesses or declarants by Defendants* substantiate the existence of a broadline product market through testimony that systems distribution, specialty distribution, and cash-and-carry stores are not viable substitutes for broadline distribution.[6]

Nor do Defendants make up any ground by arguing that some customers' usage of more than one foodservice channel to satisfy some of their foodservice needs shows the antitrust market is broader than broadline distribution.  Opp. at 20-23.  Courts in this Circuit have repeatedly rejected arguments to define the product market to include all firms that may conceivably compete on some level with the merging parties.  "'[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.'"  *Cardinal Health*, 12 F. Supp. 2d at 47 (quoting *Staples*, 970 F. Supp. at 1075-76).  In *Cardinal Health*, this Court blocked two mergers of national drug wholesalers after rejecting the defendant-wholesalers' argument that the product market should include all possible forms of prescription-drug distribution, including those already used to some extent by customers.  *Id*. at 45-49.  While recognizing "[a]ll the forms of distribution must, at some level, compete with one another," the Court found that drug wholesaling services were not interchangeable with other forms of distribution and thus constituted a relevant product market.  *Id*. at 47.  Much like the broadline distribution services a issue here (*see* Br. at 12-18), wholesale drug distribution services "provide[d] customers with an efficient way to obtain prescription drugs," including "centralized warehousing, delivery, and billing services" that enabled customers to avoid "dealing with a large number of vendors, and

---

[6] *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮ Dep. at 122-35, 156-57; ▮▮▮▮▮ Dep. at 22, 24; ▮▮▮▮▮ Dep. at 8, 106, 111-12, 117, 133; ▮▮▮▮▮ Dep. at 165-67, 169-70, 181-83; PX07000 (▮▮▮▮ Supp. Decl.) ¶¶ 5, 6; PX07001 (▮▮▮ Supp. Decl.) ¶¶ 12, 13; PX07004 (▮▮▮▮ Supp. Decl.) ¶¶ 5, 6; PX07009 (▮▮▮▮ Supp. Decl.) ¶¶ 8, 9; PX07010 (▮▮▮ Supp. Decl.) ¶¶ 5, 6; PX07012 (▮ Supp. Decl.) ¶¶ 5, 7; PX07015 (▮▮▮ Supp. Decl.) ¶¶ 4, 5; PX07016 (▮▮▮ Supp. Decl.) ¶¶ 6, 7. *See also* ▮▮▮▮▮ Dep. at 154-56; ▮▮▮▮▮ Dep. at 154-55.

negotiating numerous transactions," and offered additional value-added services that other distribution channels did not provide.  *Id.*

Likewise, in *Staples*, this Court observed that, while the office supply products sold by the merging parties were "undeniably the same no matter who sells them, and no one denies that many different types of retailers sell these products," the office supply superstore channel nevertheless comprised a distinct relevant product market.  *Staples*, 970 F. Supp. at 1075.  *See also H&R Block*, 833 F. Supp. 2d at 58-60 (explaining "the principle that the relevant product market should ordinarily be defined as the smallest product market that will satisfy the hypothetical monopolist test").  Similarly, here, broadliners' "unique combination of size, selection, depth and breadth of inventory . . . distinguishes" them from other foodservice channels.  *Staples*, 970 F. Supp. at 1079.

Notably, the D.C. Circuit also rejected a similar argument in *Whole Foods*.  The Court recognized that, while "a customer might buy a stick of gum at a supermarket or at a convenience store," this fact "does not mean there is no definable groceries market."  *Whole Foods*, 548 F.3d at 1040.  Some of the items available at premium and natural organic grocery stores, like those at issue in *Whole Foods*, are available at other grocery stores, convenience stores, and numerous other retail outlets.  But, as in this case, there were meaningful differences between the different channels.  *See id.* (finding that some customers "cross-shop" between food retailers, but rejecting defendants' claim that traditional supermarkets and premium natural and organic supermarkets were in the same product market).  Defendants provide no reason why their arguments for a broad market should fare any better than those rejected in *Whole Foods*, *Cardinal Health*, and *Staples*.

### b.  Dr. Israel's Opinion Confirms Plaintiffs' Market Definition

Contrary to Defendants' assertions (Opp. at 18), Dr. Israel used standard economic methodology to analyze whether broadline customers would be substantially more likely to switch to another broadline distributor than another form of distribution in response to a SSNIP.[7] Dr. Israel analyzed testimony and empirical evidence establishing that broadline customers are unlikely to switch to alternatives that cannot effectively meet their distinct needs.  Further, Dr. Israel performed an empirical test that, in its simplest terms, compares the profits the company would obtain for those sales it retains at a higher price with the profits it would lose for those customers that switch to different forms of distribution.

Based on this test, as well as his analysis of empirical evidence and testimony, Dr. Israel has concluded that broadline distribution services are a relevant product market.  In essence, he has found that most customers of broadline distribution services would switch to other broadline distributors as opposed to some other alternative—a conclusion that is hardly surprising in light of the overwhelming evidence that broadline distribution is a separate market under the *Brown Shoe* criteria.[8]  Defendants' own expert finds that over half of Sysco's broadline customers would switch to another broadline competitor (in fact USF) in response to a price increase.[9]

### c.  Systems, Specialty, and Cash and Carry Are Not Reasonable Substitutes for Broadline

Defendants attempt to dismiss the overwhelming evidence supporting a broadline market as being based "primarily on a small number of customers' subjective preferences for broadline

---

[7] PX09350 (Israel Report) ¶¶ 87-92.

[8] PX09350 (Israel Report) ¶¶ 87-92.  Defendants argue that Dr. Israel used the wrong margin to calculate profits. Guided by relevant literature, as well as Defendants' ordinary course documents and data, Dr. Israel considers his margin calculation to be the most appropriate for product market definition.  Defendants also argue that Dr. Israel improperly calculated the extent to which there would be switching.  However, Dr. Israel undertook an extensive review of the company's own documents and data to derive the unsurprising conclusion that the two largest broadline competitors are each other's closest competitors.

[9] PX09375 (Israel Rebuttal Report) ¶ 71 (citing Bresnahan Report § E(2)(a), F(1)(a)).

distribution."[10]  Opp. at 17.  As stressed in *H&R Block*, however, the relevant inquiry is whether

enough customers **would** switch away from the product at issue in response to a SSNIP.  *H&R*

*Block*, 833 F. Supp. 2d at 52.  This question is squarely addressed by the testimony from

customers in various classes of trade and of various sizes that account for a significant portion of

Defendants' broadline revenue; the National Customer declarants alone have combined annual

foodservice distribution purchases of approximately ████████.[11]  For example, ████████████

██████████████████, stated that no other foodservice channel—systems distribution,

specialty distribution, or cash and carry stores—"████████████████████████

██████████████."[12]  Other witnesses, including many of Defendants' own local

market declarants, testified along the same lines.[13]

This testimony makes clear that broadline distribution has different attributes from other

forms of distribution.  First, systems distributors do not compete for broadline business; they are

only able to compete for chain restaurant customers that meet certain size, density, and

---

[10] Defendants cite two customers for their claim that customers could defeat a SSNIP by switching to other
foodservice channels.  Opp. at 19-20, n.58.  But those very same customers submitted sworn supplemental
declarations clarifying that they could not switch to other foodservice channels to discipline Sysco's pricing.  *See*
PX07007 (████████ Supp. Decl.) ¶¶ 6, 7; PX07002 (████████ Supp. Decl.) ¶¶ 5-6.
[11] PX09350 (Israel Report) ¶ 155.  ██████████████ Dep. at 219-23; ██████████████ Dep. at 105-06, 117;
PX00404 (████████ Decl.) ¶ 4; PX00401 (████████ Decl.) ¶¶ 4-5; PX00402 (████████ Decl.) ¶¶ 11, 12; PX00403
(████████ Decl.) ¶¶ 5-7; PX00405 (████████ Decl.) ¶¶ 5, 7-8; PX00407 (████████ Decl.) ¶¶ 4-5;
PX00418 (████████ Decl.) ¶¶ 17-18; PX00419 (████████ Decl.) ¶¶ 3-4; PX00427 (████████ Decl.) ¶¶ 3-4, 12;
PX00431 (████████ Decl.) ¶¶ 6, 13; PX00436 (████████ Decl.) ¶¶ 4-5; PX00437 (████████ Decl.) ¶¶ 5-6; PX00445
(████████ Decl.) ¶¶ 7-8; PX00446 (████████ Decl.) ¶¶ 4-5, 11; PX00448 (████████ Decl.) ¶¶ 4-6,
11-12; PX00455 (████████ Decl.) ¶ 3, 5; PX00419 (████████ Decl.) ¶ 4; PX00437 (████████ Decl.) ¶ 5.  *See*
*also* ██████████ Dep. at 93-95, 99-100; ██████████████ Dep. at 191-92;
██████████ Dep. at 80-81; ██████████ Dep. at 114-17; ██████████ Dep. at 138;
██████████ Dep. 183-85; ██████████ Dep. 160, 162;
██████ Dep. 128-29.
[12] PX00436 (████████ Decl.) ¶ 5 (emphasis added).
[13] *See, e.g.,* ██████████ Dep. at 8, 106, 111-12, 117, 133; ██████████ Dep. at 154-55;
██████████ Dep. at 220-23; ██████████ Dep. at 121-22, 124; ██████████ Dep. at 136-37, 140-42;
██████████ Dep. 192-94; PX00401 (████████ Decl.) ¶¶ 4-5, 12, 16; PX00404 (████████ Decl.) ¶¶ 4-8;
PX00455 (████████ Decl.) ¶¶ 3, 5-6; ██████████ Dep. at 146-47, 150-51; ██████████ Dep. at 167-
70; ██████████ Dep. at 121-22; ██████████ Dep. at 93-96; ██████████ Dep. at
181-83; PX07000 (████████ Supp. Decl.) ¶¶ 5, 6; PX07001 (████████ Supp. Decl.) ¶¶ 12, 13; PX07004 (████████
Supp. Decl.) ¶¶ 5, 6; PX07009 (████████ Supp. Decl.) ¶¶ 8, 9; PX07010 (████████ Supp. Decl.) ¶¶
5, 6; PX07012 (████████ Supp. Decl.) ¶¶ 5, 7; PX07015 (████████ Supp. Decl.) ¶¶ 4, 5; PX07016 (████████
Supp. Decl.) ¶¶ 6, 7; PX00486 (████████ Decl.) ¶¶ 7-11; PX00494 (████████ Decl.) ¶¶ 4, 8-10.

purchasing thresholds.[14]  Compared to broadline customers, systems customers purchase a more limited set of largely customer-proprietary products under a different pricing scheme and often from different facilities.[15]  It would be "next to impossible" for a systems distributor to service a broadline customer.[16]  *See Brown Shoe*, 370 U.S. at 325; *Grinnell*, 384 U.S. at 574 ("What defendants overlook is that the high degree of differentiation between [one product] and the other [ ] means that for many customers, only [the first product] will do.").  In fact, ██████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████[17]

Similarly, customer after customer, including Defendants' customer-declarants, testified that they could not replace broadline distribution with a network of specialty distributors.[18] Compared to broadliners' potential to serve as a one-stop-shop, specialty distributors focus on a narrow product category (e.g., fish).[19]  There are also impediments to switching even portions of

---

[14] ████████████████ Dep. at 50-51, 58, 60; ████████████ Dep. at 38, 207-09; ████████████ Dep. at 107-09; ████████████ Dep. at 132-134; ████████ Dep. at 11-12; ████████████ Dep. at 153; ████████ Dep. at 169-70, 175-76; ████████ Dep. 192-94; ████████ Dep. at 90-91, 131-32, 223-25. ████████ Dep. at 32-36; ████████ Dep. at 223-26, ████████ Dep. at 110-11, 141, 201-02, 250-52; ████████ Dep. at 164-71; ████████ Dep. at 173-75; ████████ Dep. at 11-12. *See also* ████████ Dep. at 46-48.

[16] ████████ Dep. at 38. *See also* ████████ Dep. at 44; ████████ Dep. at 37; PX00267 at 001; ████████ Dep. 52-53; ████████ Dep. at 22-23; ████████ Dep. at 176; PX00441 (████ Decl.) ¶ 4.

[17] ████████ Dep. at 32-33.

[18] *See, e.g.*, ████████ Dep. at 157; ████████ Dep. at 115, 117; ████████ Dep. at 219-22; ████████ Dep. at 182-83; ████████ Dep. at 121-22; PX00402 (████ Decl.) ¶ 11; ████████ Dep. at 80-81; ████████ Dep. at 201; ████████ Dep. at 182-183; ████████ Dep. at 186-88; ████████ Dep. at 114; ████████ Dep. at 93; PX07002 (████████ Supp. Decl.) ¶ 8; PX07016 (████████ Supp. Decl.) ¶ 5; PX07018 (████████ Supp. Decl.) ¶ 8; PX07020 (████████ Supp. Decl.) ¶¶ 5-6; PX07011 (████████ Supp. Decl.) ¶¶ 4-5; PX07014 (████████ Supp. Decl.) ¶ 8; PX07020 (████████ Supp. Decl.) ¶ 5; PX07015 (████████ Supp. Decl.) ¶ 4; PX07012 (████████ Supp. Decl.) ¶ 7; PX07013 (████████ Supp. Decl.) ¶ 8; PX07007 (████████ Supp. Decl.) ¶ 6; PX07004. *See also* ████████ Dep. at 184-85; PX07024 (████████ Supp. Decl.) ¶ 11; PX00415 (████ Decl.) ¶ 14.

[19] *See, e.g.*, ████████ Dep. at 102-03; ████████ Dep. at 115, 117; ████████ Dep. at 116; ████████ Dep. at 79, 91-92; PX07004 (████████ Supp. Decl.) ¶ 5; PX07012 (████████ Supp. Decl.) ¶ 7; PX09237-008; PX09297-005.

purchases from broadliners to specialty distributors, such as disaggregating purchasing power,[20] loss of volume rebates and discounts,[21] higher product and distribution costs,[22] and increased administrative costs,[23] such as receiving and stocking more deliveries, checking more invoices, and paying more checks.[24] *See Cardinal Health*, 12 F. Supp. 2d at 47.  As one of Defendants' witnesses testified, it would be "financially prohibitive" to replace broadline distribution with one or more specialty distributors.[25]

Similarly, the record confirms that cash-and-carry stores are not reasonably interchangeable with broadline distribution.[26]  National Customers in particular are emphatic that they could not switch purchases from broadliners to cash-and-carry stores,[27] and they have never considered contracting with cash-and-carry stores to get better pricing from broadline distributors.[28]  Sysco and US Foods executives testified that ████████████████████████

---

[20] *See, e.g.*, PX00513 (███████ IH Tr.) at 26; ████ Dep. at 208-210; PX00403 (███████ Decl.) ¶ 6; PX00466 (███ Decl.) ¶ 6; PX07001 (███████ Supp. Decl.) ¶ 12; PX07006 (████████ Supp. Decl.) ¶ 8; PX07017 (███████ Supp. Decl.) ¶ 7; PX07018 (██████ Supp. Decl.) ¶ 8; PX07021 (███████ Supp. Decl.) ¶ 7.  *See also* ████████ Dep. at 181-183.
[21] ████ Dep. at 113-14; ████ Dep. at 84; ███████ Dep. at 166-67, 214-15; ████ Dep Tr. at 147-48; ████ Dep. at 63; PX00466 (███ Decl.) ¶ 6; PX00480 (███ Decl.) ¶ 11.  *See also* ████ Dep. at 181-83.
[22] *See, e.g.*, ████ Dep. at 165-67; 181-183; ████ Dep. at 198; ███████ Dep. at 113-14; ████████ Dep. at 109, 127-28, 209-10, 227, 229; ███████ Dep. at 111-12; ████████ Dep. at 124-26; PX07011 (███ Supp. Decl.) ¶ 5. ████ Dep. at 182; ████ Dep. at 139; ████ Dep. at 220-21; ████ Dep. at 122; ████ Dep. at 136-37; ████ Dep. at 115; ████ at 128; ████ Dep. at 141-142.
[24] *See, e.g.*, ████ Dep. at 167, 182; ████ Dep. at 120-22; ████ Dep. at 86; ████ Dep. at 220-221; ████ Dep. at 136-137; ████ Dep Tr. at 153-155; ████ Dep. at 48-49; ████ Dep. at 124-126; ████ Dep. at 209-10; PX07010 (███████ Supp. Decl.) ¶ 6; PX07011 (███ Supp. Decl.) ¶ 5.
[25] ████ Dep. at 182.
[26] *See, e.g.*, ████ Dep. at 140-42; ████ Dep. at 124; ████ Dep. at 222-23; ████ Dep. at 105-06, 133; ████ Dep. at 157; ████ Dep. at 219-20; ████ Dep. at 170-71, 210-12; ████ Dep. at 117; ████ Dep. at 150; ████ Dep. at 181; ████ Dep. 161-62; ████ Dep. at 126-27, 130; PX07014 (███████ Supp. Decl.) ¶ 6.  *See also* ████ Dep. at 88-89, 91-92, 207.
[27] ████ Dep. at 157; ████ Dep. at 106, 133; ████ Dep. at 183-85; ████ Dep. at 222-23; ████ Dep. at 140-42; ████ Dep. at 219-20; ████ Dep. at 124.  *See also* PX00500 (███████ IH Tr. at 110-11); ████ Dep. at 126.
[28] *See, e.g.*, ████ Dep. at 185.  *See also* ████ Dep. at 35.

██████████████████████,[29] and ████████████████████████████████████████
█████████████████████████.[30]  Other distributors have similar experiences.[31]

At the local level, however, even foodservice operators that sometimes shop at cash-and-carry stores today, including many of Defendants' customer-declarants, emphasize that they could not switch a significant portion of their business to cash-and-carry stores.[32]  In particular, local foodservice operators are willing to pay higher prices for products delivered by broadline distributors in order to avoid the time and expense of shopping at a cash-and-carry store.[33]  Indeed, switching to cash-and-carry stores is even more difficult than switching to specialty distribution, principally because of the lack of a delivery option at cash-and-carry stores.[34]

### d.  National Customers and Local Customers Are Distinct

As explained in Plaintiffs' opening Brief, it is appropriate to analyze the merger's effects separately for National Customers and local customers.  *See* Br. at 14.  National Customers are fundamentally different from local foodservice operators because their foodservice distribution requirements span a number of locations that are geographically dispersed.  The difference between National Customers and local customers is not just administrative, as Defendants claim.  Opp. at 14.  This reality is confirmed not only by Plaintiffs' slew of National Customer



[29] ████████████████ Dep. at 102-04; ████████████ Dep. at 52-56.
[30] *See, e.g.,* ████████████████████ Dep. at 102-04.  *See also* PX03114-003, 004; ████████████████ Dep. at 113.
[31] *See, e.g.,* PX07024 ████████████████ Supp. Decl.) ¶ 11; ████████████████ Dep. at 138-39; PX00438 (███████████ Decl.) ¶ 10; PX00460 (███████████ Decl.) ¶ 12.  *See also* ████████████████ Dep. at 42-44; PX00433 (████ Decl.) ¶ 7; PX00428 (████ Decl.) ¶ 7.
[32] *See, e.g.,* ████████████████ Dep. at 170-71, 210-12; ████████████ Dep. at 182-83; ████████ Dep. at 115-17; PX07006 (████████████ Supp. Decl.) ¶ 9; PX07008 (███████████ Supp. Decl.) ¶¶ 10-11; PX07010 (███████████ Supp. Decl.) ¶ 6; PX07012 (███████████ Supp. Decl.) ¶ 5; PX07020 (███ Supp. Decl.) ¶ 6; PX07007 (███████████ Supp. Decl.) ¶ 5; PX07014 (████████████ Supp. Decl.) ¶ 6; PX07005 (███████████ Supp. Decl.) ¶ 7; PX07002 (████████████ Supp. Decl.) ¶ 6.
[33] *See, e.g.,* PX07022 (████████████ Supp. Decl.) ¶ 6; PX07008 (███████████ Supp. Decl.) ¶ 10; ████████ Dep. at 98-99; ████████████ Dep. at 182-83; ████████████ Dep. at 135-36.
[34] *See, e.g.,* ████████ Dep. 106; ████████████ Dep. 220-221; ████████ Dep. 115-116; ████████ Dep. 161; ████████████ Dep. 183-185.  *See also* ████████ Dep. at 52.

Declarants[35]—the vast majority of which Defendants inexplicably opted ***not*** to subpoena or depose in this case[36]—but also by other evidence, including Defendants' own documents prepared in the ordinary course of business.[37]

For example, Defendants' integration consultant



[38]

[39] US Foods' documents describe

[40] Similarly, PFG, the proposed divestiture buyer in this case,

[41]

[42] Likewise,

---

[35] *See, e.g.,* PX07019 (▮ Decl.) ¶¶ 6, 8-11, 14, 17; PX00436 (▮ Decl.) ¶¶ 9, 16; PX00466 (▮ Decl.) ¶ 8; PX00404 (▮ Decl.) ¶ 4; PX00402 (▮ Decl.) ¶¶ 6, 8, 14; PX00441 (▮ Decl.) ¶¶ 6, 8; PX00439 (▮ Decl.) ¶¶ 5-7; PX00418 (▮ Decl.) ¶ 8; PX00419 (▮ Decl.) ¶¶ 6, 8; PX00427 (▮ Decl.) ¶¶ 5, 9; PX00401 (▮ Decl.) ¶ 12; PX00454 (▮ Decl.) ¶¶ 9-10.
[36] Defendants did not subpoena

[37] *See, e.g.,* PX01054 at 005; PX03000 at 014; PX03101 at 020; PX03220 at 008-011; PX03034 at 006; PX05049 at 020.
[38] PX09010 at 004 (emphasis added).
[39] *Id.*
[40] PX03122-004.
[41] PX00429 (▮ Decl.) ¶¶ 15-16, 19, 23.
[42] PX09060-013 (emphasis added).

███████████████████████████████████████████████[43]

The very existence of Distribution Market Advantage ("DMA"), which brings together a group of regional distributors under a common umbrella to attempt to compete for National Customers, is evidence that there is a distinct class of customers with geographically dispersed footprints that contract for and demand broadline distribution across their facilities.[44]

Despite Defendants' attempt to distinguish Plaintiffs' approach to market definition from the approach taken by Dr. Israel (*see* Opp. at 2, 11-12), there is no difference in how Plaintiffs and Dr. Israel analyze the proposed merger. Both use the *Merger Guidelines* to define the relevant product market as broadline foodservice distribution services, with Plaintiffs relying on controlling case law as well.[45] Within that product market, both conclude that it is appropriate to analyze the competitive effects of the merger separately for National Customers and local customers.[46] Defendants' characterization of Dr. Israel's analysis as somehow substantively at odds with the Plaintiffs is superficial, at best.

### 2. For National Customers, the Relevant Geographic Market Is National

Defendants' argument that there is no nationwide geographic market for National Customers flies in the face of their own expert's testimony[47] and cannot be reconciled with *Grinnell* or this Court's decision in *Cardinal Health*, cases Defendants' Opposition does not even address. The contractual practices and other factors that led the Supreme Court to find a national geographic market in *Grinnell* are readily present in this case. As in *Grinnell*, Defendants' individual distribution centers may be "in a sense local," but the presence of other

---

[43] ████████ Dep. at 79-81.
[44] *See* ████████ Dep. at 219 ("████████████").
[45] Br. at 12-14; PX09350 (Israel Report) § II(C); PX09375 (Israel Rebuttal Report) § II(D).
[46] Br. at 14; PX09350 (Israel Report) § II(D) (discussing national and local customers in the context of Section 4.1.4 of the *Merger Guidelines*, which is entitled "*Product* Market Definition with Targeted Customers") (emphasis added); PX09375 (Israel Rebuttal Report) ¶ 16.
[47] *See* Hausman Dep. at 132-33. *See also* Hausman Report (Opp. Ex. 14) ¶ 30.

factors knits these local units together to constitute a national footprint that is relevant for antitrust purposes.  As in *Grinnell*, Defendants plan on a national level, including by maintaining "national account" teams dedicated to serving National Customers;[48] they deal with multistate businesses on the basis of nationwide contracts;[49] their contracts with customers, like other broadliners that may service part of a National Customer's business, cover activities in many states;[50] and the pricing, service, and other terms contained in those contracts apply across regions regardless of customer location.[51]  *See Grinnell*, 384 U.S. at 575-76.  *See also Cardinal Health*, 12 F. Supp. 2d at 50 (finding a national geographic market) (citing *Grinnell*, 384 U.S. at 575).

### 3. For Local Customers, Numerous Local Areas Are Relevant Geographic Markets

Defendants also miss the mark by arguing that Dr. Israel's methodology for defining local geographic markets affected by the merger yields markets that are too narrow.  Opp. at 27-28.  Defendants offer no alternative methodology, much less calculate what their market shares would be using an alternative methodology.  Instead, they assert that Dr. Israel's methodology is "arbitrary" because it does not account for competitors' ability to enter and compete.  *Id.* at 26-27.  But, as Dr. Israel's detailed report explains, he used accepted (and conservative) methods to define the local markets in this case.

To define local markets, Dr. Israel follows the *Merger Guidelines*, "building up the

---

[48] *See, e.g.*, ███████ Dep. at 40-41, 81-84; ███████ Dep. at 235-36; ███████ Dep. at 76, 78; PX00507 (███████ IH Tr. at 226-27). *See also* PX01064 at 001; PX09010 at 004.
[49] *See, e.g.*, ███████ Dep. at 86-87, 90-91; ███████ Dep. at 90-91; ███████ Dep. at 9-10, 44-45; ███████ Dep. at 19; PX00073 at 001-002; PX00287 at 005. *See also* PX09299.
[50] *See, e.g.*, ███████ Dep. at 90-91; ███████ Dep. at 146-47; ███████ Dep. at 19-20; PX00436 (███████ Decl.) ¶¶ 3, 6; PX00437 (███████ Decl.) ¶¶ 2, 7-9. *See also* PX09299.
[51] *See, e.g.*, ███████ Dep. at 90-91; PX00509 (███████ IH Tr. at 117-18); ███████ Dep. at 147; ███████ Dep. at 19-20; ███████ Dep. at 104; PX00436 (███████ Decl.) ¶ 6; PX00445 (███████ Decl.) ¶ 4; PX00073 at 001, 007-008, 027-030; PX00287 at 008-009, 030; PX01084 at 032; PX01086 at 040 PX01107 at 015. *See also* PX09299.

candidate market starting from each party's locations, then adding the areas in which a customer

could find an alternative supplier until [he] reach[es] a geographic market over which a

hypothetical broadline monopolist could impose a SSNIP."[52]  Using this methodology, Dr. Israel

focuses on overlapping draw areas (the area within which a distribution center makes 75% of its

shipments to Local Broadline Customers (weighted by revenue)), or alternatively, CBSAs,

containing aggregations of relevant local customers.[53]  By defining geographic markets based on

market-specific draw areas, the size of a specific geographic market varies by locality.  An

"intentional feature" of Dr. Israel's approach designed to have "the benefit of expanding the area

from which the set of competitors is considered in markets where distributors tend to deliver at

farther distances (perhaps more rural areas) and contracting that area from which the competitive

set is drawn in markets where distributors tend to deliver in greater proximity to customers (often

urban markets where traffic and congestion are a factor)."[54]

Defendants do not put forth an alternative method to define geographic markets, but

instead attempt to confuse the issue by claiming that the distance travelled by distributors does

not matter to customers.  *See* Opp. at 28-29.  Nothing could be further from the truth.  Many

National Customers and local customers testified that distance is important to them and informs

their choice of a distributor.[55]  The customer testimony that Defendants cite is taken out of

---

[52] PX09350 (Israel Report) ¶ 97.  *See also id.* ¶ 216; PX09375 (Israel Rebuttal Report) ¶ 55.
[53] PX09350 (Israel Report) ¶¶ 12, 220.  Overlap areas are defined "as the overlap of the 75 percent draw areas for Sysco and USF distribution centers."  *Id.* ¶ 221, n.406.  A Core Based Statistical Area (CBSA) is a grouping of adjacent metropolitan areas drawn according to commuting patterns.  *Id.*  Dr. Israel confirms that his results are stable and robust using alternative calculations, including 90 percent draw areas and a 95 percent scaled draw area methodology.  *Id.* ¶ 98; PX09375 (Israel Rebuttal Report) ¶ 58.
[54] PX09375 (Israel Rebuttal Report) ¶ 56 n.90, ¶ 57 n.91.
[55]  ███████████ Dep. 15, 192-193; ████████ Dep. 104-105; ██████████ Dep. 129; ████████ Dep. 134-135; ██████ Dep. 217-218; ████████ Dep. 159-160; ██████ Dep. 22-23; ████████ Dep. 140-141; █████ Dep. 107; PX07003 (██████ Supp. Decl.) ¶ 8; PX07009 (████████ Supp. Decl.) ¶ 6; PX07014 (███████████ Supp. Decl.) ¶ 7; PX07020 (███████ Supp. Decl.) ¶ 3.

15

context and is immensely misleading.[56]  Defendants also cite to Dr. Bresnahan's switching study

as evidence that distributors from outside the relevant geographic market sell to customers within

the market, but that study is deeply flawed and unreliable.[57]  Furthermore, Defendants claim that

distributors travel distances far greater than Plaintiffs state, but then cite an example of

distribution to "select chain customers" rather than broadline distribution.[58]  *See* Opp. at 29 n.92.

Plaintiffs recognize that systems distributors service customers at far greater distances than

broadline distributors; indeed, that is one of the defining characteristics of systems distribution.[59]

### 4.  The Merger Is Presumptively Illegal in the Relevant Markets

The merger will combine the two largest broadline distributors in the country, which

together account for 75% of the sales to National Customers.  Importantly, Plaintiffs' national

market shares include all sales made by broadline distributors to National Customers regardless

of contracting model (e.g., sole or multi-source).  Thus, even accounting for National Customers

that bid their business regionally or contract with multiple distributors, National Customers still

overwhelmingly use Defendants for broadline distribution services.  The combined firm will also

have a commanding presence in 32 local markets, in each of which Defendants' combined share



[56] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Dep. 128 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; *id.* at 130 (▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ ); *cf.* Opp. at 28. ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Dep. 132-33.  *See also id.* at 228-30.
[57] *See* PX09375 (Israel Rebuttal Report) § III(b)(2)(a).
[58] ▮▮▮▮▮▮▮ Dep. 66 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).  *See also id.* at 57-58
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ .
[59] Importantly, the existence of some long-distance delivery from out-of-market distributors does not invalidate an
analysis of the relevant market that focuses on the area of competition between Sysco and US Foods.  As
Defendants point out, foodservice distribution customers have idiosyncrasies, and some may have reason to tolerate
the decline in service and increased cost associated with distribution from a distance.  Rather, the evidence from
Defendants and third parties shows that the overwhelming majority of broadline foodservice distribution occurs
close to the distribution center, and thus forms the basis for competitive decisions made by the companies (tailored
to the revealed preferences of customers to *typically* buy from a proximate distributor).

is greater than 50%.

Defendants do not directly address Plaintiffs' market shares for broadline services sold to National Customers.  Instead, they merely claim that Defendants' "combined 'market share' nearly triples, to 78%" from 27%, as a result of the Plaintiffs' market definition.  Opp. at 6, 10, 16.  This comparison is meaningless because Defendants have not defined *any* relevant antitrust market, much less calculated shares in such a market.  *See In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1467 (C.D. Cal. 1988) ("Evidence of market share, however, is only important after the relevant market has been defined."), *aff'd sub nom.*, *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991).

In any merger case, all that is required by the courts is that market share estimates be "reliable, reasonable, [and a] close approximation of relevant market share data" that accurately represent "the broad picture."  *H&R Block*, 833 F. Supp. 2d at 72; *FTC v. PPG Indus., Inc.*, 628 F. Supp. 881, 884 n.6 (D.D.C. 1986) ("[I]n the compilation of [market share] statistics . . . precision in detail is less important than the accuracy of the broad picture presented.") (quoting *Brown Shoe*, 370 U.S. at 342 n.69), *rev'd in part on other grounds*, 798 F.2d 1500 (D.C. Cir. 1986); *accord U.S. v. Cont'l Can Co.*, 378 U.S. 441, 459 n.10 (1964).  Defendants' extremely high market shares are confirmed by their ordinary course documents[60] and the various iterations of market share that Dr. Israel calculates as a robustness check.[61]  *See U.S. v. Bazaarvoice, Inc.*, No. 13-cv-133, 2014 WL 203966, at *69 (N.D. Cal. Jan. 8, 2014) ("The Court recognizes that the above measures do not perfectly capture the combined entity's share of the R&R market. Nonetheless, each of the measures reveals the same basic market structure:  that Bazaarvoice and PowerReviews are the two dominant providers of R&R and they have a combined market share

---

[60] *See, e.g.*, PX03123 at 064-064; PX03152 at 025; PX01080 at 001; PX03130 at 001.
[61] PX09350 (Israel Report) §§ III(A)(2), IV(A).

in excess of 50 percent.").  And Dr. Israel points out that if all broadline customers (national and local) are included in the market share calculations—which seems to be the implication of Defendants' argument—Sysco's post-merger market share would *increase* in local markets.[62]

### B.  Defendants Have Not Rebutted the Strong Presumption of Illegality or Plaintiffs' Showing of Likely Competitive Harm

With the strong presumption that the merger will substantially lessen competition firmly established, "the burden shifts to the defendants to rebut the presumption by 'show[ing] that the market-share statistics give an inaccurate account of the merger's probable effects on competition in the relevant market.'"  *H&R Block*, 833 F. Supp. 2d at 49-50 (quoting *Heinz*, 246 F.3d at 715).

### 1.  Plaintiffs' Unilateral Effect Theory Is Consistent with the Merger Guidelines and the Case Law

Courts in this Circuit have recognized that a merger is likely to generate anticompetitive effects if "the products controlled by the *merging* firms [are] close substitutes, *i.e.,* 'a substantial number of the customers of one firm would turn to the other in response to a price increase.'"[63] *H&R Block*, 833 F. Supp. 2d at 81 (quoting *CCC Holdings*, 605 F. Supp. 2d at 68) (emphasis in *H&R Block*).  Unilateral anticompetitive effects are likely if a "merger between two competing sellers prevents buyers from playing those sellers off against each other in negotiations," which

---

[62] PX09350 (Israel Report) ¶¶ 225-26; Table 7.

[63] While *H&R Block* and *Swedish Match* set forth the correct legal standard, Defendants mischaracterize the law as requiring that "the defendants' products are customers' top two choices."  Opp. at 36.  Defendants also incorrectly claim that "the FTC must show *actual* anticompetitive effects . . . ."  Opp. at 35 (emphasis added).  Section 7 of the Clayton Act prohibits any acquisition "where in any line of commerce . . . the effect of such acquisition *may be* substantially to lessen competition, or tend to create a monopoly."  15 U.S.C. § 18 (emphasis added).  "Congress used the words 'may be' . . . to indicate that its concern was with probabilities, not certainties" and to "arrest restraints of trade in their incipiency and before they develop into full-fledged restraints."  *Brown Shoe*, 370 U.S. at 323 & n.39 (finding that a "requirement of certainty . . . of injury to competition is incompatible" with Congress' intent of "reaching incipient restraints.").  Thus, to establish a Section 7 violation, "the FTC need not show that the challenged merger or acquisition *will* lessen competition, but only that the loss of competition is a 'sufficiently probable and imminent' result of the merger or acquisition."  *CCC Holdings*, 605 F. Supp. at 35.  Plaintiffs have more than met this burden, providing abundant evidence that the merger between Sysco and US Foods is likely to cause anticompetitive harm.

"alone can significantly enhance the ability and incentive of the merged entity to obtain a result more favorable to it, and less favorable to the buyer, than the merging firms would have offered separately absent the merger."  *Merger Guidelines* § 6.1; *Swedish Match*, 131 F. Supp. 2d at 168-70.  This is precisely the case here.

The evidence demonstrates that for many broadline customers, Defendants are the top two—and for some the only two—options for broadline distribution services,[64] are each other's largest and closest competitors,[65] and thus are the implicit threat in negotiations.[66]  For example,

███████████████████████████████████████████████████████████████
█████████████████████████████████████████████████[67]  The record is replete with National Customers benefiting from head-to-head competition between only Sysco and US Foods to achieve better contract terms.[68]  One of Defendants' local customer-declarants in ███████████████████████ testified that he has "serious concerns about the effect of the proposed merger on [his] business" and is "glad that the FTC is challenging it" because if the merger goes through Sysco "will no longer have to deal with head-to-head competition from its closest competitor, US Foods."[69]  Another stated that he is "concerned that this merger will create a

---

[64] *See, e.g.,* ██████████ Dep. at 111; ███████████ Dep. at 118-19; ██████████ Dep. at 175; ████████ Dep. at 52; ██████████ Dep. at 108-10; ████████ Dep. at 142; ████████ Dep. at 127; ██████████ Dep. at 222; ████████ Dep. at 124-25; 127-28; ████████ Dep. at 195, 210; PX03034-006, PX03100-004.
*See, e.g.,* ████████ Dep. at 112, 123-25, 137-39; ████████ Dep. at 111-12; ██████████ Dep. at 167; ████████ Dep. at 131; ██████████ Dep. at 133-34; ████████ Dep. at 122-23; ████████ Dep. at 195, 201; ████████ Dep. at 69; ██████████ Dep. at 113-15; PX01006 at 005, 006, 011; PX07001 ( Supp. Decl.) ¶ 7; PX07000 ( ████████ Supp. Decl.) ¶ 4.
[66] *See, e.g.,* ██████████ Dep. at 164; ████████ Dep. at 213-15; PX07019 ( Decl.) ¶ 21; ████████ Dep. at 174-75; ████████ Dep. at 131; ████████ Dep. at 82-83, 138-39; ████████ Dep. at 217-19; ████████ Dep. at 121-122; ████████ Dep. at 193-94.
[67] PX01388-004 (emphasis added).
[68] *See, e.g.,* PX01451; PX01425; PX03212; PX01032; PX03212; PX00277; PX03268.
[69] PX07020 (████████ Supp. Decl.) ¶ 7.

monster company."[70]

Defendants' arguments to the contrary are unpersuasive.  First, they argue that because

Sysco and US Foods merely provide a drayage function, any distributor, regardless of size, with

a warehouse and a truck could be an equally important competitor—"a truck is a truck and a

warehouse is a warehouse."  *See* Opp. at 36-37.  This ignores that Defendants offer value added

services,[71] promote their scale to potential customers,[72] and make the majority of their sales to

customers that use large numbers of distribution centers.[73]  As to local customers, Defendants

say merely that "[t]he FTC's theory of harm would require it to show that local restaurants will

have no real options post-merger."  Opp. at 37.  Yet, proving that this is a merger to monopoly is

not what the law requires.  *See* Section I(B)(3), *infra*.  The overwhelming evidence that Sysco

and US Foods are close competitors for both National Customers and local customers in the 32

local markets at issue demonstrates that unilateral anticompetitive harm to such customers from

this transaction is likely.

### 2.  The PFG Expansion Does Not Counteract the Merger's Anticompetitive Effects

PFG's expansion clearly does not "replac[e] the competitive intensity lost as a result of

the merger . . . ."  *See* Opp. at 38 (quoting Antitrust Division, U.S. Dep't of Justice, *Policy Guide

to Merger Remedies* at 5 (Oct. 2004)).  ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████[74] ████████████████████████████████████████████████████

---

[70] PX07012 (█████████ Supp. Decl.) ¶ 8.
[71] *See, e.g.*, PX01460 at 028-032 (████████████████████████████████████████);
PX00320-027.
[72] *See, e.g.*, PX01460-001 ██████████████████████████████████████████████).
[73] Even if some National Customers seek to use fewer distribution centers—as Defendants claim without citation—
Defendants still benefit from their ability to provide an optimal network to those customers based on a larger and
denser geographic footprint.  *See, e.g.*, ████████████████ Dep. at 134.
[74] ████████████ Dep. at 112:13-113:19 (discussing PX09257).



[75]

[76]

Even with the divestitures, PFG would lack geographic coverage ███████████ ███████████████████████████[77] ████████████████████████████████,[78] ██████████ ██████████,[79] ████████████████████████,[80] and ███████████████ █████████████████████████[81] ████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████[82] Thus, PFG's acquisition is fraught with risks. ████████ ████████████████████████████████████████████████████████████████

---

[75] *See* PX09157-0002 ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *See, e.g.,* PX09152; PX09153; PX09174; PX09185-008; PX09193-001; PX09194-006, 008; PX09197. *See also* ████████. at 277. ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████ *See* ████████ Dep. at 139-40, 144, 153; PX09190; PX09192. *See also* PX09070 ████████████████████ ████████████████████████████████████████████████████████████████ ████████; PX00429 (████████████ Decl.) ¶ 27.
[76] ████████ Dep. at 198-99.
[77] PX09060-013-015. ████████████████████ *See* ████████ Dep. at 198-99.
[78] *See, e.g.,* PX09350 (Israel Report) ¶¶ 339-344. *See also* ████████ Dep. at 240; ████████ Dep. at 14-15; ████████ Dep. at 130-131; ████████ Dep. at 155.
[79] *See* PX05051-001, 002; PX09182-001, 071.
[80] PX09060-002 (████████████████████████████████████████████████████████ ████████████████████████████████████). *See also* PX09015; ████████ Dep. at 207-08, 218-24. ████████ Dep. at 15.
[81] *CCC Holdings*, 605 F. Supp. 2d at 59. ("Mitchell's counsel [Richard Parker] has [ ] observed that it is a 'problem' to allow 'continuing relationships between the seller and buyer of divested assets after divestiture, such as a supply arrangement or technical assistance requirement, which may increase the buyer's vulnerability to the seller's behavior.'" (citing Richard G. Parker & David A. Balto, *Evolving Approach to Merger Remedies*, ANTITRUST REPORT (May 2000), available at https://www ftc.gov/public-statements/2000/05/ evolving-approach-merger-remedies)). As in *CCC Holdings*, although the combined Sysco/US Foods "will relinquish its financial interests in [the 11 US Foods distribution centers] upon consummation of the merger, ████████████████████████████ ████████████████████████ *Id.* at 59; PX01362-004.
[82] *See* PX09060.

█████████████ 83 ███████████████████████ National Customers agree that PFG would not be an effective replacement for US Foods as a national competitor.[84]

### 3. The Remaining Competitors Cannot Constrain the Merged Firm

Defendants further argue that both National Customers and local customers have other broadline alternatives. *See* Opp. at 30-35, 39-41.[85] But Plaintiffs do not allege a merger to monopoly. *See* Br. at 27-34. There is no legal support for Defendants' suggestion that only a merger to monopoly may violate the Clayton Act. *See FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (1083) (N.D. Ill. 2012) (holding that the FTC is not "required to show that all competition will be eliminated as the result of a merger").

Defendants claim that small competitors will become *more* of a competitive constraint post-merger. Yet, where the merger "eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage," the merger is likely to cause competitive harm.[86] As *H&R Block* makes clear, that harm occurs even if other competitors are present in the marketplace. *H&R Block*, 833 F. Supp. 2d at 81-89 (blocking the merger even though a competitor with more than 60% share still existed). In any event, National Customers make clear that other broadline competitors will not replace the competition lost through this merger because those competitors lack sufficient geographic coverage,[87] product breadth,[88] or other

---

[83] PX09169.

[84] *See, e.g.,* ███████████████ Dep. at 111-12; ███████████████ Dep. at 90-91, 140-174; PX07019 (█████ Decl.) ¶ 25; PX00514 (████████████ IH Tr. at 261-63. *See also* PX09299 at 005-006 ████████████ ███████████████████████████████████████████ ).

[85] They also reiterate their arguments that other non-broadline alternatives exist, which we address in the discussion of product market above.

[86] PX06059 (*Merger Guidelines*) § 8.

[87] *See, e.g.,* ███████████████ Dep. at 140-41; ███████████████ Dep. at 175-77; ████████ Dep. at 88-89, 95-96, 99, 114; ██████████ Dep. at 203; ██████████ Dep. at 90-91, 150-51, 174; PX07019 (████ Decl.) ¶¶ 19, 25; PX00436 (████ Decl.) ¶ 18.

[88] *See, e.g.,* PX07019 (████ Decl.) ¶¶ 20, 25; ██████████ Dep. at 83-85.

22

important competitive offerings.[89]  Local customers similarly would not have similarly

competitive alternatives because other broadline distributors charge higher prices,[90] and do not

offer adequate product breadth,[91] customer service,[92] or the ability to make regular on-time

deliveries.[93]

### 4.  New Entry Will Not Counteract the Likely Anticompetitive Effects

Defendants similarly fail to meet their burden on ease of entry.  *See Staples*, 970 F. Supp.

at 1086 (describing defendants' burden to show entry sufficient to avert anticompetitive effects).

Defendants make no claim that entry is likely into the national market,[94] and their only two

examples of new entry show how difficult and time-consuming entry and expansion are.[95]

Defendants claim that ███████████████████████████████████████████████████

██████████████████████████████████████ Opp. at 41.[96]





[REDACTED] [98]  Likewise, Defendants' example of [REDACTED], a local broadline distributor that sells almost exclusively to customers in [REDACTED], is misplaced.[99]  *See* Opp. at 41-42.  It has taken [REDACTED] to reach its current size,[100] which is still miniscule compared to Defendants' sales in [REDACTED].[101]

### 5.  Powerful Buyers Cannot Protect Themselves in the Absence of Meaningful Alternatives

Many of the very "power buyers" Defendants point to as able to protect themselves have expressed concern about this merger.[102]  That is unsurprising because the degree to which buyers may influence the competitive landscape depends on the "choices available" to buyers and "how those choices likely would change due to the merger."[103]  Where the merger "eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage," however, the merger is likely to cause competitive harm.  *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 440 (5th Cir. 2008).  Thus, because the merger would combine the two largest and closest broadline foodservice distributors, it would eliminate even the most powerful buyers' ability to "swing back and forth between competitors post-acquisition." *Chicago Bridge & Iron,*

---

[97] [REDACTED] Dep. at 200-03.
[98] [REDACTED] Dep. at 203.
[99] PX00414 ([REDACTED] Decl.) ¶ 5 ("[REDACTED]").
[100] *See* [REDACTED] Dep. at 32.
[101] *See* PX09350 (Israel Report) Table 43 (showing Sysco and US Foods, combined, have a market share of [REDACTED]).
[102] Defendants do not cite a single broadline customer in their discussion of "sophisticated foodservice customers." Opp. at 42.  The only customer they cite is [REDACTED], which requires systems distribution services. *See* [REDACTED] Dep. at 119-20.  Many of Defendants' largest customers have submitted complaints about the merger. *See, e.g.*, PX00403 ([REDACTED] Decl.) ¶ 14; PX00404 ([REDACTED] Decl.) ¶ 12; PX00407 ([REDACTED] Decl.) ¶ 12; PX00419 ([REDACTED] Decl.) ¶ 10; PX00436 ([REDACTED] Decl.) ¶ 17; PX00439 ([REDACTED] Decl.) ¶ 11; PX00441 ([REDACTED] Decl.) ¶ 10; PX00466 ([REDACTED] Decl.) ¶ 11; PX00493 ([REDACTED] Supp. Decl.) ¶ 2.
[103] PX06059 (*Merger Guidelines*) § 8.

534 F.3d at 440.

### 6.   Defendants Fail to Show that Efficiencies Counteract the Likely Anticompetitive Effects of the Merger

Defendants cannot meet their high burden to show that efficiencies will outweigh the demonstrable competitive harm this merger would cause.  *See Heinz*, 246 F.3d at 720 ("[T]he high market concentration levels present in this case require, in rebuttal, proof of extraordinary efficiencies, which the appellees fail to supply.").[104]  Defendants have not shown that the projected efficiencies are cognizable or that they would offset the likely and substantial competitive harm of the merger.  Even if they could, Defendants cannot show that such savings would be passed on to customers.  In fact, ██████████████████████████████████ ████████████████  Br. at 44 (citing PX06126-001, 002).

## II.  <u>The Equities Heavily Favor a Preliminary Injunction</u>

Defendants' equities argument is merely a rehash of their efficiencies claims and, therefore, does not save Defendants' anticompetitive merger.  *See, e.g.*, *Whole Foods*, 548 F.3d at 1041 ("[A] 'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction."); *Heinz*, 246 F.3d at 726-27.  Rather, the balance of the equities weighs heavily in favor of enforcement of the antitrust laws.  Br. at 44-45.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs respectfully request that the Court grant the preliminary injunction.

---

[104] Indeed, efficiencies have never saved an otherwise anticompetitive merger.  *See CCC Holdings*, 605 F. Supp. 2d at 73; *Heinz*, 246 F.3d at 720-21.

Dated:  April 29, 2015

Of counsel:

   DEBORAH L. FEINSTEIN (D.C. Bar 412109)
Director
Federal Trade Commission
Bureau of Competition

   JONATHAN NUECHTERLEIN (D.C. Bar 442470)
General Counsel
Federal Trade Commission

   ALEXIS GILMAN (D.C. Bar 483229)
Assistant Director

   MARK D. SEIDMAN (D.C. Bar 980662)
Deputy Assistant Director

   MELISSA L. DAVENPORT (D.C. Bar 990479)
CHRISTOPHER J. ABBOTT (D.C. Bar 1014487)
THOMAS H. BROCK (D.C. Bar 939207)
KRISHA A. CERILLI (D.C. Bar 983281)
MICHAEL B. DERITA
DAVID J. LAING (D.C. Bar 418597)
MATTHEW MCDONALD
STEPHEN A. MOHR (D.C. Bar 982570)
JEANNE LIU NICHOLS
MICHAEL J. PERRY
RYAN K. QUILLIAN (D.C. Bar 994846)
KRISTIAN ROGERS
CATHERINE M. SANCHEZ
SOPHIA VANDERGRIFT (D.C. Bar 1005319)

Attorneys
Federal Trade Commission
Bureau of Competition
Mergers IV Division

Respectfully Submitted,

  /s/ Stephen Weissman     

STEPHEN WEISSMAN
(D.C. Bar 451063)
Deputy Director
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Ave., NW
Washington, DC 20580
Telephone: (202) 326-2030
Email: sweissman@ftc.gov

*Attorney for Plaintiff Federal Trade
Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of April, 2015, I served the foregoing on the

following counsel via electronic mail:

Richard Parker
Ian Simmons
Edward Hassi
Katrina M. Robson
Haidee Schwartz
Steve Segal
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5380
rparker@omm.com
isimmons@omm.com
ehassi@omm.com
krobson@omm.com
hschwartz@omm.com
ssegal@omm.com


*Counsel for Defendant Sysco Corporation*


Joseph F. Tringali
Peter C. Herrick
Philip A. Mirrer-Singer
Andrea B. Levine
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-3840
jtringali@stblaw.com
peter.herrick@stblaw.com
pmirrer-singer@stblaw.com
alevine@stblaw.com


*Counsel for Defendants USF Holding Corp. and*
*US Foods, Inc.*

Tracy W. Wertz
Chief Deputy Attorney General
Commonwealth of Pennsylvania
Pennsylvania Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
717-787-4530
twertz@attorneygeneral.gov


*Counsel for Plaintiff Commonwealth of Pennsylvania*

Sarah Oxenham Allen
Assistant Attorney General
Consumer Protection Section
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
804-786-6557
SOAllen@oag.state.va.us


*Counsel for Plaintiff Commonwealth of Virginia*

Nicholas A. Bush
Assistant Attorney General
441 4th Street, N.W., Suite 600 South
Washington, D.C. 20001
202-442-9841
nicholas.bush@dc.gov


*Counsel for Plaintiff District of Columbia*


Abiel Garcia
Deputy Attorney General
Office of the Attorney General of California
300 South Spring Street, Suite 1700
Los Angeles, CA 90013
213-897-2691
abiel.garcia@doj.ca.gov


*Counsel for Plaintiff State of California*

Robert W. Pratt
Office of Illinois Attorney General
100 West Randolph Street
Chicago, IL 60601
312-814-3722
rpratt@atg.state.il.us


*Counsel for Plaintiff State of Illinois*

Layne M. Lindebak
Assistant Attorney General
Iowa Department of Justice
Hoover Office Building, Second Floor
1305 East Walnut Street
Des Moines, IA 50309
515-281-7054
Layne.Lindebak@iowa.gov


*Counsel for Plaintiff State of Iowa*

Gary Honick
Assistant Attorney General
Office of the Maryland Attorney General
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6470
ghonick@oag.state.md.us


*Counsel for Plaintiff State of Maryland*


Benjamin Velzen
Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-757-1235
benjamin.velzen@ag.state.mn.us


*Counsel for Plaintiff State of Minnesota*

Collin Kessner
Assistant Attorney General
Office of the Nebraska Attorney General

2115 State Capitol
Lincoln, NE 68509-8920
402-471-2683
collin.kessner@nebraska.gov


*Counsel for Plaintiff State of Nebraska*

Kimberly R. Parks
Antitrust Division
150 E. Gay Street, 23rd Floor
Columbus, OH 43215
(614) 466-4328
Kimberly.Parks@ohioattorneygeneral.gov


*Counsel for Plaintiff State of Ohio*

Victor J. Domen, Jr.
Senior Antitrust Counsel
Office of the Attorney General and Reporter
500 Charlotte Avenue
Nashville, TN 37202
(615) 253-3327
Vic.domen@ag.tn.gov


*Counsel for Plaintiff State of Tennessee*



April 29, 2015                                          By:      /s/ Stephen Weissman
                                                                  Attorney