# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Federal Trade Commission, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 1:15-cv-00256 (APM) |
| | ) | |
| Sysco Corporation, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

**TABLE OF CONTENTS**

**INTRODUCTION** .................................................................................................. 1

**BACKGROUND** .................................................................................................... 3

I.    The Foodservice Distribution Industry ........................................................... 3

    A.    Overview ................................................................................................ 3

    B.    Channels of Foodservice Distribution .................................................. 4

        *1.*    *Broadline Distributors* ............................................................ 4

        *2.*    *Systems Distributors* .............................................................. 6

        *3.*    *Specialty Distributors* ............................................................ 7

        *4.*    *Cash-and-Carry and Club Stores* .......................................... 7

    C.    Foodservice Distribution Customers ..................................................... 8

        *1.*    *Group Purchasing Organizations* ........................................... 8

        *2.*    *Foodservice Management Companies* ...................................... 9

        *3.*    *Hospitality Chains* ................................................................. 9

        *4.*    *Restaurant Chains* ................................................................. 10

        *5.*    *Government Agencies* ............................................................. 10

        *6.*    *"Street" Customers* ............................................................... 10

II.    Case History ................................................................................................. 11

    A.    Sysco and USF ....................................................................................... 11

    B.    History of the Merger ............................................................................ 11

    C.    History of these Proceedings ................................................................. 12

**LEGAL STANDARD** ........................................................................................... 14

I.    Section 7 of the Clayton Act ........................................................................ 14

II.    Section 13(b) Standard for Preliminary Injunctions .................................... 14

III.    *Baker Hughes* Burden-Shifting Framework ................................................ 16

**DISCUSSION** ....................................................................................................... 17

I.    The Relevant Market .................................................................................... 17

    A.    Broadline Distribution as a Relevant Product Market .......................... 19

        *1.*    *Legal Principles Affecting the Definition of the*
            *Relevant Product Market* ........................................................ 19

        *2.*    *The Brown Shoe "Practical Indicia"* ...................................... 23

        *3.*    *Expert Testimony* ................................................................... 33

        *4.*    *Conclusion as to the Broadline Product Market* ..................... 41

    B.    National Broadline Distribution as a Relevant Product Market ............ 41

        *1.*    *Legal Basis for Defining Relevant Product Market*
            *Based on Customer Type* ......................................................... 42

        *2.*    *Evidence Supporting a National Broadline Product Market* ..... 44

i

C.      Product Market Summary ...................................................................... 60

D.      Relevant Geographic Market .................................................................. 60

         1.      *National Market* ................................................................................ 62

         2.      *Local Markets* .................................................................................. 62

II.     The Probable Effects on Competition................................................................ 66

A.      Concentration in the National Broadline Customer Market ................... 67

         1.      *Dr. Israel's National Broadline Customer
               Market Shares Calculations* ............................................................. 67

         2.      *Defendants' Arguments* ................................................................... 69

         3.      *The Court's Finding as to National Broadline Customer
               Market Shares* ................................................................................... 72

B.      Concentration in the Local Markets........................................................ 72

         1.      *Dr. Israel's Local Broadline Customer
               Market Shares Calculations* ............................................................. 72

         2.      *Defendants' Arguments* ................................................................... 74

         3.      *The Court's Finding as to Local Broadline Customer
               Market Shares* ................................................................................... 81

C.      Additional Evidence of Competitive Harm ............................................ 81

         1.      *Unilateral Effects—National Customer Market* ............................. 81

         2.      *Merger Simulation Model—National Customer Market* ................ 89

         3.      *Unilateral Effects—Local Markets* ................................................. 92

         4.      *Local Event Studies* ......................................................................... 97

         5.      *Summary* .......................................................................................... 99

III.    Defendants' Rebuttal Arguments....................................................................... 100

A.      PFG Divestiture ...................................................................................... 100

         1.      *Competitive Pressure Exerted by Post-Divestiture PFG* ................ 102

         2.      *Additional Disadvantages Faced by Post-Merger PFG* .................. 107

         3.      *Post-Merger PFG as an Independent Competitor* ........................... 109

B.      Existing Competition .............................................................................. 110

         1.      *Regionalization* ............................................................................... 110

         2.      *DMA* ................................................................................................ 112

         3.      *Conclusion as to Existing Competition* ........................................... 114

C.      Entry of New Firms and Expansion of Existing Competitors .............. 114

D.      Efficiencies ............................................................................................. 117

         1.      *Requirement for Merger-Specific and Verifiable Efficiencies* ....... 117

         2.      *Insufficiency of Estimated Merger-Specific Savings* ...................... 123

E.      Conclusion .............................................................................................. 124

IV.     The Equities ...................................................................................................... 125

**CONCLUSION** ..................................................................................................... 127

**INTRODUCTION**

Americans eat outside of their homes with incredible frequency. The U.S. Department of Commerce, for instance, recently reported, for the first time since it began tracking such data, that Americans spent more money per month at restaurants and bars than in grocery stores.[1] Of course, Americans eat out at many other places, too—sports arenas, school and workplace cafeterias, hotels and resorts, hospitals, and nursing homes, just to name a few. The foodservice distribution industry supplies food and related products to all of these locations. Foodservice distribution is big business. In 2013, the market grew to $231 billion. By some estimates, there are over 16,000 companies that compete in the foodservice distribution marketplace.

The two largest foodservice distribution companies in the country are Defendants Sysco Corporation ("Sysco") and US Foods, Inc. ("USF"). Both are primarily "broadline" foodservice distributors. As the name implies, a broadline foodservice distributor sells and delivers a "broad" array of food and related products to just about anywhere food is consumed outside the home. In 2013, Sysco's broadline sales were over $▮ billion and USF's were over $▮ billion.

In December 2013, Sysco and USF announced that they had entered into an agreement to merge the companies. Fourteen months later, in February 2015, Sysco and USF announced that they intended to divest 11 USF distribution facilities to the third largest broadline foodservice distributor, Performance Food Group, Inc., if the merger received regulatory approval.

On February 20, 2015, the Federal Trade Commission ("FTC") and a group of states filed suit in this court seeking an injunction to prevent the proposed merger. Specifically, under Section 13(b) of the Federal Trade Commission Act, the FTC asked this court to halt the proposed merger

---

[1] Michelle Jamrisko, *Americans' Spending on Dining Out Just Overtook Grocery Sales for the First Time Ever*, Bloomberg Business (Apr. 14, 2015), http://www.bloomberg.com/news/articles/2015-04-14/americans-spending-on-dining-out-just-overtook-grocery-sales-for-the-first-time-ever.

until the FTC completes an administrative hearing—scheduled to begin on July 21, 2015—to determine whether the proposed combination would violate Section 7 of the Clayton Act.

The precise question presented by this case is whether the court should enjoin Sysco and USF from merging until the proposed combination is reviewed by an FTC Administrative Law Judge. The real-world impact of the case, however, is more consequential. Sysco and USF have announced that they will not proceed with the merger if the court grants the requested injunction.

The proceedings in this case have been extraordinary. The FTC investigated the proposed merger for more than a year before filing suit. Then, within a two-month period, the parties worked tirelessly to exchange millions of documents, depose dozens of witnesses, and secure over a hundred declarations. The court heard live testimony for eight days in early May 2015. Counsel for the parties have done all of this work while exhibiting the highest degree of skill and professionalism.

Congress passed the Clayton Act to enable the federal government to halt mergers in their incipiency that likely would result in high market concentrations. Congress was especially concerned with large combinations that would impact everyday consumers across the country. The court has considered all of the evidence in this case and has reached the following conclusion: The proposed merger of the country's first and second largest broadline foodservice distributors is likely to cause the type of industry concentration that Congress sought to curb at the outset before it harmed competition. The court finds that the FTC has met its burden under Section 13(b) of the Federal Trade Commission Act of showing that the requested injunction is in the public interest. The court, therefore, grants the FTC's motion for preliminary injunctive relief.

## BACKGROUND

### I.    THE FOODSERVICE DISTRIBUTION INDUSTRY

#### A.    Overview

Defendants operate in a $231 billion foodservice distribution industry, where over 16,000 companies battle daily to sell food and related products to restaurants, resorts, hotels, hospitals, schools, company cafeterias, and so on—everywhere food is served outside the home. Hr'g Tr. 1324; DX-00329 at 17.  The types of customers served by the foodservice distribution industry come in all shapes and sizes.  They range from independent restaurants, to well-known quick-service and casual dining chains (*e.g.*, Five Guys, Subway, and Applebee's), to hospitality procurement companies and hotel chains (*e.g.*, Avendra, Hilton Supply Management, and Starwood Hotels and Resorts), to government agencies (*e.g.*, the U.S. Department of Veterans Affairs), to foodservice management companies (*e.g.*, Aramark, Sodexo, and Compass Group), to healthcare group purchasing organizations (*e.g.*, Premier, Novation, and Navigator).

The industry recognizes four general categories of foodservice distribution companies: (i) broadline distributors, (ii) systems distributors, (iii) specialty distributors, and (iv) cash-and-carry and club stores.  Customers commonly purchase from foodservice distributors in one or more of these different categories, or "channels," mixing and matching to suit their needs.  For example, customers may purchase products directly from a broadline distributor; they may contract with a brand-named food manufacturer (*e.g.*, Tyson Foods for chicken or Kellogg's for cereal) and use a broadline or systems distributor for warehousing and delivery; they may use specialty distributors for select items such as produce or seafood; or they may make their purchases at a cash-and-carry or club store (*e.g.*, Restaurant Depot or Costco).

3

Understanding these different channels of distribution and the different customers they serve is central to the antitrust analysis that this case demands. The court, therefore, describes below the sellers and buyers of foodservice distribution in the United States.

**B.      Channels of Foodservice Distribution**

*1.      Broadline Distributors*

Broadline distribution is characterized by several key features, including: (i) product breadth and depth; (ii) availability of private-label products; (iii) frequent and flexible delivery, including next-day service; and (iv) "value-added" services, such as menu and nutrition planning.

Broadline distributors offer thousands of distinct items for sale—known as "stock keeping units" ("SKUs") for inventory management purposes—in a wide array of product categories, including canned and dry goods, dairy, meat, poultry, produce, seafood, frozen foods, beverages, and even janitorial supplies such as chemicals, cleaning equipment, and paper goods. Broadliners also sell "private label" goods, which are akin to "Trader Joe's" or "Safeway" brand products found in those grocery stores. "Private label" products are often comparable in quality to their name-brand counterparts, but are cheaper in price. Because they are able to offer such a diverse array of products, broadline distributors market themselves to customers as a "one-stop shop," by virtue of their ability to supply most—if not all—food and related products needed by their customers. Customers value the breadth of product offerings and the opportunity to aggregate a substantial portion of their purchases with one distributor, allowing them to save costs. They also appreciate broadliners' high level of customer service, which usually includes next-day and emergency deliveries. Focusing heavily on individualized customer service, broadline distributors employ much larger salesforces than the other channels.

4

Broadline distributors come in different sizes.  The largest, by any measure, are Sysco and USF.  In 2013, Sysco and USF made $███ billion and $███ billion in broadline sales, respectively. PX09350-236, Table 44.  The next largest broadliner made less than $6 billion.  *Id.*  Sysco and USF are also the only two broadliners with true nationwide service capability.  Sysco and USF have 72 and 61 distribution centers, respectively—each with more than twice the number of distribution centers operated by the next-largest broadliners.  Because of their nationwide footprint, Sysco and USF are often referred to as "national" broadliners.  Combined, Defendants employ over 14,000 sales representatives.  No other broadliner employs more than 1,600. Defendants together operate over 13,000 trucks.  The next largest broadliners have just over 1,600.

The next tier of companies are "regional broadliners," so called because their distribution capabilities are concentrated in discrete regions of the United States.  The largest regional broadliner, Performance Food Group ("PFG"), is the country's third-largest broadliner in terms of sales.  PFG operates 24 broadline distribution facilities, mainly in the eastern and southern parts of the country and, in 2013, earned $6 billion in broadline revenue.  The next five largest regional broadline distributors, in order of 2013 revenues, are:  (i) Gordon Food Service, which has 10 distribution centers mainly in the Midwest, Florida, and Texas; (ii) Reinhart Foodservice, which has 24 distribution centers, primarily in the East and Midwest; (iii) Ben E. Keith Company, which has seven distribution centers in Texas and bordering states; (iv) Food Services of America, which has 10 distribution centers, concentrated in the Northwest; and (v) Shamrock Foods, which has four distribution centers in the Southwest and southern California.  These regional broadliners had 2013 revenues ranging from approximately $███ billion to $███ billion.

5

The last tier of broadliners have five or fewer distribution centers and 2013 revenues of less than $1.1 billion. Many of these operate in a single locality or region, like Shetakis Wholesalers, which has one distribution center in Las Vegas, Nevada.

Regional broadline distributors have formed consortiums to compete for customers with multi-regional distribution needs. The largest consortium is Distribution Market Advantage ("DMA"). DMA is a supply chain sales and marketing cooperative owned by nine independent regional distributors, which are also its members, including Gordon Food Service, Ben E. Keith, and Reinhart Foodservice. DMA does not own any trucks or distribution facilities; rather, its purpose is to coordinate the bidding, contracting, and operational processes of its members to meet the needs of large customers that require a distributor with extensive geographic coverage. Another consortium is Multi-Unit Group ("MUG"), an alliance of 19 broadline distributors who are part of UniPro Foodservice, a larger consortium that includes distributors in different channels. As explained later, these regional consortia have had mixed results in competing for large, geographically dispersed customers.

### 2. Systems Distributors

Systems distributors, also referred to as "custom" or "customized" distributors, primarily serve fast food, quick service, fast casual, and casual chain restaurants (e.g., Burger King, Wendy's, and Applebee's), which have fixed or limited menus. Unlike broadliners, systems distributors do not carry a large, diverse number of SKUs. Rather, their inventory profile is a small number of proprietary SKUs, which are manufactured specifically for the customer. For instance, the systems distributor for Wendy's carries and delivers the food products needed for Wendy's' menu and does not make those products available to others. As a result, systems distributors typically provide only warehousing and transport services. They do not offer private label products

or value-added services such as menu planning, and they have very small salesforces, if any. Systems distributors make large, limited-SKU deliveries on a fixed, limited schedule, and typically do not offer next-day or emergency deliveries.

Some foodservice distribution companies operate both systems and broadline divisions. For instance, Sysco operates SYGMA, a systems distribution division. SYGMA is run by a different set of executives and, for the most part, operated out of separate distribution centers. PFG offers systems distribution through PFG Customized, which is run separately from its broadline division.

### 3. *Specialty Distributors*

Specialty distributors offer a limited and focused grouping of products within one or more product categories—typically fresh produce, meat, seafood, dairy or baked goods. Other specialty distributors focus on a specific type of cuisine, such as Italian fare. Many customers, especially independent restaurants, use specialty distributors to supplement their purchases from broadline distributors because the specialty distributor offers higher quality or fresher products than the broadline distributor or provides unique products that the broadline distributor does not carry, such as products from local farmers. Both in terms of number of SKUs and geographic coverage, specialty distributors are typically smaller than broadline distributors.

To compete with specialty distributors, some broadliners operate specialty divisions. Sysco, for instance, operates several specialty divisions separately from its broadline division. So, too, does PFG, which operates Roma, a specialty division for Italian food products.

### 4. *Cash-and-Carry and Club Stores*

Cash-and-carry stores offer a "self-service" model of food distribution, in which customers make purchases at the store and transport the purchased goods themselves. Club stores like Costco

and Sam's Club also fall within this distribution channel.  With limited exceptions, cash-and-carry stores do not deliver.  They also offer fewer products than broadline distributors.  For example, the largest cash-and-carry store, Restaurant Depot, only carries up to ▮ SKUs.  Additionally, cash-and-carry stores do not have sales personnel dedicated to individual customers.  Because of these features, the prices offered by cash-and-carry stores are significantly lower than those offered by broadliners.  The typical cash-and-carry customer is an independent restaurant that either does not meet broadline distributors' minimum purchase requirements or needs to supplement its broadline deliveries.

### C.     Foodservice Distribution Customers

Foodservice distribution customers are a heterogeneous group.  The largest customers, such as group purchasing organizations and foodservice management companies, buy hundreds of millions of dollars of product a year, whereas a single independent restaurant buys a small fraction of that amount.  Some customers choose to buy from a single line of distribution; others mix distribution channels.  Some customers demand fixed pricing, whereas others buy based on daily market rates.  Generally speaking, however, customers can be grouped into several categories.

### 1.     Group Purchasing Organizations

Group purchasing organizations, or GPOs, are entities that, through the collective buying power of their members, obtain lower prices for foodservice products.  GPOs negotiate direct contracts with food manufacturers and thereby secure lower prices than a member could individually.

GPOs do not have their own distribution capabilities.  Rather, they contract with broadline distributors for warehousing, delivery, and operational services.  When a member purchases a GPO-contracted good, the member pays the broadliner on a "cost-plus" basis: it pays for the "cost"

8

of the product based on the GPO's contract with the manufacturer, "plus" the distributor's markup, which is negotiated between the GPO and distributor.  GPOs also contract with broadliners to allow their members to purchase products from broadline distributors (rather than from manufacturers), in which case they pay the broadline distributor both the distribution margin (markup) and the cost for the product set by the distributor.  GPO members also buy from specialty distributors.

GPOs are prominent in the healthcare and hospitality industries.  The largest healthcare GPOs include Premier, Novation, and Navigator.  One of the largest hospitality GPOs is Avendra. These companies annually spend hundreds of millions of dollars on broadline distribution.

### 2.    Foodservice Management Companies

Foodservice management companies operate cafeterias or other dining facilities at educational institutions, sports venues, and workplaces.  Like GPOs, foodservice management companies negotiate contracts with food manufacturers and rely on broadliners for storage and delivery; they also purchase directly from broadliners and specialty distributors.  Sodexo, Compass Group, and Aramark are among the country's largest foodservice management companies.  Those three companies each spend approximately $▮ billion annually on broadline distribution.

### 3.    Hospitality Chains

Hospitality chains are also large purchasers.  Hilton Hotels, for example, uses a system similar to a GPO.  It has a subsidiary, Hilton Supply Management LLC, which negotiates contracts on behalf of over 4,000 members to obtain food and related items at a discounted price.  Other hospitality companies, such as Hyatt Hotels, purchase most of their foodservice products through Avendra, the largest hospitality GPO.  Starwood Hotels and Interstate Hotels & Resorts, on the other hand, directly manage food procurement and distribution contracts for their properties.

9

Regardless of the food purchasing model, hospitality chains also buy food directly from broadliners and rely on them for their storage and delivery needs. These companies spend hundreds of millions of dollars annually on broadline distribution. Individual hotels and resorts also buy directly from specialty distributors, as needed.

### 4.     *Restaurant Chains*

Restaurant chains come in many sizes with a wide variety of characteristics. This customer category includes nationwide fast food or quick service restaurants such as Burger King and Subway, each with thousands of locations in all regions of the country. It also includes regional fast casual restaurant chains such as Culver's (primarily in the Midwest) and Zaxby's (primarily in the Southeast), as well as nationwide sit-down restaurant chains, such as Applebee's and Cheesecake Factory. The channel of distribution a chain restaurant uses depends, in part, on the number of locations and menu variety. The greater the number of locations and the fewer the menu items, the more amenable the chain restaurant is to systems distribution.

### 5.     *Government Agencies*

Some government agencies, notably the Defense Logistics Agency and the U.S. Department of Veterans Affairs, are large buyers of broadline distribution services. Those agencies, for instance, spend hundreds of millions of dollars each year on broadline foodservice.

### 6.     *"Street" Customers*

Customers with only one location, or a handful of locations, are referred to in the industry as "street," "local," or "independent" customers. Examples of this type of customer include independent restaurants and resorts. Unlike the types of customers identified above, street customers usually do not have written contracts with broadliners; instead, they negotiate prices on a weekly or other short term basis. They also tend to diversify their purchases among multiple

distribution channels. Indeed, according to a study conducted by an industry trade group, the International Foodservice Distributors Association, the typical independent customer uses up to twelve different supply sources. DX-00293 at 29.

## II.    CASE HISTORY

### A.    Sysco and USF

Defendant Sysco is a publicly-traded corporation headquartered in Houston, Texas. As the largest North American foodservice distributor, Sysco distributes food to approximately 425,000 customers in the United States, generating sales of about $46.5 billion in fiscal year 2014. Compl. for TRO and Prelim. Inj. Pursuant to Section 13(b) of the FTC Act, ECF No. 3 at ¶ 24 [hereinafter Compl.]. Sysco's business is divided into three divisions: (i) Broadline (81 percent of revenue); (ii) SYGMA, which provides systems distribution (13 percent of revenue); and (iii) "Other," which provides, among other things, specialty produce distribution (6 percent of revenue). *Id.* ¶ 25. Sysco's broadline division operates out of 72 distribution centers located across the United States. *Id.*

Defendant US Foods, Inc., is a privately-held corporation based in Rosemont, Illinois, and is a wholly owned subsidiary of Defendant USF Holding Corp. USF is controlled by the investment funds of Clayton, Dubilier & Rice, Inc., and KKR & Co., L.P. The second-largest foodservice distributor in the United States, USF operates 61 broadline distribution centers across the country and serves over 200,000 customers nationwide. *Id.* ¶ 27. In fiscal year 2013, USF generated approximately $22 billion in revenue. *Id.*

### B.    History of the Merger

On December 8, 2013, Sysco and USF signed a definitive merger agreement, whereby Sysco agreed to acquire all shares of USF for $500 million in cash and $3 billion in newly issued

Sysco equity.  Sysco also agreed to assume $4.7 billion in USF's existing debt, for a total transaction value of $8.2 billion.  The merger agreement expires on September 8, 2015.

After announcing the merger, Defendants filed a notification regarding the merger as required by the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a.  As a result of this filing, the FTC commenced an investigation to determine the effects of the proposed combination.  The FTC is an administrative agency of the United States federal government that derives its authority from the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41 *et seq.* Among other duties, the FTC is vested with authority and responsibility for enforcing Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

During the FTC's investigation, and with the hope of gaining regulatory approval, on February 2, 2015, Sysco and USF announced an asset purchase agreement with regional broadline distributor Performance Food Group, Inc. ("PFG"), to sell 11 of USF's 61 distribution centers to PFG, contingent upon the successful completion of the merger.  The 11 USF distribution centers— intended to increase PFG's geographic footprint—are, for the most part, located within the western half of the country, where PFG at present has only one distribution center.  Currently, the 11 distribution centers account for approximately $4.5 billion in broadline sales.  PX09250-011. The parties also executed a Transition Services Agreement.  Under the two agreements, PFG would acquire all assets and employees at the 11 distribution centers, all customers under those contracts (assuming the customers consent), and the right to use USF private label products at those facilities for up to three years.

## C.    History of these Proceedings

On February 19, 2015, the Commissioners of the FTC voted 3-2 to authorize the filing of an administrative complaint in the FTC's Article I court to block the proposed merger, based on a

finding that there was reason to believe that the merger would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. Trial before an Administrative Law Judge is scheduled to begin on July 21, 2015.

Also, on February 19, 2015, the Commission authorized the FTC staff to seek a preliminary injunction in federal court under Section 13(b) of the FTC Act in order to prevent Defendants from completing the merger. The FTC filed this action on February 20, 2015, seeking a temporary restraining order ("TRO") and preliminary injunction to maintain the status quo until the conclusion of the administrative trial. The FTC is joined in this action by the District of Columbia and the following states: California, Illinois, Iowa, Maryland, Minnesota, Nebraska, North Carolina, Ohio, Tennessee, Pennsylvania, and Virginia (collectively, the "Plaintiff States"). By and through their respective Attorneys General, the Plaintiff States have joined with the FTC in this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, in their sovereign or quasi-sovereign capacities as *parens patriae* on behalf of the citizens, general welfare, and economy of each of their states.

On February 24, 2015, Defendants stipulated to a TRO, agreeing not to merge until three calendar days after this court rules on the FTC's Motion for Preliminary Injunction. The court entered the stipulated TRO on February 27, 2015. Defendants have since represented that they will abandon the transaction if this court grants the preliminary injunction.

On March 4, 2015, the court scheduled a preliminary injunction hearing to start on May 5, 2015. The parties' counsel accomplished an extraordinary amount of work in the two months leading up to the evidentiary hearing. They exchanged approximately 14.8 million documents and took 72 depositions. Moreover, in addition to the more than 90 industry participant declarations that accompanied the FTC's motion for preliminary injunction, Defendants obtained 65 new

13

declarations or counter declarations, while the FTC obtained an additional 25 new or counter declarations. During the eight-day evidentiary hearing, the court heard testimony from 20 witnesses, either live or via video deposition. The parties submitted a total of 185 declarations into evidence, as well as over 3,500 exhibits and excerpts of over 70 depositions. The court heard closing arguments on May 28, 2015.

## LEGAL STANDARD

### I.   SECTION 7 OF THE CLAYTON ACT

Section 7 of the Clayton Act prohibits mergers or acquisitions "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce or in any activity affecting commerce in any section of the country." 15 U.S.C. § 18. When the FTC has "reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act," it may seek a preliminary injunction under Section 13(b) of the FTC Act to "prevent a merger pending the Commission's administrative adjudication of the merger's legality." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1070 (D.D.C. 1997) (citing 15 U.S.C. § 53(b)). "Section 13(b) provides for the grant of a preliminary injunction where such action would be in the public interest—as determined by a weighing of the equities and a consideration of the Commission's likelihood of success on the merits." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (citing 15 U.S.C. § 53(b)).

### II.   SECTION 13(B) STANDARD FOR PRELIMINARY INJUNCTIONS

The Section 13(b) standard for preliminary injunctions differs from the familiar equity standard applied in other contexts. As the Court of Appeals explained in *Heinz*: "Congress intended this standard to depart from what it regarded as the then-traditional equity standard, which it characterized as requiring the plaintiff to show: (1) irreparable damage, (2) probability of

14

success on the merits and (3) a balance of equities favoring the plaintiff." 246 F.3d at 714 (internal citation omitted). The court continued: "Congress determined that the traditional standard was not 'appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need for injunctive relief.'" *Id.* (quoting H.R. Rep. No. 93-624 at 31 (1971)); *see also FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) ("In enacting [Section 13(b)], Congress further demonstrated its concern that injunctive relief be broadly available to the FTC by incorporating a unique 'public interest' standard in 15 U.S.C. [§] 53(b), rather than the more stringent, traditional 'equity' standard for injunctive relief.").

Under Section 13(b)'s "public interest" standard, "[t]he FTC is not required to *establish* that the proposed merger would in fact violate section 7 of the Clayton Act." *Heinz*, 246 F.3d at 714. Rather, to demonstrate the likelihood of success on the merits, "the government need only show that there is a reasonable probability that the challenged transaction will substantially impair competition." *Staples*, 970 F. Supp. at 1072 (citation omitted) (internal quotation marks omitted).

A trial court evaluating a demand for injunctive relief therefore must "measure the probability that, after an administrative hearing on the merits, the Commission will succeed in proving that the effect of the [proposed] merger 'may be substantially to lessen competition, or to tend to create a monopoly' in violation of section 7 of the Clayton Act.'" *Heinz*, 246 F.3d at 714 (quoting 15 U.S.C. § 18). The FTC satisfies this standard if it "has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Id.* at 714-15 (citations omitted) (internal quotation marks omitted). This standard reflects Congress' use of the words "*may* be substantially to lessen competition" in

Section 7, as Congress' concern "was with probabilities, not certainties" of decreased competition. *Id.* at 713 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)) (other citations omitted).

Though more relaxed than the traditional equity injunction standard, Section 13(b)'s public interest standard nevertheless demands rigorous proof to block a proposed merger or acquisition. "[T]he issuance of a preliminary injunction prior to a full trial on the merits is an extraordinary and drastic remedy." *Exxon*, 636 F.2d at 1343 (citations omitted) (internal quotation marks omitted). That is because "the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated." *Id.* "Given the stakes, the FTC's burden is not insubstantial . . . ." *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 123 (D.D.C. 2004), *case dismissed*, No. 04-5291, 2004 WL 2066879 (D.C. Cir. Sept. 15, 2004). "[A] showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief." *Id.* (citation omitted) (internal quotation marks omitted).

**III.   *BAKER HUGHES* BURDEN-SHIFTING FRAMEWORK**

In *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990), the Court of Appeals established a burden-shifting framework for evaluating the FTC's likelihood of success on the merits. *See Heinz*, 246 F.3d at 715 (applying *Baker Hughes* "to the preliminary injunctive relief stage"). Under the *Baker Hughes* framework, the FTC bears the initial burden of showing that the merger would lead to "undue concentration in the market for a particular product in a particular geographic area." *Baker Hughes*, 908 F.2d at 982; *see also Heinz*, 246 F.3d at 715 (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)) ("[T]he government must show that the merger would produce 'a firm controlling an undue percentage share of the relevant market, and [would] result[ ] in a significant increase in the concentration of firms in that

16

market.'"). Such a showing establishes a "presumption" that the merger will substantially lessen competition. *Baker Hughes*, 908 F.2d at 982.

The burden then shifts to the defendant to rebut the presumption by offering proof that "the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition in the relevant market." *Heinz*, 246 F.3d at 715 (quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975)) (internal quotation marks omitted); *see also Baker Hughes*, 908 F.2d at 991 ("[A] defendant seeking to rebut a presumption of anticompetitive effect must show that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition."). "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *Baker Hughes*, 908 F.2d at 991. "A defendant can make the required showing by affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." *Id.*

"If the defendant successfully rebuts the presumption, the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Id.* at 983. "[A] failure of proof in any respect will mean the transaction should not be enjoined." *Arch Coal*, 329 F. Supp. 2d at 116. The court must also weigh the equities, but if the FTC is unable to demonstrate a likelihood of success, the equities alone cannot justify an injunction. *Id.*

## DISCUSSION

### I.    THE RELEVANT MARKET

Merger analysis starts with defining the relevant market. *United States v. Marine Bancorp.*, 418 U.S. 602, 618 (1974) (Market definition is "'a necessary predicate' to deciding whether a

merger contravenes the Clayton Act.") (quoting *United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 586, 593 (1957)); *see also FTC v. Swedish Match*, 131 F. Supp. 2d 151, 156 (D.D.C. 2000). The relevant market has two component parts. "First, the 'relevant product market' identifies the product and services with which the defendants' products compete. Second, the 'relevant geographic market' identifies the geographic area in which the defendant competes in marketing its products or service." *Arch Coal, Inc.*, 329 F. Supp. 2d at 119; *see also FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 37 (D.D.C. 2009) (same). "Defining the relevant market is critical in an antitrust case because the legality of the proposed merger[ ] in question almost always depends upon the market power of the parties involved." *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998).

Market definition has been the parties' primary battlefield in this case. According to the FTC, the relevant product market is broadline foodservice distribution. Compl. ¶ 40. Because broadline distribution is defined by a number of distinct attributes—such as a vast array of product offerings, private label offerings, next-day delivery, and value-added services—the FTC contends that the other modes of distribution are not reasonable substitutes for broadline distribution and thus must be excluded from the product market.

The FTC further contends that, within the product market for broadline distribution, there is another product market for foodservice distribution sold to "national" customers. *Id.* ¶ 44. These customers, the FTC asserts, are distinct from "local" or "street" customers in multiple respects. National customers have a nationwide or multi-regional footprint and, because of that footprint, typically contract with a broadliner that has geographically dispersed distribution centers; they usually make purchases under a single contract that offers price, product, and service consistency across all facilities; and they award contracts through a request for proposal or bilateral

negotiations.   National customers include, among others, GPOs, foodservice management companies, hospitality chains, and national chain restaurants.   By contrast, the FTC says, the typical "local" or "street" customer is an independent restaurant, which does not require multiple, geographically dispersed distribution centers; purchases in smaller quantities; and ordinarily does not have a contract with its foodservice distributor(s) as it negotiates purchases on a weekly or other short-term basis.   The FTC contends that for national customers the geographic market is nationwide.  For local customers, it argues that the geographic market is localized near Defendants' distribution centers.

Defendants counter that the foodservice distribution market cannot be sliced and diced as advocated by the FTC.  According to Defendants, the relevant market is the entire $231 billion foodservice distribution industry, consisting not only of broadline food distributors, but also specialty distributors, systems distributors, and cash-and-carry stores.   All of these modes of distribution, Defendants argue, compete for foodservice distribution customer spending.  Based on this market definition, Defendants assert that together, they make up approximately 25 percent of total foodservice distribution sales.  They also dispute that there is a product market for "national customers," asserting that such a market has been created by the FTC out of whole cloth to artificially inflate Defendants' market shares.  According to the FTC, Defendants combined have, at least, a 59 percent share of the national customer product market.

### A.   Broadline Distribution as a Relevant Product Market

#### *1.   Legal Principles Affecting the Definition of the Relevant Product Market*

The Supreme Court in *Brown Shoe* set forth the general rule for defining a product market: "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown*

*Shoe*, 370 U.S. at 325. Stated another way, a product market includes all goods that are reasonable substitutes, even though the products themselves are not entirely the same. *Cardinal Health*, 12 F. Supp. 2d at 46; *Staples, Inc.*, 970 F. Supp. at 1074 (stating the question as "whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other").

Whether goods are "reasonable substitutes" depends on two factors:  functional interchangeability and cross-elasticity of demand.  "Functional interchangeability" refers to whether buyers view similar products as substitutes. *See id.* ("Whether there are other products available to consumers which are similar in character or use to the products in question may be termed 'functional interchangeability.'"). "If consumers can substitute the use of one for the other, then the products in question will be deemed 'functionally interchangeable.'" *Arch Coal*, 329 F. Supp. 2d at 119; *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956)) ("Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another."). "Courts will generally include functionally interchangeable products in the same product market unless factors *other than* use indicate that they are not actually part of the same market." *Arch Coal*, 329 F. Supp. 2d at 119.

As for cross-elasticity of demand, there the question turns in part on price. *E.I. Du Pont De Nemours*, 351 U.S. at 400 ("An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other."). If an increase in the price for product A causes a substantial number of customers to switch to product B, the products compete in the same market. *See id.* ("If a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to

cellophane, it would be an indication . . . that the products compete in the same market."); *Arch Coal*, 329 F. Supp. 2d at 120. Price is not, however, the only variable in determining the cross-elasticity of demand between products. Cross-elasticity of demand also depends on the "ease and speed with which customers can substitute [the product] and the desirability of doing so." *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008) (Brown, J.). Thus, substitution based on a reduction in price will not correlate to a high cross-elasticity of demand unless the switch can be accomplished without the consumer incurring undue expense or inconvenience. *See Phila. Nat'l Bank*, 374 U.S. at 358 (observing that "[t]he factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries").

Three other established principles are critical to defining the relevant product market in this case. The first is that the "product" that comprises the market need not be a discrete good for sale. As the Supreme Court has made clear: "We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966); *Phila. Nat'l Bank*, 374 U.S. at 356 (citation omitted) (finding that "the cluster of products . . . and services . . . denoted by the term 'commercial banking'. . . composes a distinct line of commerce"). Thus, what is relevant for consideration here is not any particular food item sold or delivered by Defendants, but the full panoply of products and services offered by them that customers recognize as "broadline distribution."

Second, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *Staples*, 970 F. Supp. at 1075; *Cardinal Health*, 12 F. Supp. 2d at 47 (same). That is because market definition hinges on whether consumers view the products as "reasonable

substitutes." *Cardinal Health*, 12 F. Supp. 2d at 46. So, for example, fruit can be bought from both a grocery store and a fruit stand, but no one would reasonably assert that buying all of one's groceries from a fruit stand is a reasonable substitute for buying from a grocery store. *See Whole Foods*, 548 F.3d at 1040 (Brown, J.) ("The fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market."). Thus, as applicable here, the fact that buyers may cross-shop between modes of food distribution does not necessarily make them part of the same market for the purpose of merger analysis.

Third, market definition is guided by the "narrowest market" principle. *Arch Coal*, 329 F. Supp. 2d at 120. That is, "a relevant market cannot meaningfully encompass [an] infinite range [of products]. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953). Judge Bates in *Arch Coal* succinctly described the "narrowest market" principle in practice as follows:

> The analysis begins by examining the most narrowly-defined product or group of products sold by the merging firms to ascertain if the evidence and data support the conclusion that this product or group of products constitutes a relevant market. If not, the analysis shifts to the next broadest product grouping to test whether that is a relevant market. This process continues until a relevant market is identified.

*Arch Coal*, 329 F. Supp. 2d at 120; *see also United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 58-60 (D.D.C. 2011) (explaining "the principle that the relevant product market should ordinarily be defined as the smallest product market that will satisfy the hypothetical monopolist test").

The critical question here, therefore, is whether broadline food distribution qualifies as the relevant product market, or whether the product market should be expanded to include other modes of distribution.

2.    *The Brown Shoe "Practical Indicia"*

Courts look to two main types of evidence in defining the relevant product market:  the "practical indicia" set forth by the Supreme Court in *Brown Shoe* and testimony from experts in the field of economics.  The court turns first to the *Brown Shoe* factors.

According to *Brown Shoe*, "[t]he boundaries of [a product market] may be determined by examining such practical indicia as industry or public recognition . . . , the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.  "These indicia seem to be evidentiary proxies for direct proof of substitutability." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986); *H&R Block*, 833 F. Supp. 2d at 51.   Courts have relied on the *Brown Shoe* factors in a number of cases to define the relevant product market.[2] *See, e.g.*, *Staples*, 970 F. Supp. at 1075-80; *Cardinal Health*, 12 F. Supp. 2d at 46-48; *Swedish Match*, 131 F. Supp. 2d at 159-64; *CCC Holdings*, 605 F. Supp. 2d at 39-44; *H&R Block*, 833 F. Supp. 2d at 51-60.

The court finds that the *Brown Shoe* factors support the FTC's position that broadline foodservice distribution is the relevant product market for evaluating the proposed merger.  As discussed below, an analysis of those factors demonstrates that other modes of foodservice distribution are not functionally interchangeable with broadline foodservice distribution.

a.    Product breadth and diversity

The most distinguishing feature of broadline distribution is its product breadth and diversity.  Broadliners stock thousands of SKUs across every major food and food-related category

---

[2] The *Brown Shoe* practical indicia may indeed be "old school," as Sysco's counsel asserted at oral argument, Closing Arg. Hr'g Tr. 44, and its analytical framework relegated "to the jurisprudential sidelines," *see Whole Foods*, 548 F.3d at 1059 (Kavanaugh, J., dissenting).  But *Brown Shoe* remains the law, and this court cannot ignore its dictates.

in their distribution centers. *See Staples*, 970 F. Supp. at 1078 (comparing SKU selections among different sales outlets). The average Sysco or USF distribution center carries over▮▮▮▮ SKUs. Regional broadliners carry fewer SKUs than Defendants, but still maintain between 6,000 to 19,000 SKUs in their distribution centers. PX09350-215, Table 22. Broadliners also offer "private label" products, which are a broadliner's branded products. Sysco has over▮▮▮▮ private-label SKUs, and USF has over▮▮▮▮. PX09350-219, Table 32. This product breadth and diversity enables broadliners to serve a wide variety of customers and to be a one-stop shop, if the customer wishes. As USF's Executive Vice President of Strategy David Schreibman testified at the FTC's Investigational Hearing: "[W]e have such a broad selection of SKUs because that is a key consideration of our customer base, you have to have what they want." Investig'l Hr'g Tr., PX00590-006 at 24.

The other distribution channels pale in comparison to broadline in terms of product breadth and diversity. Systems distributors carry a limited number of SKUs—usually only a few thousand—in their distribution centers. PX09350-215, Table 22. These SKUs are ordinarily proprietary in nature and used only by the customers for which they were developed, meaning that systems products are not readily sellable to other customers. Specialty distributors also carry a limited number of SKUs, usually for niche products—such as fresh produce, meat, seafood, dairy, or bakery items—which tend to complement broadline offerings. As Sysco's CEO William DeLaney explained: "We own [specialty] to create great traction with our customers, . . . we felt we had some gaps in our [broadline] product offerings, whether it was special produce, special cut steaks . . . ." Investig'l Hr'g Tr., PX00580-010 at 38. Cash-and-carry stores likewise do not have the same breadth and diversity of products as broadline distributors. One of the largest cash-and-carry stores, Restaurant Depot, carries▮▮▮▮ SKUs. USF's CHEF'STORE carries less than 4,000.

PX09350-216, Table 26. A number of customer declarants stated that cash-and-carry store products tended to be less uniform and inferior in quality to products carried by broadliners.

b.   Distinct facilities and operations

No one entering a systems, specialty, or cash-and-carry outlet would mistake it for a broadline distribution facility. *See Staples*, 970 F. Supp. at 1079 ("No one entering a Wal-Mart would mistake it for an office superstore . . . . You certainly know an office superstore when you see one."). Broadline distribution centers are massive. The average size of a Sysco distribution center is over 380,000 square feet; for USF, it is over 270,000 square feet. Some regional distributors also have distribution centers ranging from 200,000 to 400,000 square feet. PX09350-215, Table 25. Non-broadline facilities are generally smaller in size and cannot readily be converted into a broadline facility or accommodate broadline customers.

Broadline facilities also have large salesforces attached to them. Broadline facilities typically have dozens of sales representatives, while systems distributors have few sales representatives at their facilities. PX09350-215, Table 23. Cash-and-carry stores generally do not have dedicated account representatives at all. Because the model of distribution is self-service, cash-and-carry sales representatives do not learn the individualized needs of their customers in a systematic manner.

Additional proof that broadline foodservice distribution is a separate product market comes from the corporate structure of large foodservice distributors. Major foodservice distributors offer distribution in other channels besides broadline, but they run those businesses separately from their broadline businesses. *See, e.g.*, *H&R Block*, 833 F. Supp. 2d at 56 (observing that digital do-it-yourself tax preparation was a distinct product market from assisted tax preparation because H&R Block ran them as "separate business units"). Sysco runs its systems distribution business,

25

SYGMA, as a separate division. So, too, does PFG, which runs a systems business known as PFG Customized. Sysco also runs separate specialty divisions, such as Fresh Point, a fresh produce supplier. So, too, does PFG, which has its own specialty division, Roma, which supplies Italian restaurants and pizza parlors. And USF runs a separate cash-and-carry operation, CHEF'STORE. This type of corporate structuring shows that those who run and manage foodservice companies view broadline as distinct from other modes of distribution.

c.    Delivery

Timely and reliable delivery is critical in the food distribution industry. Unless customers can get the food they want when they need it, their businesses are at risk of losing clients and money. Broadliners have the capacity—due in large part to their extensive fleet of service vehicles, PX09350-217, Table 29—to offer frequent and flexible delivery schedules to meet customer needs, including next-day delivery. Ample evidence shows that, for a wide array of broadline customers—from large GPOs to individually-owned restaurants—next-day delivery is crucial to meeting their needs.

Neither systems distributors nor cash-and-carry stores offer the same degree of frequency and flexibility of delivery as broadliners.[3] Systems distributors tend to make large, limited-SKU deliveries on a fixed schedule. Also, systems fleets, on average, travel longer distances than broadline fleets to make deliveries. Carry-and-carry stores, for the most part, do not deliver. Rather, their primary model is self-service—that is, the customer transports the merchandise on her own. Some cash-and-carry outlets do offer delivery options. Costco, for example, offers limited-mileage delivery from some of its stores, and Restaurant Depot leases refrigerated trucks

---

[3] There was little evidence presented about the delivery capabilities of specialty distributors, aside from the fact that they have a limited geographic range of delivery. *See* PX00427-002 (Sodexo declarant indicating that specialty distributors covered a limited geographic range); PX00594-012 at 45 (MedAssets stating the same); PX00407-002 (Amerinet stating the same).

to its best customers. But those programs are quite limited and cannot substitute for the comprehensive and flexible delivery networks offered by broadliners to all of their customers.

### d. Customer service and value-added services

Another distinguishing feature of broadline distributors is their high degree of customer service and value-added service offerings. For example, broadliners offer menu and nutritional-meal planning services to, among others, healthcare, hospitality, and restaurant customers. They also offer value-added services at their distribution facilities, such as food safety training and new product updates. Other modes of delivery do not generally offer comparable value-added services.

### e. Distinct customers

Due in large part to the breadth of their product and service offerings, broadliners are capable of serving a wide range of customers, including classes of customers that the other channels cannot reach. Systems is a more efficient and cost-effective mode of distribution for fast food and quick service restaurants. Specialty distributors can provide higher quality and fresher products in certain categories, but have limited product offerings and charge higher prices than broadliners. Cash-and-carry stores are less expensive and more accessible for buyers such as independent restaurants, but their lack of delivery service makes them unsuitable for the large majority of foodservice customers.

These other channels, therefore, simply cannot and do not serve as wide an array of customers as broadliners do. The largest broadline customers, such as GPOs, foodservice management companies, and hospitality providers, cannot use systems or cash-and-carry for their needs. They purchase only modest quantities of product from specialty distributors. Even most independent restaurants cannot use cash-and-carry stores as a reasonable substitute for their broadliner, even though such stores offer lower prices.

### f.    Distinct pricing

Broadliners generally compete only against other broadliners on pricing. PFG's President and CEO, George Holm, who has over 37 years of industry experience, testified that systems and specialty distributors do not significantly affect the pricing and services that PFG offers to its customers. Hr'g Tr. 575-76, 643. And, although broadliners recognize that cash-and-carry stores provide lower prices, the record does not show broadliners benchmarking their prices against cash-and-carry stores or lowering prices to compete with them. To the contrary, as USF's Executive Vice President of Strategy David Schreibman succinctly stated in an email comparing pricing between USF as a broadliner and its own cash-and-carry division, CHEF'STORE: "In the store, we will be competitive with [REDACTED] on a similar cost model. On the truck, we will be competitive with broadline distributors on a similar cost model." PX03114-003.

### g.    Industry or public recognition

Overwhelmingly, the evidence shows that players in the foodservice distribution industry—both its suppliers and customers—recognize broadline, systems, specialty, and cash-and-carry to be distinct modes of distribution. *See Rothery Storage*, 792 F.2d at 219 n.4 ("The 'industry or public recognition of the submarket as a separate economic' unit matters because we assume that economic actors usually have accurate perceptions of economic realities."). The court received both live and out-of-court sworn testimony from Defendants' executives; executives from other broadline distributors; officers of non-broadline companies; and customers, large and small. They uniformly observed that these modes of distribution are distinct in the variety of ways described above. In short, the industry widely recognizes that broadline distributors offer a unique cluster of products and services that is not functionally interchangeable with other modes of distribution.

28

h.   Defendants' response to *Brown Shoe* "practical indicia"

Defendants do not, for the most part, contest the above-described distinctions between broadline and other channels of distribution.   Instead, Defendants contend that defining the relevant market to include only broadliners "misunderstands consumer behavior."  Memo of Defs. Sysco Corp., USF Holding Corp. and US Foods, Inc., in Opp'n to Pls.' Mot. for A Prelim. Inj., ECF No. 130 at 19 [hereinafter Defs.' Opp'n Br.].  They argue "customers simultaneously can, and routinely do, choose to patronize competitors of all stripes offering fungible goods through different but overlapping distribution channels."  *Id.*  What matters, Defendants claim, is that non-broadliners are able to constrain a broadliner's pricing by competing for customers who are able to move their entire purchasing, or portions of their purchasing, between channels.  *Id.* at 19 ("Whether a substitute channel is a 'comprehensive' substitute is irrelevant to that question.").  Defendants offer as one compelling example the burger chain Five Guys, which recently re-allocated over $300 million in annual business from USF to a collection of regional broadliners and systems distributors.

Defendants are indisputably correct that customers buy across channels, especially independent restaurants.  They are also unquestionably correct that some customers, particularly quick service and fast food restaurant chains, are capable of moving large segments of business from broadline to systems.  But the fact that Defendants sometimes compete against other channels of distribution in the larger marketplace does not mean that those alternative channels belong in the relevant product market for purposes of merger analysis.  *See Staples*, 970 F. Supp. at 1075 ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles*

*and Their Application* ¶ 565b (4th ed. 2014) ("[I]t would be improper to group complementary goods into the same relevant market just because they occasionally substitute for one another. Substitution must be effective to hold the primary good to a price near its costs[.]").

Two key decisions from this jurisdiction, *Whole Foods* and *Staples*, support this conclusion. In *Whole Foods*, the question was whether there existed a product market for premium natural and organic supermarkets ("PNOS") separate from ordinary supermarkets. The Court of Appeals' ultimate decision was fractured—each judge issued a separate opinion, leaving no controlling opinion from the Court. Two judges, however, concluded that PNOS is a separate product market from ordinary supermarkets, even though there was evidence that customers "cross-shopp[ed]" between the two. 548 F.3d at 1040 (Brown, J.); *id.* ("But the fact that PNOS and ordinary supermarkets 'are direct competitors in some submarkets . . . is not the end of the inquiry.'") (quoting *United States v. Conn. Nat. Bank*, 418 U.S. 656, 664 n.3 (1974)); *id.* at 1048 (Tatel, J.) ("That Whole Foods and Wild Oats have attracted many customers away from conventional grocery stores by offering extensive selections of natural and organic products thus tells us nothing about whether [they] should be treated as operating in the same market as conventional grocery stores."). Both judges agreed that just because customers were able to buy some categories of grocery products from both outlets—similar to how broadline customers are able to purchase some products from other modes of distribution—did not mean that PNOS was in the same product market as grocery stores. *See id.* at 1040 (Brown, J.) (citing testimony that "Whole Foods competes actively with conventional supermarkets for dry groceries sales, even though it ignores their prices for high-quality perishables"); *id.* at 1049 (Tatel, J.) ("As Judge Brown's opinion explains, this suggests that any competition between Whole Foods and

30

conventional retailers may be limited to a narrow range of products that play a minor role in Whole Food's profitability.").

The court in *Staples* held much the same. There, the question was whether consumable office supplies sold by office superstores constituted a separate product market from office supplies sold elsewhere. *See Staples, Inc.*, 970 F. Supp. at 1073. The court acknowledged that no matter who sells them, office supply products—to some extent, like food products—are "undeniably the same." *Id.* at 1075. The court nevertheless held that the sale of office supplies through superstores constituted the relevant product market. "[T]he unique combination of size, selection, depth and breadth of inventory offered by the superstores distinguishes them from other retailers." *Id.* at 1079. Those words apply with equal force to broadline distributors relative to other food distribution channels. *See also Cardinal Health*, 12 F. Supp. 2d at 47 (concluding that the wholesale drug industry "provide[s] customers with an efficient way to obtain prescription drugs through centralized warehousing, delivery, and billing services that enable the customers to avoid carrying large inventories, dealing with large number of vendors, and negotiating numerous transactions").

Defendants have not convincingly distinguished *Whole Foods* or *Staples*.[4]  Instead, they urge the court to look to *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172 (D.D.C.

---

[4] In neither their opposition to the FTC's motion for preliminary injunction nor their proposed findings of fact and conclusions of law do Defendants attempt to distinguish *Whole Foods* or *Staples*. At oral argument, Defendants distinguished *Staples* based on the fact that in *Staples* the FTC had pricing data to show that prices were lower in markets where both merging firms were present. Closing Arg. Hr'g Tr. at 38-40. Defendants also sought to distinguish *Whole Foods* on the facts, arguing that in *Whole Foods* the defendants could not show that in the event of a price increase consumers of PNOS could go to a standard grocery store. *Id.* at 40-41. But the court finds these efforts to distinguish *Staples* and *Whole Foods* unconvincing. It is true that there was stronger pricing data in *Staples*, but pricing data alone did not lead to the court's conclusion. The factual similarities between this case and *Staples*, particularly the *Brown Shoe* practical indicia, are otherwise strong. As for *Whole Foods*, it is even more factually analogous to this case than is *Staples*. If anything, the proof that other channels of distribution are not reasonable substitutes for broadline is more compelling in this case than the evidence in *Whole Foods* that ordinary grocery stores are not a reasonable substitute for PNOS.

2001), as an analogous case. There, the question was whether different types of disaster recovery services for computer data comprised the same product market. *Id.* at 183. The court rejected the government's product market definition as limited only to shared hotsite services because "the government's market contains an extremely heterogeneous group of customers," *id.* at 182, who "are simply too varied and too dissimilar to support any generalizations," *id.* at 193. Here, it is unquestionably true that foodservice distribution customers are incredibly varied in their needs, buying habits, and price sensitivities. But *Sungard* differs in one critical respect. The court there observed that "the striking heterogeneity of the market, particularly as reflected by the *conflicting evidence relating to customer perceptions and practices*," undercut the government's market definition. *Id.* at 182-83 (emphasis added). Here, that simply is not the case. Though the customers may be varied, the court has little doubt that the industry, from the perspective of both sellers and buyers, perceives broadline to be a separate mode of food distribution. Witnesses of all stripes had little trouble distinguishing among the different channels of distribution, and Defendants offered no evidence of any industry confusion among them. Those facts make this case fundamentally different from *Sungard*. *See id.* at 183 ("Customer responses were also often vague and confused" and product definitions were "consistently unclear.").

Defendants also argue that the FTC's definition of broadline as the relevant market improperly excludes other modes based on "a small number of customers' subjective preferences for broadline distribution." Defs.' Opp'n Br. at 17 (footnote omitted). But the evidence, as it relates to broadline versus other distribution channels, is hardly selective. Defendants' own executives acknowledged the fundamental differences between broadline and other modes of

distribution.[5]  So, too, did executives of regional broadliners, such as PFG,[6] Shamrock,[7] Reinhart Foodservice,[8] and Shetakis[9]; consortiums, such as UniPro[10]; systems distributors, such as Maines[11]; and cash-and-carry stores, such as Restaurant Depot.[12]  Likewise, customers of every size recognized the differences between broadline and the other food distribution modes.  In short, this is not the kind of case in which the testimonial evidence failed to demonstrate a consensus among the industry's players regarding the boundaries of the product market.

        *3.*     *Expert Testimony*

Having concluded that the *Brown Shoe* "practical indicia" support a product market for broadline foodservice distribution, the court turns next to the second type of evidence that courts consider in product market definition:  expert testimony in the field of economics.  One of the primary methods used by economists to determine a product market is called the "hypothetical monopolist test."  This test asks whether a hypothetical monopolist who has control over a set of substitutable products could profitably raise prices on those products.  If so, the products may comprise the relevant product market.  *See H&R Block*, 833 F. Supp. 2d at 51-52.  The theory behind the test is straightforward.  If enough consumers are able to substitute away from the

---

[5] *See, e.g.*, DX-00319 at 32-36 (Sysco's CEO, William DeLaney, explained that systems is a "tailored, customized approach to certain types of customers" and the "model is not to serve GPO customers"); Hr'g Tr. 1369-70 (DeLaney stated that, compared to cash-and-carry, broadline is a "value package" that includes delivery services and menu consulting); Hr'g Tr. 1452 (David Schreibman of USF stated that "specialty distributors compete by having a broader array of products within their expertise" that "broadliner[s] may not have in [their] portfolio"); Investigat'l Hr'g Tr., PX00580-008-010 at 32-39 (DeLaney explained that broadline and specialty are "two different businesses," whereas broadline distribution includes "a full range of products"); Investigat'l Hr'g Tr., PX00584-060 at 239-40 (Louis Nasir, the Pacific Market President for Sysco, maintained that cash-and-carry stores "don't have the same selection" of products and "also don't have consistent inventory" compared with broadliners); Investigat'l Hr'g Tr., PX00590-011 at 42 (Schreibman stated that he was not aware of a cash-and-carry store that delivers).

[6] *See* PX00429-002-007; Hr'g Tr. 571-73.

[7] DX-00285 at 115-16, 164-66.

[8] DX-00295 at 16-17, 22.

[9] PX00414-001.

[10] DX-00260 at 139.

[11] DX-00264 at 64, 141; PX00424-001 (Maines is predominantly systems, but ▮ percent of 2013 revenues were from broadline sales).

[12] DX-00314 at 146-47.

hypothetical monopolist's product to another product and thereby make a price increase unprofitable, then the relevant market cannot include only the monopolist's product and must also include the substitute goods. On the other hand, if the hypothetical monopolist could profitably raise price by a small amount, even with the loss of some customers, then economists consider the monopolist's product to constitute the relevant market.

The hypothetical monopolist test, which courts have applied, is set forth in the U.S. Department of Justice and FTC's Horizontal Merger Guidelines. *See* U.S. Dep't of Justice & FTC Horizontal Merger Guidelines § 4.1.1 (2010) [hereinafter Merger Guidelines]; *H&R Block*, 833 F. Supp. 2d at 51-52; *CCC Holdings*, 605 F. Supp. 2d at 40; *Arch Coal*, 329 F. Supp. 2d at 120 & n.7. As stated in the Merger Guidelines:

> [T]he test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products . . . likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms.

Merger Guidelines § 4.1.1. The SSNIP "is intended to represent a 'small but significant' increase in the prices charged by firms in the candidate market" and is typically assumed to be "five percent of the price paid by customers for the products or services to which the merging firms contribute value." Merger Guidelines § 4.1.2.

As applied to this case, the hypothetical monopolist test asks: If there was only one broadline food distributor, could it profitably raise price by five percent, or would that price increase result in a substantial number of customers moving enough of their spend to other modes of distribution—systems, specialty, or cash-and-carry—such that the price increase would be unprofitable? If the price increase would be profitable, then the relevant product market is broadline distribution; if unprofitable, it means that the relevant market must include at least one other channel

of distribution. Each side presented expert testimony from economists who performed the hypothetical monopolist test but who came to different results.

a.   Dr. Mark Israel

For its expert economic evidence, the FTC presented the testimony of Dr. Mark Israel, who received a doctorate in economics from Stanford University and now serves as Executive Vice President at Compass Lexecon, a consulting firm. Dr. Israel's testimony served two primary functions. First, he acted as a *de facto* summary witness, synthesizing the mass of testimonial and documentary evidence gathered by the FTC. Dr. Israel's summary of that evidence parallels the discussion in the above sub-sections, so the court does not revisit it here. Second, Dr. Israel conducted a SSNIP test, using what is known as an "aggregate diversion analysis." Its purpose is to determine the amount of sales that a hypothetical monopolist of broadline distribution could lose before a price increase becomes unprofitable. *See Swedish Match*, 131 F. Supp. 2d at 160 (describing the related methodology of "critical loss analysis"); *H&R Block*, 833 F. Supp. 2d at 63 (same). A detailed recitation of Dr. Israel's aggregate diversion analysis is necessary because Defendants challenge the basic elements of his work.

Aggregate diversion analysis has three basic steps. The first is to determine the threshold aggregate diversion ratio, which is the percentage of customers that would need to stay within the broadline market to make a price increase profitable. *See H&R Block*, 833 F. Supp. 2d at 63. This is strictly a mathematical step, with the aggregate diversion ratio a function of the subject product's gross margin. The gross margin is defined as the price of selling one additional product minus the cost of selling the additional product.[13] The second step is to determine the *actual* aggregate diversion—that is, the actual percentage of customers of a single broadliner that would switch to

---

[13] Gross margin is calculated as follows: (Revenue-Cost of Goods Sold)/Revenue.

another broadliner after a price increase. "Since these lost sales are recaptured within the proposed market, they are not lost to the hypothetical monopolist." *Id.* As will be seen, this step involved an analysis of Defendants' actual sales data. The final step is to compare the two: if the actual aggregate diversion is greater than the threshold ratio, then the hypothetical monopolist could profitably raise prices and the candidate market is the relevant product market. *See id.* In other words, as applied here, if the percentage of customers of a single broadliner who would switch to another broadliner (as opposed to another mode of distribution) in response to a price increase is greater than the percentage of customers needed to stay within the market to make a price increase profitable, then the relevant product market is properly defined as broadline distribution.

At step one of his aggregate diversion analysis, Dr. Israel assumed a gross margin of 10 percent, a figure lower than the gross margin contained in the parties' financial reporting.[14] A 10 percent gross margin, according to Dr. Israel, yields a 50 percent threshold aggregate diversion ratio based on a formula devised by two economists, Michael Katz and Carl Shapiro.[15]

Next, Dr. Israel calculated the actual aggregate diversion based on three different data sets. He constructed the first two data sets from national and regional requests for proposals ("RFPs") and "bidding" summary information and documents produced by each Defendant to the FTC. Based on this information, Dr. Israel built a database for each company that tracked, for each bidding opportunity, the incumbent distributor, the winning distributor, and the competing bidders. PX09350-104. Based on Sysco's RFP/bidding data, he found that, when Sysco lost a bid, [over 70%] of the time (based on potential revenue from sales opportunities) it was to another

---

[14] Dr. Israel testified that the parties' reported gross margins are between 15 and 20 percent, but to be conservative he used a 10 percent margin. Hr'g Tr. 1004-05.

[15] The Katz-Shapiro formula that Dr. Israel used is $L = X/(X + M)$, where L is the aggregate diversion ratio, or "critical loss," X is the price increase, and M is the margin. PX09350-055 at n.134. For his aggregate diversion analysis, Dr. Israel used a 10 percent price increase and a 10 percent margin, for a resulting critical loss of 50 percent, *i.e.*, .50 $= .10/(.10 + .10)$. Hr'g Tr. 1004-07.

broadliner; the remaining losses were to another mode of distribution. PX09350-056. Based on USF's RFP/bidding data, the percentage was even higher—USF lost to other broadliners [over 70%] of the time. *Id.*

Dr. Israel constructed his third data set from USF's "Linc" database. Linc is a customer relations management tool that USF local sales representatives used until recently to track sales opportunities. The Linc database contains fields that sales representatives can complete to describe a sales opportunity, including a "main competition" field. Dr. Israel assumed that, if USF did not win an opportunity, it was won by the identified "main competitor." The Linc database contained hundreds of thousands of observations, about a third of which included information on the "main competitor." Based on this data, Dr. Israel concluded that [over 70%] of the local sales opportunities lost by USF (again, based on potential revenue of those sales opportunities) were lost to other broadliners. PX09350-056.

At the third step, Dr. Israel compared the aggregate diversion ratio of 50 percent to the actual diversion percentages derived from the three data sets. He concluded that, because each of the three actual diversion percentages was higher than the 50 percent threshold aggregate diversion ratio, broadline distribution was the relevant product market. In other words, Dr. Israel found that only 50 percent of broadline customers would need to remain within the broadline market to make a price increase profitable, while according to three different data sets, the actual percentage of customers who would remain within the broadline market (by switching to another broadliner) was greater than 50 percent. Therefore, Dr. Israel's calculations indicated that broadline distribution was the relevant product market.

b.   Defendants' experts

Defendants mounted an aggressive challenge to Dr. Israel's work through their own expert witnesses.   Defendants first presented Dr. Jerry Hausman, a professor of economics at Massachusetts Institute of Technology.  Dr. Hausman testified, in short, that Dr. Israel's aggregate diversion analysis was wrong because (i) he used the wrong gross margin and (ii) he used the wrong mathematical formula to calculate the threshold aggregate diversion ratio.   According to Dr. Hausman, Dr. Israel excluded certain variable costs from his gross margin.  The actual gross margin was not 10 percent, according to Dr. Hausman, but between ▮ percent and ▮ percent. Also, Dr. Hausman testified that the aggregate diversion formula Dr. Israel used was incorrect and led to an overly narrow market definition.[16]  Using the proper margins and the correct formula, Dr. Hausman opined, the aggregate diversion ratio is not 50 percent, but rather over 100 percent, which is an impossibility (*i.e.*, more than 100 percent of customers cannot switch in response to a price increase).  Thus, he concluded, the relevant product market is not broadline, but all channels of food distribution.

While Dr. Hausman challenged Dr. Israel's calculation of the threshold aggregate diversion ratio, Defendants' other expert, Dr. Timothy Bresnahan, a professor of economics at Stanford University, critiqued Dr. Israel's use of the RFP/bidding and Linc data sets to calculate the actual aggregate diversion.   Regarding the RFP/bidding data, Dr. Bresnahan described the data as contrived and unreliable—a point that Defendants consistently articulated to the FTC during the investigation phase.  Dr. Bresnahan explained that the companies do not keep comprehensive RFP

---

[16] According to Dr. Hausman, the correct formula is $L = X/M$, where L is the aggregate diversion ratio, or "critical loss," X is the price increase, and M is the margin.  Dr. Hausman testified that this is the more appropriate formula in an asymmetric market, like food distribution, which involves suppliers and customers with different costs, different types of customers, and a different mix of products.  Hr'g Tr. 1960-64; DFF at 285-86 (citing to DX-05028 at 11). The formula used by Dr. Israel, on the other hand, is more appropriate in a symmetric market, that is, a market marked by homogeneity among suppliers and customers.  Hr'g Tr. 1960, 1965-66; DX-05028 at 10-11.

or bidding data in the ordinary course of business and that the information Dr. Israel relied upon was pulled together at the insistence of the FTC, in part based on employees' unreliable notes and memories. As for the Linc data, it too was flawed, Dr. Bresnahan suggested, because it is a prospective sales database, not an actual transactions database in which USF sales personnel were accurately recording wins and losses. Moreover, neither the RFP/bidding data nor the Linc data describes whether Sysco or USF lost a customer for a price-based reason or some reason having nothing to do with price.

c. The court's finding as to the expert testimony

Having weighed the competing expert testimonies and considered them in light of the evidentiary record as a whole, the court finds Dr. Israel's aggregate diversion analysis and conclusion to be more persuasive than that advanced by Defendants' expert, Dr. Hausman.[17] Dr. Israel's reliance on the RFP/bidding and Linc data sets for calculating the aggregate diversion is problematic for the reasons Defendants have identified and, for those reasons, the court hesitates to rely on Dr. Israel's precise aggregate diversion percentages. But, when evaluated against the record as a whole, Dr. Israel's conclusions are more consistent with the business realities of the food distribution market than Dr. Hausman's. *See Cardinal Health*, 12 F. Supp. 2d at 46 (stating that "the determination of the relevant market in the end is 'a matter of business reality—[ ] of how the market is perceived by those who strive for profit in it.'" (alteration in original) (quoting *FTC v. Coca-Cola Co.*, 641 F. Supp. 1128, 1132 (D.D.C. 1986), *vacated as moot*, 829 F.2d 191 (D.C. Cir. 1987)); *Arch Coal*, 329 F. Supp. 2d at 116 ("[A]ntitrust theory and speculation cannot

---

[17] In finding Dr. Israel's conclusion more persuasive than that advanced by Defendants' expert, the court might be doing more than it is required to do. As Judge Tatel stated in *Whole Foods*: "Although courts certainly must evaluate the evidence in section 13(b) proceedings and may safely reject expert testimony they find unsupported, they trench on the FTC's role when they choose between plausible, well-supported expert studies." *Whole Foods*, 548 F.3d at 1048 (Tatel, J.).

trump facts[.]"); *H&R Block*, 833 F. Supp. 2d at 65 (bearing in mind the shortcomings of the expert's analysis and treating the analysis as "another data point" in determining the relevant market, rather than as conclusive).

The court finds Dr. Hausman's conclusion—that the actual aggregate diversion ratio is greater than 100 percent—inconsistent with business reality. On cross-examination, Dr. Hausman admitted that his conclusion meant that a hypothetical monopolist who had control over *every single broadline distributor* in the country could *not* profitably impose a SSNIP on customers, because enough customers would switch to other channels of distribution. Hr'g Tr. 2003-04. Yet many industry leaders testified either that other channels of distribution did not constrain the prices charged by broadliners or that other channels were not substitutes for broadline distribution. For instance, PFG's President and CEO, George Holm, testified that systems and specialty distributors do not significantly affect the pricing and services that PFG's broadline division offers to its customers. Hr'g Tr. 575-76. He also testified that systems and specialty distributors were not substitutes for broadliners. Hr'g Tr. 573. Such evidence from industry leaders,[18] which the court credits, contradicts Dr. Hausman's conclusion that a hypothetical monopolist of broadline services would not be able to impose a SSNIP because enough customers would switch to other channels of distribution.

---

[18] *See also* PX00429-004-007 (George Holm, President and CEO of PFG, explaining that systems, specialty, and cash-and-carry distributors are not substitutes for customers needing broadline distribution); DX-00285 at 125-26 (John Roussel, COO of Shamrock Foods, stating that it's "not possible" or "practical" for a broadline customer to use a systems distributor); DX-00260 at 139 (Bob Stewart, interim CEO of Unipro, explaining that a broadline customer cannot easily switch to a systems distributor and a broadline customer's needs are different than a systems customer's needs).

### 4.   *Conclusion as to the Broadline Product Market*

In conclusion, based on the vast record of evidence the parties have presented, the court finds that the FTC has carried its burden of demonstrating that broadline distribution is the relevant product market.

## B.   National Broadline Distribution as a Relevant Product Market

The FTC asserts that, within the broader product market for broadline distribution, there is a narrower but distinct product market for "broadline foodservice distribution services sold to National Customers." Compl. ¶ 44. According to the FTC, "[d]ue to [their] geographic dispersion, National Customers typically contract with a broadline foodservice distributor that has distribution centers proximate to all (or virtually all) of their locations." *Id.* ¶ 42.

> National Customers typically contract with a broadliner that can provide—across all of their locations—product consistency and availability, efficient contract management and administration (e.g., centralized ordering and reporting, a single point of contact, and consistent pricing across all locations), volume discounts from aggregated purchasing, and the ability to expand geographically with the same broadline foodservice distributor.

*Id.* National customers include healthcare GPOs; foodservice management companies; and large hotel and restaurant chains. *Id.* ¶ 41. The FTC contends that Sysco and USF "are the only two single-firm broadline distributors with national geographic reach and, as such, are best positioned to serve National Customers." *Id.* ¶ 63.

Defendants vigorously dispute that there is such a thing as a "National Customer." They contend that a product market built around so-called national customers is "contrived," Defs.' Opp'n Br. at 16, and that the FTC's distinction between national and local customers is "factually and economically meaningless," *id.* at 13. They counter that the national-local distinction is not, as the FTC claims, built on differentiating customer characteristics, but is improperly based on an administrative distinction as to whether the customer prefers to be managed at the corporate level

(making it a "national" customer) or at the local distribution center (making it a "local" customer). *Id.* at 12-15. The so-called national customer category, they also argue, is improperly based on a "few core customers who say they prefer the merging parties." *Id.* at 13. In addition, Defendants assert that Dr. Israel did not perform a SSNIP test to assess the existence of a national customer market. *Id.* at 12.

### *1. Legal Basis for Defining Relevant Product Market Based on Customer Type*

Before turning to the evidence, the court first considers the legal basis for defining a product market based on a type of customer. Neither side comprehensively addressed this issue. Admittedly, defining a *product* market based on a type of *customer* seems incongruous. After all, one ordinarily thinks of a customer as purchasing a product in the market, and not as the product market itself. But, in this case, according to the FTC, the national customer and broadline product converge to define a market for broadline products sold to national customers. Broadline distributors must offer a particular kind of "product"—a cluster of goods and services that can be delivered across a broad geographic area—to compete for national customers. In that sense, the customer's requirements operate to define the product offering itself.

The clearest articulation of this approach to product market definition comes from the Merger Guidelines. The Merger Guidelines are not binding, but the Court of Appeals and other courts have looked to them for guidance in previous merger cases. *See, e.g., Heinz,* 246 F.3d at 716 n.9; *H&R Block,* 833 F. Supp. 2d at 52 n.10. Section 4.1.4 of the Merger Guidelines provides that "[i]f a hypothetical monopolist could profitably target a subset of customers for price increases, the Agencies may identify relevant markets defined around those targeted customers, to whom a hypothetical monopolist would profitably and separately impose at least a SSNIP." Merger Guidelines § 4.1.4. Markets to serve targeted customers are also known as "price

42

discrimination markets." *Id.* Professors Areeda and Hovenkamp have endorsed market definition of this kind, as well: "Successful price discrimination means that the disfavored geographic or product class is insulated from the favored class and, if the discrimination is of sufficient magnitude, should be counted as a separate relevant market." 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* ¶ 534d (3d ed. 2007).  The concern underlying price discrimination markets is that certain types of captured or dedicated customers could be targeted for monopolist pricing even if a price increase for all customers would not be profitable.  *See* Merger Guidelines § 3; Areeda & Hovenkamp 3d ed., *supra*, ¶ 533d ("[S]ellers may be able to discriminate against buyers who have fewer alternatives or for whom the product performs a more valuable function[.]").

Defining a market around a targeted customer, as the FTC urges here, is not free from controversy, as the different opinions in *Whole Foods* demonstrate.[19]  Relying on an earlier version of the Merger Guidelines that recognized price discrimination against "targeted buyers," Judge Brown explained that "core consumers"—in that case, those committed to premium and natural organic supermarkets—"can, in appropriate circumstances, be worthy of antitrust protection." *Whole Foods*, 548 F.3d at 1037 (Brown, J.) (citing DOJ and FTC, 1992 Horizontal Merger Guidelines § 1.12, 57 Fed. Reg. 41,552, 41,555 (1992)).  Judge Brown went on to say:

> In particular, when one or a few firms differentiate themselves by offering a particular package of goods or services, it is quite possible for there to be a central group of customers for whom "only [that package] will do." . . . Such customers may be captive to the sole supplier, which can then, by means of price discrimination, extract monopoly profits from them while competing for the business of marginal customers.

---

[19] The FTC cites to the "distinct customers" factor in *Brown Shoe* as support for defining a market around a targeted customer.  However, *Brown Shoe* only listed "distinct customers" as one of many factors for courts to consider in defining a market.  *Brown Shoe*, 370 U.S. at 325.  It did not endorse defining a market around a group of targeted customers.

*Whole Foods*, 548 F.3d at 1038 (Brown, J.) (quoting *Grinnell*, 384 U.S. at 574) (alteration in original).

Judge Kavanaugh, in dissent, rejected defining a market around a "core customer." *Whole Foods*, 548 F.3d at 1062 (Kavanaugh, J., dissenting). According to Judge Kavanaugh, "there is no support in the law for that singular focus on the core customer. Indeed, if that approach took root, it would have serious repercussions because virtually *every* merger involves some core customers who would stick with the company regardless of a significant price increase."[20] *Id.* The relevant question for market definition, according to Judge Kavanaugh, is not whether a die-hard group of core customers would be impacted by a substantial price increase, but whether the merged company "could increase prices by five percent or more without losing so many marginal customers as to make the price increase unprofitable." *Id.*

### 2.   *Evidence Supporting a National Broadline Product Market*

Ultimately, the court here need not resolve the *Whole Foods* disagreement over defining a market around a "core" customer. That is because the ordinary factors that courts consider in defining a market—the *Brown Shoe* practical indicia and the Merger Guidelines' SSNIP test—support a finding that broadline distribution to national customers is a relevant product market. *See, e.g.*, Areeda & Hovenkamp 3d ed., *supra*, ¶ 533d ("If the defendant *can* profit by charging pharmacies a price significantly over its cost, then the pharmacy sales are a relevant market[.]").

---

[20] The Merger Guidelines do not, for instance, set forth how a court is to distinguish a "targeted" group of customers from customers in general. This gives rise to the question of what limiting principles or factors a court should apply in defining a price discrimination market. Absent limitations, price discrimination against a single customer might be used to justify blocking a merger. This is not a mere theoretical possibility. According to the Merger Guidelines, "[i]f prices are negotiated individually with customers, the hypothetical monopolist test may suggest relevant markets that are *as narrow as individual customers*." Merger Guidelines § 4.1.4 (emphasis added).

a.    Industry and public recognition

Among the most compelling evidence supporting a product market for national customers

is the fact that regional broadliners have formed cooperatives, such as DMA and MUG, to compete

for customers with a geographically dispersed footprint.  Regional distributors, because of their

limited footprints, do not have the capacity to serve customers with multi-regional needs across all

of their locations.    Only Sysco and USF have that capacity.   These cooperatives were formed

specifically to compete against Sysco and USF, by enabling regional competitors to combine to

provide nationwide or multi-regional delivery and, importantly, to offer a single point of contact

for the customer.  Dan Cox, the President and CEO of DMA, explained that DMA was formed in

1988 as a competitive response to Sysco's merger with another company, Continental.  *See*

PX00565-051 at 202.  He explained that "[w]hen that industry event took place, it was the first

time that there was truly a national platform for foodservice distribution." *Id.*  Put simply, business

ventures like DMA would not exist if there were not a separate market for customers who have

national or multi-regional distribution needs.  *See Rothery Storage*, 792 F.2d at 218 n.4 (stating

that courts must "assume that economic actors usually have accurate perceptions of economic

realities").

Equally compelling evidence of the national-local distinction comes from a report done by

the management consulting firm, McKinsey & Co., whom Sysco hired to assist with merger

integration.    After closely analyzing the two companies' operations, McKinsey prepared a

presentation in July 2014, titled "National, Intermediate, and Field Coverage Models."   The

presentation observed that "Sysco and US Foods have different approaches to *grouping customers*

and determining service models. . . .  Both companies effectively operate two service models with

distinct capabilities to serve *two types of customers*."  PX09010-002 (emphasis added).   The

45

presentation described "National Customers" as those who "use complex contracts with margin schedules, make online purchases of proprietary products, require auditing support, and coordinate across multiple markets." *Id.* By contrast, "Field Customers" were those who "make weekly purchases through in-person consultations, receive specialist support tailored to independent restaurants, require minimal auditing support, and operate in 1 or few markets." *Id.* McKinsey further observed that national customers' "requirements" included "[s]et margin schedule contract[s]"; "[e]fficient ordering across multiple locations"; "[l]arge number[s] of deviated, proprietary and close-coded products"; "[r]egulatory and audit support"; "[i]n-depth reporting"; and "[c]onsistency of service, pricing and products across multiple [m]arkets." PX09010-004. Field customers' "requirements," on the other hand, included the "[a]bility to make decisions each week along with consultation"; "[a]ccess to national, commodity, and some proprietary products"; "[f]ull business, culinary, and product support for independent businesses"; and "minimal" "[c]oordination across geographies." *Id.* McKinsey ultimately recommended that the companies recognize and build a new service model around a third kind of customer—an "Intermediate" customer—who would be identifiable based on five variables: (i) national contract/no contract; (ii) nature of industry; (iii) number of markets; (iv) number of regions; and (v) size of annual sales. PX09010-007. The McKinsey presentation identified as "conclusively" national those customers who operate in three or more markets or two or more regions. *Id.*

McKinsey is not the only industry analyst or expert to acknowledge that national customers form a market distinct from local buyers. Cleveland Research Company, an investment research firm, produced an analyst report on Sysco after the merger's announcement and recognized that Sysco and USF serve a distinct group of national customers. One of the report's conclusions was that "Sysco/USF will [be] able to keep most of their larger contracted and *national account*

46

*customers* for the near- and medium-term due to national scale and existing contracts . . . . Based on our research, most national operators prefer to deal with one distributor because it is more efficient and less expensive than dealing with several regional players." PX09332-006 (emphasis added).

The industry's trade group, the International Food Distributors Association ("IFDA"), also recognizes a distinction between national and local customers. IFDA produces a Quarterly Operations survey that reports separate sales figures for "national" and "street" accounts. PX00570-004 at 78. IFDA's President, Mark Allen, explained that IFDA distinguishes between the two because "the dynamics between the two [types of] businesses might be a little bit different. The operating metrics might be a little bit different." *Id.* at 80.

Defendants' ordinary course documents also recognize the national-local distinction and tout their strategic advantage as to the former. *See H&R Block*, 833 F. Supp. 2d at 52 ("When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents."). A Sysco "Investor Day" presentation from 2010 distinguishes the company's "Contract Sales (Broadline)" from "Street Sales," PX03101-010, and separates its "Key Competitors - National," from regional competitors, PX03101-020. Similarly, a presentation entitled "Board of Directors Strategy Sessions," dated July 2010, distinguishes between Sysco's market size for "corporate contracts"—defined to include "major foodservice management (FSM) sales, major group purchasing organization (GPO) sales, and major chain sales (non FSM or GPO)"—and "Street" business. PX01008-006.

USF has similar documents. An internal USF presentation, titled "Business Overview," describes "[USF's] Customers" as falling into three categories: (i) "Street: Independent restaurants or small local chains"; (ii) "National Accounts: Contracted customers located across the country,"

including acute and long-term healthcare facilities, hotels and the hospitality industry, schools, and U.S. military and government agencies; and (iii) "National Chain Restaurants: Fast food and quick-serve establishments." PX03122-004. *See also* PX03034-006 (similarly categorizing the company's customers). A USF "Investor Presentation" from November 2012 describes USF as the "2nd largest national broadline distributor," PX03000-006, and touts its "[a]bility to leverage our national scale to cost effectively service customers nationally," PX03000-014. Further, it distinguishes between "National Scale," where "US Foods is the second-largest broadline foodservice distributor in the U.S.," and "Local Scale," where "US Foods is estimated #1 or #2 position in ■ of served markets," PX03000-014. *See also* PX03007-007 (internal document in which KKR & Co., one of USF's private equity owners, distinguishes between "Street and National Account customer segments").

Other key players in the industry also recognize that national customers are different. For instance, the President and CEO of PFG, George Holm, agreed that "Sysco and US Foods are the only two distributors for broadline with the capability to serve national broadline customers with locations dispersed throughout the United States," including foodservice management companies, GPOs, large healthcare systems, and certain restaurant chains. Hr'g Tr. 596. Representatives of DMA and Reinhart likewise referred to national customers as those that are geographically dispersed and need a single point of contact. *See* PX00412-002-003; PX00415-004.

b.   Distinct customer needs

There is ample record evidence that national customers' needs differ from those of local customers. The McKinsey analysis described above concisely summarized those distinctions. PX09010-004.

48

For starters, national customers, because of their dispersed geographic presence, often require a broadliner to meet their foodservice needs in more than one region. As a result, the number of distribution centers in a broadliner's network is often an important factor for such customers. In sharp contrast, according to Sysco, "all, or almost all," of its "local contract customers" are served by only one distribution center. PX01400-001.

The Defendants' ordinary course documents highlighted their comprehensive distribution networks as a competitive advantage for serving national customers. *See, e.g.*, PX03000-014 (USF presentation touting its "[a]bility to leverage our national scale to cost effectively service customers nationally"); PX00247-001-002 (USF email communication to ███████ describing the "US Foods Value Proposition" as including "Privately held National Distribution footprint company"; "Single IT operating platform nationally"; and a "Single Point of Contact"); PX01062-005 (Sysco presentation to Aramark highlighting that Sysco's "national footprint, strong service approach and our breadth of product offerings is what differentiates us from our competition"). As USF's David Schreibman acknowledged during the evidentiary hearing, "US Foods['] leading national market position is due to US Foods['] geographic presence that includes 62 distribution centers across the United States." Hr'g Tr. 1520-21. He also acknowledged that Sysco was the only company with greater scale than USF. *Id.* at 1522.

In addition to multi-regional distribution capabilities, national customers generally demand a set margin contract that applies across multiple locations. As PFG's George Holm testified, a single contract enables customers to simplify contract administration and to reduce administrative costs. *Id.* at 600-02. Additionally, national customers often use RFPs and/or bilateral negotiations to award broadline foodservice distribution contracts. *Id.* at 1595-97. In sharp contrast, pricing for local or "street" customers, according to Sysco, "[is] ultimately the result of individual

49

negotiations between the customer and [broadliner]" and "can vary on a weekly and even daily basis." PX06057-032.

National customers also seek a single technology platform for handling their purchases. Consolidating purchasing through a single ordering platform creates efficiencies and cost savings, particularly as it relates to managing direct contracts with manufacturers and administering price changes. The importance of this feature is evidenced by DMA's development of a single ordering platform that enables customers to purchase from its members. Indeed, DMA promotes its technology platform as superior to Sysco's and USF's. PX00565-006 at 23-24. If national customers had not demanded such a feature, DMA would not have developed it.

Finally, product consistency is a factor for some national customers, particularly for those who wish to purchase private label products. *See* PX09010-004 (McKinsey report identifying as a "Customer requirement[]" for "National" customers "consistency of service, pricing, and products across multiple Markets"). Large customers can achieve a high degree of product consistency through direct contracting with product manufacturers or by purchasing proprietary brands stocked by Defendants. DX-01359 at 73 (Dr. Bresnahan report observing that "one way customers that value consistency achieve it is through direct negotiation with manufacturers to create propriety products" and that "[c]ustomers can also rely on national brands to ensure consistency"). However, because private label goods offer a strong value benefit, if a national customer wishes to purchase such goods and have them available across all of its locations, it can do so most efficiently through a broadliner with national geographic scope. *See* Hr'g Tr. 600 (George Holm of PFG stating that one reason national customers prefer to contract with Sysco or USF is that "[w]here they have a preference for a private brand, [ ] it is the same product [across] their system").

50

c.    Defendants' Operations

Both Sysco and USF operate dedicated sales groups from their national headquarters that are responsible for negotiating and managing contracts with customers who use multiple distribution centers. *See Grinnell*, 384 U.S. at 572-74 (holding that centralized station security services operated on a national level is a relevant product market). Sysco refers to these customers as "corporate multi-unit customers," or CMUs. USF refers to them as "national sales customers." According to USF's Senior Vice President for National Sales, Tom Lynch, each national customer in his group has a single USF representative who is responsible for that customer. The largest customers are assigned a full-time dedicated employee to manage the account. PX00517-014-015 at 56-58.

d.    SSNIP Test

Contrary to what Defendants contend, Dr. Israel did perform a SSNIP test to determine whether there is a separate product market for national customers. That SSNIP test was performed as an element of the SSNIP test that Dr. Israel used to assess whether broadline distribution was a relevant product market. As Dr. Israel testified, he applied to national customers the same 10 percent gross margin that he used to calculate the aggregate diversion ratio for all customers. Hr'g Tr. 1005 (stating that he used a 10 percent gross margin "to both local and national customers"). He derived the actual diversion for national customers based on the RFP/bidding data provided by the defendant companies. *Id.* at 1009 (describing the "RFP/bidding data" as "really national [customer] data"). Using the same methods discussed above, Dr. Israel calculated the actual diversion for Sysco's national customers to be [over 70%] and the actual diversion for USF's national customers to be [over 70%] . In other words, over [70%] of the time (based on potential revenue from sales opportunities), when Sysco or USF lost a bid opportunity for a

national customer, it was to another broadliner. Because these percentages were greater than the aggregate diversion ratio of 50 percent, Dr. Israel concluded that broadline service to national customers was a relevant market. In other words, Dr. Israel found that only 50 percent of national broadline customers would need to remain within the broadline market to make a price increase profitable, while the actual percentage of national customers who would remain within the broadline market (by switching to another broadliner) was greater than 50 percent. Dr. Israel's calculations, therefore, indicated that broadline distribution to national customers was the relevant product market.

The court already has expressed its reservations about relying on the RFP/bidding data to precisely calculate the aggregate diversion ratio. But, as before, the court finds that the ultimate conclusion of the SSNIP test—that broadline foodservice to national customers is a relevant product market—is supported by the weight of the evidence. Numerous national customer witnesses testified that other channels of distribution were not adequate substitutes for broadline distribution.[21] Although Defendants have shown that some national customers who were served by broadliners are now served by systems or systems-like distributors—most notably, Subway and Five Guys—those are the exceptions. Subway and Five Guys, because of their limited menus, are more amenable to substituting to a systems model. The same simply cannot be said of other large national customers, like GPOs, foodservice management companies, and hospitality chains, which rely heavily on broadliners.

---

[21] *See* Hr'g Tr. 143-145 (Christine Szrom, fact witness for U.S. Department of Veteran Affairs, explaining that she is not familiar with systems distribution and could "absolutely not" use a cash-and-carry distributors); Hr'g Tr. 214-17 (James Thompson, Head of Procurement for Interstate Hotels and Resorts, stating that "it would be very difficult if not impossible" to operate Interstate's foodservice distribution without a broadliner and that specialty is not a substitute for broadline distribution); PX████-002 (Joan Ralph, Group Vice President at Premier, Inc., saying that "[e]ven if we choose one day to contract with systems distributors, specialty distributors, or cash and carry stores, each would be as an additional, distinct service for our members who may need a quick, last-minute item or two; none could replace or serve as a substitute for broadline distribution services"); PX████-002 (████████████ ████████, noting that ████████ cannot contract with a systems distributor or use other forms of distribution).

c.      Defendants' arguments against a national customer market

Asserting that there is no separate product market for national broadline customers, Defendants first argue that the national-local distinction is "arbitrary" because it is based on nothing more than customer preference about account management.  Defendants' executives testified that Sysco's CMU customers and USF's national customers are so designated, not because of any particular characteristic or group of characteristics, but purely because the customer prefers to have its account managed by the headquarters sales team, instead of by its local distribution center.  The FTC's and Dr. Israel's reliance on the companies' administrative designation, Defendants argue, leads to arbitrary classifications.  For example, some of Defendants' customers who use a small number of distribution centers are counted by the FTC as "national" customers. As Dr. Hausman demonstrated, 37 percent of Sysco's CMU customers use five or fewer distribution centers and 55 percent use ten or fewer.  And, for USF, 51 percent of their national customers use five or fewer distribution centers and 67 percent use ten or fewer.  Hr'g Tr. 1976. Additionally, similarly situated customers—in terms of size, number of distribution centers, revenues, etc.—are sometimes treated differently.  One customer may be identified as national and another as local, simply because one prefers to be managed from headquarters and the other from the local distribution center.

Defendants are correct that their "national" customer lists are over-inclusive—not every customer on those lists has multi-regional distribution needs.  And they are also correct that the FTC could have more accurately defined a class of "national" customers by testing each candidate national customer against specific "national" criteria, such as the number of distribution centers used.  But, ultimately, for the purpose of defining a product market, the court finds that the parties'

"national" customer designation is a useful proxy for customers requiring geographically dispersed distribution and attendant services.

As the graphic below prepared by Dr. Israel shows, if the merger were to occur, a significant proportion of the combined company's national customer revenues would come from customers who use a large number of distribution centers.  PX09375-077, Figure 3.  National customers using more than 35 distribution centers would account for ■ percent of a merged Sysco-USF's revenue; national customers using more than 24 distribution centers would account for ■ percent of revenue; and national customers using at least 10 distribution centers would account for ■ percent of revenue.  Those figures demonstrate that Defendants' national-customer designations capture those key customers (based on revenues) who use a large number of distribution centers.  The "national" designation includes, among others, the largest GPOs, like Premier, Novation, and MedAssets, each of whom uses over ■ distribution centers; the largest foodservice management companies, like Sodexo, Aramark, and Compass, each of whom uses more than ■ distribution centers; the largest hotel management company, Hilton, which uses ■ distribution centers; and the second largest government customer, the U.S. Department of Veterans Affairs, which uses ■ distribution centers (the largest is the U.S. Department of Defense, which uses ■ distribution centers).  PX09375-076, Table 5.  Thus, for these customers, the label "national" is not merely administrative; it accurately reflects this high revenue-generating group's actual needs.  The fact

that some smaller customers are included among the Defendants' "national" designations does not mean that the designation lacks evidentiary value for defining a market for national customers.

**Figure 3**

**Sysco and USF 2013 Revenues by Number of Distribution Centers Used**



Next, Defendants assert that defining a price discrimination market around national customers is untenable because the FTC failed to show that so-called national customers shared any objectively observable characteristics that would enable the combined company to price discriminate against that group. *See* Merger Guidelines § 3 (stating that "differential pricing" is an essential element of price discrimination, which "may involve" offering different pricing to different types of customers "based on observable characteristics"). In other words, they argue that this grouping of customers is so heterogeneous that there is no common, identifiable

55

characteristic that could serve as a proxy for determining which customers in the broadline market have inelastic demand.

Defendants are undoubtedly correct that, even among their largest customers, there is great variety in the customers' servicing needs and requirements. But price discrimination can occur even when customers do not have common observable characteristics. As the Merger Guidelines state, markets for targeted customers may exist "when prices are individually negotiated and suppliers have information about customers that would allow a hypothetical monopolist to identify customers that are likely to pay a higher price for the relevant product." Merger Guidelines § 4.1.4; see also Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 49, 93 (2010) (observing that, in markets for intermediate goods and services, "prices typically are negotiated and price discrimination is common").

Here, the evidence is clear that Defendants engage in individual negotiations with their national customers and possess substantial information about them. Indeed, the fact that Defendants employ substantially more sales representatives than other broadliners, PX09350-218, Table 30, and assign full-time dedicated employees to some of their largest customers is indicative of the "know-your-customer" philosophies of both firms. Defendants, therefore, already have substantial customer information that would allow them to predict which of their customers have inelastic demand and which do not. Price discrimination can occur in such a marketplace, even if the targeted customers do not share specific identifiable traits.

Finally, Defendants contend that a product market of targeted national customers does not comport with business realities. This argument has two main elements. First, they assert that, contrary to what the FTC contends, Compl. ¶¶ 5, 42, national customers do not require a broadline foodservice distributor that is national in scope. Rather, they argue, even at current prices, many

large customers spread their distribution needs over multiple regional suppliers. For instance, Defendants cite GPOs, like ███████, ███████, Amerinet, and large government agencies, like the Defense Logistics Agency, as using a regional contracting approach. Defs.' Opp'n Br. at 15. They also refer to one of the largest foodservice management companies, Sodexo, which splits its distribution into ██ regions. *Id.* And, then there is Subway and Five Guys, two large chain restaurants that have regionalized and purchase from multiple suppliers. *Id.* at 15-16. Because these types of customers can regionalize or credibly threaten to regionalize, Defendants argue, the merged company would not be able to discriminate against them on price.

But Defendants' argument founders when faced with the actual purchasing habits of the industry's largest customers. The evidence shows that the bulk of the broadline purchasing done by most geographically dispersed broadline customers is still done through Sysco and USF. Of Avendra's members' broadline spend, ██ percent is with Sysco and USF. Pl.'s Corrected Proposed Findings of Fact and Conclusions of Law, ECF No. 173 at 114 [hereinafter PFF]. Members of other GPOs similarly purchase a large percentage of their goods from Sysco and USF. The total broadline spend of Premier,[22] Novation, MedAssets, and HPSI members with Sysco and USF is, respectively, ██ percent, ██ percent, ██ percent, and ██ percent. *Id.* at 113-15; FTC Closing Arg. Slides at 35. Large foodservice management companies similarly make the bulk of their broadline purchases from Sysco and USF. Sodexo, Aramark, Compass, and Centerplate, respectively, spend ██ percent, ██ percent, ██ percent, and ██ percent of their broadline foodservice distribution dollars with Sysco and USF. PFF at 113-16; FTC Closing Arg. Slides at 35. The story is similar for large hospitality customers. Two of the largest, Hilton and Interstate,

---

[22] As to Premier, the person responsible for its foodservice program, Joan Ralph, testified that ███████████████████████████████████████████████ ████████████████████████████████████████████████. Hr'g Tr. 474; PX00475-001-002.

allocate ▮ percent and ▮ percent of their broadline spend, respectively, to the two companies. PFF at 114, 116; FTC Closing Arg. Slides at 35. Even the Defense Logistics Agency, which contracts regionally, dedicates ▮ percent of its broadline spend to Sysco and USF. PFF at 116; FTC Closing Arg. Slides at 35.

The court infers from this evidence that geographically dispersed customers view Sysco and USF as having significant comparative advantages over regional distributors, particularly because of their far-reaching distribution networks. Though some customers have spread their business over multiple broadliners, a significant portion (as measured by total revenues) have not. Indeed, PFG's George Holm observed that the "*clear trend* amongst national broadline customers is to move toward a single nationwide provider." Hr'g Tr. 598 (emphasis added); PX09081-002 (letter from PFG's counsel to FTC, dated November 14, 2014, stating the same). *See Brown Shoe*, 370 U.S. at 332 (footnote omitted) ("Another important factor to consider is the trend toward concentration in the industry."). Mr. Holm further admitted that either Sysco or USF essentially wins every RFP issued by a national customer. Hr'g Tr. 598-99. And PFG acknowledged by letter to the FTC that, even as the country's third-largest broadliner, "PFG has difficulty competing for national broadline accounts because it does not have a nationwide footprint of broadline distribution centers." PX09081-001. Other large regional broadliners have said the same about their own businesses models.[23] Defendants' contention—that a product market defined around national customers does not comport with business reality because such customers have regionalized or can regionalize—is thus belied by the record evidence.

---

[23] *See, e.g.*, PX00415-004 (Reinhart); PX00416-003 (Merchants); PX00434-003-004 (Labatt); PX00438-002-003 (Cash-Wa); PX00443-005 (Ben E. Keith); PX00449-003 (Jacmar); PX00451-005 (Services Group of America); PX00458-004 (Nicholas & Co.); PX00460-002-003 (Shamrock); PX00529-047-048 at 188-89 (Gordon).

Second, Defendants argue that margin data shows that, as a merged entity, they would not be able to price discriminate against national customers.   Dr. Hausman demonstrated that Defendants' margin on sales to customers who use fewer distribution centers is actually *higher* than their margin on sales to those who use more.  DX-01355 at 58-61.  Defendants contend that under the FTC's theory, they presently have a duopoly as to national customers, yet they do not earn duopoly profits on that customer class.  Defendants thus maintain that, just as they cannot today price discriminate to earn duopoly profits, they would not be able to price discriminate after the merger to earn monopoly profits.

Defendants' argument, however, is unconvincing.  Defendants' present inability to earn duopoly profits on national customers is probably because large customers can keep prices down by leveraging the defendant companies against one another.  As the Cleveland Research Company observed: "Based on our research, **we believe both Sysco and US Foods have priced each other down competing for larger national/regional contract accounts** over the last several years." PX09332-004.  The ability of large buyers to keep prices down, functioning as what is known in antitrust literature as "power buyers," *see Cardinal Health*, 12 F. Supp. 2d at 58-59; Merger Guidelines § 8, depends on the alternatives these large buyers have available to them, *see* Shapiro, *supra*, at 95; Areeda & Hovenkamp 3d ed., *supra*, ¶ 943a.  If a merger reduces alternatives, the power buyers' ability to constrain price and avoid price discrimination can be correspondingly diminished.  *See* Merger Guidelines § 8 ("Normally, a merger that eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage will harm that buyer.").  Thus, the fact that Defendants are currently unable to price discriminate against national customers does not mean that they would be unable to do so as a merged firm.

### C.     Product Market Summary

Having considered and weighed the parties' arguments and evidence, the court concludes that the FTC has carried its burden of showing that, for purposes of merger analysis, (i) broadline foodservice distribution is a relevant product market, and (ii) broadline foodservice distribution to national customers is also a relevant product market.

### D.     Relevant Geographic Market

The court now turns to the second part of defining the relevant market, which involves determining the relevant geographic market. The Supreme Court has stated that, for Section 7 of the Clayton Act, the relevant geographic market is "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm." *Marine Bancorp.*, 418 U.S. at 620-21. Stated differently, "[t]he proper question to be asked . . . [is] where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *Phila. Nat. Bank*, 374 U.S. at 357; *see also Cardinal Health*, 12 F. Supp. 2d at 49 (citation omitted) (internal quotation marks omitted) (stating that the relevant geographic market is "the area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition"). Like the product market, the geographic market must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336-37 (footnote omitted) (internal quotation marks omitted). The Supreme Court has recognized that an "element of 'fuzziness would seem inherent in any attempt to delineate the relevant geographical market,'" and therefore "such markets need not—indeed cannot—be defined with scientific precision." *Conn. Nat. Bank*, 418 U.S. at 669 (quoting *Phila. Nat'l Bank*, 374 U.S. at 360 n.37). That said, the relevant geographic market "must be sufficiently defined so that the

[c]ourt understands in which part of the country competition is threatened." *Cardinal Health*, 12 F. Supp. 2d at 49.

The FTC contends that there are two relevant geographic markets in this case. For national broadline customers, the relevant geographic market is nationwide. For local broadline customers, the relevant geographic markets are localized around Defendants' distribution centers.

With regard to national customers, for essentially the same reasons that the FTC asserts that there is a product market for broadline distribution to national customers, the FTC asserts that the geographic market for those customers is nationwide. The FTC relies on the fact that Defendants plan on a national level and have "national account" teams dedicated to national customers; their contractual pricing and service terms with national customers apply across regions; and their competition for national customers is largely other broadliners with nationwide coverage.

As for local customers, as discussed in more detail below, the FTC's local geographic markets were constructed by Dr. Israel and are premised on customers' proximity to Defendants' distribution centers. The basic idea is that, for local customers, distance to a distribution center is a key service factor and, for Defendants, distance traveled from a distribution center to make deliveries is a critical cost component. The FTC alleges that the merger threatens to harm competition in 32 local geographic markets where Sysco and USF together currently have dominant market shares. Compl. ¶ 60.

Defendants dispute that there is a nationwide geographic market for the same reasons that they contend that there is no national customer product market. As for the local geographic markets, Defendants aggressively challenge the methodology that Dr. Israel used in defining local markets. Their primary criticism is that the geographic areas are drawn so narrowly that they

exclude actual competition from the relevant market. This results, they contend, in local market concentrations that artificially inflate Defendants' market shares.

### 1.    National Market

Although the physical act of delivering food products occurs locally, for national customers the relevant geographic area for competitive alternatives is nationwide, primarily because of their geographically dispersed footprint. Defendants compete within this market by touting their nationwide distribution capabilities to these customers; bidding against other broadliners with multi-regional capabilities (which is to say, against each other and the regional cooperatives); coordinating the marketing, negotiating, and managing of these customers through their "national account" teams; and entering with these customers into a single contract whose terms, including pricing, apply across regions. For these reasons, the court finds that the relevant geographic market for broadline foodservice to national customers is nationwide. *See Grinnell*, 384 U.S. at 575-76 (finding a national geographic market where central station services "operated on a national level," and there was "national planning," a nationwide schedule of prices, and nationwide contracting for multi-state businesses); *Cardinal Health*, 12 F. Supp. 2d at 50 (finding a national geographic market where evidence showed that "GPOs negotiate contracts with several wholesalers, making the same prices available throughout the country to all of their members—local, regional, or national").

### 2.    Local Markets

Defining the local geographic market presents a far greater challenge. Not surprisingly, there is no industry standard for delineating the area that makes up a local geographic market for broadline distribution. Each local market has its own unique attributes. Customer composition and concentration differs across markets; so does the demand for products, with SKU variations

reflecting local tastes and palettes. Average driving distances for foodservice distributors vary depending on the density of the area, with longer hauls more common in rural parts of the country and shorter trips more prevalent in urban areas. And, of course, the competitors vary from market to market.

The FTC tasked Dr. Israel with defining the local geographic markets. He constructed them as follows. In his first step, Dr. Israel drew circles around the location of each Sysco and USF distribution center. To determine the size of each circle, Dr. Israel used a radius, referred to as the "draw distance," that, on average, captured 75 percent of the distribution center's sales to local customers. The length of each distribution center's 75 percent draw radius differed. For example, the 75 percent draw distance around Sysco's Billings, Montana, facility was 262 miles, whereas the 75 percent draw distance around Sysco's Jersey City, New Jersey, facility was only 24 miles. PX09350-221-224, Table 38. What that means is Sysco drives over 200 miles further to capture 75 percent of its local sales in Billings than it does in Jersey City. That disparity makes sense, as more populated areas correspond to higher customer concentrations and shorter delivery distances.

In his second step, Dr. Israel identified each company's local customers that fell within an area of intersection between the draw circle around the Sysco distribution center and the draw circle around the USF distribution center. This area of intersection was termed the "overlap area." These "overlap customers," according to Dr. Israel, were the customers most likely to suffer harm from the merger, because these were the customers who would be left with one less alternative supplier after the merger. Exhibit 40 from Dr. Bresnahan's report, which is reproduced below, shows Dr. Israel's methodology in the Omaha, Nebraska, area. The blue-dotted circle corresponds

to Sysco's 75 percent draw area, and the green-dotted circle corresponds to USF's.  The dark gray

area corresponds to the "overlap customers."  DX-01359, Ex. 40.



**EXHIBIT 40**
**DISTRIBUTION CENTERS LOCATED NEAR THE FTC'S CONTESTED LOCAL AREAS**
**OMAHA, NE/COUNCIL BLUFFS, IA**

| | | |
|---|---|---|
| ⊛ Sysco Broadline | ★ US Foods Divestiture | ⊛ Major Broadliner |
| ➖ 75% Sysco Draw Area (91.4 mile radius) | ⊛ US Foods Broadline | ⊕ Major Broadliner with Sales Data |
| | ➖ 75% USF Draw Area (90.8 mile radius) | |

In his third step, Dr. Israel identified the broadline distributors who could compete for the

customers in the overlap area.  To do this, Dr. Israel drew circles around each overlap customer

using the 75 percent draw radius.  This created a larger circle that moved the outer boundaries of

the overlap area by the same radius as the 75 percent draw area, which is represented by the light

gray area in Exhibit 40 above.  According to Dr. Israel's analysis, the light gray area is the area to

which customers can practically turn for alternative sources of broadline distribution.  All of the

competitors located within the light gray area were factored into Dr. Israel's local market share computations.

Defendants attack Dr. Israel's "circle drawing exercise" as "arbitrary" and not reflective of industry realities. Defs.' Opp'n Br. at 27. Specifically, they assert that Dr. Israel's methodology is flawed because it assumes that competitors will drive no greater distance than Sysco's or USF's 75 percent draw radius to serve customers. Defendants point to competitor declarations and testimony showing that in many of the 32 local markets in which the FTC claims Defendants have a dominant market share, competitors are willing to, and do, drive distances greater than the 75 percent draw radius to compete for and deliver to customers.

Notwithstanding this criticism, the court finds that there is nothing inherently "arbitrary" about Dr. Israel's methodology in defining the local markets. To the contrary, given the absence of an industry standard for defining a local market, Dr. Israel's methodology provides a practical approach and solution to an otherwise thorny problem. Dr. Israel's premise in defining these markets—that driving distance matters—is amply supported by the record and common sense. Customers who are farther away from a distribution center cost more to service. Longer distances correspond to, among other things, higher gas usage, more labor hours, and increased wear and tear on trucks. Given that the geographic market need not be defined by "metes and bounds," *Conn. Nat'l Bank*, 418 U.S. at 669 (citation omitted) (internal quotation marks omitted), Dr. Israel's 75 percent draw methodology identifies "the area of competitive overlap, [where] the effect of the merger on competition will be direct and immediate," *Phila. Nat'l Bank*, 374 U.S. at 357. *See also Conn. Nat'l Bank*, 418 U.S. at 670 n.9 (remanding to the district court to define the local market and observing that the "federal bank regulatory agencies define a bank's service area as the geographic area from which the bank derives 75% of its deposits"). The court therefore

concludes that the relevant local geographic markets are the areas of overlap resulting from

Dr. Israel's 75 percent draw methodology.

Ultimately, what really troubles Defendants about Dr. Israel's "circle drawing exercise" is

not the resulting geographic areas, but what those areas mean for calculating Defendants' local

market shares. The court considers those arguments in the next section.

## II.    **THE PROBABLE EFFECTS ON COMPETITION**

Having concluded that the FTC has carried its burden of establishing a relevant market—

both a nationwide market for broadline foodservice to national customers and various local

markets for broadline foodservice to local customers—the court turns next to "the likely effects of

the proposed [merger] on competition within [those] market[s]." *Swedish Match*, 131 F. Supp. 2d

at 166. As the Court of Appeals explained in *Heinz*, the government "must show that the merger

would produce 'a firm controlling an undue percentage share of the relevant market, and [would]

result[ ] in a significant increase in the concentration of firms in that market.'" 246 F.3d at 715

(quoting *Phila. Nat'l Bank*, 374 U.S. at 363). "Such a showing establishes a 'presumption' that

the merger will substantially lessen competition." *Id.* (citation omitted).

The Court of Appeals has held that the FTC can establish its *prima facie* case by showing

that the merger will result in an increase in market concentration above certain levels. *Id.* "Market

concentration is a function of the number of firms in a market and their respective market shares."

*Arch Coal*, 329 F. Supp. 2d at 123. A common tool used to measure changes in market

concentration is the Herfindahl-Hirschmann Index (HHI). *Heinz*, 246 F.3d at 716; *see also* Merger

Guidelines § 5.3. HHI figures are "calculated by summing the squares of the individual firms'

market shares," a calculation that "gives proportionately greater weight to the larger market

shares." Merger Guidelines § 5.3. "Sufficiently large HHI figures establish the FTC's prima facie

case that a merger is anti-competitive." *Heinz*, 246 F.3d at 716. The Merger Guidelines, which provide "a useful illustration of the application of HHI," *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 n.4 (D.C. Cir. 1986), state that a market with an HHI above 2,500 is considered "highly concentrated"; a market with an HHI between 1,500 and 2,500 is considered "moderately concentrated"; and a market with an HHI below 1,500 is considered "unconcentrated," Merger Guidelines § 5.3. Furthermore, a merger that results in "highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power." *Id.* In *Heinz*, the Court of Appeals recognized that an increase in HHI by 510 points "creates, by a wide margin, a presumption that the merger will lessen competition." 246 F.3d at 716.

### A.    Concentration in the National Broadline Customer Market

#### *1.    Dr. Israel's National Broadline Customer Market Shares Calculations*

In some cases the merging parties' market shares and post-merger HHIs are seemingly uncontroversial. *See, e.g.*, *Staples*, 970 F. Supp. at 1081-82; *H&R Block*, 833 F. Supp. 2d at 71-72. Not so here. Because there are no industry-recognized market shares for national broadline customers, the FTC tasked Dr. Israel with calculating the market shares and the HHIs. Not surprisingly, Defendants vigorously contested his methodology and conclusions.

Dr. Israel calculated Defendants' national customer shares as follows. As his first step, he identified Defendants' individual sales to national broadline customers, *i.e.*, the numerator for the market share calculation. Those sales figures came directly from the parties' "national" customer designations: for Sysco, its sales to CMU customers, and for USF, its sales to national customers.

Next, Dr. Israel determined the total sales by all broadline distributors to national customers, *i.e.*, the denominator for the national share calculation. Again, because there is no

67

industry-recognized figure for such sales, Dr. Israel estimated them. He did so in two ways. First, he aggregated the national sales of the three principal competitors for national customers—Sysco, USF, and DMA—and added in another share equal to DMA's. This total comprised the denominator for his "baseline" shares calculation. PX09350-074. The addition of another DMA-sized share to the denominator was premised on his observation from the RFP/bidding data that the size of sales to national customers by all broadliners other than Sysco, USF, and DMA was about the same as DMA's.

Dr. Israel also used a second method to calculate the total sales to national customers. He aggregated the national sales reported by the largest 16 broadliners, including DMA and MUG, in response to the FTC's civil investigative demands. This data is referred to as CID data. Dr. Israel ran several "sensitivities" on this sum, adding in sales to account for variations in CID responses (*e.g.*, some distributors did not segregate "national" from total sales). Dr. Israel also aggregated the national sales of Sysco, USF, DMA, and MUG, plus an estimate of national sales for *all* other responding distributors based on the assumption that each distributor's national-local sales ratio was the same as Defendants' ratio. Dr. Israel's various approaches yielded a total national broadline sales estimate of $28 to $30 billion. Hr'g Tr. 1177-78; *see also* PX09060-006 (PFG business plan estimating the size of the national customer market to be approximately $20 billion).

As his last step, Dr. Israel adjusted his market shares to account for the divestiture to PFG. The chart below reflects Dr. Israel's post-merger, post-divestiture market share and HHI calculations. For his "baseline" calculation, Dr. Israel determined that the parties' post-merger national broadline customer market share would be 71 percent with an HHI increase of nearly 2,000 points. His CID data-based calculations, shown as (i) through (vi) in the chart, also yielded high post-merger shares and significantly increased HHIs. Dr. Israel's most conservative

approach, in which he assumed that the top 16 broadliners had national to local sales ratios that were equal to Defendants' ratio of such shares—(iv) in the chart below—resulted in a post-merger market share of 59 percent and an HHI increase of 1,500 points.  PX09350-186, Table 18.

Table 18

Shares of Sales to National Broadline Customers, After Accounting for the Proposed Divestiture

| | Post-Divestiture Shares | Post-Divestiture HHI's | |
| --- | --- | --- | --- |
| | Combined Share | HHI | Δ HHI |
| Baseline | 71% | 5.119 | 1.966 |
| (i)    National | 68% | 4.935 | 1.953 |
| (ii)   National + Imputed National | 65% | 4.549 | 1.799 |
| (iii)  National + Regional | 66% | 4.614 | 1.822 |
| (iv)  National + Systems | 62% | 4.217 | 1.643 |
| (v)   National + Regional + Systems | 61% | 4.087 | 1.590 |
| (vi)  Parties' Ratio of National | 59% | 3.809 | 1.500 |

2.    *Defendants' Arguments*

Defendants raise a host of objections to the reliability of Dr. Israel's methodology and calculations.  They contend that his use of their "national" sales in the numerator was arbitrary because, as discussed above, not all of Defendants' "national" sales are to customers with a multi-regional footprint.  The inclusion of those sales, they contend, overstated Defendants' national market share.  They also argue that Dr. Israel's numerator included some sales to systems-like customers, such as to Five Guys, but his denominator excluded competitors' systems sales.  This asymmetry, they assert, also resulted in an overstatement of Defendants' share.  They further contend that the denominator used in Dr. Israel's "baseline" calculation is unreliable because it relies on the flawed RFP/bidding data set.  And, finally, they argue that the denominator in the CID data calculation excludes over $30 billion in sales—though the source of this number is

69

unclear.[24] They contend that these errors in developing the numerator resulted in biased market share calculations.

None of these arguments ultimately persuade the court that Dr. Israel's methodology or his market shares and HHI calculations are unreliable. The FTC need not present market shares and HHI estimates with the precision of a NASA scientist. The "closest available approximation" often will do. *PPG*, 798 F.2d at 1505 (citation omitted); *see also H&R Block*, 833 F. Supp. 2d at 72 (stating that a "reliable, reasonable, close approximation of relevant market share data is sufficient"). Indeed, in *PPG*, the FTC presented, and the Court of Appeals accepted, share calculations for "every market the evidence suggests is remotely possible," which "yield[ed] results of similar magnitudes in market concentration." 798 F.2d at 1506. Similarly, Dr. Israel ran multiple variants of his market shares and concentration analysis, using two different data sets and modifying one of these data sets, the CID data, in six different ways. Most convincing to the court was Dr. Israel's final method of calculating shares using the CID data, which assumed that all 16 of the top broadliners had the same national-local sales ratio as Defendants did. That approach yielded a low-end market share of 59 percent and an HHI increase of 1,500 points— almost three times the 510 points that the Court of Appeals in *Heinz* found created a presumption of harm by a "wide margin." 246 F.3d at 716. This variation almost certainly *underestimated* Defendants' market shares, as smaller broadliners are unlikely to have a ratio of national-local sales comparable to Defendants' ratio.

Another reason Defendants' arguments do not sway the court is that other evidence in the record supports Dr. Israel's calculations. As discussed above, the largest customers for broadline

---

[24] "Dr. Israel acknowledged that he left out $30 billion in systems distribution in the "sensitivity analysis purporting to account for systems sales." Defs.' Proposed Findings of Fact and Conclusions of Law, ECF No. 171 at 263 (citing Hr'g Tr. 1259-60).

distribution in the country—healthcare GPOs, foodservice management companies, hospitality companies, and large government agencies—make the vast majority of their broadline purchases from Defendants. These customers individually spend hundreds of millions of dollars (or more) on broadline distribution—totaling approximately half of the national broadline market (based on Dr. Israel's calculation of a total market of $28 to $30 billion). *See* FTC Closing Arg. Slides at 35. If the largest customers are presently spending between 60 to 100 percent of their total food budget with Defendants, *id.*, then Dr. Israel's low-bound, post-merger combined market share of 59 percent is consistent with market realities.

In addition, the only independent market share analysis of the broadline industry identified by the parties corroborates Dr. Israel's conclusions. The foodservice industry research firm Technomic collected 2014 sales data from the country's 43 largest broadliners. DX02016. Taken together, Technomic estimated total broadline sales to be $125 billion. Of that total, Sysco accounted for $35.7 billion and USF $23 billion, for a combined sum of $58.7 billion—nearly 47 percent of U.S. sales. *See id.*; *see also* PX09045-015 (PFG presentation to FTC stating that "[t]he two largest broadliners (Sysco and US Foods) accounted for 51% of all broadline sales in 2010," based on a study by Hale Group, "Focus on Foodservice Distribution," dated April 11, 2013); PX09045-014 (PFG presentation to FTC highlighting a 2011 Technomic study showing that Sysco and USF had a combined market share of 58 percent among the top 10 broadline food distributors).

Technomic's 47 percent combined market share estimate for *total broadline* sales is consistent with Dr. Israel's low-end, post-divestiture estimate of 59 percent for *national broadline* sales. The Technomic data did not segregate national and local broadline customers. However, because the largest customers buy disproportionately from Sysco and USF, it stands to reason that

the companies' combined market share for national customers would be greater than 47 percent, as Dr. Israel found. Even a combined market share of 47 percent (admittedly, a pre-divestiture number) can give rise to a presumption of harm. *See Phila. Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.").

### 3. *The Court's Finding as to National Broadline Customer Market Shares*

The court thus finds that the FTC has shown, through Dr. Israel's testimony and other evidence, that a merger of Sysco and USF will result in a significant increase in market concentration in the market for national broadline customers. The FTC therefore has established a rebuttable presumption that the merger will substantially lessen competition in the market for national broadline distribution.

### B.      Concentration in the Local Markets

### 1. *Dr. Israel's Local Broadline Customer Market Shares Calculations*

In addition to the market for national customers, the FTC also contends that the merged firm would create highly concentrated local markets for broadline foodservice distribution. To be precise, the FTC asserts that, in 32 different local markets, the merger between Sysco and USF would result in dramatic increases in HHIs, thereby substantially lessening the competition in those markets. Compl. ¶ 60, App. A. The FTC also maintains that the divestiture to PFG will not resolve Defendants' post-merger local market dominance.

As with the market for national customers, there is no industry study of local market shares. *See* PX09045-019 ("PFG is not aware of any systematic industry market share data."). The FTC again relied on Dr. Israel for those numbers. His starting point for calculating local share percentages was his 75 percent draw area methodology for defining the local geographic markets.

*See* PX09350-058.  As already discussed, Dr. Israel first identified the 75 percent overlap area in each local market and then identified the competitors that could serve those customers by drawing a circle with a radius equal to the 75 percent draw distance around each overlap customer.  Next, to calculate the overall local market shares, Dr. Israel calculated a customer-specific market share. That is, for each customer in the overlap area, he calculated the market shares for the competitors who were located within the customer's 75 percent draw distance radius.  Dr. Israel then aggregated each of these customer-specific shares to the local level, using weighted averages across all overlap customers.  The consequence of this methodology was that, the greater the competitor's distance from the center of the overlap area, the less weight that competitor would receive in the overall local market share calculations.  Stated differently, because these distant competitors' market shares would only come into the calculation due to customers on the borders of the overlap area, those competitors' shares would be smaller than the shares of competitors whose distribution centers were closer to the middle of the overlap area—namely, Sysco and USF.

When calculating market shares, Dr. Israel used three different metrics: (i) square footage of distribution centers; (ii) local broadline sales; and (iii) number of sales representatives. Dr. Israel used the first and third variables as proxies for revenues and as a way to confirm the market share calculations that were based on the second variable, sales revenues.  To calculate shares based on revenues, Dr. Israel used the Defendants' sales data for the numerator.  For the denominator, he used the sales numbers, where available, for local broadliners.  For those local competitors for whom he did not have actual sales data, he estimated the sales revenue based on the size of the distribution center.  PX09350-134 at n.410.  Based on those metrics, in local markets with the 20 highest increases in pre-divestiture HHIs, Defendants' combined market shares ranged

from 100 percent in San Diego, California, to over 65 percent in multiple markets. The HHI increases in each of top 20 markets were over 2,000 points. PX09350-135-137.

Dr. Israel also calculated post-divestiture market concentrations and HHI increases. According to the table below, in Memphis, Tennessee; Omaha, Nebraska; Sacramento, California; and Charleston, South Carolina, the post-divestiture combined markets shares remain above 80 percent with HHI increases in excess of 4,100, 1,400, 2,900, and 2,900 points, respectively. PX09350-213, Table 21. In seven other local markets, Dr. Israel calculated the post-divestiture combined market shares to be between 57 percent and 76 percent, with HHI increases in each case in excess of 1,500 points. *Id.*

### Table 21

### Examples of Areas with Large Change in HHI despite Divestitures

| CBSA | Post-Merger Combined Share | Delta HHI |
|------|---------------------------|-----------|
| Omaha-Council Bluffs, NE-IA | 90.3% | 1,410 |
| Sacramento--Roseville--Arden-Arcade, CA | 88.6% | 2,974 |
| Durham-Chapel Hill, NC | 75.4% | 2,807 |
| Charleston-North Charleston, SC | 80.2% | 2,947 |
| Birmingham-Hoover, AL | 57.5% | 1,542 |
| Jackson, MS | 66.0% | 2,155 |
| Memphis, TN-MS-AR | 93.8% | 4,123 |
| Columbia, SC | 72.8% | 2,315 |
| Raleigh, NC | 71.3% | 2,188 |
| Lynchburg, VA | 63.3% | 1,588 |
| Rochester, NY | 63.7% | 1,574 |

### 2.    *Defendants' Arguments*

Defendants attack Dr. Israel's local market share calculations in much the same way they did his national market share calculations—by contesting his methodology and inputs. Defendants assert that Dr. Israel's methodology was premised on the unreliable assumption that no competitor

would drive a greater distance than Sysco or USF currently does to provide broadline services. In other words, they criticize Dr. Israel's use of the same draw radius to identify the relevant local competition as he did to identify the overlap area. As a result, they argue, Dr. Israel's local market share calculations excluded sales from broadliners who travel greater distances and thereby overstated Defendants' combined market shares.

To demonstrate this point, Dr. Bresnahan presented an analysis of the Omaha, Nebraska market. He testified that, according to Dr. Israel's analysis, Defendants had combined sales in Omaha of $95 million and a combined market share of 90 percent. According to Dr. Bresnahan, Dr. Israel's methodology did not factor in at least $▇ million in sales by another local distributor, Cash-Wa, whose distribution facility is 129 miles west of Omaha—farther out than the 91-mile 75 percent draw radius that Dr. Israel had used for the area. Dr. Bresnahan based his conclusion on sales data per zip code produced by Cash-Wa, which Dr. Israel had not considered in his analysis. According to Dr. Bresnahan, the zip code data showed that in 2013, Cash-Wa made sales to customers in zip codes within the 75 percent overlap area—at least $▇ million worth—which Dr. Israel did not account for because of his driving distance assumption. Had these Cash-Wa sales been taken into account, Defendants' combined market shares and increase in HHIs would have been lower. As illustrated by his Omaha study, Dr. Bresnahan concluded that Dr. Israel's local market share methodology produced unreliable results.

Dr. Bresnahan's Omaha study convincingly demonstrated that Dr. Israel's 75 percent draw area methodology resulted in underreported competitor sales in the Omaha market. But what it did not show convincingly was by *how much*. Dr. Bresnahan's initial expert report stated that Cash-Wa's sales in the overlap area were over $▇ million. DX01359-139. At the evidentiary hearing, however, he said that Cash-Wa's sales into that area were "at least $▇ million," DX-

75

05029 at 42, and he did not explain why that number differed from his report.[25]   More

fundamentally, Dr. Bresnahan's reliance on zip code data had its limits.   As Dr. Bresnahan

conceded, the zip code data did not differentiate between local and national customers or broadline

and systems customers.  Hr'g Tr. 2186.  Dr. Israel explained that he did not use the zip code data

for that very reason, as well as the additional reason that he did not have zip code data for all local

market competitors.   In addition, Cash-Wa does substantial business selling tobacco products;

however, the zip code data does not segregate those sales.   *Id.*   As a result, although the court

agrees with Defendants that Dr. Israel's methodology excluded some local broadline sales in

Omaha, the court cannot reliably determine the extent of the underestimation.  And, notably, even

if Dr. Bresnahan's $▇ million figure consisted entirely of local broadline sales, Defendants would

still have a high combined local market share of ▇ percent ($95 million/($▇ million + $95

million) = ▇ percent).

Ultimately, the court finds that Dr. Israel's specific local market calculations is informative,

but not conclusive evidence, of the merger's potential harm to local broadline customers.  As the

Omaha study showed, because Dr. Israel's 75 percent draw methodology excluded some

competitor sales and because each local market has nuances that cannot be captured by his

methodology, the court cannot rely conclusively on Dr. Israel's precise local share calculations as

a measure of competitive harm.

The court, however, finds variations on Dr. Israel's 75 percent draw methodology to

provide persuasive evidence of the merger's impact on local markets.  Dr. Israel did more than

---

[25] The court infers that the sales figure was reduced, in part, to estimate only Cash-Wa's *broadline* sales, as opposed to all sales.  But that reason, if correct, was not made clear on the record.  Additionally, in his report, Dr. Bresnahan reported over $▇ million in sales by another broadliner, Reinhart.  However, he made no mention of Reinhart's sales in his testimony.   That may be because Reinhart reported that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇.  PX09034-019.

calculate local share percentages based on 75 percent draw areas.  He also used a 90 percent draw

area and a weighted 95 percent draw area.  Those increased draw areas captured some of the

competitor sales that the 75 percent draw area excluded.[26]  Dr. Israel then aggregated the local

market share figures across all overlap customers in all markets, using distribution center square

footage, adjusted revenues, and number of sales representatives to estimate market share.

PX09350-137-139.  As shown in the table below,[27] these alternative approaches—designated as

variations (i) and (ii)—demonstrate that for half of the customers in overlap areas, Defendants

would have a post-merger combined local market share of more than 50 percent and the HHI would

increase at least 1,300 points.  PX09350-139, Table 7.  A quarter of the overlap customers would

face even greater market concentrations:  Defendants post-merger would have at least 68 percent

in combined local market share and the HHI would increase by at least 2,000 points.  And, 10

percent of the overlap customers would face a combined market share north of 74 percent and an

HHI increase of greater than 2,500 points.  The picture that clearly emerges from these numbers

is that, in many areas across the country, USF and Sysco already control a substantial share of the

market for local broadline distribution.  A merger between the two would lead to a significant

increase in market concentration in many areas.

---

[26] In a third variant, Dr. Israel went beyond the overlap areas and performed market calculations that took into account all local broadline customers, regardless of whether they fell into the overlap area.  Dr. Israel also used a fourth variant—though not entirely clear from his report—in which he appears to have re-run his 75 percent draw methodology using all of Defendants' broadline customers in the overlap area, not just local broadline customers. PX09350-137-138.

[27] These figures are pre-divestiture share calculations.  But the local market share percentages and HHI increases are so high that, even taking into account the divestiture, when aggregated across numerous markets, these figures are unlikely to decrease enough to change the overall picture.  *See* PX09375-103-104.

Table 7

Summary Statistics for Local Market Shares under Alternative Methodologies

| | Combined Share | | | ΔHHI | | |
|---|---|---|---|---|---|---|
| | Median | 75th Pctile | 90th Pctile | Median | 75th Pctile | 90th Pctile |
| Square footage shares | | | | | | |
| Baseline | 59.8% | 71.8% | 81.5% | 1,763 | 2,375 | 3,169 |
| (i) 90% distribution distance | 58.3% | 68.3% | 75.3% | 1,557 | 2,149 | 2,621 |
| (ii) Continuous distribution distance | 55.7% | 68.3% | 82.6% | 1,369 | 2,013 | 2,765 |
| (iii) All local CBSA customers | 58.9% | 70.4% | 80.6% | 1,603 | 2,364 | 3,081 |
| (iv) All overlap CBSA customers* | 60.9% | 70.6% | 78.3% | 1,851 | 2,420 | 2,775 |
| Adjusted revenue shares** | | | | | | |
| Baseline | 62.6% | 74.7% | 86.0% | 1,574 | 2,778 | 3,094 |
| (i) 90% distribution distance | 57.2% | 71.6% | 79.2% | 1,471 | 2,342 | 2,886 |
| (ii) Continuous distribution distance | 54.6% | 70.6% | 83.3% | 1,208 | 1,849 | 3,000 |
| (iii) All local CBSA customers | 59.8% | 74.6% | 85.7% | 1,327 | 2,614 | 2,974 |
| (iv) All overlap CBSA customers* | 66.7% | 80.2% | 86.1% | 1,962 | 2,886 | 3,598 |
| Sales representative shares | | | | | | |
| Baseline | 62.5% | 70.8% | 80.8% | 1,854 | 2,406 | 3,152 |
| (i) 90% distribution distance | 58.0% | 68.0% | 74.8% | 1,594 | 2,217 | 2,531 |
| (ii) Continuous distribution distance | 52.7% | 70.5% | 86.5% | 1,345 | 2,039 | 2,655 |
| (iii) All local CBSA customers | 61.1% | 70.4% | 80.3% | 1,595 | 2,308 | 3,099 |
| (iv) All overlap CBSA customers* | 61.6% | 69.8% | 79.4% | 1,777 | 2,306 | 2,749 |

\* Includes all customers.
\*\*For variation (iv), unadjusted revenues are used.

Defendants' combined strength in local markets is corroborated by documents compiled during the Defendants' ordinary course of business. For example, in an Investor Presentation, dated November 2012, USF represented that it "estimated [having the] #1 or #2 position in ▮ of served markets." PX03000-014. Mr. Schreibman's investigational hearing testimony confirmed the present-day accuracy of that statement. Investigat'l Hr'g Tr., PX00515-017 at 65. He also confirmed that, in many of those markets, Sysco occupied the number one or two market position. *Id.*

Another USF document, a strategy document created in 2011, shows USF and Sysco with sizeable "market penetrations" in many local markets. PX03073-023-030. Mr. Schreibman testified that "market penetration" was different from "market share," as the former reflected the percentage of customers that purchased even $1 of product, whereas the latter reflected

percentages of overall sales volumes. Hr'g Tr. 1508-09. But even if "market penetration" and "market share" have different definitions, both concepts are a measure of market strength, and the "market penetration" percentages show USF and Sysco to be first and second in numerous markets. Indeed, the very same strategy document lists 54 separate markets and identifies Sysco as a competitor in each of them. Of those 54 markets, USF estimated that Sysco had the number one position in ▮ markets and that, within those ▮ markets, USF was number two in ▮. USF also estimated that it was number one in ▮ markets, with Sysco ranked number two in those same ▮ markets. And, in ▮ markets, USF viewed itself as tied for number one with Sysco. Thus, of the ▮ local markets, USF viewed Sysco or USF as the leading broadliner in ▮ and as the number two broadliner (or tied for first) in ▮. This internal assessment clearly supports Dr. Israel's local market share calculations.

Defendants offer a different ordinary course document to rebut Dr. Israel's market share calculations. In 2013, relying on a sizeable third-party sales database of 335,000 independent restaurants, USF calculated its share of sales to independent restaurants in 53 local markets. That study showed USF with market shares much lower than that shown by Dr. Israel's calculations, ranging from a high of ▮ percent in Columbia, South Carolina, to a low of ▮ percent in the "Northwest." DX-00397-002.

But Defendants' reliance on the independent restaurant study as an indicator of local market shares is problematic for several reasons. First, there is no evidence that the underlying database differentiated between purchases from broadline distributors and purchases from other channels of distribution. The evidence has shown that, among foodservice customers, independent restaurants are among the most likely to buy from other channels, such as specialty and cash-and-carry. In other words, unless broadline sales are segregated from the rest—which the restaurant

study appears not to have done—the resulting market share estimate will underestimate USF's actual share of only broadline purchases. A market share calculation that uses at its numerator purchases from *all channels* cannot be relied upon to determine USF's *broadline* market shares.

Second, no evidence was presented showing that the buying habits of independent restaurants is representative of other local broadline customers. Thus, by focusing only on independent restaurant purchasing, the data set does not provide an accurate picture of local market shares.

Third, the independent restaurant study's results conflict with other documents. For instance, USF's 2011 strategy document describes the company as having a "[s]olid #█" position in "Reno/Sacramento," PX03073-019, but the restaurant study finds a less than 10 percent share in Reno, DX-00397-002. Similarly, the strategy document describes USF as having the "#█ position" in St. Louis, PX03073-018, but the restaurant study reported only a 13.3 percent share in the "Missouri Group," DX-00397-002.

Finally, Dr. Israel's conclusions are corroborated by PFG's analysis of the local markets. In January 2014, PFG made a presentation to the FTC in which it addressed the state of competition in various local markets. PFG, at the time, was represented by antitrust counsel, Kirkland & Ellis. Because there was no comprehensive industry data for local market shares, PFG "estimated local broadline market shares based upon [distribution center] square footage, which PFG uses to gauge competitor strength in the ordinary course of business"—one of the very methods that Dr. Israel used for calculating market shares. PX09045-019. PFG observed that, "[w]hile not perfect, we believe this approach produces *directionally correct results* and can be useful in flagging areas that merit closer consideration." *Id.* (emphasis added). PFG's analysis showed that in six major markets—New York, Philadelphia, Detroit, Denver, Las Vegas, and Los Angeles—a combined

Sysco-USF, based on distribution center square footage, would control between 45 percent (New York City) to 80 percent (Las Vegas) of those local broadline markets. PX09045-020. PFG also calculated that a merger in those markets would result in HHI increases ranging from 1,000 points (New York City) to 3,100 points (Las Vegas). *Id.* Consistent with Dr. Israel's market shares and HHI calculations, PFG concluded that the "[p]reliminary findings indicate significant concentration in many local markets." *Id.*

        *3.*     *The Court's Finding as to Local Broadline Customer Market Shares*

The court thus finds, based on Dr. Israel's testimony and other evidence, that the FTC has shown that a merged Sysco-USF will significantly increase concentrations in local markets for broadline distribution. The FTC therefore has made its *prima facie* case and established a rebuttable presumption that the merger will lessen competition in the local markets.

**C.**     **Additional Evidence of Competitive Harm**

The FTC did not rely solely on increased HHIs to establish that Defendants' proposed merger would cause competitive harm. *See Baker Hughes*, 908 F.2d at 992 ("The Herfindahl-Hirschman Index cannot guarantee litigation victories."). It offered additional evidence to strengthen its *prima facie* case, to which the court now turns.

        *1.*     *Unilateral Effects—National Customer Market*

The FTC advanced a "unilateral effects" theory to argue that the merger would harm competition in both the national and local broadline distribution markets. In this section, the court considers the evidence of unilateral effects in the national customer market and subsequently turns to the evidence regarding local customer markets.

Courts have recognized that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition. *See Heinz*, 246 F.3d at 717-

19 (holding that elimination of competition between second- and third-largest jarred baby food manufacturers would weaken competition); *Swedish Match*, 131 F. Supp. 2d at 169 (finding a likelihood of unilateral price increase where merger would eliminate one of Swedish Match's "primary direct competitors"); *Staples*, 970 F. Supp. at 1083 (finding anticompetitive effects where the "merger would eliminate significant head-to-head competition between the two lowest cost and lowest priced firms in the . . . market."); *see also* Merger Guidelines § 6 ("The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition.").   In such circumstances, a merger "is likely to have unilateral anticompetitive effect if the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms." *H&R Block*, 833 F. Supp. 2d at 81.

Unilateral anticompetitive effects can arise in a host of different settings. *See generally* Merger Guidelines § 6.   Here, the FTC's case for unilateral effects rests on the fact that the broadline distribution industry is marked by negotiations between buyers and sellers.   In such a market, "buyers commonly negotiate with more than one seller, and may play sellers off against one another." *Id.* § 6.2.   If two competitors merge, buyers will be prevented from playing the sellers off one another in negotiations. *See id.* This elimination of competition "can significantly enhance the ability and incentive of the merged entity to obtain a result more favorable to it, and less favorable to the buyer, than the merging firms would have offered separately absent the merger." *Id.*

On the other hand, even if the merging parties had large market shares, if they were not particularly close competitors, then the market shares might overstate the extent to which the merger would harm competition.   Although the merging parties need not be the top two firms to

cause unilateral effects, *see, e.g.*, *Heinz*, 246 F.3d at 717-19; *H&R Block*, 833 F. Supp. 2d at 83-84, the FTC argues that the potential for unilateral effects here is magnified because Defendants are particularly close competitors and many national customers consider them the top two choices for broadline distribution. *See* Merger Guidelines § 6.2 ("Anticompetitive unilateral effects . . . are likely in proportion to the frequency or probability with which, prior to the merger, one of the merging sellers had been the runner-up when the other won the business.").

The FTC offered various sources of evidence to show that the proposed merger will result in unilateral anticompetitive effects. The evidence includes empirical data collected and analyzed by Dr. Israel, Defendants' ordinary course documents, and testimonial evidence from other market actors.

a.    Dr. Israel's RFP/bidding study

To show that Defendants were frequent head-to-head competitors—indeed, each other's closest rivals—Dr. Israel analyzed each company's bidding opportunities for national customers based on the RFP/bidding database that he compiled from the companies' records. The RFP/bidding records that Dr. Israel collected spanned a seven-year period, from 2007 to 2014. PX09375-088. He formed the database not only from the parties' reconstructed RFP data, but also from a host of ordinary course records reflecting bidding opportunities, PX09375-089-091. From this evidence, Dr. Israel concluded: "[I]n competitions for National Broadline Customer business, both USF and Sysco compete with and lose to one another much more than they compete with or lose to any other distributor and, indeed, more than all other distributors combined." PX09375-088. More specifically, based on Sysco's RFP/bidding records, Dr. Israel observed that USF appeared as a competitor for national broadline business twice as often as the next competitor and that, when Sysco lost, it lost to USF two and a half times more often than it lost to the next

competitor.  Similarly, based on USF's RFP/bidding records, Dr. Israel observed that Sysco appeared as a competitor for national broadline business four times as often as the next competitor and that, when USF lost, it lost to Sysco three and a half times more often than it lost to the next competitor.  PX09350-105-109.

Defendants disputed the reliability of Dr. Israel's RFP/bidding data study in two primary ways.  First, as already discussed, they forcefully challenged the underlying data set, arguing that neither company keeps ordinary course RFP and bidding records and that Dr. Israel's reliance on these artificially created data sets to calculate an empirical "win-loss" analysis is inherently flawed. As previously explained, the court has found that drawing precise conclusions based on the RFP/bidding data is problematic because of the data's limitations.

Second, to demonstrate that the merger would not create unilateral anticompetitive effects, Defendants offered a "switching study" conducted by Dr. Bresnahan.  A switching study, as the name implies, analyzes customers' decision to "switch" their business to other competitors.  For his study, Dr. Bresnahan acquired from a company called Aggdata the location information of tens of thousands of restaurant and hotel chain customers that are on either Sysco's or USF's "national customer" roster.  He then analyzed Defendants' transaction records by quarter from the first quarter of 2011 to the third quarter of 2013 to determine if either company provided broadline distribution to a specific restaurant or hotel location.  If either Defendant provided broadline distribution, he tracked the company's sales to the location and noted if it lost sales to the location during the period.  If the company lost sales in a particular quarter, he checked the other defendant company's transaction records to see if it picked up the customer.  If it did not, Dr. Bresnahan assumed that some other competitor did.

So, for example, if USF's records showed that a particular Sonic franchise did not purchase from USF in a particular quarter, he would turn to Sysco's records to see if Sysco had picked up the customer; if it did, he counted it as a switch to Sysco; if not, he assumed that the customer purchased from another distributor and counted it as a switch to a competitor other than Sysco. Based on this analysis, Dr. Bresnahan concluded that Sysco and USF are not uniquely close competitors. He found that USF lost business to Sysco 15 percent of the time based on both revenue and number of locations, and that Sysco lost business to USF 57 percent of the time based on revenue and 39 percent of the time based on number of locations. These percentages of switches, Dr. Bresnahan testified, were much lower than what one would have expected to see if Dr. Israel's national market shares were accurate.

For a variety of reasons, the court cannot agree with Dr. Bresnahan's ultimate conclusion—that USF and Sysco are not uniquely close competitors—based on his switching study. First, though the number of observations in Dr. Bresnahan's study were significant, they were limited almost exclusively to restaurant and hotel locations (including, it appears, restaurants served by Sysco's systems division, SYGMA).[28] The observations did not include other types of large national customers, such as GPOs, foodservice management companies, and large government agencies, which, as the evidence showed, spend large percentages of their foodservice distribution budget on Defendants. As Dr. Bresnahan admitted, he does not claim that his switching analysis reflects the buying habits of these national customers. Hr'g Tr. 2180-82.

Second, the time period of Dr. Bresnahan's study—two-and-a-half years—is shorter than the seven-year time period covered by Dr. Israel's RFP/bidding analysis. Significant switches that

---

[28] The study did include one health care organization, Kaiser Permanente, and one GPO, Amerinet.

might have occurred between Defendants outside the two-and-a-half year period, therefore, were not counted.

Third, the switching analysis does not capture the full extent of competition between Defendants (or between other competitors, for that matter), because it only tracks switches, not instances where a customer might have played one broadliner off the other to get better pricing. That kind of situation reflects actual competition at least as much as a switch, but such competition is not reflected in the data.

Fourth, unlike an RFP or bid situation, a switch does not necessarily equate to actual competition. A switch might have occurred for any number of reasons having nothing to do with pricing or service (*e.g.*, the customer's sister-in-law went to work for a competitor), but the study treats every switch as a loss for competitive reasons.

Fifth, Dr. Israel's rebuttal report pointed out a number of limitations in Dr. Bresnahan's switching analysis, including the exclusion of certain switches between Defendants and the treatment of actual switches, such as timed phase outs from one Defendant to the other, as non-switches. PX09375-081-084. Although Dr. Bresnahan testified that he corrected for these criticisms and that the adjustments did not materially alter his results or conclusion, the need for those adjustments reflects the limitations of drawing firm conclusions from such undifferentiated data.

Finally, Dr. Bresnahan's conclusion that USF and Sysco are not close competitors brings him into conflict with Defendants' other expert, Dr. Hausman. Dr. Bresnahan testified that, although he agrees that Sysco and USF are competitors, he did not think that one was a "particularly strong price constraint" on the other. Hr'g Tr. 2183. Dr. Hausman, on the other hand, unequivocally agreed that "USF is a strong price constraint on Sysco." *Id.* at 2005. He

testified Sysco and USF "compete and they compete hard. I'd be the first to agree." *Id.* at 1986;

*see id.* at 2037 ("I am not arguing with you that—or disagreeing with you that Sysco and US Foods

are important competitive constraints on each other."). Defendants do not explain how

Dr. Bresnahan's switching study can be reconciled with Dr. Hausman's unqualified opinion that

Defendants mutually constrain each other's prices, which can only mean that they are close

competitors; if they were not, the pricing of one would not matter to the other.

In the end, the court finds that Dr. Israel's RFP/bidding analysis is more persuasive than

Dr. Bresnahan's switching study. Both empirical studies are imperfect for the reasons already

discussed. But Dr. Israel's analysis better captures instances of actual competition across a more

representative cross-section of national customers over a longer period of time. Additionally,

Dr. Israel's conclusions are corroborated by other evidence in the record, which, as discussed

below, indicate that Sysco and USF are close competitors, particularly for large national

customers.

b.    <u>The parties' ordinary course documents</u>

The FTC presented ordinary course documents, from both Defendants and third parties,

which support Dr. Israel's conclusion that Sysco and USF are particularly close competitors. For

example, a 2012 USF presentation, titled "Strategy Refresh," explains that one reason for strategic

rethinking is that "[c]ustomers perceive little difference between us and *our main competitor*,"

identified as Sysco. PX03031-003 (emphasis added). The same presentation devotes a section to

"Performance v. Sysco" and describes the companies as "[i]ndustry leaders." PX03031-010-011.

Another USF document describes Sysco as USF's "major rival." PX03032-043.

Similarly, a Sysco presentation to its Board of Directors describes USF as its "next largest

competitor" and puts forth "recent intelligence" about USF and two other competitors. PX01007-

87

018; PX01007-023. Another Sysco strategy document focusing on the healthcare sector states that "US Foodservice is our strongest competitor for Healthcare GPO dollars." PX01388-004. In addition, there are many specific instances in the record demonstrating fierce competition between Sysco and USF for national customer accounts.[29] These documents indicate that Sysco and USF compete aggressively against one another on price; non-price incentives, such as signing bonuses; service; and other value-added offerings.

Industry analysts also have recognized the close competition between Defendants. For instance, the Cleveland Research Group's January 2014 market report on Sysco noted the Cleveland Research Group's assessment that "both Sysco and US Foods have priced each other down competing for larger national/regional contract accounts over the last several years" and that "the acquisition removes a key price competitor (particularly with larger contract accounts)." PX09332-004.

c.   <u>Testimonial evidence</u>

A number of industry actors testified that they view Sysco and USF to be close competitors for national customers. Particularly compelling testimony came from Mark Allen, the head of the foodservice distributors' trade group, IFDA. In his deposition, Mr. Allen agreed that Sysco and USF were "closest competitors" for national accounts, such as GPOs, hospitality, and foodservice management companies. PX00570-012; PX00570-014. He further described Sysco and USF as "powerful competitors" for independent customers, PX00570-113, and testified that, in his experience, GPOs, foodservice management companies, and hospitality chains use Sysco and USF to keep each other honest on price and service, PX00570-019. The testimony of the PFG's President and CEO, George Holm, was to the same effect. He testified that in his experience

---

[29] *See, e.g.*, PX01066-001-002; PX03064-001; PX01061-001-006.

"foodservice management companies, GPOs[,] and certain restaurant groups" have "obtained lower prices by bidding Sysco and US Foods against each other." Hr'g Tr. 651.

> d.    Conclusion on unilateral effects in the national customer market

The court's finding that Sysco and USF are close competitors in the national customer market is no surprise, given the uncontested facts of this case. Sysco and USF are the country's two largest broadliners by any measure. They have far more distribution centers, SKUs, private label products, sales representatives, and delivery trucks than any other broadline distributor. That they rely on these competitive advantages to compete, and compete aggressively against one another in the market for national customers, is amply born out on this record.

Based on all of the evidence presented, the court finds that, because the proposed merger would eliminate head-to-head competition between the number one and number two competitors in the market for national customers, the merger is likely to lead to unilateral anticompetitive effects in that market. Evidence of probable unilateral effects strengthens the FTC's *prima facie* case that the merger will lessen competition in the national customer market. *See Heinz*, 246 F.3d at 717 (footnote omitted) (finding that "the FTC's market concentration statistics are bolstered by the indisputable fact that the merger will eliminate competition between the two merging parties"); *Whole Foods*, 548 F.3d at 1043 (Tatel, J.) (citation omitted) (internal quotation marks omitted) (stating that "there can be little doubt that the acquisition of the second largest firm in the market by the largest firm in the market will tend to harm competition in that market").

> 2.    *Merger Simulation Model—National Customer Market*

To further show that the merger would harm national customers, Dr. Israel ran a merger simulation model to predict the merger's effect. Dr. Israel used an "auction model" to estimate the harm to national customers based on his real-world observation that national customers used RFP

processes that "typically involve[d] competitive bids and bilateral negotiations between distributors and foodservice operators" to award business. PX09350-110. Under an auction model, the terms offered by the winning bidder are determined (or at least heavily influenced) by the second-best bidder, because the winning bidder will offer price and service terms that are just good enough to win the business. In theory, if the top two bidders merge, price and service terms will be determined (or at least heavily influenced) by the previously third-best bidder, who in a post-merger world would move into the number two spot. An auction model predicts harm to customers if, as here, the top two bidders merge and the next best bidder is a distant third. The magnitude of the harm is defined as the difference between the values offered by the companies that had been the pre-merger second- and third-place bidders. PX09350-113-114; *see CCC Holdings*, 605 F. Supp. 2d at 69 (describing a similar auction model for predicting a price increase).

Practically speaking, the premise of Dr. Israel's auction model was that, in the pre-merger world, Sysco and USF are national customers' top two choices and, therefore, each company sets the other company's price. But, if they were to merge, the winning bidder's price would only be subject to competitive pressure by a pre-merger third-place bidder, such as PFG or some other distant competitor. If the next best bidder is not a major competitor, and therefore does not play a significant role in affecting prices, national customers will be harmed. An email dated December 12, 2013, summarizing a "USF Senior Teams" webcast addressing the proposed merger, perfectly captures this core premise of Dr. Israel's model. The email identified as one of the "key messages": "The 'distance' between the combined company and the next set of regional players *is huge*. Those regional players will have an even harder time trying to play catch up going forward because they simply won't have the resources that the combined company has to transform the industry."

PX00103-002 (emphasis added). The "huge" distance between the merged entity and the rest of the field corresponds to the merger harm that Dr. Israel's model predicts.

To quantify the likely harm to national customers, Dr. Israel performed calculations that used as inputs, among others, his estimates of the parties' national customer market shares and their price-cost margins. PX09350-118. He concluded that, absent significant efficiencies and other mitigating factors, the merger would harm national customers on the order of more than $1.4 billion annually. PX09350-120; PX09350-220. Factoring in the divestiture to PFG and its increased market share, Dr. Israel calculated likely merger harm of more than $900 million annually. PX09350-189; PX09350-237.

Defendants assert that Dr. Israel's model is flawed for the same reason that they criticize his national market share calculations—both rely on the unreliable RFP/bidding data. Specifically, Defendants argue that, because the merger simulation model relies on the national market share calculations as a critical input, and because those market shares depend on the unreliable RFP/bidding data, Dr. Israel's estimate of likely merger harm is likewise unreliable. As discussed, the court agrees that the RFP/bidding data set is imperfect and its resulting market share calculations are imprecise to some degree. Dr. Israel's most conservative market share analysis, however, did not rely on the RFP/bidding data but rather on the CID data, and provided a reasonable approximation of the parties' share of the national customer market. Dr. Israel ran his merger simulation using that lower-bound market share estimate and still reached the conclusion that, absent significant efficiencies, the merger would likely cause significant harm. PX09350-121 n.363 ("Finally, I tested the robustness of my results to Sysco and USF having lower combined shares. I found that even when I use the lowest (and almost certainly too low) Sysco and USF shares presented in **Table 1**, the required efficiencies predicted by the model still far outweigh the

efficiencies claimed by the parties."). The court, therefore, concludes that Dr. Israel's merger simulation model strengthens the FTC's *prima facie* case that the merger will substantially lessen competition in the market for national customers.

### 3.    Unilateral Effects—Local Markets

As it did for the national customer market, the FTC presented empirical, documentary, and testimonial evidence to demonstrate the potential for unilateral effects to harm local markets. That evidence, however, presented a more muddled picture of the potential for unilateral effects than did the evidence for the national customer market.

### a.    Dr. Israel's empirical analysis

As he did with the national customer market, Dr. Israel looked at Defendants' business records to determine how closely they compete in local markets. The data came from two sources—USF's Linc database and Sysco's request for incentives (RFI) records. The Linc database, as discussed earlier, is a customer relations management tool used by USF sales personnel to manage and store information on existing and prospective customer accounts. RFIs are internal Sysco records that sales personnel were required to submit to regional presidents to obtain approval to offer incentives to customers to either switch to Sysco or stay with the company.

Starting with the Linc database, Dr. Israel observed and analyzed nearly 100,000 business opportunities between January 2011 and June 2014 and divided them into two groups—USF wins and USF losses. When USF won the business, sales personnel identified Sysco as the main competitor 43 percent of the time (and 48 percent of the time measured by revenue); when USF lost the business, USF sales personnel identified Sysco as the main competitor 46 percent of the time (and 68 percent of the time measured by revenue). PX09350-143, Table 11. Whether USF won or lost, sales personnel identified Sysco as the main competitor eight times more frequently

than the next most mentioned competitors (PFG and Gordon Food Service). Dr. Israel also segregated the Linc database's mentions of competitors in 20 local markets. That study showed that sales personnel in every market identified Sysco as USF's main competitor by a wide margin, especially when measured by revenues. PX09350-145, Table 14.

The RFI data painted a similar picture from the Sysco perspective. Dr. Israel reviewed 224 Sysco RFIs, covering a three-year period from 2011 to 2014, when Sysco discontinued the practice. In more than 66 percent of the RFIs, Sysco sales personnel identified USF as the reason for the incentive request. No other competitor appeared more than 10 percent of the time. PX09350-146-147.

Defendants attacked Dr. Israel's reliance on the Linc database, as they did when he used it in his aggregate diversion analysis. They asserted that Dr. Israel improperly relied on the Linc database as a win-loss record, when it was never intended as such. USF's Executive Vice President of Strategy, David Schreibman, testified that sales people did not use the database consistently and would sometimes enter competitor information simply to fill in the database; ultimately, USF did not rely on it to identify market competition. Hr'g Tr. 1505-06. Defendants also presented a local switching study performed by Dr. Bresnahan, which used the same switching methodology as described above but applied to local customers. According to Dr. Bresnahan, when local customers switch away from Sysco, they switch to USF only 11 percent of the time; and when they switch away from USF, they switch to Sysco only 15 percent of the time. Hr'g Tr. 2163. In other words, according to Dr. Bresnahan's switching analysis, when local customers switched away from Sysco it was typically to distributors other than USF.[30]

---

[30] Dr. Bresnahan also did another switching study to support his findings. He conducted a study of fresh chicken purchases by customers in San Diego, from which he concluded that customers "turn off and on buying fresh chicken from Sysco" and that most of the time when they "turn off" Sysco they buy from someone other than USF. Hr'g Tr. 2162.

The court finds that the empirical evidence, on balance, shows that Sysco and USF are close competitors for local customers. As the court has already observed, relying on the Linc database to draw firm conclusions is problematic for the reasons raised by Defendants. That said, even recognizing the data's limitations, it so overwhelmingly demonstrated primary competition between Sysco and USF based on a sizeable number of observations (nearly 100,000 entries) that it cannot be wholly disregarded as evidence of close competition. Furthermore, the court found the RFI analysis especially compelling; indeed, Defendants did little to contest it. Although the number of observations was low, the RFI data overwhelmingly showed Sysco seeking incentives to attract or keep local customers in response to USF's efforts far more often than Sysco attempted to respond to any other competitor's efforts.

Dr. Bresnahan's switching study provided some counterweight to Dr. Israel's work. Like his national switching analysis, however, it did not account for competition when customers used Sysco and USF as leverage against each other, as many local customers said regularly occurred. The local switching study also relied heavily on chain restaurants and hotels and thus did not factor in the buying habits of other types of local customers, particularly independent restaurants. Therefore, notwithstanding the limits of the data sets relied on by Dr. Israel, the court finds that the empirical evidence supports the conclusion that Sysco and USF are close competitors in local markets.

> b.    The parties' ordinary course documents

Two notable ordinary course documents also support the conclusion that Sysco and USF are close competitors for local customers. The first is USF's November 2012 "Investor Presentation," which represented that "US Foods is estimated #1 or #2 position in ■ of served markets." PX03000-014; *see also* PX03118-006. As previously noted, USF's David Schreibman

confirmed both the present-day accuracy of that statement and the fact that, in many of those markets, Sysco occupied the number one or two position.  DX-00272 at 62, 65.  The second is the July 2011 USF acquisitions strategy document, which estimated USF's position in 54 separate markets, apparently based on market penetration rather than market share.  USF estimated that either Sysco or USF was the leading broadliner in ▮ of those markets and was the number two broadliner (or tied for first) in ▮.  *See also* PX03002-009 (Clayton, Dubilier & Rice document, titled "Operating Review," acknowledging that one of Sysco's strengths is "[g]eographic coverage in all the key markets in the U.S. - #1 or #2 in virtually all the markets in which they operate"); PX03004-001 (Clayton, Dublier & Rice memo stating that USF is a "leader in both national and local markets" and that "Sysco [is the] closest competitor with similar business mix").  Sysco's and USF's leading positions in multiple local markets shows that they are close competitors in those markets.

c.    Testimonial evidence

The testimonial evidence was more equivocal about the closeness of competition between Defendants.  It demonstrated that Sysco and USF are strong competitors for local customers in several markets, but it also showed that other broadliners are competing effectively in many of those areas.  The FTC's case featured four local markets:  (i) Columbia/Charleston, South Carolina;  (ii) Omaha, Nebraska;  (iii) Raleigh/Durham, North Carolina;  and (iv) Southwest Virginia.  For each of those markets, the FTC presented testimonial evidence supporting Defendants' leading market positions.  For instance, PFG's George Holm agreed that Sysco and USF were the largest and two most "competitively significant" broadline distributors in Columbia/Charleston, Raleigh/Durham, and Southwest Virginia.  Hr'g Tr. 653-57; DX-00276 at 70-72.  Mark Allen, IFDA President, agreed with those assessments, calling Defendants the

"dominant" or "strongest" competitors in those three markets (and Las Vegas). DX-00294 at 170; *see also* Hr'g Tr. 1800 (testimony from Sysco Mid-Atlantic President Mike Brawner stating that USF is a "strong competitor" in Columbia, Raleigh/Durham). USF's ordinary course materials corroborate those observations, at least in terms of market penetration. PX03118-007-008 (showing USF as a "Strong #█," based on market penetration, in Raleigh, Columbia, and Roanoke, with Sysco as number two in those areas, and showing Sysco as the number one broadliner in Omaha with USF a "Distant #█").

Yet, when customer-level testimony is considered, the evidence of Defendants' leading market positions and their post-merger ability to increase prices becomes less clear. Both sides deposed and obtained numerous declarations from various customers in these local markets. The customer testimony obtained by the FTC invariably decried the merger's impact on local markets, whereas Defendants' customer witnesses emphasized alternatives in the marketplace and the ability to switch broadliners if the merged company attempted to impose a price increase.[31]

---

[31] *Compare* PX07020-002 (Champ McGee, owner of Little Pigs Barbeque and FTC-sponsored declarant expressing "serious concerns" about merger's effect on business in the Columbia market), *and* Hr'g Tr. 344 (FTC witness, Gary Hoffman, Vice President and Corporate Executive Chef of Upstream Brewing Company from the Omaha market, expressing concern that the proposed merger would prevent him from playing Defendants off one another), *and* PX00487-005 (FTC-sponsored declarant Jason Smith of 18 Restaurant Group, from the Raleigh/Durham market, expressing concerning about the merger "because it eliminates one of our only two options for broadline distribution services" and rejects other competitors), *and* Hr'g Tr. 544-45 (FTC witness, Daniel Schablein, Controller at Wintergreen Resort from the southwestern Virginia market, stating that Sysco and USF were the only legitimate broadliners for his business), *with* DX-00227 at 2 (Justin Brooks, owner of Frayed Knot Restaurant and Defendants-sponsored declarant, stating "I do not believe that Sysco could raise prices or reduce services on my business" in the Columbia market because of competition from PFG, Merchants, Reinhart, and Gordon Food Service), *and* DX-00191 at 2 (Defendants-sponsored declarant Anthony Fucinaro of Anthony's Steakhouse, from the Omaha market, stating, "If Sysco were to raise prices or lower service levels, I would move my contract to Reinhart, Martin Brothers, and/or Cash-Wa"), *and* DX-00232 at 2 (Defendants-sponsored declarant Patrick Cowden of Tobacco Road Sports Cafe, from the Raleigh/Durham market stating, "If Sysco tried to raise prices or decrease service quality following the merger, I could and would replace them with any of the other bidders in a heartbeat"), *and* DX-00209 at 1 (Defendants-sponsored declaration from George Huger of Southern Inn Restaurant, from the southwestern Virginia market, stating that he would have alternatives, including PFG and Staunton Foods, if he became dissatisfied with Sysco's prices or service after the merger).

Because of these conflicting local market assessments, the court cannot draw firm conclusions about the competitiveness of the local broadline markets from the testimonial evidence.[32]

d.    Conclusion on unilateral effects in the local markets

In the final analysis, after considering all of the record evidence on local markets, the court finds that the FTC has shown that unilateral effects are likely to occur in many local markets because the merger will eliminate one of the top competitors in those markets. Though the court finds the evidence of unilateral effects in the local markets to be less convincing than in the national customer market, the evidence nevertheless strengthens the FTC's *prima facie* case of merger harm.

4.    *Local Event Studies*

To further show that the merger would adversely impact local customers, the FTC presented the results of an econometric event study conducted by Dr. Israel. Dr. Israel analyzed Sysco's opening of two distribution centers—one in Long Island, New York, in July 2012, and one in Riverside, California, in June 2013—to determine the impact those openings had on prices paid by USF customers served from a nearby competing facility. Known as an "entry study," Dr. Israel selected the Long Island and Riverside events because they were the only two recent instances in which Sysco had opened a new distribution center in the same market as a USF distribution center. From these event studies, the FTC hoped to show that prices fell when Sysco and USF directly competed and that the merger's elimination of USF as a competitor would have an upward effect on pricing.

---

[32] The FTC did not present testimony or customer declarations about many of the markets that it claims will be highly concentrated after the merger. That is not, however, fatal to its case. *See Brown Shoe*, 370 U.S. at 339, 341 (rejecting the argument that the government had not proven its case because it did not present evidence "in each line of commerce and each section of the country" and stating that "[t]here is no reason to protract already complex antitrust litigation by detailed analyses of peripheral economic facts, if the basic issues of the case may be determined through study of a fair sample").

Dr. Israel found that Sysco's entry in Long Island resulted in a 1.4 percent decline in USF's prices for customers in the 75 percent overlap area. PX09350-148. He also ran variations of his regression analysis on other groupings—customers within a 50 percent overlap area, customers purchasing more than 100 SKUs, and customers buying private label products—and found that the price decrease on these groupings was even greater. PX09350-148. By contrast, Dr. Israel found a less significant price impact in the Riverside entry study—a negligible price decline of only .06 percent.

Dr. Israel explained that neither of these events were clean entry studies because, in both cases, Sysco already had an existing distribution facility in the area, and thus already was competing against USF. In his opinion, the resulting price effects, therefore, were actually understated. Dr. Israel also found the results of the Long Island event more compelling than the Riverside event for two reasons. First, the Long Island facility was a greater distance away from Sysco's existing facility than the new Riverside facility was from its existing facility. Second, the Long Island facility served more new business than the Riverside facility. For those reasons, he concluded, the Long Island study better approximated a true entry event. Hr'g Tr. 1097-98. Dr. Israel ultimately concluded, based largely on the Long Island study, that the merger's elimination of USF as a competitor would have an upward pricing effect in local markets.

The court does not find Dr. Israel's entry studies to be convincing evidence that the merger will harm local customers. Dr. Israel's efforts to distinguish the Long Island and Riverside events simply do not hold up. Defendants' expert, Dr. Bresnahan, showed that the difference in distance between the Riverside facility and its nearby existing facility, on the one hand, and the Long Island facility and its nearby existing facility, on the other, was a mere 14 miles. He also showed that both new Sysco facilities served a similar fraction of existing Sysco customers. Thus, the two

entry events were not as dissimilar as Dr. Israel testified, yet they produced very different results—one showing a significant price decrease, the other showing a negligible one. There may be location-specific reasons for the different results, but the reasons offered by Dr. Israel do not withstand scrutiny and no other evidence explained the difference. The court thus cannot conclude from these seemingly conflicting entry studies that the merger will harm local customers.

The court further notes that the pricing evidence here is far weaker than that found in other merger cases. In *Staples*, for instance, there was "compelling evidence" showing that prices were 13 percent higher in markets where Staples did not have competition from another office superstore. 970 F. Supp. at 1075-76 (pricing study). Similarly, in *Whole Foods*, an entry study showed that Whole Foods dropped its prices by five percent when another organic supermarket opened in the area. 548 F.3d at 1046-47 (Tatel, J.). In fairness, the FTC was unable to conduct pricing studies like those done in *Staples* and *Whole Foods* here because Defendants have competing facilities in nearly every local market. But the absence of convincing pricing effects evidence is the weakest aspect of the FTC's case.

5.    *Summary*

In summary, the FTC has bolstered its *prima facie* case with additional proof that the merger would harm competition in both the national and local broadline markets. Although the FTC's case would have been strengthened with more convincing pricing effects evidence, the court nevertheless finds that the FTC has presented a compelling *prima facie* case of anticompetitive effects. *See Baker Hughes*, 908 F.2d at 991 ("The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."). The court now turns to Defendants' rebuttal arguments.

### III. DEFENDANTS' REBUTTAL ARGUMENTS

The FTC has established a presumption that the proposed merger will substantially lessen competition. Defendants, however, may rebut that presumption by showing that the traditional economic theories of the competitive effects of market concentration are not an accurate indicator of the merger's probable effect on competition or that the procompetitive effects of the merger are likely to outweigh any potential anticompetitive effects. *Heinz*, 246 F.3d at 715. The more "compelling the [FTC's] prima facie case, the more evidence the defendant must present to rebut [the presumption] successfully." *Baker Hughes*, 908 F.2d at 991. "A defendant can make the required showing by affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." *Id.*

Defendants advance four arguments to support their claim that the food industry will remain competitive after the merger: (i) a post-divestiture PFG will be a strong competitor for customers seeking nationwide distribution; (ii) competition from other broadliners and other distribution channels will continue and grow; (iii) the entry of new competition and the repositioning of existing competitors will keep the industry competitive; and (iv) customers will benefit from efficiencies arising from the merger. The court addresses each of those arguments in turn and finds that, even taken collectively, Defendants cannot overcome the FTC's strong presumption of anticompetitive harm.

#### A. PFG Divestiture

Aside from the Supreme Court's guidance that "[t]he relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition,'" *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (footnote omitted) (quoting *United States v. E.I. Du Pont De Nemours*

& Co., 366 U.S. 316, 326 (1961)), there is a lack of clear precedent providing an analytical framework for addressing the effectiveness of a divestiture that has been proposed to remedy an otherwise anticompetitive merger. *Compare CCC Holdings*, 605 F. Supp. 2d at 56-59 (applying the framework for market entry analysis in assessing the effectiveness of a licensing agreement that would enhance the competitiveness of an existing competitor) *with FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 47-48 (D.D.C. 2002) (finding defendants' proposed "fix" inadequate—without going into market entry analysis—because competitor would face higher costs).

Here, both sides cite to the 2004 U.S. Department of Justice's "Policy Guide to Merger Remedies," which provides the following guidance: "Restoring competition requires replacing the *competitive intensity* lost as a result of the merger rather than focusing narrowly on returning to premerger HHI levels." Antitrust Div., U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 5 (Oct. 2004) [hereinafter 2004 Policy Guide] (emphasis added); *see also* Areeda & Hovenkamp 3d ed., *supra*, ¶ 990d (citing 2004 Policy Guide). A more recent U.S. Department of Justice Policy Guide provides: "The touchstone principle for the Division in analyzing remedies is that a successful merger remedy must effectively preserve competition in the relevant market." Antitrust Div., U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 1 (June 2011) [hereinafter 2011 Policy Guide] (footnote omitted). Both the 2004 Policy Guide and the 2011 Policy Guide add that an effective divestiture should address:

> [W]hatever obstacles (for example, lack of a distribution system or necessary know-how) lead to the conclusion that a competitor, absent the divestiture, would not be able to discipline a merger-generated increase in market power. That is, the divestiture assets must be substantial enough to enable the purchaser to *maintain the premerger level of competition*, and should be sufficiently comprehensive that the purchaser will use them in the relevant market and be unlikely to liquidate or redeploy them.

2004 Policy Guide at 9 (emphasis added) (footnotes omitted); *see also* 2011 Policy Guide at 8. With these principles in mind, the court analyzes the effect of the proposed divestiture.

*1.     Competitive Pressure Exerted by Post-Divestiture PFG*

Defendants argue that the divestiture of 11 "strategically located" USF distribution centers to PFG, coupled with PFG's "aggressive" expansion across the country, will "replace [any] competitive intensity lost as a result of the merger." Defs.' Proposed Findings of Fact and Conclusions of Law, ECF No. 171 at 156 [hereinafter DFF] (alteration in original) (quoting 2004 Merger Guidelines at 5).  In addition to the 11 divested distribution centers, PFG's owner, The Blackstone Group, a leading private equity firm, has committed $490 million to develop seven more distribution centers (called "foldouts") and to expand capacity in 16 existing facilities. Hr'g Tr. 724, 767-69; DFF at 155.  Defendants also point to the industry acumen and experience of PFG's executives, particularly that of its President and CEO, George Holm, who has over 37 years of experience in the foodservice distribution industry.  The court does not doubt Blackstone's financial commitment to PFG or Mr. Holm's leadership capabilities.  However, based on the evidence presented, the court is not persuaded that post-merger PFG will be able to step into USF's shoes to maintain—certainly not in the near term—the pre-merger level of competition that characterizes the present marketplace.

PFG's five-year business plan shows that post-merger PFG will not be nearly as competitive as USF is today.  In the lucrative market for national customers, the plan projects that PFG will have approximately $█ billion in national broadline sales by 2019—*less than half* of USF's 2013 national broadline sales of $█ billion.  PX09350-074; PX09060-002; PX09060-004; PX09060-006; PX09253-023.  Stated in terms of market share, PFG estimates that it will grow to 20 percent of the national broadline market over five years, with the merged Sysco-USF

company having the "remaining share of the national broadline business." PFF at 220; Hr'g Tr. 719, 721-22. That percentage is smaller than USF's share of the national broadline customer market today. PX09350-187 (Dr. Israel's report stating "the best case scenario under the divestiture is the emergence of a significantly smaller competitor than USF even several years into the future"). Defendants are correct that the divestiture does not have to replicate pre-merger HHI levels. However, the fact that PFG only expects to achieve less than *half* of USF's current national customer sales in five years—assuming that its planned expansion efforts are successful—does not demonstrate that PFG will be sufficiently able to "discipline a merger-generated increase in market power." *See* 2011 Policy Guide at 8 (footnote omitted).

The court's concern about PFG's ability to compete effectively in the post-merger world is not limited to sales and market share projections. PFG's short-term effectiveness will depend in large part on its ability to incorporate the 11 formerly-USF-held distribution centers. Even assuming that PFG can do so seamlessly, the new PFG will have only 35 distribution centers—far fewer than the at least 100 distribution centers owned by the combined Sysco/USF. Having only one-third of the merged company's distribution centers will put PFG at a significant disadvantage in competing for national customers. Indeed, as Dr. Israel demonstrated, Defendants' largest national customers use more than 35 distribution centers. Those customers represent ▮ percent of Sysco's national broadline revenues, and ▮ percent of USF's national broadline revenues. PX09375-075-077, Figure 3. The court is not convinced that these large national customers will consider a post-merger PFG to be as capable of meeting their needs as USF is today.

Defendants counter that "PFG will be able to compete aggressively with its additional distribution centers because the fewer the distribution centers used for a particular customer, the greater the inbound efficiencies." DFF at 161-62. Because of higher volume per warehouse and

lower freight costs, Defendants claim, many customers *prefer* to be served out of fewer distribution centers—so having a larger number of distribution centers is not necessarily a competitive advantage. *Id.* at 28, 161-62; Hr'g Tr. 1570-71, 1573-74; DX-00264 at 122-23. For example, to serve Zaxby's, a regional quick serve chain, PFG trucks drive past some of their own distribution centers because the longer drive "proves cheaper for the customer." DFF at 161; Hr'g Tr. 852. PFG can also take advantage of "shuttling," a technique of caravanning multiple trailers on a single truck, to increase efficiencies. DFF at 162; Hr'g Tr. 855-57. Mr. Holm even stated at his deposition that he believed that PFG would be able to serve ██████ out of 35 distribution centers more effectively than USF currently does out of ██ DX-00276 at 96.

The court is skeptical of Defendants' claim that, even with far fewer distribution centers, PFG will be on equal competitive footing with the merged firm, especially for national customers. Defendants' own growth belies this fact. Both Sysco and USF have, over time, increased their number of distribution centers, demonstrating that Defendants view more distribution centers to be a competitive advantage. Indeed, when Defendants presently compete for national business, they highlight their nationwide geographic coverage to potential customers. *See, e.g.*, PX03000-014 (USF presentation touting its "[a]bility to leverage our national scale to cost effectively service customers nationally); PX00247-001-002 (USF email communication to ██████ describing the "US Foods Value Proposition" as including a "Privately held National Distribution footprint company"); PX01062-005 (Sysco presentation to ██████ highlighting that Sysco's "national footprint, strong service approach and our breadth of product offerings is what differentiates us from our competition"); PX00279-001 (USF email to ██████ (a restaurant chain), mentioning "national footprint and scale" as a selling point); PX00281-006 (slide presentation to ██████ ███████████████ touting USF's "extensive" distribution network). USF's Executive Vice

President of Strategy David Schreibman also testified that USF has the ability to leverage its national scale to cost-effectively service customers, and that USF views its national scale as a significant competitive advantage.  Hr'g Tr. 1521-22; *see also* PX03010-001 (internal USF document stating that the "[o]nly 'true' options for both Premier and Novation is either Sysco or USF[;] [t]he regional players will bid, but not be seriously considered").  Furthermore, there was no evidence presented that Defendants have moved to consolidate their distribution facilities to take advantage of the supposed benefits of having fewer distribution centers.[33]

Notably, not even PFG has always considered the divestiture of only 11 distribution centers to be sufficient for it to compete on a national level.  A PFG internal strategy document, dated April 3, 2014, sets forth two "final" proposals for additional distribution centers "necessary to establish a national broadline network."  One proposal included options of 16 to 20 distribution centers, and the other included a list of 14 to 15.  Hr'g Tr. 669-71 (discussing PX09193).  Six months later, in October 2014, after PFG had started negotiations with Sysco about the divestiture, internal PFG communications re-affirmed the need for more than 11 distribution centers.  Following Sysco's proposal to sell only seven distribution centers, a PFG board member wrote to George Holm:

> I would still find a way to tell the FTC that we think it takes 13 but that Sysco won't let us look at more than 7 *which will get us nowhere near a national solution.*  We need the package size to be bigger to have any chance of winning *and to ever compete nationally. . . .*  [We] should proactively educate the FTC why 13 opcos [another word for distribution center] is the *bare mimimum.*

PX09192-001 (emphasis added); *see also* PX00526-036; PX00526-141-142; PX09190.  PFG did just that when it met with the FTC, making the case that it needed 13 distribution centers to

---

[33] Defense counsel at oral argument represented that USF recently had closed two distribution centers, Closing Arg. Hr'g Tr. 113, but counsel for the FTC noted that USF also recently had opened a new distribution center, *id.* at 125-26.

"compete effectively for national business." PX00526-039 at 153; PX09070 (PFG's presentation to the FTC with a map of 13 USF distribution centers needed by PFG, which included the four metropolitan areas mentioned below). Ultimately, PFG was not able to negotiate the sale of more than 11 distribution centers, with Sysco having made the decision that it "would rather litigate w[ith] the FTC than sell more than 11." PFG felt that it was "prudent to engage on 11 for now to keep the momentum/dialogue going." PX09157-002; PX00526-041 at 163.

Having fewer distribution centers means that PFG will face coverage gaps in the geographic areas where it sought, but did not receive, a distribution center. Those areas include: Cincinnati, Ohio; Omaha, Nebraska; Oklahoma City, Oklahoma; and Los Angeles, California, where PFG received a different, smaller distribution center than it requested. PX00526-039 at 155-56; *see also* PX09070.

Defendants argue that PFG's requests to Sysco for a larger number of distribution centers than they actually received was part of a bargaining strategy. Closing Arg. Hr'g Tr. 115-16. However, PFG's recognition that it needed more than 11 distribution centers to compete nationally is reflected in internal documents that were created months before PFG began negotiating with Sysco. The court credits those internal projections over PFG's current position that an additional 11 distribution centers is enough to compete for national customers. *See* Amicus Br. of PFG, ECF No. 133 at 22-24 (arguing that PFG will be able to compete effectively with 35 distribution centers).

Defendants argue that, with the planned "foldouts," *i.e.*, new distribution facilities located in contiguous geographic markets, PFG will have more than the 13 distribution centers it was seeking, including one in Cincinnati. DX-01706 at 14. However, PFG has never done a foldout, and according to internal estimates, these facilities may not be operational until, at the earliest,

several years following the merger.[34]  Defendants assert that "PFG will be well-positioned to *bid on Day One*," because even after the bids are submitted, discussions between a customer and a distributor can take up to a year before a contract is finalized, and PFG can continue its foldout efforts in the meantime.  DFF at 160 (emphasis added).  According to Defendants, if the customer needs service sooner, PFG can provide service via shuttling until the foldout is complete.  *Id.* at 161.  However, there is substantial evidence showing that customers value having distribution centers close to their locations and that distribution costs increase with driving distance.  Thus the court is not persuaded that—even with promises of foldouts and the use of shuttling—a sufficient number of national customers will view PFG as a viable alternative to the merged entity "on day one" to maintain the intensity that characterizes the present competition between Sysco and USF.

2.  *Additional Disadvantages Faced by Post-Merger PFG*

In addition to its lack of nationwide geographic coverage, the court has other concerns about PFG's ability to compete against the merged entity.  Because it will purchase in smaller product volumes than the merged Sysco entity, PFG could face higher product acquisition costs, or cost of goods sold ("COGS"), than its competitor.  PX05051-003 (Blackstone Memorandum indicating that "due to its scale, USF has better procurement than PFG and the 11 [distribution centers] will likely spend more to acquire private label products and get less supplier rebate dollars"); PX09350-205 (Dr. Israel's opinion that, even with the divestiture, PFG is unlikely to make up the gap in COGS between itself and the parties today).  PFG also will offer substantially fewer SKUs than the merged entity.  PFG today sells less than half the total number of SKUs as USF and one third the number of private label SKUs.  PX06055-004 (USF offers 350,000 SKUs,

---

[34] PFG's Senior VP of Operations estimated that PFG's "priority" foldouts in Cincinnati, Ohio, Detroit, Michigan and Buffalo, New York, will not be operational until fiscal year 2018, and Montgomery, Alabama will not be operational until 2017.  Hr'g Tr. 735-38.

of which 30,000 are private label); PX09507-007; PX09507-013 (PFG offers 150,000 SKUs, of which ███ are private label).  PFG's fewer SKU offerings will be a competitive disadvantage.

PFG also will face disadvantages in terms of human resources.  Defendants point out that, as part of the divestiture package, PFG would acquire over "4,400 USF personnel, including senior executives and personnel with healthcare expertise at the 11 distribution centers, and corporate regional leadership, national sales personnel, merchandising personnel, and others with national sales expertise; [and] a 12 month non-solicit of PFG employees at the 11 distribution centers." DFF at 155 (citing Hr'g Tr. 815-25; DX-06100 at 1).  However, even assuming that every USF employee at the 11 distribution centers becomes a PFG employee, PFG will still have fewer than half the sales representatives of either Sysco or USF today and less than one-quarter of the sales representatives of the combined firm.  PX09350-181-184, Figure 18.  And, PFG will only receive, at most, one-fifth of the national sales employees at USF dedicated to serving national customers. Hr'g Tr. 1528-31 (stating that only about 20 percent of USF's national account team will be made available for PFG to hire).

Moreover, PFG will be at a competitive disadvantage in its ability to offer value-added services.  The lucrative healthcare segment is illustrative.  George Holm conceded that PFG has had limited success with national healthcare customers.  Hr'g Tr. 716-17.  Some of that lack of success is due to PFG's limited footprint, but it is also attributable to PFG's lack of expertise in the healthcare segment and its inability to deliver value-added services to those customers.  *See, e.g.*, PX00594-025 at 100 (PFG has a very small portion of ███ members' business because PFG lacks acute care expertise); PX00474-001 ("PFG offers a more limited selection of healthcare-specific products than US Foods.").  Even if over time PFG can acquire health care expertise, in the short run it will be at a competitive disadvantage as compared to the merged

entity.[35]  For instance, Joan Ralph, Group Vice President of Premier testified that, even with the healthcare employees PFG acquires through the divestiture, PFG will have significantly less healthcare expertise than USF today. Hr'g Tr. 413; PX09350-211-212. And, as IFDA President Mark Allen testified, Sysco and USF have the best understanding of the healthcare class of trade. DX-00294 at 121. The merger would only enhance that strategic advantage.

### 3.    *Post-Merger PFG as an Independent Competitor*

A final factor that cuts against the divestiture as a proposed fix is that PFG will be dependent on the merged entity for years following the transaction. "In order to be accepted, curative divestitures must be made to . . . a willing, *independent* competitor capable of effective production . . . ." *CCC Holdings*, 605 F. Supp. 2d at 59 (quoting *White Consol. Indus. v. Whirlpool Corp.*, 781 F.2d 1224, 1228 (6th Cir. 1986)) (internal quotation marks omitted).  As the court observed in *CCC Holdings*, it can be a "problem" to allow "continuing relationships between the seller and buyer of divested assets after divestiture, such as a supply arrangement or technical assistance requirement, which may increase the buyer's vulnerability to the seller's behavior." *Id.* (internal quotation marks omitted).  Under the Transition Services Agreement, PFG will have complete access to USF private label products for three years at its 11 new distribution centers, and therefore will be relying on the merged entity to license those products to PFG. *See* DX-06100 at 1; PX09060-005. PFG will also have the right to license USF's database for at least five years, with a continuing option for five more. PFG, therefore, will not be a truly independent competitor.

---

[35] PX███-002 (███████████████████ stating that USF is able to offer "certain value-added services that are especially important to healthcare facilities"); PX███-002 (Joan Ralph of Premier stating, "[i]t is critical to Premier that its members have access to foodservice representation with healthcare expertise who can provide nutritional guidance, menu-planning services, and ████████████████."); PX███-004 (█████████████████ discussing his concern that PFG "may lack the ability to provide the information technology services" like dynamic item ordering ██████ currently receives from USF); PX███-009 (███████████████ ████████████ stating "I do not know whether PFG has the healthcare experience, which ████ highly values.").

109

For the foregoing reasons, the court is not persuaded that the proposed divestiture will remedy the anticompetitive effects of the merger.

**B.      Existing Competition**

*1.      Regionalization*

Defendants assert that existing competition can and will constrain potential price increases or other unilateral effects in the national customer market. Their primary argument is that the ability of national customers to switch or threaten to switch to a network of regional distributors will inhibit anticompetitive behavior by the merged company. *See* Defs.' Opp'n Br. at 40-41. Defendants point to many large national customers who multi-source their foodservice distribution needs, including using various regional broadliners to service individual locations. Defendants cite as examples Amerinet, Sodexo, the Defense Logistics Agency, ████, Subway, and ████, all of whom operate regionally under multiple contracts. *See id.* at 15.

But, for several reasons, the ability to regionalize is not likely to inoculate national customers from potential anticompetitive effects. The decision of many large customers to predominantly use one broadline distributor is not simply a preference, as Defendants would characterize it, but a rational business decision. As already discussed, for the most part, the largest national customers—particularly GPOs, foodservice management companies, and hospitality companies—predominantly rely on Sysco or USF for their broadline distribution needs. The largest customers, generally speaking, make from 61 percent to 100 percent of their broadline purchases from Sysco or USF. *See* FTC Closing Slide 35; PFF at 113-16. Even customers who contract regionally, such as ████ and ████, buy in very high quantities from Defendants. Regionalization is available today, as it will be after the merger. But market actors are not moving to that model. To the contrary, as PFG's George Holm testified, the "clear trend" among large

customers is to move to a single nationwide provider. Hr'g Tr. 597-98. The court can only infer from this trend that regionalization is not a reasonable option for many national customers.

Regionalization likely has not taken hold for a variety of reasons. The record shows that when a customer increases its number of distributors, it incurs greater management and supply chain costs, making it far less desirable to switch to a multi-regional model. The court found the deposition testimony of Dan Cox, the President and CEO of DMA, particularly illuminating, given that the reason for DMA's existence is to consolidate the product and service offerings of multiple regional distributors and compete for national customers. Mr. Cox testified that using a sole source broadliner "forms the most efficient supply chain." DX00265 at 44. He explained that "[m]ore products at each delivery reduces our cost to service and therefore reduces their supply chain costs. . . . By aggregating [customers'] spend it makes the delivery system more efficient." *Id.* at 44-45.

A regional arrangement also brings with it the disadvantage of multiple points of contact. As Mr. Cox testified, a single point of contact simplifies communications, which DMA touts as an advantage over multi-sourcing broadline distribution. *Id.* at 14, 46, 68. He also added that a single information technology system is important to national customers, and DMA offers such a platform to attract them. As Mr. Cox explained: "[I]f they come to DMA and deal with five different members, they wouldn't have to learn and understand five different order entry platforms. We have just one platform." *Id.* at 68. A multi-regional approach thus likely would require a customer to develop greater information technology capabilities to manage its foodservice distribution contracts.

Another downside of a multi-regional model is the difficulty in obtaining consistent products—particularly private label products—across a national customer's different locations. Mr. Cox offered the example of ███████, with which DMA does over $██ million in business.

███ demands that DMA comply with its product specifications "at a level of 90 percent," *id.* at 74, indicating that even when a large customer uses multiple regional distributors, they impose rigorous demands with regard to product consistency. Product consistency, of course, can be achieved by purchasing from multiple distributors who carry the same brand-named products. But that approach would limit a customer's ability to purchase private label products, which typically offer a better value proposition than branded products.

PFG's George Holm concurred with Dan Cox's assessment of national customers' business needs and why they avoid regionalization. When asked why large national customers contract mainly with either Sysco or USF and why there is a clear trend toward those customers using a single broadliner, Holm offered numerous reasons: the "ability to get SKUs in quickly"; "one place to contact"; "[o]ne IT system"; "[o]ne sales contract"; "[o]ne person to deal with"; "the same product [across] their system"; writing "one check as opposed to several"; "simplified contract administration"; and easier "management of approved item lists and specifications." Hr'g Tr. 600-04. The court thus concludes that the possibility of regionalizing broadline foodservice is not likely to protect national customers from the merger's anticompetitive effects.

### 2. DMA

Today, the only other competitor with a nationwide footprint is DMA. Defendants claim that DMA is capable of effectively competing against the merged entity because it provides a single point of contact, a single contract with consistent terms across customer locations, and a single ordering platform. DFF at 165-66 (citing DX-00265 at 63-64, 66, 68). The court disagrees.

Defendants acknowledge that DMA is not a one-stop-shop for national customers as Sysco and USF are today. Indeed, Defendants recognize that "larger customers 'look to [DMA's]

members regionally . . . rather than DMA as a national solution.'" *Id.* at 164-65 (quoting DX-00265 at 86).

███████████████████████████████████████████

███████████████████████████ As Dan Cox, the President and CEO of DMA, explained:

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████

DX-00265 at 64-65.  As a result, ███████████████████████████████
███████████████████ *Id.* at 65.

National customers who value private label products, such as GPOs or foodservice management companies, ███████████████████████████████████
██████████ ████████████████████████████████████████
██████████████████████████████████████████████
████████████ *Id.* at 79-80. ███████████████████████
████████████████████████ *See id.* at 224-26.

And, even if a national customer wanted to switch to DMA, ███████████████
████████████████████████ As Mr. Cox explained, "██████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████ " *Id.* at 99. █████████████████████████████
████████████████████████████████████████████████



*Id.* at 100, 157. For example, ████████ recently considered switching its business to DMA, but decided to stay with Sysco ████████████████████. *Id.* at 227-29. ████████████████████████████████████████

████████████████████████, the court does not view DMA as a viable competitor that can constrain a post-merger Sysco.

### 3.    *Conclusion as to Existing Competition*

Based on the evidence presented, the court is convinced that national customers will be better off in a marketplace that has two strong competitors capable of nationwide broadline distribution than in a marketplace in which there is a single undisputed heavyweight of broadline distribution whose only competitive constraints is a transitioning PFG, DMA, and a collection of regional players.

### C.    Entry of New Firms and Expansion of Existing Competitors

Defendants argue that the entry of new competitors and the expansion of existing competitors will keep the industry competitive. If a court finds that "there exists ease of entry into the relevant product market," that finding "can be sufficient to offset the government's prima facie case of anti-competitiveness." *Cardinal Health*, 12 F. Supp. 2d at 55. "The prospect of entry into the relevant market will alleviate concerns about adverse competitive effects only if such entry will deter or counteract any competitive effects of concern so the merger will not substantially harm customers." Merger Guidelines § 9. Ease of entry must be "*timely, likely, and sufficient* in its magnitude, character, and scope to deter or counteract the competitive effects of concern." *Id.* (emphasis added). As with their other rebuttal arguments, Defendants bear the burden of demonstrating the ability of other distributors to "fill the competitive void" that will result from

114

the proposed merger. *See Swedish Match*, 131 F. Supp. 2d at 169. Defendants assert that a lack of technological, legal, and regulatory barriers makes entry into the foodservice distribution industry relatively easy. Yet although all it may take is a "guy and a truck" to become a foodservice distributor, becoming a *broadline* foodservice distributor with the ability to compete for national customers is another thing altogether.

The broadline foodservice distribution industry is extraordinarily capital and labor intensive. It costs roughly $35 million to build a single distribution center. Hr'g Tr. 586. In addition, the distribution center must be stocked with goods. A fleet of expensive, refrigerated trucks is required to deliver the products. People—lots of them—are needed to sell the broadline service, maintain and stock the warehouse, and deliver the products. *See Swedish Match*, 131 F. Supp. 2d at 171 (finding high barriers to entry where the evidence showed "substantial sunk costs in plant construction, product development, and marketing" required to compete). And, even if a newcomer were to make the substantial investment to start a broadline distribution company, there is no guarantee that customers will follow. Incumbency is a powerful force in the foodservice distribution industry. *See H&R Block*, 833 F. Supp. 2d at 75 (finding that "importance of reputation and brand in driving consumer behavior" limited an existing competitor's ability to expand). Even if it were possible for a new entrant to overcome the incumbent's advantage, it would take years. These high barriers to entry will further entrench the merged company's market power. PX03003-005 (USF lender presentation describing broadline foodservice distribution as having "High barriers to entry for scale players").

Defendants also contend that existing firms have demonstrated the capacity to expand to compete against the merged firm. They highlight the fact that other broadline distributors— including Shamrock, Ben E. Keith, and Reinhart—started out as small businesses serving only

limited items to local customers, but were able to grow to regional prominence. They describe examples of competitors that have recently opened new facilities or plan to do so.

But none of these examples overcome the fundamental problem with expansion as a constraint on the merged company—like new entry, successful expansion is extraordinarily capital intensive and demands a long time horizon. Based on their assessment that expansion would not be an economically viable strategy, regional distributors have said that they have no plans to expand or reposition in order to serve national customers. ███████, which has █ distribution centers mostly located in the ████████████, has told the FTC that such a massive expansion would not be "viable" in the short term, given the "time and cost required." PX███-006. Other regional distributors, including ████████████████████████████████████████████ have similarly been dissuaded by the time, costs, or risks of expansion. PX███-036 at 139-42; PX███-004; PX███-003; PX███-005-006; PX███-048-049.

Companies rarely enter new markets without an existing customer base because the costs and risks are prohibitive. There is a real "chicken-and-egg" problem with such expansion, known in the industry as "greenfield" expansion. Companies will not make the significant capital expenditure of building a new distribution center unless they already have customers to serve, but customers will not commit to a distributor unless it has demonstrated the ability to serve its needs. As a result, expansion in the industry is typically done through "foldouts"—building distribution centers in contiguous geographic areas—so that customers can be served from an existing facility until the new facility is built. But even foldouts take time to succeed. They can take from one to three years to complete, and it can take four to five years for a foldout facility to achieve sales per square foot similar to established broadline facilities. PX00529-042 at 166-68; Hr'g Tr. 837-39; *see also* PX00558-051 at 201-04. Although a foldout strategy may preserve competition in a

116

particular local market, it cannot effectively be used to replace the competition benefitting national customers lost by the merger. The only way in which a regional player could expand sufficiently and quickly enough to compete with the merged company would be through a sizeable acquisition of multiple distribution centers.

In summary, the court finds that, absent a substantial acquisition opportunity, expansion by regional players will not be timely, likely, and of sufficient magnitude to counteract anticompetitive harm. *See Cardinal Health*, 12 F. Supp. 2d at 58 ("Although the smaller wholesalers may adequately compete and expand to service both the primary and secondary needs of local customers, this Court finds that they would not sufficiently expand to compete with the nationals.").

### D.    Efficiencies

#### *1.    Requirement for Merger-Specific and Verifiable Efficiencies*

Although the Supreme Court has never recognized the "efficiencies" defense in a Section 7 case, the Court of Appeals as well as the Horizontal Merger Guidelines recognize that, in some instances, efficiencies resulting from the merger may be considered in rebutting the government's *prima facie* case. *Heinz*, 246 F.3d at 720 (citations omitted). Where, as in this case, the court finds high market concentration levels, defendants must present "proof of extraordinary efficiencies" to rebut the government's *prima facie* case. *Id.* (citations omitted) (requiring "extraordinary" efficiencies to rebut an increase in HHI of 510 points); *see also* Areeda & Hovenkamp 3d ed., *supra*, ¶ 971f (requiring "extraordinary" efficiencies where the "HHI is well above 1800 and the HHI increase is well above 100"). The court is not aware of any case, and Defendants have cited none, where the merging parties have successfully rebutted the government's *prima facie* case on the strength of the efficiencies. *See CCC Holdings*, 605 F. Supp. 2d at 72 (stating that "courts

have rarely, if ever, denied a preliminary injunction solely based on the likely efficiencies"). Yet even if evidence of efficiencies alone is insufficient to rebut the government's *prima facie* case, such evidence may nevertheless be "relevant to the competitive effects analysis of the market required to determine whether the proposed transaction will substantially lessen competition." *Arch Coal*, 329 F. Supp. 2d at 151 (citations omitted).

The court must "undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *Heinz*, 246 F.3d at 721. Specifically, the court must determine whether the efficiencies are "merger specific"—meaning they represent "a type of cost saving that could not be achieved without the merger"—and "verifiable"—meaning "the estimate of the predicted saving must be reasonably verifiable by an independent party." *H&R Block*, 833 F. Supp. 2d at 89 (internal quotation marks omitted) (citing Merger Guidelines § 10); *Cardinal Health*, 12 F. Supp. 2d at 62 ("In light of the anti-competitive concerns that mergers raise, efficiencies, no matter how great, should not be considered if they could also be accomplished without a merger."). Defendants bear the burden of demonstrating that their claimed efficiencies are merger specific, *H&R Block*, 833 F. Supp. 2d at 90, which requires demonstrating that the efficiencies "cannot be achieved by either company alone," *Heinz*, 246 F.3d at 722. And, Defendants must also demonstrate that their claimed efficiencies would benefit customers. *CCC Holdings*, 605 F. Supp. 2d at 74.

Defendants claim that the merger will generate over one billion dollars in annual cost savings and operational synergies and, "[e]ven when discounted substantially for unforeseen integration complications, possible customer loss, and the divestiture, the merged company's efficiencies are expected to generate over $600 million in savings." DFF at 178. Defendants argue

that the $600 million efficiencies estimate is "the product of meticulous analysis and planning," which occurred over the course of eight months and involved over 100 employees at McKinsey, an independent consulting firm, and over 170 Sysco and USF employees who are extremely familiar with the business. *Id.* at 179. As Defendants explained, "Sysco, USF, and McKinsey reviewed a back-breaking amount of information from the merging firms, analyzed historical integration data, modeled possible cost-savings opportunities, and built a new organizational structure around the companies' combined customer base, and designed detailed day 1, day 100, and year 1 plans for integration." *Id.* Of the $600 million cost savings identified by McKinsey, Defendants' expert Dr. Hausman identified more than $490 million as merger specific. To rebut Dr. Hausman's opinion on efficiencies, the FTC presented Mr. Rajiv Gokhale of Compass Lexecon as an expert in financial economics. He opined that at least 65 percent of Defendants' efficiencies were not merger specific. PX09351-007.

The court does not question the rigor and scale of the analysis conducted by McKinsey. Nor does the court have any reason to question the accuracy of McKinsey's total annual cost savings estimate. But that is not the issue before the court. The issue is whether Defendants have shown that the projected "merger-specific" cost savings are substantial enough to overcome the presumption of harm arising from the increase in market concentration and other evidence of anticompetitive harm. As to that question, the court is unpersuaded that Defendants' combination would result in $490 million in merger-specific cost savings. Defendants have not shown that that amount, or at least a substantial portion of it, could not be achieved independently of the merger. Nor does it appear that Dr. Hausman conducted any independent analysis of the McKinsey estimate to determine which savings, if any, can be achieved without the merger.

119

Sysco did not hire McKinsey to identify merger-specific savings for antitrust purposes. Rather, it initially hired McKinsey in the fall of 2013 to determine whether a merged company could achieve enough cost savings to make the combination worthwhile. Hr'g Tr. 1862-63. After McKinsey concluded that the merger would generate sufficient cost savings and Sysco and USF announced the merger, McKinsey began a more in-depth analysis beginning in January 2014 to identify "particular synergies that would arise from the deal." *Id.* at 1864-65. Carter Wood, the McKinsey Director who led the effort, testified that his firm was hired "to estimate what is possible by combining these two companies such that, number one, they would have confidence or not to go ahead with the deal; and two, to create value for the newly integrated company." *Id.* at 1914. McKinsey was not given instructions on identifying merger-specific savings, and Mr. Wood testified that he was not familiar with the term "merger specific." *Id.* at 1904.

Dr. Hausman used McKinsey's projections as his baseline for identifying merger-specific savings. *Id.* at 2053. However, it is not clear what independent analysis Dr. Hausman did to reduce McKinsey's projected savings of $600 million annually to $█ million in merger-specific savings. In his report, Dr. Hausman explained:

> In my previous academic research I have emphasized the effect of cost saving efficiencies on marginal cost, which can be approximated by average variable cost. Thus I will take a conservative approach to the estimated efficiencies and focus on cost savings from changes in variable costs that arise from the merger and would not occur otherwise.

DX-01355 at 67 (footnote omitted). It is not apparent, however, how Dr. Hausman calculated merger-specific savings using this approach, as neither his testimony nor his report spell out precisely how he went about identifying the amount of variable cost savings to include in his merger-specific estimate.

Table 4a of Dr. Hausman's rebuttal report illustrates the difficulties with verifying his

analysis. Dr. Hausman itemized the "run-rate of merger-specific variable cost synergies" into four

**Table 4a:  Estimated Cost Efficiencies**
**Adjusted for Divestiture, Customer Loss, and Contingencies**

| Category | Run-Rate Synergies | Run-Rate of Variable Cost Synergies | Run-Rate of Merger Specific Variable Cost Synergies |
|---|---|---|---|
| Merchandising Total | ███ | ███ | ███ |
| Best cost and terms | | | ███ |
| Enhance terms | | | ███ |
| Consolidate suppliers | | | ███ |
| Full category management | | | ███ |
| Corporate billing | | | ███ |
| | | | |
| Operations Total | ███ | ███ | ███ |
| Network Optimization | | | ███ |
| Driver Efficiency[xx] | | | ███ |
| Reduce average cost per mile for inbound freight[x] | | | ███ |
| Leverage network | | | ███ |
| Dis-synergy (LEI loss) from consolidation | | | ███ |
| Indirect Sourcing[xx] | | | ███ |
| | | | |
| Sales Total | ███ | ███ | ███ |
| Sales associate headcount | | | ███ |
| DSM and RSM headcount | | | ███ |
| Reduce variable opex | | | ███ |
| | | | |
| Corporate Total | ███ | ██ | ██ |
| Combined Total: | ███ | ███ | ███ |

categories:  (i) Merchandising, (ii) Operations, (iii) Sales, and (iv) Corporate. In each of those four

categories, Dr. Hausman listed the component parts (in the first column) and the corresponding

amounts (in the fourth column) that comprise the category cost savings estimate. Yet for each of

these elements, Dr. Hausman relied exclusively on documents created by either McKinsey or Defendants. *See* DX-01353 at Ex. C, 2 n.i.  He performed no independent analysis to verify these numbers. *Id.* ("All source material is either Sysco, US Foods, or McKinsey material and I take those materials at face value.").

But even taking Dr. Hausman's variable cost savings numbers as presented, the court is not convinced that the full $490 million in projected savings is merger specific.  For example, nearly half of the $▉ million in merger-specific savings identified by Dr. Hausman come from the "Merchandising" category, also known as "category management."  The $281 million that Dr. Hausman attributed to category management cost savings comes directly from McKinsey's calculations.  Category management refers to a process of optimizing a distributor's product assortment by gaining insights into which SKUs its customers value and then optimizing the SKU inventory to match customers' demands and procure those products in the most cost-efficient manner. Hr'g. Tr. 1881.  Both companies prior to the merger already were undertaking category management efforts.  PX00592-035 at 137-40; PX00592-049 at 193-94.

Although McKinsey Director Mr. Wood testified that McKinsey made an effort to identify only incremental merchandising savings, that is, savings arising only because of the merger, he could not say whether the $281 million included some cost savings that Defendants might have been able to achieve separately.  For instance, before the merger, Sysco was undergoing a category management program, called Project Naples, which was due to end in June 2015.  However, Project Naples covered only two-thirds of Sysco's product categories; Sysco planned to complete the remaining categories at a later date.  Mr. Wood testified that the $281 million figure was in addition to the Project Naples costs savings, but he could not say whether or not that number was

in addition to the cost savings that Sysco could achieve through its continued cost savings efforts beyond June 2015.

USF, meanwhile, suspended its category management project after the merger's announcement. At the time the merger was announced, USF had only conducted category management on ▋ to ▋ categories out of 300. PX00592-035 at 139; PX00592-048-049 at 192-93. Mr. Wood could not say whether the $281 million was in addition to cost savings that USF might have achieved had it continued its category management program. Thus, Dr. Hausman's estimate of $281 million in "merger-specific" savings in Merchandising—a number that, again, relied exclusively on McKinsey's calculations—likely overstates the achievable merger-specific category management savings.

The FTC has pointed to, and Defendants have not rebutted, other ways in which Dr. Hausman's reliance on McKinsey's estimates likely overstated the savings arising from the merger. During the hearing, Mr. Wood acknowledged that part of the sales synergy estimate—which represents savings from combining the salesforces of the two companies—would be achieved by having customers place orders via an e-commerce platform. However, migration to electronic ordering can be achieved by either company independently of the merger. Hr'g Tr. 1904-05. Another savings strategy identified by McKinsey, "maximizing backhaul," refers to having delivery trucks stop by suppliers to reload goods on their way back to the warehouse, in order to save an extra trip to those suppliers. Hr'g Tr. 1894-95. However, backhaul savings can also be achieved independently of the merger. *See* Hr'g Tr. 1905-06.

    2.    *Insufficiency of Estimated Merger-Specific Savings*

Even if the court were to credit Dr. Hausman's total estimate of merger-specific efficiencies, the figure would only amount to less than one percent of the merged entity's annual

revenue.  PX09375-118 (Dr. Israel's rebuttal report stating that Dr. Hausman's original estimate of merger-specific, variable cost efficiencies of $███ million per year represents only one percent of Sysco and USF's combined annual broadline revenue).[36]  Even assuming that 100 percent of the cost savings would be passed on to customers, the savings are unlikely to outweigh the competitive harm to customers.  Since the savings are equal to a small percentage of the combined company's total revenue, even a modest increase in price could offset any cost savings generated by the efficiencies.  At oral argument, Defendants' response to this concern was that the market would not allow even a slight price increase, as customers would exercise their other options, such as regionalizing.  *See* Closing Arg. Hr'g Tr. 117-18.  Having found that this merger will result in high national customer and local market concentration levels, the court does not share Defendants' confidence that the market would not tolerate such a price increase.  As the court observed in *Cardinal Health*, "[t]he critical question raised by the efficiencies defense is whether the projected savings from the merger[ ] are enough to overcome the evidence [showing] that possibly greater benefits can be achieved by the public through existing, continued competition."  12 F. Supp. 2d at 63.  Here, Defendants have fallen short of making that showing.

> ### E.     Conclusion

Upon consideration of all of the evidence presented, the court concludes that Defendants' rebuttal evidence is not sufficient to overcome the presumption of anticompetitive harm that the FTC was able to establish through evidence of high post-merger market concentrations and other evidence of competitive harm.  The court thus concludes that the FTC has met its burden of demonstrating a likelihood of success.  That is, the FTC has raised "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough

---

[36] In 2013, Sysco and USF's combined broadline revenue was **over $50 B** PX09350-216, Table 27.  One percent of that sum is greater than Dr. Hausman's merger-specific cost savings estimate of $███ million.

investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Heinz*, 246 F.3d at 714-15 (citation omitted) (internal quotation marks omitted).

## IV.     THE EQUITIES

Although the court has found that the FTC has shown a likelihood of success on the merits and thus created a presumption in favor of injunctive relief, *see Swedish Match*, 131 F. Supp. 2d at 172, Section 13(b)'s "public interest" standard still requires the court to weigh the public and private equities of enjoining the merge, *Heinz*, 246 F.3d. at 726. Here, the primary public interests to be considered include (i) the public interest in effectively enforcing antitrust laws and (ii) the public interest in ensuring that the FTC has the ability to order effective relief if it succeeds at the merits trial.

The public's interest in enforcing antitrust law plainly favors enjoining Defendants' proposed merger. *See id.* ("The principle public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws."); *Swedish Match*, 131 F. Supp. 2d at 173 ("There is a strong public interest in effective enforcement of the antitrust laws that weighs heavily in favor of an injunction in this case.").

The second public interest factor—preserving the FTC's ability to order effective relief after the administrative hearing—also supports an injunction. As stated by the Court of Appeals, "if the merger were ultimately found to violate the Clayton Act, it would be impossible to recreate pre-merger competition" because the merging parties would have already combined their operations and they would be difficult to separate, even by a subsequent divestiture order. *Id.* ("Section 13(b) . . . embodies Congressional recognition of the fact that divestiture is an inadequate and unsatisfactory remedy in a merger case."). That problem is amplified here because the

proposed merger involves two transactions, not just one: (i) Sysco's merger with USF and (ii)

PFG's purchase of USF's distribution centers and other assets. The parties have represented that,

absent an injunction, Sysco and USF will merge their operations and divest 11 distribution centers

and associated assets—including personnel, IT Systems, and USF private label products—to PFG,

which will incorporate those assets into its own operations. As the FTC has pointed out, it would

face an especially daunting and potentially impossible task of "unscrambling" the eggs (*i.e.*,

returning the merging companies to their pre-merger state) if the ensuing administrative

proceedings were to determine that the merger violates Section 7 of the Clayton Act. Additionally,

it is difficult to conceive how a subsequent divestiture order—which would attempt to restore the

parties to their pre-merger state—could be fulfilled without causing significant disruption to the

foodservice distribution industry, its customers, and the ultimate consumers—Americans who eat

outside the home.

Defendants contend that the public equities weigh against granting the preliminary

injunction because the merger will generate substantial efficiencies that will be passed on to

customers. They claim that, if the FTC obtains the injunction, Defendants and their customers will

be harmed because "Sysco and US Foods will abandon the merger and consumers will be deprived

of its benefits." DFF at 186-87 (citing Hr'g Tr. 1516-17). But the court cannot conclude, on this

record, that the merger's cost savings will outweigh the potential harm to customers from losing

the country's second largest broadline distributor as a competitor for their business. Dr. Israel's

merger simulation model predicted that, even taking into account the estimated cost savings, the

merger would harm customers. PX09350-114-121, Table 3. Although the court has reservations

about some of Dr. Israel's merger simulation model inputs, the court finds that the record as a

whole—at the very least—raises substantial questions about whether the merger will harm consumers. Therefore, the public equities here favor granting the preliminary injunction.

The court recognizes the extraordinary amount of time, energy, and money that Sysco, USF, and PFG have devoted to the proposed merger. Their efforts, and the risk that the parties will abandon the merger rather than proceed to an administrative trial on the merits is, however, "at best, a private equity" which cannot overcome the significant public equities weighing in favor of a preliminary injunction. *See Heinz*, 246 F.3d at 727 (internal quotation marks omitted).

## CONCLUSION

In the end, after considering the record in its entirety, the court returns to Judge Tatel's observation in *Whole Foods*: "[T]here can be little doubt that the acquisition of the second largest firm in the market by the largest firm in the market will tend to harm competition in that market." *Whole Foods*, 548 F.3d at 1043 (Tatel, J.) (citation omitted) (internal quotation marks omitted). The court finds that the FTC has carried its burden of showing a "reasonable probability" that a merger of the country's two largest broadline foodservice distributors, Sysco and USF, would harm competition. Defendants' merger is likely to cause unduly high market concentrations in two relevant markets—broadline foodservice distribution to national customers and broadline foodservice distribution to local customers—and eliminate a key competitor in those markets, USF. The evidence offered by Defendants to rebut the FTC's showing of likely harm was unavailing. The equities also favor granting the requested preliminary injunction. The FTC, therefore, has established that it is likely to succeed in proving, after a full administrative hearing, that the effect of Sysco's proposed acquisition of USF "may be substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act.

127

The court thus grants the FTC's Motion for Preliminary Injunction.   A separate order accompanies this Memorandum Opinion.


Dated:  June 23, 2015

Amit P. Mehta
United States District Judge